# EXHIBIT 18



1  SARAH E. ROBERTSON #142439
   MARK A. DELGADO #215618
2  FITZGERALD ABBOTT & BEARDSLEY LLP
   1221 Broadway, 21st Floor
3  Oakland, California 94612
   Telephone: (510) 451-3300
4  Facsimile: (510) 451-1527
   Email: srobertson@fablaw.com
5       mdelgado@fablaw.com

6  Attorneys for Defendants
   CALIFORNIA EMERGENCY
7  PHYSICIANS MEDICAL GROUP,
   MARK ALDERDICE, M.D.,
8  and ROBERT BUSCHO, M.D.

F I L E D
ALAMEDA COUNTY

SEP - 2 2008

CLERK OF THE SUPERIOR COURT

9              SUPERIOR COURT OF CALIFORNIA

10      COUNTY OF ALAMEDA - RENE C. DAVIDSON COURTHOUSE

11 DONALD GOLDEN, M.D.,                Case No.: RG08388602

12            Plaintiff,               COMPENDIUM OF NON-CALIFORNIA
                                       AUTHORITIES IN SUPPORT OF
13                                     DEMURRER BY DEFENDANT
       vs.                             CALIFORNIA EMERGENCY
14                                     PHYSICIANS MEDICAL GROUP AND
                                       DEMURRER BY ROBERT BUSCHO
15 CALIFORNIA EMERGENCY                AND MARK ALDERDICE TO
   PHYSICIANS MEDICAL GROUP;           PLAINTIFF'S FIRST AMENDED
16 MEDAMERICA; MARK ALDERDICE;         COMPLAINT
   ROBERT BUSCHO; AND DOES 1
17 THOUGH 1000, AND EACH OF THEM,      Date:   October 9, 2008
   INCLUSIVE,                          Time:   8:30 a.m.
18                                     Dept:   19
            Defendants.               Judge:  Stephen Dombrink
19                                     Reservation No.: 861483

20                                     ASSIGNED FOR ALL PURPOSES TO
                                       JUDGE STEPHEN DOMBRINK
21                                          DEPARTMENT 19

22      Pursuant to Rule 3.1113 of the California Rules of Court, Defendant California

23 Emergency Physicians Medical Group and Defendants Robert Buscho, M.D. and Mark

24 Alderdice, M.D. provide copies of the following non-California authorities in support of their

25 demurrers to Plaintiff's First Amended Complaint:

26 ///

27 ///

28 ///

                                       1

| | | |
|---|---|---|
| 1 | EXHIBIT A | 4 Witkin, Cal. Procedure, Pleading §479 |
| 2 | EXHIBIT B | Fountain v. Metcalf, Zima & Co. (11th Cir. 1991) 925 F.2d 1398 |
| 3 | EXHIBIT C | Hyland v. New Haven Radiology Associates (2nd Cir. 1986) 794 F.2d 793 |
| 4 | EXHIBIT D | Johnson v. Riverside Healthcare System, LP (9th Cir. July 28, 2008) 2008 |
| 5 | | WL 2875305 |
| 6 | EXHIBIT E | Serapion v. Martinez (1st Cir. 1997) 119 F.3d 982, 992 |
| 7 | EXHIBIT F | Solon v. Kaplan (7th Cir. 2005) 398 F.3d 629 |
| 8 | EXHIBIT G | Sprewell v. Golden State Warriors (9th Cir. 2001) 266 F.3d 979, 989 |
| 9 | EXHIBIT H | Strother v. Southern California Permanente Medical Group, et al. (9th Cir |
| 10 | | 1996) 79 F.3d 859 |
| 11 | EXHIBIT I | Wheeler v. Hurdman (10th Cir. 1987) 825 F.2d 257, 277 |

Dated: September 2, 2008

FITZGERALD ABBOTT & BEARDSLEY LLP

By _Mark Delgado_

Mark A. Delgado
Attorneys for Defendants
CALIFORNIA EMERGENCY
PHYSICIANS MEDICAL GROUP, MARK
ALDERDICE, M.D.,
and ROBERT BUSCHO, M.D.

PROPOSED ORDER GRANTING DEMURRER BY DEFENDANTS ALDERDICE AND BUSCHO
8/29/08 (25615) #315498.1



Westlaw.

Copyright (c) 1997, 2007 B.E. Witkin Article Sixth Testamentary Trust

Witkin
California Procedure, Fourth Edition
B.E. Witkin and Members of the Witkin Legal Institute

Chapter V. Pleading
IX. THE COMPLAINT
B. Legal Actions Arising Out of Contract.
1. Damages for Breach of Contract.
b. The Contract.
1. Written Contract.

**aa. |§ 479| Setting Out Copy.**

A written contract is usually pleaded by alleging its making and then setting it out verbatim ("*in haec verba*") in the body of the complaint or as a copy attached and incorporated by reference. This method of pleading has already been discussed. (See supra, §388.; see also *Lambert v. Haskell* (1889) 80 C. 611, 612, 22 P. 327; *Schumm v. Berg* (1951) 37 C.2d 174, 179, 182, 231 P.2d 39 [contract<<* p.573>> for benefit of third party]; *Sweet v. Vista Irr. Dist.* (1933) 134 C.A. 518, 520, 25 P.2d 512 [plaintiff's incorporation of written contract and various preliminary instruments enabled court to decide against him on general demurrer]; *Bates v. Daley's* (1935) 5 C.A.2d 95, 42 P.2d 706; *International Aerial Tramway Corp. v. Konrad Doppelmayr & Sohn* (1969) 70 C.2d 400, 406, 74 C.R. 908, 450 P.2d 284, citing the text; *Kaufman & Broad Bldg. Co. v. City & Suburban Mortg. Co.* (1970) 10 C.A.3d 206, 210, 88 C.R. 858, infra, §489 [separate counts setting forth copy and alleging particular interpretation]; James 4th, §3.20; 7A Am.Jur. P.P. Forms (1995 ed.), Contracts, §65 et seq.; cf. *Staples v. Arthur Murray* (1967) 253 C.A.2d 507, 513, 61 C.R. 103 [citing text but holding requirement inapplicable in action to set aside contract under Dance Act where plaintiffs were not given copies of contracts].)

Contents Index and Tables

4 WITPROC Ch. V, § 479

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Supplement

Copyright (c) 1997, 2007 B.E. Witkin Article Sixth Testamentary Trust

Witkin
California Procedure, Fourth Edition
B.E. Witkin and Members of the Witkin Legal Institute

Chapter V. Pleading
IX. THE COMPLAINT
B. Legal Actions Arising Out of Contract.
1. Damages for Breach of Contract.
b. The Contract.
1. Written Contract.

**bb. [§ 480] Pleading According to Legal Effect.**

The other method of pleading a written contract is according to its *legal effect*, by alleging the making, and then proceeding to allege the substance of its relevant terms. This is more difficult, for it requires a careful analysis of the instrument, comprehensiveness in statement, and avoidance of legal conclusions, and it involves the danger of variance where the instrument proved differs from that alleged; it is not frequently employed. Nevertheless, it is an established method. (See *Snyder v. United Properties Co.* (1921) 53 C.A. 428, 431, 200 P. 366; *Pneucrete Corp. v. United States Fidelity & Guaranty Co.* (1935) 7 C.A.2d 733, 741, 46 P.2d 1000; James 4th, §3.20.)

****SUPPLEMENT****
4 Witkin, Cal. Proc. 4th (2007 supp.) Plead, § 480, p. 170

**bb. [§ 480] Pleading According to Legal Effect.**

See *Construction Protective Services v. TIG Specialty Ins. Co.* (2002) 29 C.4th 189, 199, 126 C.R.2d 908, 57 P.3d 372, infra, §1091, citing the text ["plaintiff may plead the legal effect of the contract rather than its precise language"].

Contents Index and Tables

4 WITPROC Ch. V, § 480

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Copyright (c) 1997, 2007 B.E. Witkin Article Sixth Testamentary Trust

Witkin
California Procedure, Fourth Edition
B.E. Witkin and Members of the Witkin Legal Institute

Chapter V. Pleading
IX. THE COMPLAINT
B. Legal Actions Arising Out of Contract.
1. Damages for Breach of Contract.
b. The Contract.
1. Written Contract.

### cc. |§ 481| Essential Terms Must Be Pleaded.

In *Gilmore v. Lycoming Fire Ins. Co.* (1880) 55 C. 123, 124, the court said: "Where a party relies upon a contract in writing, and it affirmatively appears that all the terms of the contract are not set forth in *haec verba*, nor stated in their legal effect, but that a portion which may be *material* has been omitted, the complaint is insufficient." Plaintiff, suing on a fire insurance policy, merely annexed a copy, but the policy recited that the assured's application was a part of the policy and the assured's warranty. *Held*, the complaint was subject to general demurrer; plaintiff's allegation of due performance of conditions was insufficient where the complaint did not set forth the entire agreement with all of its conditions.<<* p.574>>

The more reasonable approach, however, is that the plaintiff need not allege *every* promise of the defendant, but only those that he claims were breached and others that affect them. (See James 4th, §3.20.) And practical considerations may be controlling. In *Hancock v. Clark* (1922) 56 C.A. 277, 204 P. 1098, plaintiff builder sought recovery for construction of a house. He set forth the building *contract*, but not the plans and specifications. *Held*, the complaint was sufficient. Although as a matter of law the plans and specifications are part of the contract, it would often be wholly impracticable, because of their nature, to make them part of the pleadings, and it would be impossible to plead them according to their legal effect.

Contents Index and Tables

4 WITPROC Ch. V, § 481

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

925 F.2d 1398                                                                                    Page 1
925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

▷
Fountain v. Metcalf, Zima & Co., P.A.
C.A.11 (Ga.),1991.

United States Court of Appeals,Eleventh Circuit.
Alan D. FOUNTAIN, Plaintiff-Appellant,
v.
METCALF, ZIMA & COMPANY, P.A., Defend-
ant-Appellee.
No. 90-8391.

March 11, 1991.

Member/shareholder of professional corporation
brought action under Age Discrimination in Em-
ployment Act (ADEA). The United States District
Court for the Northern District of Georgia, No.
1:89-cv-168-RCF, Richard C. Freeman, J., dis-
missed complaint, and appeal was taken. The Court
of Appeals, Markey, Circuit Judge, sitting by desig-
nation, held that member/shareholder functioned as
"partner" rather than as "employee" who could sue
for violation of ADEA.

Affirmed.

West Headnotes

[1] Civil Rights 78 ⟜1110

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
        (Formerly 78k169)
In determining whether member/shareholder of pro-
fessional corporation was "partner" as opposed to
"employee" who could sue for violation of ADEA,
focus was not on any label, but on actual role
played by member/shareholder in operations of cor-
poration and extent to which that role dealt with
traditional concepts of management, control, and
ownership. Age Discrimination in Employment Act
of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[2] Civil Rights 78 ⟜1110

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
        (Formerly 78k169)
Member/shareholder of professional corporation
functioned as "partner" rather than as "employee"
who could sue for violation of ADEA, notwith-
standing use of term "employee" in certain docu-
ments and alleged "autocratic" manner of control
exercised by another member/shareholder; member/
shareholder shared in corporation's profits, losses,
and expenses, was compensated on basis of share in
corporation's profits, was liable for certain debts,
obligations, and liabilities, and had right to vote his
ownership interest on amendments to agreement es-
tablishing corporation, on admission of new mem-
ber/shareholders, on termination of relationship
with member/shareholders, on draws, and on distri-
bution of profits and income. Age Discrimination in
Employment Act of 1967, § 2 et seq., 29 U.S.C.A.
§ 621 et seq.

*1398 Richard P. Decker,Peter V. Hasbrouck,
Decker & Hallman, Atlanta, Ga., for plaintiff-ap-
pellant.
David R. Aufdenspring, Susan J. Moore, Dara L.
DeHaven, Powell Goldstein Frazer & Murphy, At-
lanta, Ga., for defendant-appellee.

Appeal from the United States District Court for the
Northern District of Georgia.

Before FAY, COX and MARKEY [FN*], Circuit
Judges.

        FN* Honorable Howard T. MARKEY,
        U.S. Circuit Judge, for the Federal Circuit,
        sitting by designation.

*1399 MARKEY, Circuit Judge:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

925 F.2d 1398
925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

Alan D. Fountain (Fountain) appeals from a summary judgment entered by the U.S. District Court for the Northern District of Georgia dismissing the complaint because Fountain was not an "employee" as required by the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* (ADEA). We *AFFIRM.*

## BACKGROUND

Fountain sued an accounting firm, Metcalf, Zima & Company, P.A. (the firm), alleging that its termination of his relationship with the firm violated the ADEA. Fountain, Arthur Metcalf, Donald Zima, and Hunter Rice were the only member/shareholders comprising the firm. In granting summary judgment for the firm because Fountain was a partner and not an "employee", the district court noted these undisputed facts set forth in the affidavit of Arthur Metcalf, as member/shareholder and President/Co-Managing Director of the firm:

[Fountain] owned 31% of the outstanding shares of the capital stock of the professional association.

The four shareholders are referred to as partners by clients, employees and by each other. Firm publications also refer to the four shareholders as partners.

The partners have final authority and responsibility in all aspects of the Firm's operation. Responsibility for satisfactory completion of the Firm's engagements, for the general administration of the entire practice and contributions to solutions of problems affecting the Firm as a whole rest with the partners.

Unlike the Firm's employees, the partners share in the profits, losses and expenses of the Firm.

Unlike the Firm's employees, [Fountain's] compensation was based on a share of the Firm's profits ...

Unlike the Firm's employees, [Fountain] was jointly and severally liable for certain debts, obligations and liabilities of the professional association.

Unlike the Firm's employees, [Fountain] had a right to vote on his shares on such matters as amendment of the Firm's agreement, admission of new shareholders, termination of a shareholder's interest, approval of draws, shares of net profits, special distributions, and any other income to be allocated to any shareholders and dissolution of the Firm.

The firm is a "professional association" or "professional corporation" (professional corporation), an entity that allows doctors, lawyers, accountants, and other professionals to practice their profession as do partners in a partnership while benefitting from certain liability and tax considerations applicable to corporations.

## OPINION

### *Introduction*

[1] The sole issue is whether Fountain was a partner in the firm or an employee of the firm and thus an ADEA beneficiary. The present fact pattern-a member/shareholder of a professional corporation suing as an "employee" for violation of the ADEA-constitutes a case of first impression in this court. On a national scale, ADEA cases dealing with the partner/employee dichotomy are rare. The Supreme Court, however, has recognized a parallelism between the ADEA and Title VII. *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979). In a Title VII case, this circuit noted a clear distinction between a law firm partner and an "employee" of the partnership:

We find a clear distinction between employees of a corporation and partners of a law firm. In making this distinction, we do not presume to exalt form over substance.

*Hishon v. King & Spalding,* 678 F.2d 1022, 1028 (11th Cir.1982), *reversed on other grounds,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). *Hishon* did not involve a member/shareholder of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

925 F.2d 1398

925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

professional corporation, but did involve a female associate who sued a law firm for discrimination when the firm denied her a partnership. She argued: (1) partners of a law firm were equivalent to employees of a *1400 corporation; (2) the prospect of partnership was an "employment opportunity" or a "term, condition or privilege of employment"; or (3) her termination for failure to make partner was an unlawful discharge. 678 F.2d at 1026. This court accepted none of the three proposed bases for jurisdiction. In reversing (because the second basis properly conferred jurisdiction), 467 U.S. at 76, 104 S.Ct. at 2234, the Court had no need to and did not distinguish between a partner and an employee. Nor did the Court discuss indicia useful in making such distinction. Justice Powell, however, stated in his concurring opinion:

I write to make clear my understanding that the Court's opinion should not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an "employment" relationship to which Title VII would apply. The relationship among law partners differs markedly from that between the partnership and its associates.

In *Hishon* this court dealt with the assertion that partners were equivalent to employees by looking to the decisional approach set out in *Calderon v. Martin County*, 639 F.2d 271, 272-73 (5th Cir.1981)[FN1]:

> FN1. The Eleventh Circuit sitting *en banc* adopted as precedent the law of the Fifth Circuit as it existed on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc* ).

status as an employee under Title VII is a question of federal, rather than of state, law; it is to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand.

Neither *Hishon* nor *Calderon* dealt with the issue *sub judice*. As above indicated, cases that have are rare, but two instances appear in the Reports. In *E.E.O.C. v. Dowd & Dowd*, 736 F.2d 1177 (7th Cir.1984), the court held that a member/shareholder of a professional corporation was not an "employee", citing Justice Powell's *Hishon* concurrence and *Burke v. Friedman*, 556 F.2d 867 (7th Cir.1977) (accounting firm partner not an "employee"):

The EEOC contends that *Burke* is inapplicable to the present case because it involved a partnership rather than a professional corporation. We disagree. As Dowd correctly contends, this distinction is of little value to Title VII purposes. The role of a shareholder in a professional corporation is far more analogous to a partner in a partnership than it is to the shareholder of a general corporation.

736 F.2d at 1178.

In *Hyland v. New Haven Radiology Ass.*, 794 F.2d 793 (2nd Cir.1986), the court said that a professional corporation could not be considered a partnership because of the form of the entity involved:

the use of the corporate form precludes any examination designed to determine whether the entity is in fact a partnership.

794 F.2d at 798.

We reject the exaltation of form over substance that resides in reliance on a label ("corporation") applied to the entity as in *Hyland*, or on a label applied to a claimant[FN2]. We agree with this statement found in Fountain's brief: "[t]he definition of employee 'is not restrictive and must turn on the facts of a particular case.' *E.E.O.C. v. Pettegrove Trash [Truck ] Service, Inc.*, 716 F.Supp. 1430, 1433 (S.D.Fla.1989)."

> FN2. Justice Powell stated in his *Hishon* concurrence that "Of course, an employer may not evade the strictures of Title VII simply by labeling its employees as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

925 F.2d 1398
925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

"partners." As applied here, that concept precludes a partner from obtaining the benefits of the ADEA simply by labeling himself or herself an "employee". 467 U.S. at 79, 104 S.Ct. at 2235.

Consideration of the statutory language, the legislative history, and federal case law having reduced the issue to the single question "partner or employee", we look to the particular circumstances of the case at hand, *Calderon,* 639 F.2d at 273, and, in so doing, we focus not on any label, but on the actual role played by the claimant in the *1401 operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control, and ownership.

### Fountain's Role

[2] Fountain challenges none of the findings of the district court quoted above. Nor does he raise any genuine issue of material fact relating to the role he played and the status he occupied in the firm. It is undisputed that, unlike the firm's employees, Fountain: shared in the firm's profits, losses, and expenses; was compensated on the basis of a share in the firms's profits; was liable for certain debts, obligations, and liabilities of the firm; and had a right to vote his thirty-one percent ownership on member/shareholders' amendments to the agreement, on admission of new member/shareholders, on termination of relationship with member/shareholders, on draws, and on distribution of profits and income. Those facts are virtually a textbook listing of the management, control and ownership factors that establish Fountain's role as that of partner, not employee. As stated by the 7th Circuit:

The economic reality of the professional corporation in Illinois is that the management, control, and ownership of the corporation is much like the management, control, and ownership of a partnership. We therefore see no reason to treat the shareholders of a professional corporation, differently for purposes of Title VII actions than we did partners of

the accounting firm in *Burke.*

*E.E.O.C. v. Dowd & Dowd,* 736 F.2d 1177, 1178 (7th Cir.1984) (en banc). The economic reality in this case is that Fountain was a partner in the firm.

Fountain's reliance on *Hyland* is unavailing. Though we have rejected the court's indication in *Hyland* that use of the corporate form is controlling, the court did note that Hyland had signed a two-year renewable employment agreement and received a fixed $60,000 annual salary from which tax was withheld. Fountain's agreement was not limited in time; his compensation was a share of firm profits, if any; and the record reflects no tax withholding.

The appealed-from judgment having been summary, it is axiomatic that we must draw all reasonable fact inferences in favor of Fountain. As bases for such inferences, Fountain cites use of the label "employee" in two firm documents and the "autocratic" manner of control exercised by Metcalf as President and Co-Managing Director. Neither citation raises a genuine issue of material fact and neither would constitute a reasonable basis for drawing even an inference that Fountain was an employee.

As above indicated, the evidentiary value of a label is extremely limited, the economic reality of the role played being a more probative indication. Moreover, if further proof of the inadequacy of labels were needed, the label "partner" was commonly and more frequently applied to Fountain by clients, employees, other shareholders, and firm publications, and in his complaint Fountain labeled his purported replacement and his fellow member/shareholders as "partners." Similarly, assertions of Metcalf's "autocratic" manner of control do not create a genuine issue of material fact or a reasonable basis for inferring that Fountain was a mere employee. The district court correctly held that Fountain's participation in the firm's management, control, and ownership was uncontroverted. Domination by an "autocratic" partner over others is not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

925 F.2d 1398
925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

uncommon and does not support a finding that the others are "employees." *Wheeler v. Hurdman,* 825 F.2d 257, 273-74 (10th Cir.1987).

## CONCLUSION

There was no genuine issue of material fact. Fountain was a partner and not an employee entitled to sue under the ADEA. Accordingly, the judgment of the district court must be and is

*AFFIRMED.*

C.A.11 (Ga.),1991.
Fountain v. Metcalf, Zima & Co., P.A.
925 F.2d 1398, 55 Fair Empl.Prac.Cas. (BNA) 428, 56 Empl. Prac. Dec. P 40,611, 59 USLW 2567

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

794 F.2d 793
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

Hyland v. New Haven Radiology Associates, P.C.
C.A.2 (Conn.),1986.

United States Court of Appeals,Second Circuit.
John HYLAND, M.D., Plaintiff-Appellant,
v.
NEW HAVEN RADIOLOGY ASSOCIATES, P.C.
and Gerald Fishbone, M.D., Shelby Galloway,
M.D., Arthur Knowlton, M.D., Edward Prokop,
M.D., Solomon Schwartz, M.D., and Robert Sha-
piro, M.D., individually and in their corporate capa-
cities, Defendants-Appellees.
No. 253, Docket 85-7396.

Argued Oct. 2, 1985.
Decided June 27, 1986.

Radiologist brought Age Discrimination in Em-
ployment Act suit claiming that he was forced to
resign as an employee, officer and director of de-
fendant radiology associates, a professional corpor-
ation, because he was 51 years of age. The United
States District Court for the District of Connecticut,
Peter C. Dorsey, J., 606 F.Supp. 617, rendered sum-
mary judgment dismissing the action, and appeal
was taken. The Court of Appeals, Miner, Circuit
Judge, held that having elected to do business in the
corporate status, the defendant could not assert that
in economic reality it was a partnership and that
plaintiff, as a partner, was not covered by the Act.

Reversed and remanded.

Cardamone, Circuit Judge, filed dissenting opinion.

West Headnotes

[1] Civil Rights 78 ⬅1110

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases

(Formerly 78k169, 78k9.15)
Protection of Age Discrimination in Employment
Act extends only to those individuals who are in a
direct employment relationship with an employer; a
claim under its provisions lies solely in favor of a
person who is an employee at time of termination.
Age Discrimination in Employment Act of 1967, §§
4(a)(1), 11(b), 12(a), 29 U.S.C.A. §§ 623(a)(1),
630(b), 631(a).

[2] Courts 106 ⬅89

106 Courts
    106II Establishment, Organization, and Proced-
ure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling
or as Precedents
                106k89 k. In General. Most Cited Cases
Fair Labor Standards Act, Title VII and Age Dis-
crimination in Employment Act have a similar pur-
pose, i.e., to stamp out discrimination in various
forms, and have nearly identical provisions defining
"employer" and "employee" and, hence, cases con-
struing the definitional provisions of one are per-
suasive authority when interpreting the other. Age
Discrimination in Employment Act of 1967, § 11(a,
b, f), 29 U.S.C.A. § 630(a, b, f); Fair Labor Stand-
ards Act of 1938, § 3(a, d), (e)(1), 29 U.S.C.A. §
203(a, d), (e)(1); Civil Rights Act of 1964, §§ 701
et seq., 701(a, b, f), 42 U.S.C.A. §§ 2000e et seq.,
2000e(a, b, f).

[3] Civil Rights 78 ⬅1110

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
                (Formerly 78k169, 78k9.15)

Labor and Employment 231H ⬅2232

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

Page 2

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime Pay
         231HXIII(B)2 Persons and Employments Within Regulations
            231Hk2231 Employees Included
               231Hk2232 k. In General. Most Cited Cases
      (Formerly 232Ak1124 Labor Relations)
Benefits of Fair Labor Standards Act, Title VII and Age Discrimination in Employment Act do not extend to those who properly are classified as partners. Age Discrimination in Employment Act of 1967, § 11(a, b, f), 29 U.S.C.A. § 630(a, b, f); Fair Labor Standards Act of 1938, § 3(a, d), (e)(1), 29 U.S.C.A. § 203(a, d), (e)(1); Civil Rights Act of 1964, §§ 701 et seq., 701(a, b, f), 42 U.S.C.A. §§ 2000e et seq., 2000e(a, b, f).

|4| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
      (Formerly 78k169, 78k9.15)
For purposes of radiologist's Age Discrimination in Employment Act claim, the defendant radiology association, a professional corporation, was to be treated as a corporate employer and not as a partnership, with suing radiologist being a partner outside scope of the Act, by application of the economic realities test; suing radiologist was specifically designated as an employee in an employment agreement containing detailed provisions relating to terms and conditions of employment; disagreeing with *E.E.O.C. v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir.). Age Discrimination in Employment Act of 1967, §§ 4(a)(1), 11(a, b, f), 12(a), 29 U.S.C.A. §§ 623(a)(1), 630(a, b, f), 631(a).

*794 Joseph D. Garrison, New Haven, Conn. (Garrison, Kahn, Crane & Silbert, New Haven, Conn., Lucinda M. Finley, Yale Law School, New Haven, Conn., of counsel), for plaintiff-appellant.
David R. Schaefer, New Haven, Conn. (Robert J. Lofgren, Brenner, Saltzman, Wallman & Goldman, New Haven, Conn., James A. Wade, Robinson & Cole, Hartford, Conn., of counsel), for defendants-appellees.

Before CARDAMONE, PRATT and MINER, Circuit Judges.

MINER, Circuit Judge:
Plaintiff-appellant, John Hyland, M.D., claiming a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), alleges that he was forced to resign as an employee, officer and director of defendant-appellee, New Haven Radiology Associates, P.C. ("NHRA") because he was fifty-one years of age. Following extensive discovery, NHRA, a professional corporation, moved for summary judgment, asserting that Hyland lacked the necessary standing to invoke the protections afforded by the ADEA. Applying an "economic realities" test, the District Court for the District of Connecticut (Dorsey, J.) granted the motion, finding that NHRA "amounts to a partnership in all but name,"*Hyland v. New Haven Radiology Associates*, 606 F.Supp. 617, 621 (D.Conn. 1985), and that Hyland was, in effect, a partner in the enterprise. According to the district court, Hyland therefore was not an employee entitled to claim the benefits provided by the ADEA. Because we find that there is no basis for a finding that NHRA is a partnership, and that Hyland was in fact a corporate employee, we reverse and remand.[FN1]

> FN1. By decision of Magistrate Smith dated January 12, 1983, adopted and approved by Judge Daly on February 4, 1983, pendent state claims of breach of contract, wrongful discharge and intentional infliction of emotional distress were dismissed. The same pendent claims, reasserted in the amended complaint, were dismissed by Judge Dorsey in an order dated January 23, 1984, which also dismissed the ADEA

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793

794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

claim as against the individual defendants. No appeal is taken from any of these rulings.

### I.

Appellant and four other radiologists organized NHRA in 1972 as a professional services corporation under the laws of the State of Connecticut to conduct the practice of radiology. Pursuant to the terms of a stockholders' agreement, [FN2] each of the five founding members contributed the same amount of capital for equal shares in the corporation and an equal voice in management. Profits and losses were divided evenly among the members, all of whom served as corporate officers and directors. The stockholders agreed that stock could be held only by shareholder-members, who were required to be licensed physicians. Upon the death, withdrawal or termination of any member, the member or his estate was required to sell, and NHRA to purchase, that shareholder's stock at a price fixed in accordance with the valuation provisions of the agreement. No stock could be held in the corporation by a non-member or non-employee. The stockholders' agreement provided for the admission to membership of additional "Stockholder-Employees," who would enjoy the benefits of the corporation and participate in the management*795 of its affairs equally with the other shareholders. [FN3]

> FN2. The stockholders' agreement referred to consists of an original agreement dated October 3, 1972 and a "First Amendment" to the agreement dated February 3, 1976.

> FN3. The original shareholders were Drs. Robert Shapiro, Solomon Schwartz, Wayne Whitcomb, Gerald Fishbone and John Hyland. It appears that Dr. Whitcomb is now deceased.

Each shareholder also signed a separate two-year renewable employment agreement with the corporation, and the terms of these agreements were substantially identical. All members were compensated at the rate of $60,000 annually, subject to withholding of applicable taxes. A further provision in each doctor's employment agreement allowed for the payment of bonuses to members in the sole discretion of the Board of Directors. Each physician was required to be "a full time employee of the company during the term of this agreement," with a duty to devote his best efforts in rendering services to NHRA's patients. He also was required to comply with all company policies and regulations, to turn over to the corporation all compensation earned from rendering professional services of any kind, and to maintain membership in medical societies as required by the Board of Directors. The agreement also entitled each member to a four-week paid vacation; disability payments from the corporation; leave to attend, and reimbursement for the cost of, educational programs; and certain payments upon termination of employment.

The corporation performed all radiological services for St. Raphael Hospital. Each member agreed that he would not work in any radiological capacity for St. Raphael Hospital during the two-year period following termination of his corporate employment. No individual shareholder-member could be terminated without cause from NHRA unless by the vote of three-fourths of all stockholder-members. Hyland's employment agreement differed from those signed by the other co-founders in that he was required to give six-months' written notice of his intention to leave the corporation's employ. The agreement entered into between NHRA and Robert Shapiro, the corporation's president, also was somewhat different from the others in that it called for a payment of $500 a month to a deferred compensation account to replace a benefit Dr. Shapiro lost from another source when he joined NHRA.

On July 22, 1980, upon the unanimous consent of all the other members, Hyland, then fifty-one years of age, was asked to resign his position as a member and employee of NHRA. According to NHRA, the request was prompted by complaints of appellant's unavailability, lack of cooperation and abus-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

ive conduct. Thereafter, appellant entered into an agreement with the corporation relating to the conditions of his termination as an employee, shareholder, director and officer in the corporation. This agreement dealt with the repurchase of Hyland's stock, severance pay and the lump-sum withdrawal of a profit-sharing account balance, among other things.

As a result of his termination, appellant brought this action, claiming NHRA discriminated against him in violation of section 623(a)(1) of the ADEA. Hyland argued that the corporation may be classified as an employer under the Act, and that he and its staff were employees protected by the ADEA. The corporation moved for summary judgment on the grounds that it was not an employer and that Hyland was not an employee as defined by the AD-EA. It contended that because NHRA is more like a partnership than a corporation, Hyland should be considered a partner and not an employee. The district court granted the motion. In doing so, the court decided that NHRA chose to do business in the corporate form merely "to gain advantageous tax and civil liability treatment,"606 F.Supp. at 621, and that although the corporation could be classified as an employer, Hyland could not be classified as an employee. Judge Dorsey found that NHRA was actually managed and operated like a partnership and held that Hyland, as a member of this common enterprise, could not separate himself from his management and ownership role so as to be considered an "employee."

*796 II.

[1] Appellant advances his claim under section 623(a)(1) of the ADEA, which provides:

It shall be unlawful for an employer-to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age....'FN4

FN4. The discrimination complained of must be suffered by one between the ages of 40 and 70. 29 U.S.C. § 631(a).

The statute is considered remedial in nature and must be given a liberal interpretation in order to effectuate its purposes, *Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983); *E.E.O.C. v. First Cätholic Slovak Ladies Association,* 694 F.2d 1068, 1070 (6th Cir.1982), *cert. denied,*464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983). Its language demonstrates a single congressional aim-to prohibit "age discrimination by employers against employees and applicants for employment." *Levine v. Fairleigh Dickinson University,* 646 F.2d 825, 828 (3d Cir.1981). A plain reading of the Act indicates that its protection extends only to those individuals who are in a direct employment relationship with an employer, and that a claim under its provisions lies solely in favor of a person who is an employee at the time of termination. *See Garrett v. Phillips Mills, Inc.,* 721 F.2d 979, 980-81 (4th Cir.1983).

The Act defines employer in general terms as "a person engaged in an industry affecting commerce who has twenty or more employees...." 29 U.S.C. § 630(b). "Person" is defined as "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. § 630(a). The ADEA definition of employee, "an individual employed by any employer,"29 U.S.C. § 630(f), excludes only elected officials and their personal staff members, *id.*

[2] The Fair Labor Standards Act of 1938, 29 U.S.C. § 203(a), (d), (e)(1) (1982) ("FLSA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(a), (b), (f) (1982) ("Title VII"), and the ADEA carry nearly identical provisions defining "employer" and "employee." Since all three statutes have a similar purpose-to stamp-out discrimination in various forms-cases construing the definitional provisions of one are persuasive authority when interpreting the others. *See Lorillard v. Pons,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793

794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980), *cert. denied,*451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). In various situations calling for the application of these statutes, an individual's status as a major stockholder, officer or director of a corporation has been found to be compatible with his or her status as an employee. *See, e.g., Zimmerman,* 704 F.2d at 350-54 (ADEA plaintiff, a corporate vice president and one-third shareholder, considered as employee); *First Catholic Slovak Ladies Association,* 694 F.2d at 1070 (officer-directors held entitled to ADEA protections); *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 920 (2d Cir.1981) (high level executive employee protected by ADEA); *Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235, 1261 (3d Cir.1978) (person holding positions of secretary and director held an employee for Title VII purposes), *vacated on other grounds,*442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Hoy v. Progress Pattern Co.,* 217 F.2d 701, 704 (6th Cir.1954) (one-eighth shareholder, vice president, director and chairman of board may be employee within purview of FLSA). This is so because "[t]here is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship." *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 32, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961) (shareholders in knitwear cooperative held to be employees under FLSA). *797 "Once a contractual relationship of employment is established, the provisions of [the ADEA] attach and govern certain aspects of that relationship." *Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) (Title VII case) (footnote omitted).

### III.

[3] It is generally accepted that the benefits of the antidiscrimination statutes referred to in Part II, *supra,* do not extend to those who properly are classified as partners. In *Hishon,* 104 S.Ct. at 2236, where the Supreme Court held that a law partner-

ship's decision to deny admission into the partnership of a female associate/employee was covered by the provisions of Title VII, Justice Powell's concurring opinion expressed the view that Title VII does not cover the *members* of a partnership. The concurrence noted, however, that "an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.' " *Id.* at 2236 n. 2. It is by reason of their unique status as business owners and managers that true partners cannot be classified as employees. *Burke v. Friedman,* 556 F.2d 867, 869 (7th Cir.1977).

The Equal Employment Opportunity Commission ("EEOC"), charged with the interpretation and enforcement of both Title VII and the ADEA, examined an eight-member law firm and found that the partners could not be classified as employees for Title VII purposes, EEOC decision No. 85-4, Emp. Prac. Guide (CCH) ¶ 6840, at 7040 (Mar. 18, 1985). The EEOC established the following standard for distinguishing between partners and employees: "In determining whether the individual is a partner or an employee in a particular case, the Commission will consider relevant factors including, but not limited to, the individual's ability to control and operate the business and to determine compensation and the administration of profits and losses." *Id.* at 7041 n. 4. In the performance of its statutory duty to investigate possible violations of the ADEA, the EEOC did not exceed its authority by issuing a subpoena duces tecum to an accounting firm claiming to be a partnership when "the information sought may be relevant to a legitimate purpose because it is possible [the firm] may label some of its members as 'partners' when, in fact, those members may not fit within the traditional definition of the term." *E.E.O.C. v. Peat, Marwick, Mitchell & Co.,* 589 F.Supp. 534, 539 (E.D.Mo.1984), *aff'd,*775 F.2d 928 (8th Cir.1985), *cert. denied,*475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

[4] Rather than accept the obvious contractual employment relationship voluntarily entered into by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

Hyland and the corporation, the district court found that NHRA "amounts to a partnership" by applying an economic realities test originally developed by the courts to distinguish corporate employees from independent contractors. *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979) (Title VII case). The test entails consideration of numerous circumstances relating to the work relationship, with the most important factor being the extent of the employer's right to control the means and manner of the employee's performance. *Id.* A "hybrid" economic realities/right to control standard has been introduced to determine whether one claiming the benefits of the ADEA is an employee or an independent contractor. *E.E.O.C. v. Zippo Manufacturing Co.*, 713 F.2d 32, 38 (3d Cir.1983); *Hickey v. Arkla Industries, Inc.*, 699 F.2d 748, 752 (5th Cir.1983).

In only one reported case has the corporate form been disregarded in favor of a finding that the shareholders were in fact partners under the economic realities test. Without further analysis, the court in *E.E.O.C. v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178 (7th Cir.1984) (Title VII case) found that "[t]he role of a shareholder in a professional corporation is far more analogous to a partner in a partnership than it is to the shareholder of a general corporation," and that "[t]he economic reality of the professional corporation in Illinois is that the management, control and ownership of the corporation is much like the management, *798 control and ownership of a partnership." We disagree with the Seventh Circuit and hold that the use of the corporate form precludes any examination designed to determine whether the entity is in fact a partnership.

While it is true, as contended by NHRA, that shareholders of certain professional and other types of corporations have many of the attributes of partners, it also is true that partnerships frequently are organized in the manner of corporations. *Bellis v. United States*, 417 U.S. 85, 93-94, 94 S.Ct. 2179, 2185-86, 40 L.Ed.2d 678 (1974). The fact that certain modern partnerships and corporations are prac-

tically indistinguishable in structure and operation, however, is no reason for ignoring a form of business organization freely chosen and established. Concededly, the physician members of NHRA found that incorporation provided them with important tax advantages and employee benefits not available in any other type of business organization. Having made the election to incorporate, they should not now be heard to say that their corporation is "essentially a medical partnership among co-equal radiologists." Affidavit of Gerald Fishbone, M.D., in Support of Defendant's Motion for Summary Judgment at 5, para. 13 (Sept. 24, 1984).[FN5]

> FN5. Dr. Fishbone, who has served as vice-president, treasurer and director of NHRA, attempts to secure the "best of both possible worlds" by alleging that the "choice, in 1972, to employ a corporate form was made for sound business and financial reasons but has not affected the conduct of our affairs as equal partners in this medical practice." Affidavit of Gerald Fishbone, M.D., at 5, para. 14.

It is one thing to apply an economic realities test to distinguish an employee from an independent contractor or partner, but it is quite another to apply the test in an attempt to identify as partner one associated with a corporate enterprise. While those who own shares in a corporation may or may not be employees, they cannot under any circumstances be partners in the same enterprise because the roles are mutually exclusive. NHRA urges us to "develop a ... list of factors to be considered in determining if an individual is a 'partner' or a covered 'employee.' " There is no need to develop such a list of factors where the individual involved is a corporate employee, for we hold that every such employee is "covered" for purposes of the ADEA and that any inquiry respecting partnership status would be irrelevant.

The status of Dr. Hyland is clear-not only was he an officer, director and shareholder of NHRA, he also was specifically designated as an employee of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793

794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

Page 7

corporation in an employment agreement containing detailed provisions relating to the terms and conditions of his employment. There was nothing inconsistent between his proprietary interest (whether or not it was exactly equal to the interests of each of his associates) and the corporate employment relationship he held. An analysis of his status need proceed no further. His fellow shareholders, officers and directors in NHRA simply are precluded from expelling him from the corporation on the statutorily disapproved basis of age discrimination.

Accordingly, the judgment of the district court is reversed and the matter is remanded for further proceedings consistent with the foregoing.

CARDAMONE, Circuit Judge, dissenting:

The majority today decides that once the corporate form is chosen for the avowed and conceded purpose of gaining tax advantages, the corporate entity is bound by that choice for all other purposes, including being subject to the anti-discrimination laws. Because NHRA chose to adopt the corporate form the majority holds that NHRA is bound by that choice and, appellant Hyland, merely because he worked for that corporation must be classified as an employee when a court applies the ADEA. Because I disagree with both of these contentions, I respectfully dissent.

First, we are not obliged to adopt a take-it-or-leave-it attitude toward the status of NHRA and hold that once a corporation, then always a corporation. The manner in *799 which a corporation functions determines what kind of entity it is for purposes of the discrimination laws. Neither labels, nor titles dictate the answer. Second, regardless of the talismanic words used to characterize the actual manner in which NHRA functioned-corporation or partnership-the ADEA does not mandate that everyone who works for a corporation must be an employee within the Act, as the majority believes. The label that characterizes the substance of an entity does not necessarily determine the employment status of all those who work within it. The only

hard and fast rule is that there should be no hard and fast rule to determine an individual's employee status for purposes of coverage within the anti-discrimination provisions of the ADEA. Case by case determinations best fulfill that Act's purposes. Hence, the status of the entity Hyland was associated with and his status within that entity must be analyzed in order to determine whether he was an employee covered by the ADEA.

I STATUS OF ENTITY

The district court made a finding that NHRA should realistically be characterized as a partnership rather than a professional corporation, since the "structure of defendant's business is an equal division of ownership and management, and the equal sharing of profits and losses among the members, are all hallmarks of partnership status." I agree.

Appellant counters this conclusion by citing cases where courts evinced a general refusal to look beyond the corporate form, once the members of that entity made that choice. Yet, even in the context of an adjudication of tax liability, the Supreme Court has recognized the need to look at the substance of a transaction when the purposes behind an applicable statute have been subverted.

The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

*Gregory v. Helvering,* 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935).

In the present case, substance should also take precedence over form, not because "corporation" and "partnership" are ambiguous terms, but because the Act's broad definition of employee leaves the individual's status to be determined in each case irrespective of the form chosen to conduct business or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

---

794 F.2d 793

794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

Page 8

the labels attached to an individual. This proposition finds ample support in the decisions. *See, e.g., E.E.O.C. v. Dowd & Dowd, Ltd.,* 736 F.2d 1177, 1178 (7th Cir.), *reh'g and reh'g en banc denied* (1984) (role of an attorney shareholder in attorneys professional corporation more analogous to a partner than corporate shareholder. The reality of the situation, *i.e.,* management, control, and ownership closely resembled a partnership and these realities control, not the corporate label under which the entity operated); *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.), *reh'g denied,* (1983) (while parties' view of relationship is evidence of whether one is an employee, it is not determinative; the economic reality of the relationship is examined); *Spirides v. Reinhardt,* 613 F.2d 826, 829, 832 (D.C.Cir.1979) (in applying the statutory language and legislative history of Title VII mere fact that contracting parties label an individual an independent contractor does not bind a court when an examination of the substance of that relationship dictates otherwise).

Examining the economic and structural realities of NHRA for purposes of applying the ADEA, the district court correctly found that the organization established by the original founding doctors more closely resembles a partnership than a corporation. This conclusion necessarily follows from a consideration of the distinctions between the two forms. Section 6 of The Uniform Partnership Act defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit."*800 Partners traditionally manage and control the business and share in the profits and losses. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is a community of interest in the profits and losses." *Commissioner v. Tower,* 327 U.S. 280, 286, 66 S.Ct. 532, 535, 90 L.Ed. 670 (1946). Moreover, shareholders in a professional corporation rarely achieve the total limitation of personal liability enjoyed by owners of a corporation, and are subject to liability for malpractice. *See Dowd & Dowd, Ltd.,* 736 F.2d at 1178-79.

Further support for concluding that NHRA was a partnership is found in the fact that each founding member contributed an equal amount of capital and agreed to be bound by the shareholders' agreement and by individual employment agreements. All shareholder members were required to and practiced the same specialty (radiology) and agreed to share a designated percentage of the profits and losses, as well as management responsibilities. All could withdraw at any time, turn in their stock and be paid according to an agreed method of valuation. While not all professional corporations are partnerships, NHRA's insistence on equality in vote, voice and profits for all member-shareholders, including those subsequently joining the practice, demonstrates, as the district court found, that structurally and economically the entity is best characterized as a partnership.

## II HYLAND'S STATUS

### A. *No per se Rule Applies*

Next, consideration should be given to Hyland's status within that partnership. It is tempting to adopt a rule that everyone who works for a corporation is an employee, and everyone labelled "partner" is a partner. Like life, the law is not that simple. In fact, decisional law makes plain that no *per se* rule has been adopted that includes all those working for a corporation as employees-regardless of the amount of their stock ownership, their lack of involvement in the day-to-day activities of the business, or their failure to perform additional employee duties. And, by the same token, no rule excludes high-level individual officers in corporations from being considered as employees for purposes of the ADEA. *See, e.g., Zimmerman v. North American Signal Co.,* 704 F.2d 347, 351-52 & n. 4 (7th Cir.1983) (unpaid, inactive corporate officers or directors not characterized as employees; labels do not control as decisive issue is whether an employer-employee relationship exists rather than title held

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

by worker); *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1300 (9th Cir.1982), *cert. denied*,467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984) (member-shareholders in family corporation, where each member owned an equal block of shares, classified as employees); *E.E.O.C. v. First Catholic Slovak Ladies Ass'n*, 694 F.2d 1068, 1070 (6th Cir.1982) (coverage under ADEA should not center on labels the organization gives a position).

### B. *Legislative History*

The question is what definition should be used to determine whether Hyland is an employee or a traditional partner of NHRA. The first place to look is the statute. The Act's inconclusive definition-an individual employed by any employer-is of no help. While the legislative history is sparse, it does reveal Congress' aim to permit classification of professionals-for example, professors, doctors, and lawyers-as employees. One of the 1972 amendments to Title VII extended its coverage to academic institutions. 42 U.S.C. § 2000e-1 (1982). Further, Congress considered but did not include a proposal that physicians be excluded from Title VII's protection. 118 Cong.Rec. 3802 (1972) (Statement of Senator Javits).

There can be no doubt that it was Congress' purpose to prohibit employment discrimination against "any individual" in an employment relationship of the type defined in the Act. *Fairleigh Dickinson University*, 646 F.2d at 828; 29 U.S.C. § 623(a); *see also*29 U.S.C. § 621 (statement*801 of findings and purpose). Title VII's legislative history indicates that the term "employer" was intended to have "its common dictionary meaning, except as expressly qualified by the Act." 110 Cong.Rec. 7216 (April 8, 1964). It would seem to follow that the same common, dictionary meaning should be used when defining the term "employee" because "legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary

words addressed to him." *Addison v. Holly Hill Co.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).

### C. *Partnership Under the ADEA*

Those cases that consider an individual's status in a partnership setting are particularly relevant. They support the view that those labelled "partners" do not always fall within the traditional definition of that term. When all the indicia of partnership status are not present, an individual is an employee within the purview of the ADEA-regardless of the label attached to his position. Such an approach best fulfills the Act's remedial purposes.

The Supreme Court in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), held that a law partnership's decision to deny admittance of a female associate/employee into the partnership was covered by the provisions of Title VII. In a concurring opinion, Justice Powell wrote to express his view that the Court's decision did not apply to the relationship *among* already existing partners, who cannot be characterized as employees. *Id.* at 2236. The concurring justice added "[o]f course, an employer may not evade the strictures of Title VII simply by labelling its employees as 'partners.' " *Id.* at 2236 n. 2.

The Equal Employment Opportunity Commission ("EEOC"), the agency charged with the interpretation and enforcement of both Title VII and the ADEA, has adopted a similar position. In *E.E.O.C. Decision No. 85-4*, CCH Emp.Prac.Rptr. ¶ 6845, at 7040 (March 18, 1985), the Commission found that partners in an eight-member law firm could not be classified as employees for purposes of Title VII. Examining a number of factors, the Commission was influenced by the fact that all the partners controlled and managed the operation of the business, each partner had an equal voice in the management and direction of the firm, and all profits and losses were shared according to designated percentages outlined in the partnership agreement. *Id.* at 7040.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793

Page 10

794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

But the Commission recognized that, in some cases, an individual who is called a partner may be characterized as an employee. "In determining whether the individual is a partner or an employee in a particular case, the Commission will consider relevant factors including, but not limited to, the individual's ability to control and operate the business and to determine compensation and the administration of profits and losses." *Id.* at 7041 n. 4.

The Commission's view received judicial support in *E.E.O.C. v. Peat, Marwick, Mitchell and Co.,* 589 F.Supp. 534 (E.D.Mo.1984), *aff'd,* 775 F.2d 928 (8th Cir.1985), when it sought to compel the accounting firm's compliance with a records subpoena relating to an investigation of its mandatory retirement policies. Peat, Marwick argued that the subpoena issued by the EEOC was not reasonably related to any purpose of the ADEA since it sought information concerning possible discrimination against partners, and partners in an accounting firm are not employees protected by the provisions of the Act. The court upheld enforcement of the subpoena and agreed with the EEOC that respondents may label some of its members as "partners", when in reality those members may not fit within the traditional definition of the term. 589 F.Supp. at 538.

### D. *Factors Appropriate for Testing the Status of Persons Associated with a Partnership Under ADEA*

Although the right to control/economic realities test is appropriate, for example, to test whether a person is an independent contractor or an employee, the majority *802 correctly observes that this classic hybrid test is inappropriate in a partnership setting. Some of the factors, for example, skill required, equipment furnished and place of work, length of time worked are not relevant inquiries. Moreover, the focus is different when analyzing employment in a partnership setting since the question is the status of the individual within an organization of which he is concededly a part. By contrast, when testing whether someone is an independent con-

tractor the question is not the individual's status within the entity, but rather whether the person is or is not a member of that entity.

When applying the ADEA a court must evaluate two factors in deciding whether a so-called partner in an entity best characterized as a partnership should be classified as a traditional partner or as an employee. Those two factors are compensation and control. The first is more accurately stated as whether profits and losses were shared according to a predetermined formula. Traditional partners need not share profits and losses equally; but unless each is paid a predetermined share of profits, the individuals are not actually carrying on the business as co-owners. In this case, the shareholders' agreement stipulated in advance for an equal division of profits and losses between the shareholder members and any subsequently admitted member.

Second, is the individual's control and responsibility vis-a-vis the other partners in the organization. Although all individuals need not have an equal voice, an individual whose voice in the management of a business is substantially less than the others is better classified as an employee since-unlike a traditional partner-he lacks a significant voice in the business' direction. An individual whose opinions and business judgment are drowned out by more powerful individuals is more susceptible to the discriminatory practices that the ADEA and Title VII were designed to eliminate. Here, Hyland had an equal right to operate and control New Haven Associates. No shareholder-member exercised any greater degree of control in the management of the business than he did. Concededly, the entity here is a small one; but size is not the test when analyzing control and responsibility. He was one of the original group of radiologists who founded a business that they could manage and profit by. They were employees in name only, and organized their entity as a corporation only to the extent that the tax laws required them to do so.

This original group therefore considered themselves as founders and owners, not employees. After ex-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

794 F.2d 793                                                                                          Page 11
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

amining Hyland's compensation and control, it is evident that he was in fact a traditional partner, and not an employee.

### III CONCLUSION

Therefore, NHRA should be immune from liability for discriminating against him on the basis of age. For the majority now to treat Hyland and his co-partners as employees places a premium on devising a simplistic rule easy to apply, but one that ignores the reality of the entity's and the individual's status. Accordingly, I vote to affirm the order granting summary judgment in favor of NHRA and that dismissed appellant's complaint.

C.A.2 (Conn.),1986.
Hyland v. New Haven Radiology Associates, P.C.
794 F.2d 793, 41 Fair Empl.Prac.Cas. (BNA) 183, 41 Empl. Prac. Dec. P 36,460, 55 USLW 2043

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

534 F.3d 1116

534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

**H**
Johnson v. Riverside Healthcare System, LP
C.A.9 (Cal.),2008.

United States Court of Appeals,Ninth Circuit.
Christopher Lynn JOHNSON, M.D., Plaintiff-Appellant,
v.
RIVERSIDE HEALTHCARE SYSTEM, LP, a
California limited partnership, d/b/a Riverside
Community Hospital; Riverside Healthcare System,
LLC, a California limited liability corporation;
Columbia/HCA Western Group, Inc., a Tennessee
corporation, doing business in California; Medical
Staff of Riverside Community Hospital, a California unincorporated association; Robert Duncanson,
M.D.; Libby Martin; Barbara Marshall; Gay
Dickinson; Patricia Lemmle; Earl Tate; Michael
Rawlings, Defendants-Appellees.
No. 06-55280.

Argued and Submitted Oct. 18, 2007.
Filed July 28, 2008.

**Background:** African-American physician,
formerly under contract with hospital and formerly
a member of its medical staff, sued hospital, medical staff, and chief of staff, alleging that termination
of his medical staff membership and his contract
was due to racial and sexual orientation discrimination, and asserting claims under § 1981 and California civil rights statutes. The United States District
Court for the Central District of California, Audrey
B. Collins, J., dismissed for failure to state claim,
and physician appealed.

**Holdings:** The Court of Appeals, O'Scannlain, Circuit Judge, held that:
(1) physician's allegations were sufficient to state
hostile work environment claim under § 1981;
(2) physician had employee relationship with hospital and thus could not bring action against it under California's Unruh Civil Rights Act; and
(3) no equitable tolling applied on physician's claim

under California's Fair Employment and Housing
Act (FEHA).

Affirmed in part, reversed in part, and remanded.

Opinion, 516 F.3d 759, withdrawn and superseded
on rehearing.

West Headnotes

**[1] Federal Courts 170B ⟲759.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk759 Theory and Grounds of Decision of Lower Court
               170Bk759.1 k. In General. Most
Cited Cases
Court of Appeals may affirm district court's determination on any ground supported by record.

**[2] Federal Civil Procedure 170A ⟲1772**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1772 k. Insufficiency in General. Most Cited Cases
Dismissal for failure to state claim may be based on
either lack of cognizable legal theory or absence of
sufficient facts alleged under cognizable legal theory. Fed.Rule Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⟲673**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(B) Complaint
         170AVII(B)1 In General
            170Ak673 k. Claim for Relief in Gen-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116                                                                                         Page 2
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

eral. Most Cited Cases
Specific facts are not necessary in a complaint under rule requiring a "short and plain" statement of the claim; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

|4| Civil Rights 78 ☞1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
Claims alleging hostile work environment are cognizable under § 1981. 42 U.S.C.A. § 1981.

|5| Civil Rights 78 ☞1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
Hostile work environment claims under Title VII contain the same elements of a § 1981 hostile work environment claim and, thus, the legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action. 42 U.S.C.A. § 1981.

|6| Civil Rights 78 ☞1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
To state a hostile work environment claim under § 1981, plaintiff must allege that (1) he was subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the

conditions of his employment and create an abusive work environment. 42 U.S.C.A. § 1981.

|7| Civil Rights 78 ☞1147

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
Whether discriminatory conduct forming basis for § 1981 hostile work environment claim was sufficiently severe or pervasive depends on all circumstances, including frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating or mere offensive utterance, and whether it unreasonably interferes with employee's work performance. 42 U.S.C.A. § 1981.

|8| Civil Rights 78 ☞1395(8)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(8) k. Employment Practices.
Most Cited Cases
Allegations of African-American physician who was under contract with hospital were sufficient to state race-based hostile work environment claim against hospital under § 1981, although complaint was rife with irrelevant allegations that physician's coworkers harassed him because of his sexual orientation, where physician alleged that a colleague used a racial epithet and moved as if to strike him, that he learned indirectly about a second incident of racial discrimination directed against an African-American candidate for residency at hospital, and that a nurse made repeated requests that he remove trash from the operating room, which she viewed as "funny." 42 U.S.C.A. § 1981; Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

|9| Civil Rights 78 ☞1009

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116                                                                Page 3
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1007 Bases of Discrimination and
Classes Protected
         78k1009 k. Race, Color, Ethnicity, or Na-
tional Origin. Most Cited Cases
Section 1981 creates a cause of action only for
those discriminated against on account of their race
or ethnicity. 42 U.S.C.A. § 1981.

**[10] Civil Rights 78 &copy;=>1147**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1147 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited Cases
Discriminatory conduct directed at an individual
other than the plaintiff may be relevant to a hostile
work environment claim under § 1981. 42 U.S.C.A.
§ 1981.

**[11] Civil Rights 78 &copy;=>1049**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1043 Public Accommodations
         78k1049 k. Place of Business or Public
Resort. Most Cited Cases

**Civil Rights 78 &copy;=>1103**

78 Civil Rights
   78II Employment Practices
      78k1102 Constitutional and Statutory Provi-
sions
         78k1103 k. In General. Most Cited Cases
Employment discrimination claims are excluded
from California's Unruh Civil Rights Act, guaran-
teeing right to equal accommodations, advantages,
facilities, or services in business establishments.
West's Ann.Cal.Civ. Code § 51.

**[12] Civil Rights 78 &copy;=>1049**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1043 Public Accommodations
         78k1049 k. Place of Business or Public
Resort. Most Cited Cases
Relief under California's Unruh Civil Rights Act,
guaranteeing right to equal accommodations, ad-
vantages, facilities, or services in business
establishments, is available when plaintiff is in re-
lationship with offending business establishment
similar to that of customer in customer-proprietor
relationship. West's Ann.Cal.Civ. Code § 51.

**[13] Federal Courts 170B &copy;=>924.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(L) Determination and Disposition
of Cause
         170Bk924 Effect of Changes in Law or
Facts
            170Bk924.1 k. In General. Most Cited
Cases
In reviewing district court's judgment, Court of Ap-
peals applies state law as it is presently defined,
even if state law has been altered subsequent to dis-
trict court's decision.

**[14] Civil Rights 78 &copy;=>1045**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1043 Public Accommodations
         78k1045 k. Medical Facilities and Ser-
vices. Most Cited Cases

**Civil Rights 78 &copy;=>1110**

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
Physician who worked at hospital under profession-

&copy; 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

al services agreement, and was member of hospital's medical staff, had relationship with hospital that was materially indistinguishable from that of employee, and thus could not bring race and sexual orientation discrimination action against hospital under California's Unruh Civil Rights Act, guaranteeing right to equal accommodations, advantages, facilities, or services in business establishments; hospital retained control over all material aspects of physician's activities at hospital. West's Ann.Cal.Civ. Code § 51.

**[15] Civil Rights 78 ☞1049**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1043 Public Accommodations
         78k1049 k. Place of Business or Public Resort. Most Cited Cases
Plaintiff asserting claim under California statute prohibiting business establishments from "boycott[ing] or blacklist[ing]" must demonstrate that he stands in relationship with offending business establishment similar to that of customer in customer-proprietor relationship. West's Ann.Cal.Civ. Code § 51.5.

**[16] Civil Rights 78 ☞1732**

78 Civil Rights
   78V State and Local Remedies
      78k1730 Time for Proceedings; Limitations
         78k1732 k. Employment Practices. Most Cited Cases
No equitable tolling of limitations period, which was one year after issuance of a right-to-sue letter, was warranted in race and sexual orientation discrimination action brought against employer under California's Fair Employment and Housing Act (FEHA), in which employee timely filed original complaint, but voluntarily dismissed that complaint and then filed second action outside limitations period; there was no evidence that employer's conduct had caused employee to voluntarily dismiss action. West's Ann.Cal.Gov. Code § 12965(b).

**[17] Limitation of Actions 241 ☞104.5**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(G) Pendency of Legal Proceedings, Injunction, Stay, or War
         241k104.5 k. Suspension or Stay in General; Equitable Tolling. Most Cited Cases
Under California law, equitable tolling of limitations period is warranted where defendant has induced plaintiff to delay filing until after statute of limitations has run.

**[18] Limitation of Actions 241 ☞130(5)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(H) Commencement of Proceeding; Relation Back
         241k130 New Action After Dismissal or Nonsuit or Failure of Former Action
            241k130(5) k. Dismissal or Nonsuit in General. Most Cited Cases
Under California law, absent express statutory language, plaintiff's voluntary dismissal does not entitle him to toll statute of limitations.

*1119 Dale L. Gronemeier, Gronemeier & Associates, P.C., South Pasadena, CA, argued the cause for the plaintiff-appellant, and filed briefs.
James L. Payne, Payne & Fears LLP, Irvine, CA, argued the cause for the defendants-appellees, and filed a brief; Laura Fleming, Payne & Fears LLP, Irvine, CA, and Tami Smason, Foley & Lardner LLP, Los Angeles, CA, were on the brief.

Appeal from the United States District Court for the Central District of California; Audrey B. Collins, District Judge, Presiding. D.C. No. CV-03-01392-ABC.

Before: DIARMUID F. O'SCANNLAIN and MILAN D. SMITH, JR., Circuit Judges, and MICHAEL W. MOSMAN,[FN*] District Judge.

FN* The Honorable Michael W. Mosman,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

Page 5

United States District Judge for the District of Oregon, sitting by designation.

ORDER AND OPINION

O'SCANNLAIN, Circuit Judge:

### ORDER

The petition for panel rehearing is GRANTED. The opinion filed on February 13, 2008, and appearing at 516 F.3d 759 (9th Cir.2008) is withdrawn. The superseding opinion will be filed concurrently with this order.

### OPINION

We are called upon to decide whether a physician who asserts that he was discriminated against (based on his race, sexual orientation, and perceived disability) by doctors and nurses at the hospital where he treated patients can establish civil rights claims under federal and state law.

I

A

Christopher Lynn Johnson worked as a physician at the Riverside Community Hospital ("Riverside") FN1 and as a member of the Medical Staff of Riverside Community Hospital ("Medical Staff") from October 1999 until February 2002. Johnson's responsibilities included performing plastic surgeries and providing trauma consultations in Riverside's emergency room. Johnson identifies himself as African American and bisexual. Soon after he began his tenure at Riverside, Johnson alleges that several physicians regularly harassed him because of his sexual orientation and their mistaken belief that he suffered from HIV/AIDS. He alleges that several nurses harassed him and refused *1120 to participate in surgeries with him for the same reas-

ons. In addition, Johnson points to several incidents of racial discrimination during his time at Riverside. The first was particularly serious. According to Johnson, a colleague, Dr. Vlasak, admonished him by using a racial slur after Johnson performed surgery on one of Vlasak's patients. As the facts are set forth in Johnson's complaint, Vlasak failed to review the patient's CT scan and consequently failed to realize that the patient was suffering from a skull fracture with an underlying brain contusion. Upon discovering the problem, Johnson admitted the patient for surgery and performed the necessary procedure. When Vlasak learned that Johnson had corrected (and therefore exposed) his oversight, Vlasak moved as if to strike Johnson, "charged" into the room where Johnson was standing and "screamed ...'You fucking nigger-why did you do that to me?' "

> FN1. Also named as defendants in this suit are Riverside Healthcare System, LLC ("RHCS"), a limited partnership doing business as Riverside under California law, and Columbia/HCA Western Group, Inc., a Tennessee corporation with an ownership interest in RHCS. Hereinafter, all three entities will be referred to collectively as "Riverside."

Second, Johnson alleges that the Medical Staff's Residency Selection Committee refused to consider a residency candidate because he was African-American and, after rejecting the application, the Chairman and other members of the committee "stated in the presence of other physicians" that they would not rank the applicant because of his race and sexual orientation. Finally, Johnson states that a certain nurse "consistently" refused to provide him with necessary equipment during surgical procedures and "repeatedly" asked him to remove trash from the Operating Room, acting as if these requests were "funny." He further alleges that these remarks were racially motivated, as they reflected the nurse's view that he was required to act as a "maintenance man" simply because he was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

Page 6

African-American. Johnson alleges that Riverside and the Medical Staff, of which defendant Dr. Robert Duncanson was the chief, were aware of all of these incidents and made no effort to address them.

Johnson worked at Riverside under the terms of a professional services agreement. The contract explicitly designated Johnson as a "Contractor," rather than an employee. The contract also required Johnson to retain his membership and privileges with the Medical Staff. Failure to do so was a cause for termination.

In February 2002, Johnson's Medical Staff privileges were revoked after he failed to pay his membership dues by a deadline Johnson claims the Medical Staff imposed arbitrarily and without warning while he was traveling out of the country. Because full membership on the Medical Staff was a condition of his contract, Riverside terminated Johnson soon afterwards. Johnson immediately applied to the Medical Staff for reinstatement, but was informed that he could only regain his status by reapplying to the Staff as a new applicant, which would require him to submit to a hearing before the Medical Staff Credentials Committee. Johnson obliged, and was confronted at the hearing with numerous complaints about his behavior filed by coworkers, all of which he contends were fabricated. After the hearing, the Committee voted to uphold the denial of Johnson's Medical Staff membership. Prior to the completion of the hearing, Riverside filed a report describing the complaints against Johnson with the California Medical Board pursuant to California Business and Professions Code § 805. Johnson argues that the filing of this report was premature and cost him future opportunities for employment.

## B

On September 26, 2002, Johnson filed a complaint against Duncanson with the California Department of Fair Employment and Housing ("DFEH") alleging that he *1121 had been harassed, denied employment, and denied privileges to admit patients to Riverside on account of his race and sexual orientation. On September 30, 2002, DFEH issued Johnson right to-sue notices for Duncanson and several other individuals on the Medical Staff and nursing staff.

On September 2, 2003, Johnson filed a complaint in California state court against Riverside and several other defendants setting forth multiple civil rights claims under federal and state law. He voluntarily dismissed that action, however, on October 16, 2003. Later, on December 2, 2003, Johnson filed a complaint in the District Court for the Central District of California against Riverside, the Medical Staff, Duncanson, and other individuals alleging the same causes of action, including three relevant to this appeal: (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) racial and sexual orientation discrimination in violation of California Civil Code § 51 (the "Unruh Civil Rights Act claim") and § 51.5; and (3) racial and sexual orientation discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't.Code §§ 12940 et seq.

The defendants moved to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court dismissed Johnson's claims under California Civil Code §§ 51 and 51.5 with prejudice, finding that Johnson had failed to state a claim upon which relief could be granted because neither provision creates a cause of action for employment discrimination. The district court did not specifically address Johnson's § 1981 claims, but dismissed his remaining claims, including his FEHA claims, without prejudice, granting him leave to amend.

Johnson timely filed a first amended complaint which omitted, and thereby waived, all other claims except those mentioned here.[FN2] Thereafter, he reached a settlement with several defendants, leaving only Riverside, Duncanson, and the Medical Staff as defendants in this action. The district court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

then dismissed each of Johnson's remaining claims under Rule 12(b)(6) for failure to state a claim.

> FN2. Johnson's § 1981 claim against the Medical Staff, which included his contentions that the Medical Staff wrongfully revoked his staff privileges and that the Medical Staff created a hostile work environment, was among those claims waived by the first amended complaint.

Johnson appeals. First, he argues that the district court erred in dismissing his § 1981 claims against Duncanson and Riverside, contending that he has sufficiently alleged that the defendants created a racially hostile work environment in violation of that provision. Second, Johnson argues that the district court erred in dismissing his §§ 51 and 51.5 claims against all three defendants because both statutes recognize a cause of action for the type of workplace discrimination Johnson alleges here. Finally, Johnson argues that the district court erred in dismissing his FEHA claims against all three defendants even though the statute of limitations expired, suggesting that he was entitled to equitable tolling. We consider each argument in turn.

## II

[1][2][3] We begin with Johnson's § 1981 claim against Duncanson and Riverside. The district court dismissed such claim without discussion. Nevertheless, we may affirm based on any ground supported by the record. *Papa v. United States,* 281 F.3d 1004, 1009 (9th Cir.2002). A Rule 12(b)(6) dismissal may be based on either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *1122Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). In other words, Johnson's complaint must provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed.R.Civ.P. 8(a)(2). This is not an onerous burden. "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of

what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). Still, Johnson's complaint must, at a minimum, plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Finally, in reviewing the district court's decision, we view Johnson's complaint in the light most favorable to him, accepting all well-pleaded factual allegations as true, as well as any reasonable inferences drawn from them. *Braam v. Bogan,* 320 F.3d 1023, 1028 (9th Cir.2003).

### A

[4][5][6][7] Among other things, § 1981 guarantees "all persons" the right to "make and enforce contracts." 42 U.S.C. § 1981(a). This right includes the right to the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including the relationship between employer and employee. *Id.* § 1981(b). Johnson contends that Duncanson and Riverside were aware of the harassment he faced from his co-workers and failed to take steps to address it, thereby creating a hostile work environment. In this circuit, such claims are cognizable under § 1981. *Manatt v. Bank of Am.,* 339 F.3d 792, 797 (9th Cir.2003). A hostile work environment, by its "very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). To state a hostile work environment claim here, Johnson must allege that "(1) [he] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt,* 339 F.3d at 798 (internal quotation marks omitted).FN3 In considering whether the discriminatory conduct was "severe or pervasive," we look to "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir.2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

> FN3. Hostile work environment claims under Title VII contain the same elements of a § 1981 hostile work environment claim and, thus, the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt*, 339 F.3d at 797.

**B**

[8] At the motion to dismiss stage, Johnson need not support his allegations with evidence, but his complaint must allege sufficient facts to state the elements of a hostile work environment claim. *See Twombly*, 127 S.Ct. at 1974; *see also Williams v. Boeing Co.* 517 F.3d 1120, 1130 (9th Cir.2008) ("Even though heightened pleading is not required in discrimination cases, the complaint must still give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))).

*1123 [9] Johnson's complaint is rife with allegations that his coworkers harassed him because of his sexual orientation. Nevertheless, because § 1981 creates a cause of action only for those discriminated against on account of their race or ethnicity, such allegations are irrelevant to his claim. *See Jones v. Bechtel*, 788 F.2d 571, 574 (9th Cir.1986) (holding that a plaintiff could not assert a § 1981 claim based on gender discrimination). Still, Johnson's complaint includes at least three allegations that are relevant to his claim that he was subjected to a hostile work environment because of his race.

[10] First, Johnson's encounter with Dr. Vlasak, in which Vlasak uttered a racial epithet and moved as if to strike him, was a serious act of discrimination. While "an isolated incident of harassment by a coworker will rarely (if ever) give rise to a reasonable fear that [such] harassment has become a permanent feature of the employment relationship,"*Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir.1999), Johnson's complaint contains other relevant allegations. While the complaint does not allege that Johnson was present at the time when the African-American residency candidate's application was rejected or when the members of the Residency Selection Committee's offensive remarks were made, discriminatory conduct directed at an individual other than the plaintiff may be relevant to a hostile work environment claim. *See, e.g., Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir.1998). Finally, the allegations of the nurse's "repeated" requests that Johnson remove trash from the Operating Room, which she viewed as "funny," are also relevant to his § 1981 claim. We have previously held that a coworker's use of a "code word or phrase" can, under certain circumstances, contribute to a hostile work environment. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir.2004); *see also El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073-74 (9th Cir.2005) (same). While we are not obligated to accept every conclusory allegation as true, *see, e.g., Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir.2007), we believe the inference that racial animus motivated the nurse's frequent requests that Johnson perform the tasks of a maintenance man is a reasonable one that we must construe in his favor at the motion to dismiss stage.[FN4]

> FN4. Not *every* conclusory allegation must be accepted as true, however. Johnson's complaint also states that after he was bitten by a security dog stationed in Riverside's emergency room, the dog's trainer told him not to complain to the hospital administrators because the dog was "more popular" with the nurses than Johnson was.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The complaint further alleges that this remark "clearly reflected the trainer's opinion that an African American physician ... was lower on the Hospital's social scale than a dog." Rule 8 requires "allegations plausibly suggesting (not merely consistent with) [racial animus]." *Twombly,* 127 S.Ct. at 1966. While we believe it is plausible to infer that the nurse's comments were racially motivated, the dog trainer's otherwise race-neutral insult is not so easily categorized. We, of course, accept as true Johnson's allegation that such remark was made. Nevertheless, because the remaining allegations in his complaint are sufficient to state a hostile work environment claim, we need not decide whether we must accept his further allegation that the remark was motivated by race.

Johnson's complaint provides Duncanson and Riverside with "fair notice of what [his] claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. 992. And, viewing the totality of the alleged circumstances in the light most favorable to him, the complaint puts forth "enough facts to state a claim for relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. Our notice pleading requirements do not require more. "Indeed, it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *1124Swierkiewicz,* 534 U.S. at 515, 122 S.Ct. 992 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Accordingly, we conclude that Johnson's § 1981 claim must survive Duncanson and Riverside's motion to dismiss.

## III

Our next task is to determine whether the district court erred in dismissing Johnson's claims under California Civil Code §§ 51 and 51.5.

## A

## 1

[11] California Civil Code § 51 codifies the Unruh Civil Rights Act and provides that all persons within the State of California are "free and equal" and "no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ.Code § 51(b). California courts have interpreted the term "business establishment" in the "broadest sense reasonably possible," *see Burks v. Poppy Constr. Co.,* 57 Cal.2d 463, 468, 20 Cal.Rptr. 609, 370 P.2d 313 (1962), and hospitals such as Riverside meet the definition. *O'Connor v. Vill. Green Owners Ass'n,* 33 Cal.3d 790, 796, 191 Cal.Rptr. 320, 662 P.2d 427 (1983). Nevertheless, the California Supreme Court has expressly held that employment discrimination claims are excluded from § 51's protection. *Alcorn v. Ambro Eng'g, Inc.,* 2 Cal.3d 493, 500, 86 Cal.Rptr. 88, 468 P.2d 216 (1970); *Rojo v. Kliger,* 52 Cal.3d 65, 77, 276 Cal.Rptr. 130, 801 P.2d 373 (1990). The court has explained this exclusion by noting that the Unruh Act was designed to prohibit discrimination by business establishments "in the course of furnishing goods, services, or facilities" to its "clients, patrons, or customers," but does not extend to claims for employment discrimination because other California statutes are specifically tailored to provide relief for such conduct, most notably the FEHA, which was passed by the California Legislature in the very same session as the Unruh Act. *Alcorn,* 2 Cal.3d at 500, 86 Cal.Rptr. 88, 468 P.2d 216.

[12] Twenty-six years later in *Strother v. Southern California Permanente Medical Group,* 79 F.3d 859 (9th Cir.1996), we interpreted the scope of liability available under § 51 in light of *Alcorn* and subsequent California cases and concluded that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116

534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

those precedents established the rule that relief under § 51 was available when the plaintiff was in a relationship with the offending business establishment "similar to that of the customer in the customer-proprietor relationship which the Act and its predecessors have most commonly covered." [FN5] *Id.* at 874.

> FN5. In *Strother*, we acknowledged that California courts had allowed parties who were "not 'clients, patrons, or customers,' in the traditional sense" to bring claims under § 51. *Id.* at 873. Nevertheless, we determined that the plaintiffs in each of these cases stood in a position with the defendant similar to that of a customer in the "customer-proprietor relationship" the Unruh Act was designed to protect. *Id.* at 873-74 (citing *O'Connor,* 33 Cal.3d at 796, 191 Cal.Rptr. 320, 662 P.2d 427 (holding that condominium owners could bring § 51 claims against their condominium owners' association); *Isbister* v. *Boys' Club of Santa Cruz, Inc.,* 40 Cal.3d 72, 81, 219 Cal.Rptr. 150, 707 P.2d 212 (1985) (holding that female children excluded from membership in the Boys' Club could bring claims against the organization); *Jackson v. Superior Court,* 30 Cal.App.4th 936, 941, 36 Cal.Rptr.2d 207 (1994) (holding that an African-American investment advisor who accompanied two clients into a bank could assert a § 51 claim alleging discrimination against the bank even though his clients were the actual customers of the bank); *Rotary Club of Duarte v. Bd. of Dirs.,* 178 Cal.App.3d 1035, 1059, 224 Cal.Rptr. 213 (1987) (holding that a local chapter of the Rotary Club could challenge the National Rotary Club's "male-only" policy under § 51)).

\*1125 2

Applying these precedents, the district court dismissed Johnson's § 51 claims against the defend-

ants, reasoning that his allegations amounted to employment discrimination claims excluded from the Unruh Act's protection. One month later, however, the California Court of Appeal's decision in *Payne v. Anaheim Memorial Hospital,* 130 Cal.App.4th 729, 30 Cal.Rptr.3d 230 (2005), became final. In that case, the Third Division of the Court of Appeal held that a physician could assert a § 51 claim against the hospital where he treated patients because that physician did not have the type of employment relationship with the hospital which foreclosed § 51 relief. *Id.* at 748-49, 30 Cal.Rptr.3d 230. Johnson argues that *Payne* has changed the applicable state law and requires us to reverse the district court's dismissal of his claims.

[13] In reviewing the district court's judgment, we must apply state law as it is presently defined, even if state law has been altered subsequent to the district court's decision. *Vandenbark v. Owens-Illinois Glass Co.,* 311 U.S. 538, 541, 61 S.Ct. 347, 85 L.Ed. 327 (1941); *Nelson v. Brunswick Corp.,* 503 F.2d 376, 381-82 (9th Cir.1974). In interpreting state law, we are bound to follow the decisions of the state's highest court. *Hewitt v. Joyner,* 940 F.2d 1561, 1565 (9th Cir.1991). When the state's highest court has not spoken on an issue, we must determine what result the court would reach if we were standing in its shoes by examining "state appellate court opinions, statutes and treatises." *Id.* In undertaking this task, "the California Court of Appeal's announcement of a rule of law 'is a datum for ascertaining state law' " which we may not omit unless we are " 'convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1012-13 (9th Cir.2004) (quoting *Hicks v. Feiock,* 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988)) (internal quotation marks omitted).

Accordingly, we must first determine whether *Payne's* holding applies to the facts of this case. If we answer that question in the affirmative, we must next determine whether there is any persuasive

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

evidence to suggest that the California Supreme Court would have decided *Payne* differently, such that a contrary result would be warranted here.

### 3

[14] Several factual distinctions between Johnson's case and *Payne* are readily apparent. First, Johnson's relationship with Riverside differed from Payne's relationship with his hospital in the material respect that Johnson was compensated while Payne was not. In finding Payne's claims against his hospital cognizable under § 51, the court in *Payne* explained, "Payne does not work for the hospital, and has no obligation to treat his patients there as opposed to any other hospital. Anaheim Memorial does not compensate Payne for his medical services, nor does it exercise any direct control over the manner in which he practices. Instead, the hospital merely provides a facility which a qualified physician may access in connection with providing medical care to his patients." *Payne*, 130 Cal.App.4th at 748, 30 Cal.Rptr.3d 230. Riverside, on the other hand, paid Johnson $250 per month to be on call in its emergency room and also compensated him for each trauma patient *1126 he treated in an amount not to exceed $10,000 per month.

Second, although Johnson's professional services agreement referred to him as a "contractor," Riverside retained control over all material aspects of his activities at the hospital. While the parties' affiliation did not contain every component of the traditional employer-employee relationship (most notably, Riverside was not required to pay Social Security taxes for Johnson or provide him with retirement benefits), Riverside determined the shifts Johnson was responsible to work, the nurses who would be assigned to work with him, and the credentials it would be necessary for Johnson to display when inside the hospital. Riverside also required Johnson to remain a member in good standing on the Medical Staff.

Thus, we find Johnson's relationship with Riverside distinguishable from the relationship described in *Payne*. Indeed, Johnson's complaint is based solely on allegations of workplace discrimination, not discrimination in the provision of "goods, services, or facilities" prohibited by § 51. On the other hand, we find it quite similar to the relationship we held insufficient to state a § 51 claim in *Strother*. In that case we determined that a physician could not bring a claim under § 51 against the medical group in which she was a partner because her relationship with the group was more akin to that of an employee than that of a "client, patron, or customer" § 51 was designed to protect. *Strother*, 79 F.3d at 863. Although the plaintiff asserted that her relationship with the medical group entitled her to many benefits, such as "the use of certain medical facilities, medical supplies ... and other goods, management courses, and a variety of privileges, advantages, and services," we concluded that such benefits were no different than those that would be received by a physician employed by the medical group, and thus determined that regardless of whether the plaintiff was a bona fide partner of the group or an employee, because her relationship with the group was analogous to that of an employee, California law precluded her from seeking relief under § 51. *Id.* at 874-75.

We continue to follow our decision in *Strother* and conclude that Johnson's § 51 claims are foreclosed by the fact that his relationship with Riverside was materially indistinguishable from that of an employee. We find nothing in the California Court of Appeal's holding in *Payne* to counsel against such a decision because the hospital in that case neither compensated the plaintiff nor controlled the manner of his practice to the degree Riverside does here. Consequently, it is unnecessary for us to decide whether the California Supreme Court would have decided *Payne* differently. California law continues to require a plaintiff asserting a claim under § 51 to demonstrate that his relationship with the offending organization was "similar to that of the customer in the customer-proprietor relationship." *Id.* at 874.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

534 F.3d 1116
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

Johnson has made no such demonstration.

### B

[15] Johnson has also asserted claims against the defendants under California Civil Code § 51.5. Section 51.5 provides in relevant part:

> No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristics listed or defined in subdivision (b) ... of Section 51....

Cal. Civ.Code § 51.5(a). In *Strother* we interpreted § 51.5 as a mere extension of the Unruh Act. 79 F.3d at 875 (citing *Roth v. Rhodes,* 25 Cal.App.4th 530, 537, 30 Cal.Rptr.2d 706 (1994)). Explaining that § 51.5, like § 51, is aimed only at discrimination*1127 in "relationships similar to the proprietor/customer relationship," we held that § 51.5 required the plaintiff to make the same showing. *Id.* We see no reason to abandon that determination here. Thus, we conclude that a plaintiff asserting claims under § 51.5 must demonstrate that he stands in a relationship with the offending business establishment similar to that of a customer in a customer-proprietor relationship. As explained above, Johnson has failed to do so here. Accordingly, we conclude that his claims under § 51.5 must meet the same fate as his claims under § 51.

### IV

[16] Finally, we must determine whether the district court erred in dismissing Johnson's FEHA claims as barred by the statute of limitations. Under California law, a plaintiff who intends to assert a FEHA claim must first file a complaint with the California DFEH, Cal. Gov't.Code § 12960, and then must file the claims within one year after the DFEH issues a right-to-sue letter for the defendants listed in the complaint, *id.*§ 12965(b). Johnson received a right-to-sue letter from the DFEH on September 30, 2002

and timely filed an action in California state court on September 5, 2003. Nevertheless, he voluntarily dismissed that action on October 16, 2003 and then waited until December 2, 2003, 64 days after the limitations period expired, to file this action in federal court. Johnson contends that his timely state court filing satisfies the statute of limitations under theories of equitable estoppel and equitable tolling. We disagree.

[17] Under California law, equitable tolling will be warranted where the defendants have induced the plaintiff to delay filing until after the statute of limitations has run. *See Mills v. Forestex Co.,* 108 Cal.App.4th 625, 652, 134 Cal.Rptr.2d 273 (2003) (citation omitted). We discern nothing in the record to suggest that the defendants' conduct caused Johnson to voluntarily dismiss his state court action or wait an additional 47 days before filing this action in federal court.

[18] In addition, California courts have concluded that absent express statutory language, a plaintiff's voluntary dismissal will not entitle him to toll the statute of limitations. *See Wood v. Elling Corp.,* 20 Cal.3d 353, 359, 142 Cal.Rptr. 696, 572 P.2d 755 (1977); *Thomas v. Gilliland,* 95 Cal.App.4th 427, 433, 115 Cal.Rptr.2d 520 (2002). Thus, Johnson's voluntary dismissal of his state court action is not an event to which equitable tolling applies.[FN6]

> FN6. Even if Johnson could demonstrate that he was entitled to equitable tolling, he would not be entitled to toll the period necessary to render his FEHA claim timely. The effect of equitable tolling is that "the limitations period stops running during the tolling event, and begins to run again only when the tolling event has concluded. As a consequence, the tolled interval ... is tacked onto the end of the limitations period, thus extending the deadline for suit by the entire length of time during which the tolling event previously occurred." *Lantzy v. Centex Homes,* 31 Cal.4th 363, 370-71, 2 Cal.Rptr.3d 655, 73 P.3d 517 (2003)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(emphasis omitted).

> Johnson filed his state action on September 5, 2003, 25 days before the statute of limitations period expired. He voluntarily dismissed the state action 41 days later, on October 16, 2003. Consequently, if equitable tolling applied, Johnson would have been entitled to file his claims in federal court within 41 days of his voluntary dismissal. Johnson delayed filing until December 2, 2003, however, 47 days after his voluntary dismissal, and 6 days after the maximum tolling period would have expired.

## V

Based on the foregoing, the district court's dismissal of Johnson's § 1981 hostile*1128 work environment claim against defendants Duncanson and Riverside is **REVERSED** and **REMANDED.** The dismissal of Johnson's claims under California Civil Code §§ 51 and 51.5 for failure to state a claim upon which relief can be granted and the dismissal of his FEHA claims for failure to comply with the statute of limitations are **AFFIRMED.** Each party shall bear its own costs on appeal.

C.A.9 (Cal.),2008.
Johnson v. Riverside Healthcare System, LP
534 F.3d 1116, 103 Fair Empl.Prac.Cas. (BNA) 1553, 08 Cal. Daily Op. Serv. 9618

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

▷
Solon v. Kaplan
C.A.7 (Ill.),2005.

United States Court of Appeals,Seventh Circuit.
James D. SOLON, Plaintiff-Appellant,
v.
Larry S. KAPLAN, individually and as partner in
the firm of Kaplan, Begy & von Ohlen; Robert C.
von Ohlen, individually and as partner in the firm
of Kaplan, Begy & von Ohlen; Fred C. Begy, III,
individually and as partner in the firm of Kaplan,
Begy & von Ohlen; et al., Defendants-Appellees.
No. 04-2113.

Argued Dec. 9, 2004.
Decided Feb. 15, 2005.
As Amended Feb. 23, 2005.

**Background:** Lawyer brought action under Title
VII alleging that his former law partners terminated
his interest in their firm in retaliation for his oppos-
ition to sexual harassment. The United States Dis-
trict Court for the Northern District of Illinois,
Samuel Der-Yeghiayan, J., 2004 WL 725893,
entered summary judgment in favor of partners, and
lawyer appealed.

**Holding:** The Court of Appeals, Flaum, Chief
Judge, held that lawyer was not "employee" en-
titled to sue for retaliation under Title VII.

Affirmed.

West Headnotes

[1] Civil Rights 78 ⏦1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
In determining whether individual is "employee"
entitled to sue for retaliation under Title VII, court

should consider: (1) whether organization can hire
or fire individual or set rules and regulations of in-
dividual's work; (2) whether and, if so, to what ex-
tent organization supervises individual's work; (3)
whether individual reports to someone higher in or-
ganization; (4) whether and, if so, to what extent in-
dividual is able to influence organization; (5)
whether parties intended that individual be employ-
ee, as expressed in written agreements or contracts;
and (6) whether individual shares in profits, losses,
and liabilities of organization. Civil Rights Act of
1964, §§ 701(f), 704(a), 42 U.S.C.A. §§ 2000e(f),
2000e-3(a).

[2] Civil Rights 78 ⏦1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
General partner in law firm was not "employee" en-
titled to sue for retaliation under Title VII, despite
partner's contention that partners ignored partner-
ship agreement so frequently that it no longer had
any legal effect, where firm had only four partners,
partnership agreement allowed for his involuntary
termination only by two-thirds vote of general part-
ners, and partner served as managing partner, held
equity interest in firm, shared in its profits, attended
partnership meetings, had access to private finan-
cial information, and possessed unilateral veto
power over new admissions. Civil Rights Act of
1964, §§ 701(f), 704(a), 42 U.S.C.A. §§ 2000e(f),
2000e-3(a).

*630 Michael J. Hamblet, Hamblet, Oremus &
Little, Chicago, IL, Terry L. Mann (argued), Mar-
tin, Pringle, Oliver, Wallace & Bauer, Wichita, KS,
for Plaintiff-Appellant.
Joel W. Rice (argued), Jane M. McFetridge, Fisher
& Phillips, Donald Hubert, Hubert, Fowler, &
Quinn, Stephen J. Bisgeier, Miller, Shakman &
Hamilton, Chicago, IL, for Defendants-Appellees.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

Before FLAUM, Chief Judge, and BAUER and WILLIAMS, Circuit Judges.

FLAUM, Chief Judge.
James Solon filed this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e*et seq.*, alleging that his former law partners Larry Kaplan, Robert von Ohlen, and Fred Begy terminated his interest in their firm in retaliation for his opposition to sexual harassment. The district court granted summary judgment in favor of defendants, concluding inter alia that Solon was not an "employee" as defined by 42 U.S.C. § 2000e-3(a) and therefore not protected by Title VII. For the reasons stated herein, we affirm.

## I. Background

On September 1, 1989, Solon joined the law firm of Adler, Kaplan & Begy as a partner. The partnership agreement, as amended January 1, 1993, named Solon as one of eight general partners. It provided that each general partner would fund an equal share of the firm's capital interest, be liable for an equal proportion of the firm's debts, and have an equal voice in the management of the firm and the conduct of its business. The allocation of income among the general partners, the need for additional capital contributions, and financial commitments in excess of $5,000 would be decided by a majority vote of the general partners, with each entitled to cast one vote. A two-thirds vote would be required for amendments to the partnership agreement, dissolution of the firm, or the involuntary termination of any general partner. New general or special partners could be brought into the firm only by unanimous vote. Special partners would have no equity interest or voting rights, and could be terminated by a simple majority vote of the general partners.

As a general partner, Solon paid a total of $50,000 in capital contributions to the firm over the course of his tenure. He received an allocated share of its income, attended compensation meetings with the other general partners, and was privy to daily cash reports and other sensitive financial information. None of the special partners or associates received these benefits.

On December 31, 1994, three general partners voluntarily left the firm. Solon drafted a separation agreement specifying that he and four others would continue as general partners under the terms of the 1993 partnership agreement. The next day, the firm changed its name to Kaplan & Begy, and plaintiff was named managing partner. In 1996, another general partner departed, leaving Solon, Larry Kaplan, Fred Begy, and Robert von Ohlen as the remaining general partners. In 1997, von Ohlen was added as a named partner and the firm became Kaplan, Begy & von Ohlen ("KBV"). As of January 1, 1998, a total of twenty-one lawyers, including general partners, special partners, and associates, worked at the firm.

As managing partner, Solon was the only general partner authorized to draw on all of the firm's bank accounts. He signed checks in that capacity to pay rent and distribute profits. He had extensive knowledge of KBV's financial condition, handled its relationship with LaSalle Bank, *631 and applied for and signed financing agreements as managing partner. He also served as the point of contact with the firm's landlord and acted as trustee of the firm's 401(k) account. On January 18, 1998, Solon stepped down as managing partner, but continued to direct some administrative matters, signing a revolving letter of credit with LaSalle Bank, and looking for new office space when the firm's lease expired.

In August 1998, Kaplan and von Ohlen approached Begy about their desire to terminate Solon's interest as a general partner. Over lunch one afternoon, the three agreed to remove plaintiff as a general partner, but considered allowing Solon to stay on as a salaried administrator or to work for Begy as an independent contractor. In October, Begy advised Solon of the partners' decision to terminate his interest as of December 31, 1998. Begy presented Solon

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

with the options of working as an administrator or an independent contractor. Solon rejected these alternatives and left the firm in January 1999.

Solon contends that von Ohlen pressed for his ouster because he had spoken out against von Ohlen's alleged sexual harassment of two of the firm's secretaries. Kaplan and von Ohlen assert that they wanted to remove Solon from the partnership because they had lost confidence in his legal, rain-making, and administrative skills. They state that von Ohlen never sexually harassed either secretary, and that Solon could not have reasonably believed to the contrary. Begy asks us to affirm on the ground that Title VII does not protect Solon, and takes no position regarding whether von Ohlen harbored retaliatory motives.

Plaintiff filed this suit against the firm and von Ohlen, Kaplan, and Begy individually. His amended complaint alleges violations of Title VII, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621et seq., and supplemental state-law claims. Begy, who was pushed out of the partnership after Solon was removed, filed cross-claims against von Ohlen, Kaplan, and the firm for indemnification, partner indemnification, and a declaratory judgment.

The district court granted summary judgment in favor of defendants on the Title VII and ADEA claims. It concluded that: (i) Solon was an employer, not an employee, and therefore was not protected by Title VII or the ADEA; and (ii) plaintiff failed to establish a prima facie case under either statute. The district court declined to exercise supplemental jurisdiction over Solon's state-law claims or Begy's cross-claims, and dismissed them without prejudice. Solon appeals the grant of summary judgment as to his Title VII claim only.

## II. Discussion

Summary judgment is appropriate where the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the non-moving party. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir.2004).

Section 704(a) of Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The parties agree, and we assume without deciding, that Title VII does not protect employers against retaliation. *See* **\*632**EEOC v. Severn Trent Servs., Inc., 358 F.3d 438, 445 (7th Cir.2004) (stating in dicta that Title VII does not prohibit retaliation against employers). *Cf. Schmidt v. Ottawa Med. Ctr.*, 322 F.3d 461, 468 (7th Cir.2003) (ADEA does not protect employers); *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 698 (7th Cir.2002) (same). Solon argues that the district court erred in granting summary judgment, however, because there are genuine factual disputes regarding whether he is an employee rather than an employer, and whether he established a prima facie case of retaliation. We agree with the district court that Solon is an employer as a matter of law, and do not reach the latter issue.

Title VII defines "employee," subject to exceptions not relevant here, as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Recent Supreme Court precedent sheds light on this circular definition. *See Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003). In *Clackamas*, the Court addressed whether shareholder-directors of a professional corporation counted as "employees" towards the fifteen-employee threshold for covered employers under the Americans with Disabilities Act of 1990 ("ADA"). *Id.* at 442, 123 S.Ct. 1673; 42 U.S.C. § 12111(5). Because it found the ADA's definition of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

"employee" circular, the Court looked to the common-law definition of the master-servant relationship, focusing on the element of control. *Clackamas*, 538 U.S. at 448, 123 S.Ct. 1673. It highlighted six non-exhaustive factors as relevant to whether the shareholder-directors were employees:

Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work

Whether and, if so, to what extent the organization supervises the individual's work

Whether the individual reports to someone higher in the organization

Whether and, if so, to what extent the individual is able to influence the organization

Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts

Whether the individual shares in the profits, losses, and liabilities of the organization.

*Id.* at 449-50, 123 S.Ct. 1673 (quoting 2 Equal Employment Opportunity Commission Compliance Manual § 605:0009 (2000)). "[W]hether a shareholder-director is an employee depends on 'all of the incidents of the relationship ... with no one factor being decisive.' " *Id.* at 451, 123 S.Ct. 1673 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)).

[1] The factor test announced in *Clackamas* applies to this case. Although the Court focused on the meaning of the term "employee" under the ADA rather than Title VII, both statutes define "employee" in nearly identical language. *See* 42 U.S.C. §§ 12111(4), 2000e(f) (both defining "employee," subject to exceptions not relevant here, as "an individual employed by an employer"). The Court signaled that its analysis would extend to Title VII cases by noting that it was resolving a

conflict among the Circuits that was "not confined to the particulars of the ADA."*Clackamas*, 538 U.S. at 444 n. 3, 123 S.Ct. 1673 (citing Title VII and ADEA cases as evidence of the split). Moreover, the framework is not limited to the narrow question of whether a shareholder-director is an employee. The six factors were selected because they provided guidance in resolving the more general issue of whether an individual "is an employee or, alternatively, the kind of person that the common law would consider an employer." *633Id.* at 445 n. 5, 123 S.Ct. 1673.Indeed, the source of the factors-an EEOC compliance manual-identifies them as relevant to whether "partners, officers, members of boards of directors, and major shareholders qualify as employees." *Id.* at 449, 123 S.Ct. 1673 (citing 2 EEOC Compliance Manual §§ 605:0008-605:00010 (2000)). The Court also made clear that its test would determine whether someone was an employee both for purposes of the fifteen-employer threshold and in deciding whether a plaintiff could bring a claim. *See Clackamas*, 538 U.S. at 446 n. 6, 123 S.Ct. 1673.*Cf. Schmidt*, 322 F.3d at 464 (cited with approval in *Clackamas*, 538 U.S. at 446 n. 6, 123 S.Ct. 1673) (holding one framework applicable to both questions). In sum, the analysis presented in *Clackamas* applies to the question presented here: whether a partner is an employee entitled to sue for retaliation under Title VII.

[2] Turning to the facts of this case, no reasonable juror could find that Solon was an employee of the firm. By 1998, Solon was one of only four general partners. The partnership agreement allowed for his involuntary termination only by a two-thirds vote of the general partners, meaning that the other three had to agree unanimously to remove him. Holding one quarter of the voting power, Solon also exercised substantial control over how to allocate the firm's profits, and whether to require additional capital contributions, make financial commitments, amend the partnership agreement, and dissolve the firm. Because special or general partners could be added to the firm only by a unanimous vote of the existing general partners, Solon possessed a unilat-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

eral veto power over new admissions. In addition to his voting rights, Solon held an equity interest in the firm, shared in its profits, attended partnership meetings, and had access to private financial information. Each of these benefits distinguished him from the firm's special partners and associates. Solon's broad authority as trustee of the firm's 401(k) account and as its managing partner also supports the conclusion that he was an employer. And though he stepped down as managing partner a few months before being voted out of the firm, he continued to handle the firm's banking needs and landlord/tenant issues.

Solon maintains, nevertheless, that he was not an employer because he exercised no real control as a general partner or managing partner. Plaintiff asserts that defendants ignored the partnership agreement so frequently that it no longer had any legal effect, and that any leverage conferred to him by the agreement was illusory. Solon identifies two instances when defendants allegedly failed to observe the terms of the agreement. First, plaintiff contends that defendants should have held a formal meeting to debate whether he would be removed from the firm. Instead, defendants met over lunch without notifying Solon, gave him no opportunity to defend himself, and never officially voted for his ouster. In fact, Solon asserts that only Kaplan and von Ohlen voted to remove him, while Begy dissented.

The partnership agreement, however, does not demand a formal meeting, notice, or a hearing before removing a general partner. Defendants' decision to proceed informally is not evidence that the agreement had no legal effect. Moreover, the evidence shows that Begy agreed to remove Solon. In a January 13, 1999 memorandum written by Solon, plaintiff recounts that Begy had notified him in an October 1998 meeting "that the partners had decided to terminate my equity interest in the firm," and that Begy had advised "that this decision had been reached after a series of partnership meetings." The memorandum *634 states that Solon and Begy met again on December 23, 1998 and January 12, 1999 to discuss the options of working as an administrator or independent contractor. During those meetings, Solon told Begy that the alternatives were unworkable "given the earlier decision to terminate my equity interest." It is undisputed that Solon never called for an official meeting to challenge his termination. Had Begy dissented, he would not have repeatedly advised Solon that the partners had terminated his interest, nor would plaintiff have accepted the sentiments of only two of the four general partners as final.

Second, Solon asserts that defendants routinely ignored the agreement when distributing firm profits. For example, he alleges that he was barred from attending some end-of-year partner compensation meetings. The record shows, however, that Solon was excluded from only one compensation meeting that occurred in 1999, after he had been terminated as a general partner and been divested of his right to attend. Solon also testified during his deposition that decisions made at compensation meetings that he attended were sometimes later changed at informal meetings in his absence. Nevertheless, plaintiff concedes that he was given an opportunity to call for a meeting of all of the general partners to revisit the issue. He did not request a meeting because he believed he could not persuade the others to change their minds. Neither example cited by Solon is evidence that defendants ignored the partnership agreement, much less did so routinely.

Plaintiff also argues that he had no control over the firm because he was supervised closely by the other partners, who made all of the key decisions about how to staff cases, bring in new business, and steer the firm without consulting him. The record does not support this contention. Solon had substantial control over the firm; control that he exercised in fact as managing partner, and control that he had the right to exert by virtue of the partnership agreement. Plaintiff's assertion that he consulted with his fellow partners before making major decisions may demonstrate that he was passive, but it does not show that he was powerless. Nor does his conten-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

398 F.3d 629
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

tion that he was outvoted undermine the conclusion that he was an employer. *See Schmidt,* 322 F.3d at 467 ("[T]he mere fact that lately [plaintiff's] preferences on shareholder-compensation proposals have not secured the majority opinion of his fellow shareholders does not alter the fact that with each vote he has exercised this right to control. Even though [plaintiff] rejected the current plan because he would be affected by its passage, he nevertheless had the opportunity to participate in revising and voting on it.").

Plaintiff was one of four general partners who, by virtue of his voting rights, substantially controlled the direction of the firm, his employment and compensation, and the hiring, firing, and compensation of others. He played an active role in the operation of the firm as trustee of its 401(k) account, as managing partner, and informally thereafter. Under the facts of this case, he was an employer as a matter of law.

### III. Conclusion

For the reasons stated herein, we AFFIRM the district court's grant of summary judgment.

C.A.7 (Ill.),2005.
Solon v. Kaplan
398 F.3d 629, 95 Fair Empl.Prac.Cas. (BNA) 289, 85 Empl. Prac. Dec. P 41,850

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



**Westlaw.**

79 F.3d 859                                                                                              Page 1
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

▷
Strother v. Southern California Permanente Medical
Group
C.A.9 (Cal.),1996.

United States Court of Appeals,Ninth Circuit.
Germaine D. STROTHER, M.D., Plaintiff-Appel-
lant,
v.
SOUTHERN CALIFORNIA PERMANENTE
MEDICAL GROUP, a California partnership; Gary
A. Lulejian, an individual; David Bridgeford, an in-
dividual, Defendants-Appellees.
Germaine D. STROTHER, M.D., Plaintiff-Appel-
lant,
v.
SOUTHERN CALIFORNIA PERMANENTE
MEDICAL GROUP; Gary A. Lulejian, an individu-
al; David Bridgeford, an individual, Paul Deiter, an
individual, Defendants-Appellees.
Nos. 94-56046, 94-56279.

Argued and Submitted Jan. 10, 1996.
Decided March 8, 1996.
As Amended on Denial of Rehearing April 22, 1996.
As Amended on Denial of Rehearing June 3, 1996.

Physician brought action against medical group al-
leging racial discrimination in violation of § 1981,
California Fair Employment and Housing Act
(FEHA), California Constitution, and Unruh Civil
Rights Act. The United States District Court for the
Central District of California, Ronald S.W. Lew, J.,
dismissed FEHA claim and granted summary judg-
ment for medical group on all other claims. Physi-
cian appealed. The Court of Appeals, Wiggins, Cir-
cuit Judge, held that: (1) fact issues existed as to
whether physician was "employee" subject to pro-
tection of FEHA; (2) physician proffered facts suf-
ficient to establish prima facie case of retaliation
under FEHA; (3) physician proffered sufficient
evidence to establish that medical group's proffered
reasons for its adverse employment actions were

pretextual; (4) physician failed to state cause of ac-
tion under section of California Constitution pro-
hibiting disqualification from entering or pursuing
business or profession based on race; (5) physician
could not maintain Unruh Act action against medic-
al group, since she was more like employee than
client, patron or customer; (6) physician could not
maintain cause of action under section of California
Constitution prohibiting business establishment
from discriminating on basis of race; and (7) deni-
als of promotion prior to enactment of Civil Rights
Act of 1991 were not actionable under § 1981,
since promotions would not have risen to level of
opportunity for new and distinct relationship
between physician and medical group.

Affirmed in part; reversed and remanded in part.

West Headnotes

[1] Federal Courts 170B ☞776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Dismissal for failure to state claim is reviewed de
novo. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[2] Federal Civil Procedure 170A ☞1773

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in Gen-
eral
                170Ak1773 k. Clear or Certain Nature
of Insufficiency. Most Cited Cases
Complaint should not be dismissed unless it ap-
pears beyond doubt that plaintiff can prove no set
of facts in support of claim which would entitle
plaintiff to relief. Fed.Rules Civ.Proc.Rule

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                 Page 2
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

12(b)(6), 28 U.S.C.A.

**[3] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
Grant of summary judgment is reviewed de novo.
Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[4] Federal Courts 170B ☞766**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)1 In General
            170Bk763 Extent of Review Depend-
ent on Nature of Decision Appealed from
                170Bk766 k. Summary Judgment.
Most Cited Cases

**Federal Courts 170B ☞802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)3 Presumptions
            170Bk802 k. Summary Judgment.
Most Cited Cases
In reviewing grant of summary judgment, appellate
court must determine, viewing evidence in light
most favorable to nonmoving party, whether there
are any genuine issues of material fact and whether
district court correctly applied relevant substantive
law. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[5] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases

Court of Appeals reviews district court's interpreta-
tion of state law under same independent de novo
standard that it reviews questions of federal law.

**[6] Federal Courts 170B ☞382.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Au-
thority
          170Bk382 Court Rendering Decision
            170Bk382.1 k. In General. Most Cited
Cases
When interpreting state law, federal courts are
bound by decisions of state's highest court.

**[7] Federal Courts 170B ☞382.1**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Au-
thority
          170Bk382 Court Rendering Decision
            170Bk382.1 k. In General. Most Cited
Cases

**Federal Courts 170B ☞391**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as Au-
thority
          170Bk388 Federal Decision Prior to State
Decision
            170Bk391 k. Sources of Authority; As-
sumptions Permissible. Most Cited Cases
When interpreting state law, in absence of decision
by state's highest court, federal court must predict
how highest state court would decide issue using
intermediate appellate court decisions, decisions
from other jurisdictions, statutes, treatises, and re-
statements as guidance.

**[8] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                    Page 3
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
170Ak2497.1 k. In General. Most
Cited Cases
Fact issues existed as to whether, under California
law, physician who was labeled as "partner" by
medical group for which she worked was
"employee" subject to protection of Fair Employ-
ment and Housing Act (FEHA), precluding sum-
mary judgment. West's Ann.Cal.Gov.Code § 12900
et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**|9| Civil Rights 78 ☞1110**

78 Civil Rights
78II Employment Practices
78k1108 Employers and Employees Affected
78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
(Formerly 78k143)
Courts must analyze true relationship among part-
ners, including method of compensation, putative
partner's responsibility for partnership liabilities,
and management structure and putative partner's
role in that management, to determine if individual
should be treated as partner or employee for pur-
poses of employment discrimination laws.

**|10| Limitation of Actions 241 ☞58(1)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(A) Accrual of Right of Action or De-
fense
241k58 Liabilities Created by Statute
241k58(1) k. In General. Most Cited
Cases
Under California law, assuming that physician was
"employee" entitled to Fair Employment and Hous-
ing Act (FEHA) protection, she could base her
claims in part on events occurring outside FEHA's
one-year limitations period, based on continuing vi-
olations doctrine; physician alleged that some al-
leged discriminatory practices continued past stat-

ute of limitations date. West's Ann.Cal.Gov.Code §
12960.

**|11| Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
170Ak2497.1 k. In General. Most
Cited Cases
To avoid summary judgment on unlawful retali-
ation claim, employee must first produce evidence
supporting prima facie case of employment dis-
crimination; after prima facie case is established,
burden shifts to employer to articulate legitimate
nondiscriminatory reason for its decision, and if
such reason is articulated, employee must demon-
strate that reason given was merely a pretext for
discriminatory motive.

**|12| Civil Rights 78 ☞1243**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1243 k. Practices Prohibited or Re-
quired in General; Elements. Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Under California law, to assert prima facie retali-
ation claim under Fair Employment and Housing
Act (FEHA), employee must show that he or she
engaged in protected activity, employer subjected
employee to adverse employment action, and there
is causal link between protected activity and em-
ployer's action. West's Ann.Cal.Gov.Code § 12900
et seq.

**|13| Civil Rights 78 ☞1244**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1244 k. Activities Protected. Most

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                           Page 4
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

Cited Cases
 (Formerly 255k30(6.10) Master and Servant)
Under California law, assuming that physician was
"employee" entitled to protection of Fair Employ-
ment and Housing Act (FEHA), her complaint with
Department of Fair Employment and Housing
(DFEH) about her treatment by employer was pro-
tected activity that would establish first element of
prima facie claim under FEHA. West's
Ann.Cal.Gov.Code § 12900 et seq.

|14| Civil Rights 78 ☞1244

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1244 k. Activities Protected. Most
Cited Cases
 (Formerly 255k30(6.10) Master and Servant)
Under California law, assuming that physician was
"employee" entitled to protection of Fair Employ-
ment and Housing Act (FEHA), even if she could
not bring FEHA discrimination claim, she could
still assert FEHA retaliation claim if she had reas-
onable belief that she had legitimate FEHA claim
when she filed complaint with Department of Fair
Employment and Housing (DFEH). West's
Ann.Cal.Gov.Code § 12900 et seq.; Cal.Code Regs.
title 2, § 7287.8(a)(1)(C).

|15| Civil Rights 78 ☞1744

78 Civil Rights
  78V State and Local Remedies
    78k1742 Evidence
      78k1744 k. Employment Practices. Most
Cited Cases
 (Formerly 255k40(4) Master and Servant)
Under California law, even if physician was not
"employee" protected by Fair Employment and
Housing Act (FEHA), employee proffered facts
sufficient to establish first element of prima facie
retaliation claim under FEHA, i.e., that she engaged
in protected activity; evidence existed from which
reasonable fact finder could conclude that physician
had reasonable belief that she was opposing unlaw-
ful employment practices when she filed complaint
with Department of Fair Employment and Housing
(DFEH). West's Ann.Cal.Gov.Code § 12900 et seq.

|16| Civil Rights 78 ☞1246

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1246 k. Particular Cases. Most Cited
Cases
 (Formerly 255k40(4) Master and Servant)

Civil Rights 78 ☞1250

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1250 k. Harassment; Work Environ-
ment. Most Cited Cases
 (Formerly 255k40(4) Master and Servant)
Under California law, physician proffered facts suf-
ficient to establish second element of prima facie
case of retaliation under Fair Employment and
Housing Act (FEHA), i.e., that she suffered adverse
employment action; physician alleged that she was
replaced as coordinator for personal physician pro-
gram, was excluded from seminars and meetings,
suffered verbal and physical abuse, was denied sec-
retarial support, and was given burdensome work
schedule. West's Ann.Cal.Gov.Code § 12900 et seq.

|17| Civil Rights 78 ☞1119

78 Civil Rights
  78II Employment Practices
    78k1119 k. Adverse Actions in General.
Most Cited Cases
 (Formerly 78k141)
Under California law, not every employment de-
cision amounts to adverse employment action, for
purposes of prima facie case under Fair Employ-
ment and Housing Act (FEHA). West's
Ann.Cal.Gov.Code § 12900 et seq.

|18| Civil Rights 78 ☞1147

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                    Page 5
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

78 Civil Rights
    78II Employment Practices
        78k1143 Harassment; Work Environment
            78k1147 k. Hostile Environment; Sever-
ity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k145)
Under California law, mere ostracism in workplace
is not enough to show adverse employment de-
cision for purposes of prima facie case under Fair
Employment and Housing Act (FEHA). West's
Ann.Cal.Gov.Code § 12900 et seq.

**[19] Civil Rights 78 ☞1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Under California law, physician proffered facts suf-
ficient to establish third element of prima facie re-
taliation case under Fair Employment and Housing
Act (FEHA), i.e., causal link between complaints
and adverse employment decision; physician al-
leged that physician-in-charge stated that it would
not be in physician's best interests to file discrimin-
ation charge, and that she was removed from physi-
cian the day after she filed first complaint with De-
partment of Fair Employment and Housing
(DFEH). West's Ann.Cal.Gov.Code § 12900 et seq.

**[20] Civil Rights 78 ☞1744**

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
            78k1744 k. Employment Practices. Most
Cited Cases
    (Formerly 78k453)
Under California law, employee produced sufficient
evidence to establish that employer's proffered reas-
ons for its adverse employment action, i.e., employ-
er's reorganization and employee's alleged abrasive
personality, were pretextual in Fair Employment

and Housing Act (FEHA) action; letter from super-
visor indicated that employee could get along with
anyone, and adverse employment decisions were
temporally proximate to employee's complaint to
Department of Fair Employment and Housing
(DFEH). West's Ann.Cal.Gov.Code § 12900 et seq.

**[21] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
Under California law, while mere existence of
prima facie case is insufficient to preclude sum-
mary judgment in Fair Employment and Housing
Act (FEHA) action, employee need produce very
little evidence of discriminatory motive to raise
genuine issue of fact as to pretext. West's
Ann.Cal.Gov.Code § 12900 et seq.

**[22] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employ-
ment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
Under California law, to survive employer's sum-
mary judgment motion in Fair Employment and
Housing Act (FEHA) action, only a genuine factual
issue with regard to discriminatory intent need to be
shown; such requirement is almost always satisfied
when employee's evidence, direct or circumstantial,
consists of more than presumption established by
three-pronged prima facie case test. West's
Ann.Cal.Gov.Code § 12900 et seq.

**[23] Civil Rights 78 ☞1744**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                    Page 6
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment Practices. Most Cited Cases
    (Formerly 78k453)
Under California law, same evidence can be used to establish prima facie case and to create genuine issue regarding whether employer's explanations are pretextual in action under Fair Employment and Housing Act (FEHA). West's Ann.Cal.Gov.Code § 12900 et seq.

**|24| Civil Rights 78 ☞1740**

78 Civil Rights
   78V State and Local Remedies
      78k1738 Pleading
         78k1740 k. Employment Practices. Most Cited Cases
    (Formerly 78k452)
Under California law, physician failed to state cause of action under section of Constitution prohibiting disqualification from entering or pursuing business or profession based on race, where she alleged that employer harassed her and subjected her to discriminatory appointments. West's Ann.Cal. Const. Art. 1, § 8.

**|25| Civil Rights 78 ☞1720**

78 Civil Rights
   78V State and Local Remedies
      78k1718 Right of Action; Nature and Grounds
         78k1720 k. Employment Practices. Most Cited Cases
    (Formerly 78k449)

**Civil Rights 78 ☞1721**

78 Civil Rights
   78V State and Local Remedies
      78k1718 Right of Action; Nature and Grounds
         78k1721 k. Other Particular Cases and Contexts. Most Cited Cases
    (Formerly 78k449) ·
Under California law, claim may be brought directly under article of Constitution prohibiting disqualification from entering or pursuing business or profession based on race where person has been denied entrance into profession or particular employment or terminated from same. West's Ann.Cal. Const. Art. 1, § 8.

**|26| Constitutional Law 92 ☞1114**

92 Constitutional Law
   92VII Constitutional Rights in General
      92VII(B) Particular Constitutional Rights
         92k1113 Liberty to Choose Occupation, Pursue Livelihood, or Enjoy Fruits of Labor
            92k1114 k. In General. Most Cited Cases
    (Formerly 92k88)
Under California law, section of Constitution prohibiting disqualification from entering or pursuing business or profession based on race prohibits discrimination that disqualifies employee from employment with a particular entity, not just disqualification from an entire profession. West's Ann.Cal. Const. Art. 1, § 8.

**|27| Constitutional Law 92 ☞1114**

92 Constitutional Law
   92VII Constitutional Rights in General
      92VII(B) Particular Constitutional Rights
         92k1113 Liberty to Choose Occupation, Pursue Livelihood, or Enjoy Fruits of Labor
            92k1114 k. In General. Most Cited Cases
    (Formerly 92k88)
Under California law, section of Constitution prohibiting disqualification from entering or pursuing business or profession based on race governs actions which result in complete exclusion of individual from employment with a particular employer, and does not govern conduct affecting particular aspects of individual's job. West's Ann.Cal. Const. Art. 1, § 8.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                    Page 7
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

|28| **Civil Rights 78 ☞1045**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1045 k. Medical Facilities and Services. Most Cited Cases
      (Formerly 78k119.5, 78k119.1)

**Civil Rights 78 ☞1110**

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
      (Formerly 78k119.5)
Under California law, physician who was allegedly discriminated against by medical group for whom she worked could not maintain Unruh Act action; physician was not subject to Act, since she was more like employee than "client, patron or customer" of medical group. West's Ann.Cal.Civ.Code § 51.

|29| **Civil Rights 78 ☞1049**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1049 k. Place of Business or Public Resort. Most Cited Cases
      (Formerly 78k123)
Under California law, physician who was allegedly discriminated against by medical group for whom she worked could not maintain action under statute prohibiting business establishments from discriminating against persons because of race. West's Ann.Cal.Civ.Code § 51.5.

|30| **Civil Rights 78 ☞1006**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General

        78k1002 Constitutional and Statutory Provisions
            78k1006 k. Retrospective Application. Most Cited Cases
      (Formerly 78k102.1)
Claims under § 1981 arising out of acts occurring prior to enactment of Civil Rights Act of 1991 on November 12, 1991, are governed by § 1981 as it was interpreted by Supreme Court prior to its amendment. 42 U.S.C.A. § 1981.

|31| **Civil Rights 78 ☞1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
      (Formerly 78k144)
Employees can bring claim under § 1981 for acts occurring prior to enactment of Civil Rights Act of 1991 only if they allege discrimination in formation of employment contract, as opposed to claims based on discrimination while they are working in a particular position for discriminatory termination. 42 U.S.C.A. § 1981.

|32| **Civil Rights 78 ☞1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases
      (Formerly 78k148)
For denials of promotions prior to enactment of Civil Rights Act of 1991 on November 12, 1991, only where denied promotion rises to level of opportunity for new and distinct relation between employee and employer is such claim actionable under § 1981. 42 U.S.C.A. § 1981.

|33| **Civil Rights 78 ☞1135**

78 Civil Rights
    78II Employment Practices
        78k1135 k. Promotion, Demotion, and Transfer. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                          Page 8
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

(Formerly 78k148)
Denials of promotions to physician prior to enact-
ment of Civil Rights Act of 1991 were not action-
able under § 1981, since promotions would not
have risen to level of opportunity for new and dir-
ect relationship between employee and employer;
physician, who had already supervised other physi-
cians to some extent, would merely have gained ad-
ditional supervisory responsibilities upon promo-
tion. 42 U.S.C.A. § 1981.

*862 Theresa M. Traber and Bert Voorhees, Traber,
Voorhees & Olguin, Law Office of Traber &
Voorhees, Pasadena, California, for the plaintiff-
appellant.
David D. Kadue, Seyfarth, Shaw, Fairweather &
Geraldson, Los Angeles, California, for the defend-
ants-appellees.

Appeals from the United States District Court for
the Central District of California; Ronald S.W.
Lew, District Judge, Presiding.

*863 Before: BRIGHT,[FN*]SKOPIL, and WIG-
GINS, Circuit Judges.

> FN* Hon. Myron H. Bright, Senior United
> States Circuit Judge for the Eighth Circuit,
> sitting by designation.

WIGGINS, Circuit Judge.
Dr. Germaine D. Strother, a physician partner in the
Southern California Permanente Medical Group
("Medical Group"), sued the Medical Group and
two physician partners in the Medical Group al-
leging racial discrimination and retaliation under 42
U.S.C. § 1981; racial and gender discrimination and
retaliation in violation of the California Fair Em-
ployment and Housing Act, Cal.Gov't Code §§
12900 et seq.; race discrimination and retaliation
in violation of Article I, § 8 of the California Con-
stitution; and arbitrary gender and race discrimina-
tion in violation of the Unruh Civil Rights Act,
Cal.Civ.Code §§ 51 and 51.5. The district court
granted the Medical Group's motion to dismiss pur-

suant to Fed.R.Civ.P. 12(b)(6) on the FEHA dis-
crimination claim, and the Medical Group's motion
for summary judgment on all other claims. We have
jurisdiction pursuant to 28 U.S.C. § 1291 and af-
firm in part and reverse and remand in part.


FACTS

Strother is an African-American female partner in
the Medical Group, which provides medical ser-
vices in Southern California to members of the
Kaiser Permanente Health Plan. From 1985 to the
present, Strother has worked as a family practice
physician in the Medical Group's West Covina clin-
ic. In 1987, Strother received the title of partner in
the Medical Group, and in July 1989 she was ap-
pointed Assistant Physician-in-Charge ("APIC") at
the West Covina clinic.

The West Covina clinic had historically been a part
of the Los Angeles Area of the Medical Group. In
1988-91, the Medical Group expanded its services
in the San Gabriel Valley, warranting the creation
of a new Baldwin Park service area, which included
facilities in West Covina and four other communit-
ies. Defendant Gary A. Lulejian was appointed to
head this new Baldwin Park Area, first as an acting
director, and then as Area Associate Medical Dir-
ector when the area officially opened in 1992. The
Medical Group claims that Lulejian set out to reor-
ganize the clinics within the Baldwin Park Area,
which included the elimination of the APIC posi-
tion and the selection of several "Module Lead"
physicians overseeing groups of doctors in each
clinic.

Lulejian first met with Strother in December 1989.
According to the Medical Group, Lulejian had re-
ceived numerous negative reports about Strother's
performance as APIC. Lulejian shared these per-
ceptions with Strother and offered to help her im-
prove her personal leadership skills, but Strother al-
legedly failed to acknowledge and address Luleji-
an's observations. Strother claims that Lulejian told
her at the meeting that her APIC position "did not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                          Page 9
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

exist," that she should stop attending certain admin-
istrative meetings, and that she would not achieve
any professional advancement in the Medical
Group so long as he had the power to prevent it.

From 1990 through the present, the Medical Group
made a series of appointments to administrative and
committee positions for which Strother claims she
was qualified, including Physician in Charge
("PIC") positions at other clinics and Module Lead
positions at West Covina, but for which she was
neither considered nor appointed. For its part, the
Medical Group asserts that others were more appro-
priate appointees for these positions because of bet-
ter interpersonal skills and, in some cases, because
of medical specialties more appropriate for the pos-
itions. The Medical Group contends that Dr. David
Bridgeford, PIC for West Covina and an African-
American, found Strother to have an "overbearing
and abrasive personality style" which disqualified
her for certain leadership positions. Strother twice
ran to represent the Baldwin Park Area on the Med-
ical Group's Board of Directors, but received only
one and two votes out of 45-50 doctors in each of
the elections. Her APIC position was phased out as
part of the area reorganization, but Strother contin-
ues to serve the *864 Medical Group as a partner in
a variety of administrative capacities.[FN1]

> FN1. These include: Triage Physician at
> the West Covina Urgent Care Center;
> Physician Liaison to the Chemical Recov-
> ery Program, a position that identifies
> Strother as a contact for physicians who
> have patients with chemical dependency
> problems; Physician Mentor to the West
> Covina Advice Nurse Center; Family Prac-
> tice Representative on the Pharmacy and
> Therapeutics Committee, for which she
> makes recommendations to the Committee
> at monthly meetings; and coordinator of
> the West Covina hospitalizing doctors. The
> exact nature of many of these positions is
> unclear from the record.

Starting on May 30, 1991, Strother complained to

other partners of the Medical Group, including the
Associate Area Medical Director, about the alleged
discriminatory promotions and appointments being
made by Lulejian. On August 13, 1991, Bridgeford
allegedly told Strother that he knew about her com-
plaints and warned that filing a discrimination
charge would be against her interests. Strother filed
a complaint with the California Department of Fair
Employment & Housing on September 12, 1991, al-
leging violations of Title VII. On September 13,
1991, she was replaced as Personal Physician co-
ordinator. According to Strother, she was later
barred from attending several Quality Assurance
seminars and committee meetings, and was denied
two Quality Assurance positions in 1992. She also
alleges that she suffered discrimination and verbal
and physical abuse in a number of ways.[FN2]

> FN2. Strother alleges, *inter alia*, that she
> was held to a higher standard of job per-
> formance than male doctors; she was re-
> quired to work under different and more
> stressful conditions; she was denied secret-
> arial support and other services granted to
> other physicians; she was assigned unusu-
> ally burdensome work schedules; she was
> denied reimbursement of certain expenses;
> she was subjected to surveillance, monitor-
> ing of her telephone calls, and searches
> through her personal belongings and docu-
> ments; she received rude and abusive
> phone calls; she was subjected to insulting
> treatment and public ridicule; and that one
> male doctor once struck her with a clip-
> board, and that another forced her out of
> his office with his door.

On September 15, 1992, Strother commenced an
action in the United States District Court for the
Central District of California against the Medical
Group and several individual partners, including
Lulejian and Bridgeford,[FN3] alleging racial dis-
crimination and retaliation under 42 U.S.C. § 1981;
racial and gender discrimination and retaliation in
violation of the California Fair Employment and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                      Page 10
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

Housing Act, Cal.Gov't Code §§ 12900 *et seq.* ("FEHA"); race discrimination and retaliation in violation of Article I, § 8 of the California Constitution; arbitrary racial and gender discrimination in violation of the Unruh Civil Rights Act, Cal.Civ.Code § 51 ("Unruh Act"); and related common law claims. In March 1993, the district court granted the Medical Group's 12(b)(6) motion to dismiss Strother's FEHA discrimination claim "on the grounds that [Strother] is a bona fide partner of the medical group and not an employee for the purpose" of FEHA. Strother later added Cal.Civ.Code § 51.5 to her claims, and abandoned several of her common law claims.

> FN3. The defendants will be referred to collectively as "the Medical Group" when convenient.

On May 25, 1994, the district court granted the Medical Group's motion for summary judgment on all of Strother's remaining claims. The district court held that under *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), Strother's 42 U.S.C. § 1981 claims based on "post-contract formation" treatment prior to November 12, 1991 were untenable, and that insofar as the claim was based on conduct occurring prior to September 15, 1991, it was barred by the applicable one-year statute of limitations. The court held that Strother had "failed to show that there is a genuine issue as to any material fact to support" her FEHA retaliation claim. Because Strother had "not shown that she was denied the ability to enter or pursue her profession," the district court found that her claims based directly on Article I, § 8 of the California Constitution could not lie. Finally, the district court dismissed Strother's claims under the Unruh Act, Cal.Civ.Code §§ 51 and 51.5 because Strother failed to "qualify as a customer, client, or patron of defendant Medical Group." [FN4]

> FN4. Strother does not appeal the district court's grant of summary judgment in favor of the Medical Group on several other claims, including breach of contract, inva-

sion of privacy, and intentional infliction of emotional distress.

**\*865 DISCUSSION**

Strother appeals the district court's decision on her state and federal statutory and state constitutional claims. We reverse the district court's grant of the Medical Group's Rule 12(b)(6) motion on Strother's FEHA claim and remand for further proceedings. We also reverse and remand the district court's grant of summary judgment in favor of the Medical Group on Strother's FEHA retaliation claim and her claim under revised 42 U.S.C. § 1981, insofar as it is based on her treatment after November 12, 1991. We affirm the district court's grant of summary judgment in favor of the Medical Group on Strother's § 1981 claim based on conduct occurring prior to November 12, 1991, her claims under Article I, § 8 of the California Constitution, and her claims under Cal.Civ.Code §§ 51 and 51.5.[FN5]

> FN5. The parties stipulated to the amount of statutory costs to which the Medical Group is entitled as a result of the district court's judgment, but Strother appeals the district court's underlying finding that the Medical Group was a prevailing party. Thus, because we reverse and remand to the district court on several grounds, we reverse the district court's finding that the Medical Group was the prevailing party.

*I. Standard of Review*

[1][2] A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo. Stone v. Travelers Corp.,* 58 F.3d 434, 436-37 (9th Cir.1995). A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Parks Sch. of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995).

[3][4] A grant of summary judgment is reviewed *de*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                    Page 11
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

*novo. Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1995). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

[5][6][7] We review the district court's interpretation of state law under the same independent *de novo* standard that we review questions of federal law. *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). "When interpreting state law, federal courts are bound by decisions of the state's highest court. 'In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.' " *Arizona Elec. Power Coop., Inc. v. Berkeley,* 59 F.3d 988, 991 (9th Cir.1995) (quoting *In re Kirkland,* 915 F.2d 1236, 1239 (9th Cir.1990)).

## II. Discrimination Under FEHA

[8] Strother challenges the district court's dismissal of her FEHA discrimination claim pursuant to Fed.R.Civ.P. 12(b)(6). Under FEHA, it is unlawful:

> For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment.

Cal.Gov't Code § 12940(a) (West Supp.1996). The district court erred in granting the Medical Group's

12(b)(6) motion on Strother's FEHA claim on the ground that Strother, as a bona fide partner in the Medical Group, could not be an employee covered by FEHA.

California authority is of limited assistance in determining whether Strother is protected by FEHA, but does reveal the provision's general purpose. FEHA's broad goal is to forward "the public policy of the state that it is necessary to protect and safeguard the *866 right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement" on account of race, sex, or other specifically named characteristics. *Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 133, 801 P.2d 373, 376 (1990) (quoting Cal.Gov't Code § 12920). It is to be "construed liberally." *Robinson v. FEHC,* 2 Cal.4th 226, 5 Cal.Rptr.2d 782, 785, 825 P.2d 767, 770 (1992) (quoting Cal.Gov't Code § 12993(a)). The California Code of Regulations, which governs the affairs of the Fair Employment and Housing Commission, defines "employee" as "[a]ny individual under the direction and control of an employer," and does not explicitly exclude individuals labeled as partners from the definition of employee. Cal.Code Regs. tit. 2, § 7286.5(b) (1995). No California FEHA case has examined whether a "partner" can be characterized as an "employee" entitled to FEHA protection. However, because California courts have interpreted § 12940 in accordance with cases interpreting the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.,*[FN6] and the federal Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.,*[FN7] we look to federal cases in those areas that have addressed whether an individual labeled as a partner can be considered an employee for the purpose of employment discrimination laws.

> FN6. *Breitman v. May Co. California,* 37 F.3d 562, 565 (9th Cir.1994) (citing *Stephens v. Coldwell Banker Commercial Group, Inc.,* 199 Cal.App.3d 1394, 245 Cal.Rptr. 606, 609 (1988)).

> FN7. *See, e.g., Carr v. Barnabey's Hotel*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                                          Page 12
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

*Corp.*, 23 Cal.App.4th 14, 18, 28 Cal.Rptr.2d 127, 129 (1994); *University of S. Cal. v. Superior Court*, 222 Cal.App.3d 1028, 1035, 272 Cal.Rptr. 264, 268 (1990).

This circuit has not addressed whether an individual labeled a "partner" can be entitled to the protection of federal employment discrimination laws. A number of other circuits and district courts have examined the issue, finding in some cases that a partner was not entitled to the protection of the federal employment discrimination laws, and finding elsewhere that an individual labeled a "partner" was entitled to the same discrimination protection as other employees. In *Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398 (11th Cir.1991), the Eleventh Circuit held that determining whether an individual was a partner or employee required the court to "look to the particular circumstances of the case at hand" and "focus not on any label, but on the actual role played by the claimant in the operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control, and ownership." *Id.* at 1400-01. The court determined that a member/shareholder of a four-member accounting firm who owned 31% of the firm could not assert an ADEA claim against the firm because he shared in the firm's profits, losses, and expenses; was liable for certain debts and obligations of the firm; and had the right to vote his shares on amendments to the partnership agreement, admission of new members, termination of the agreement, and distribution of profits. *Id.* at 1401. The court found that Fountain's contention that one of the partners ran the firm in an "autocratic" manner was insufficient to avoid summary judgment because domination by one "autocratic" partner over other partners is not uncommon. *Id.*

In *Wheeler v. Hurdman*, 825 F.2d 257 (10th Cir.), *cert. denied,*484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), the Tenth Circuit determined that one of 502 partners in a national accounting firm was not an "employee" entitled to the protection of Title VII, ADEA, or the Equal Pay Act. *Id.*

at 277. Wheeler's partner benefits and responsibilities were similar to those of the partner in *Fountain*, but she also alleged that she continued to be subject to a great deal of supervision, that the firm was run by an extensive hierarchical structure, and that she made an insignificant contribution to the firm's capital in becoming a partner. *Id.* at 261-62. The court nonetheless held that the "total bundle of partnership characteristics" was sufficient to differentiate Wheeler from employees covered by federal discrimination laws. *Id.* at 276. Despite its finding that Wheeler was not an employee, the court cautioned that in some instances an individual labeled a "partner" might actually be an employee. "The bundle of partnership characteristics we have identified may be lacking *867 in important particulars, or there may be some deception which compromises the actuality of those characteristics." *Id.* at 277.[FN8]

> FN8. *See also E.E.O.C. v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178-79 (7th Cir.1984) (considering "economic realities of the employment relationship" in determining that lawyer-shareholder in professional corporation was not protected by Title VII); *Burke v. Friedman*, 556 F.2d 867, 869 (7th Cir.1977) (partners not "employees" for the purpose of determining whether law firm had enough employees to be covered by Title VII); *Ehrlich v. Howe*, 848 F.Supp. 482, 486-89 (S.D.N.Y.1994) (looking at attorney's "actual duties and status" rather than his title in determining that non-equity partner with 10.7% voting share in seven-partner firm was not an employee entitled to ERISA protection).

Other federal cases have determined that individuals referred to as "partners" were nonetheless entitled to anti-discrimination law protection. In *Simpson v. Ernst & Young*, 850 F.Supp. 648 (S.D.Ohio 1994), the court held that a "partner" in a large national accounting firm was an "employee"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859 Page 13
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

entitled to ADEA protection where the plaintiff "lacked any meaningful control and voting rights in Ernst & Young U.S., did not share in the firm's profits and losses, did not enjoy a fiduciary relationship with the Management Committee members, and had no other ownership rights therein." *Id.* at 663. The court also noted that "labeling a person 'partner' does not make him so." *Id.* In *Caruso v. Peat, Marwick, Mitchell & Co.,* 717 F.Supp. 218 (S.D.N.Y.1989), the court denied a large national accounting firm's motion for summary judgment on a "partner's" ADEA claim. The district court found that it was unclear whether the "partner" played any more than a nominal role in management of the partnership, and whether the provision in the partnership agreement calling for a two-thirds vote of the partnership before he could be required to resign gave him any real job security. *Id.* at 221-22. Though the "partner" did receive a portion of Peat Marwick's profits as compensation, his compensation was also based on performance, "much like that of a traditional employee." *Id.* at 222. At trial, the jury determined that Caruso was an "employee" for ADEA purposes. *See Caruso v. Peat, Marwick, Mitchell & Co.,* 779 F.Supp. 332, 333 (S.D.N.Y.1991).[FN9]

> FN9. *Cf. Hyland v. New Haven Radiology Associates,* 794 F.2d 793, 797-98 (2d Cir.1986) (holding that doctor shareholder in professional corporation was an "employee" entitled to ADEA protection); *Jones v. Baskin, Flaherty, Elliot and Mannino, P.C.,* 670 F.Supp. 597, 601-02 (W.D.Pa.1987) (holding that shareholder attorney in professional corporation was an "employee" entitled to ADEA protection; each shareholder was paid like an employee and the corporation was run by a Board of Directors, of which the plaintiff was not a member).

[9] The cases discussed above, including those in which the courts found that the "partners" in question were not protected by the federal anti-discrimination laws, reveal that determining whether an individual is an "employee" typically requires a factual inquiry which goes beyond merely the partnership agreement and the "partner" label. Courts must analyze the true relationship among partners, including the method of compensation, the "partner's" responsibility for partnership liabilities, and the management structure and the "partner's" role in that management, to determine if an individual should be treated as a partner or an employee for the purpose of employment discrimination laws.

[10] In the case at hand, the district court made a determination that Strother was not an employee based solely on her complaint, the attached partnership agreement, and Strother's "partner" label. Although the Medical Group points to a number of partnership rights provided to Strother in the partnership agreement,[FN10] the affairs of the "partnership" are conducted predominantly by the Board of Directors, over which she has little control and to which she has limited access. Her compensation is determined to a significant degree by her performance, and she can be disciplined for poor performance. The size of the Medical Group-Strother is one of 2400-2500 "partners"-makes it more likely that Strother could demonstrate that her actual *868 partnership rights are limited enough that she should be characterized as an employee. The complaint and the partnership agreement leave many unanswered questions about how the partnership actually conducts itself. Although it may ultimately be demonstrated that Strother is not an "employee" entitled to FEHA protection, and resolution of the issue on summary judgment could be appropriate, the district court erred in determining that Strother could plead no set of facts to show that she was actually an "employee" entitled to FEHA protection.[FN11]

> FN10. These include the rights to run for election to the Board of Directors, and to vote on proposed amendments to the partnership, Board of Directors representatives, discharges of partners, and termina-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                      Page 14
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

tion of the partnership itself.

FN11. If the district court determines that
Strother is an "employee" of the Medical
Group who is entitled to FEHA protection,
she may be able to base her claims in part
on events occurring outside the FEHA one-
year limitations period, Cal.Gov.Code §
12960 (West 1962), because of the
"continuing violations" doctrine. *See, e.g.,
Accardi v. Superior Court,* 17 Cal.App.4th
341, 349, 21 Cal.Rptr.2d 292, 296 (1993)
("Under this doctrine, a complaint arising
under FEHA is timely if *any* of the dis-
criminatory practices continues into the
limitations period."). We leave it to the
district court to determine whether the con-
tinuing violations doctrine allows Strother
to rely on conduct occurring prior to the
relevant FEHA limitations date in support
of her FEHA discrimination claim.

*III. Retaliation Under FEHA*

[11] In granting the Medical Group's motion for
summary judgment on Strother's FEHA retaliation
claim, the district court held that Strother "failed to
show that there is a genuine issue of material fact to
support" her claim. To avoid summary judgment on
an unlawful retaliation claim, a plaintiff must first
produce evidence supporting a *prima facie* case of
employment discrimination. After a *prima facie*
case is established, the burden shifts to the defend-
ant to articulate a legitimate nondiscriminatory
reason for its decision, and if such a reason is artic-
ulated, the plaintiff must demonstrate that the reas-
on given was merely a pretext for a discriminatory
motive. *See Lam v. University of Hawai'i,* 40 F.3d
1551, 1559 & n. 11 (9th Cir.1994). Because Stroth-
er offered evidence to prove a *prima facie* FEHA
retaliation case and proffered sufficient facts so that
a reasonable trier of fact could find that the Medical
Group's explanation of its actions was merely a pre-
text for discrimination, we reverse the district
court's grant of summary judgment.

[12][13][14] To assert a *prima facie* retaliation
claim under FEHA, "the plaintiff must show that he
engaged in a protected activity, his employer sub-
jected him to adverse employment action, and there
is a causal link between the protected activity and
the employer's action." *Flait v. North American
Watch Corp.,* 3 Cal.App.4th 467, 476, 4
Cal.Rptr.2d 522, 528 (1992); *see also Moyo v.
Gomez,* 40 F.3d 982, 984 (9th Cir.1994)
(articulating the same three-pronged requirement
for Title VII retaliation claim), *cert. denied,*513
U.S. 1081, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995).
If Strother is an "employee" entitled to FEHA pro-
tection, as discussed above, her complaint with the
California Department of Fair Employment and
Housing ("DFEH") about her treatment by the
Medical Group was clearly a protected activity that
would establish the first element of a *prima facie*
retaliation claim. Moreover, even if Strother cannot
bring a FEHA *discrimination* claim, she can still as-
sert a FEHA *retaliation* claim if she had a
"reasonable" belief that she had a legitimate FEHA
claim when she filed her first complaint with the
DFEH. *See Flait,* 3 Cal.App.4th at 477, 4
Cal.Rptr.2d at 529 (" '[I]t is good faith and reason-
ableness, not the fact of discrimination, that is the
critical inquiry in a retaliation case.' ") (quoting
*Rucker v. Higher Educ. Aids Bd.,* 669 F.2d 1179,
1182 (7th Cir.1982)); Cal.Code Regs. tit. 2, §
7287.8(a)(1)(C) (1995) (prohibiting retaliation
against an employee for "[o]pposing employment
practices which an individual reasonably believes
to exist and believes to be in violation of [FEHA]").

In *Moyo,* a black prison guard alleged that he was
fired from his job with the California Department
of Corrections for protesting against the Depart-
ment's policy of allowing white inmates to take
showers after work shifts, but not allowing the
same privilege to black inmates. The Department
argued that inmates were not "employees" entitled
to the *868 protection of Title VII. While we were
unable to conclude from the record that the inmates
were not "employees," we found that such a de-
termination was irrelevant to Moyo's retaliation

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                    Page 15
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

claim because he could "state a retaliation claim if he could show that his belief that an unlawful employment practice occurred was 'reasonable,' " regardless of the inmates' status as "employees." 40 F.3d at 985. "The reasonableness of Moyo's belief that an unlawful employment practice occurred must be assessed according to an objective standard-one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." *Id.*

[15] In the case at bar, there is evidence from which a reasonable factfinder could conclude that Strother had a reasonable belief that she was opposing unlawful employment practices when she filed her complaint with DFEH on September 12, 1991. As discussed above, there is some doubt about whether she is an "employee" protected by FEHA. As *Moyo* makes clear, a complaint about treatment of someone not covered by discrimination laws can nonetheless give rise to a retaliation claim if the complaining party reasonably believed that that person was covered. It follows that an individual who is reasonably mistaken about *her own* coverage by employment discrimination laws may assert a claim for retaliation. There is no evidence that Strother's complaints to DFEH were in any way brought in bad faith or meant to harass the Medical Group. Thus, even if Strother is not an "employee" for the purpose of FEHA, a finder of fact could conclude that she had a "reasonable" belief that a FEHA violation had occurred when she filed her charge with the DFEH, making her action a protected activity.

[16][17][18] Strother also proffered sufficient facts to establish that she suffered an adverse employment action, the second element of a *prima facie* case. Not every employment decision amounts to an adverse employment action.[FN11] For example, mere ostracism in the workplace is not enough to show an adverse employment decision. *See Fisher v. San Pedro Peninsula Hosp.,* 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842, 856 (1989) (finding that the

existence of a hostile work environment could make employer liable for retaliation, but noting that "[o]stracism ... does not amount to a hostile environment"). Here, however, Strother has alleged in her answers to interrogatories that she was replaced as the Coordinator for the "Personal Physician Program," and that she was excluded from educational seminars, meetings, and positions involving quality assurance after her complaint to the DFEH. Under the partnership agreement, these positions may have put her in a position for merit pay increases. Her answers to interrogatories also allege that she was excluded from meetings with nurses and regarding telephone access, that she suffered some verbal and physical abuse at the hands of other doctors, that she has been excluded from Urgent Care meetings, that she has been denied secretarial support, and that she had been given a more burdensome work schedule. These allegations, if proven, would be sufficient to demonstrate an adverse employment decisions.

> FN12. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (questioning existence of "adverse" employment action where employee "was not demoted, or put in a worse job, or given any additional responsibilities"), *cert. denied,*513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987) (no adverse employment decision where temporary transfer did not result in loss of salary or benefits). *But see Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1254-55 (2d Cir.1987) (employee showed adverse employment decision where he was transferred to area with poor working conditions and deluged with work).

[19] Strother has proffered sufficient facts that could establish the third element of a *prima facie* retaliation case-a causal link between her complaints and the adverse employment decisions. Ac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                 Page 16
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

cording to Strother's answers to interrogatories, on August 13, 1991, David Bridgeford, the West Covina PIC, told Strother "that he knew that she *870 had contacted the EEO people up north and that it would not be in her best interests to file a discrimination charge." [FN13] Strother was allegedly removed from her position as Coordinator for the Personal Physician Program the day after she filed her first complaint with DFEH on September 12, 1991. Several other alleged acts of retaliation occurred within months afterward.[FN14] A reasonable factfinder could conclude that the Medical Group's adverse employment decisions were caused by Strother's complaint.

FN13. These alleged threats could be considered actual evidence of the Medical Group's discriminatory motive, which alone would be sufficient to establish a *prima facie* case. *See Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir.1985) ("[A]ny indication of discriminatory motive-including evidence as diverse as '... [defendant's] reaction, if any, to [plaintiff's] legitimate civil rights activities; and [defendant's] general policy and practice with respect to minority employment,'-may suffice to raise a question that can only be resolved by a factfinder.") (alteration in original) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804-05, 93 S.Ct. 1817, 1825-26, 36 L.Ed.2d 668 (1973)), *amended on other grounds,* 784 F.2d 1407 (9th Cir.1986).

FN14. *Cf. Flait,* 3 Cal.App.4th at 478, 4 Cal.Rptr.2d at 529 (sufficient causal link where supervisor who terminated employee had made sexist comments to another employee and fired employee five months after a confrontation); *Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 505 (9th Cir.1989) (sufficient causal link pled where employees were laid off 42 and 59 days after EEOC hearing), *cert. denied,*494

U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

[20] To rebut Strother's *prima facie* case, the Medical Group does not specifically provide legitimate explanations for treatment that supports Strother's *retaliation* claim, focusing instead on providing explanations for its actions which formed the basis of Strother's FEHA *discrimination* claim, events occurring before Strother filed her administrative complaint with DFEH. Even if we accept the reorganization of the Baldwin Park Area and Strother's abrasive personality style as the Medical Group's explanation of its actions after Strother filed her DFEH claim, Strother has produced sufficient evidence so that a reasonable factfinder could find that this explanation was merely a pretext.

[21][22][23] Although the mere existence of a *prima facie* case is insufficient to preclude summary judgment, a plaintiff "need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext." *Warren,* 58 F.3d at 443 (quoting *Lindahl v. Air France,* 930 F.2d 1434, 1437 (9th Cir.1991)). "To survive an employer's summary judgment motion, only a genuine factual issue with regard to discriminatory intent need be shown, a requirement that is almost always satisfied when the plaintiff's evidence, 'direct or circumstantial, consists of more than the [presumption established by the three-pronged *prima facie* case test].' " *Lam,* 40 F.3d at 1559 (quoting *Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991)). The same evidence can be used to establish a *prima facie* case *and* to create a genuine issue regarding whether the employer's explanations are pretextual. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir.1994).[FN15]

FN15. *See also Sischo-Nownejad,* 934 F.2d at 1112 (holding that direct evidence of discrimination can be "sufficient not only to establish [plaintiff's] *prima facie* case, but also to create a genuine issue of material fact regarding whether the defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                       Page 17
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

articulated reasons are pretextual"); *Flait,* 3 Cal.App.4th at 479, 4 Cal.Rptr.2d at 530 ("Pretext may also be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.").

Though the Medical Group alleges that its decisions were made in part because of Strother's poor interpersonal skills, Strother produced a letter from David Bridgeford, dated November 14, 1990, in which he writes that she was "well respected and literally able to get along in any situation with anyone." Strother also produced a letter, dated June 7, 1991, signed by eleven other physicians containing words to the same effect. While Bridgeford asserts that his letter was untrue and signed with the hope that Strother would leave the West Covina office, the truth of the documents is nonetheless a factual issue based on credibility issues. These letters, along with the temporal proximity of the adverse employment decisions to Strother's complaint to DFEH and Bridgeford's alleged threats to Strother, are sufficient to raise a genuine issue of material fact as to *871 Strother's retaliation claim, even if Strother ultimately cannot bring a FEHA discrimination claim. We reverse the district court's grant of summary judgment for all defendants on Strother's FEHA retaliation claim.

*IV. Article I, § 8 of the California Constitution*

[24][25] Strother challenges the district court's grant of the Medical Group's motion for summary judgment on her claim brought directly under the California Constitution. Article I, § 8 of the California Constitution reads in full:

> A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

Cal. Const. art. I, § 8 (West 1983). The district court granted summary judgment in favor of the Medical Group on Strother's § 8 claim because she had "not shown that she was denied the ability to enter or pursue her profession," and held that "claims based directly on [§ 8] may not be based on the regulation of particular aspects of plaintiff's work or her duties within that profession." We affirm the district court on the ground that a claim brought directly under Article I, § 8 of the California Constitution may only be brought where a plaintiff has been denied entrance into a profession or particular employment or terminated from the same.

The Medical Group argues that Strother cannot bring a § 8 claim because she was not prevented from pursuing an entire profession, relying on *Long v. California State Personnel Board,* 41 Cal.App.3d 1000, 116 Cal.Rptr. 562 (1974). In *Long,* the California Court of Appeals interpreted the predecessor to § 8, Cal.Const. art. XX, § 18 (repealed 1974), which read: "A person may not be disqualified because of sex, from entering or pursuing a lawful business, vocation, or profession." *Long,* held that a youth detention center's requirement that its chaplains be male did not offend the constitutional provision because the restriction did not entirely prohibit the female petitioner "from pursuing the occupation of minister or chaplain." 41 Cal.App.3d at 1007, 116 Cal.Rptr. at 567. "In other words article XX section 18 does not prohibit *regulation* of an occupation in such way as to exclude one sex under certain justifiable circumstances; rather it forbids a *prohibition* from the pursuit of that occupation by either sex." *Id.,* 116 Cal.Rptr. at 567. *See also Locker v. Kirby,* 31 Cal.App.3d 520, 526, 107 Cal.Rptr. 446, 451 (1973) (holding that Alcohol Beverage Control rule that prohibited women from serving drinks while topless did not violate Article XX, § 18 because "it did not prevent petitioner ... from working as a waitress, nor indeed [did] it prevent her from doing so in topless dress so long as no alcoholic beverage license is involved on the premises in question").

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                    Page 18
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

[26] Adopted in 1974, Article 1, § 8 extended the protection previously provided by Article XX, § 18 to those discriminated against because of "race, creed, color, or national or ethnic origin" and also prohibits discrimination in "employment." The legislative history of the provision's adoption refers to the statute as a "new Section" designed to prohibit "discrimination in economic opportunities." California Constitution Revision Commission: Proposed Revision of Article 1, Article XX, Article XXII of the California Constitution (1971). Case law indicates that § 8 prohibits discrimination that disqualifies an employee from employment with a particular entity, not just disqualification from an entire profession. *See, e.g., Rankins v. Commission on Professional Competence of the Ducor Union Sch. Dist.,* 24 Cal.3d 167, 154 Cal.Rptr. 907, 911, 593 P.2d 852, 856 ("[A]rticle 1, section 8 forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship."), *appeal dismissed,*444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).

Strother argues that § 8 not only prohibits complete disqualification from a particular job or profession, but also provides individuals with a remedy against employers for harassment or disparate treatment in different aspects of a particular job. She relies on *Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 801 P.2d 373 (1990), in which two female physician's assistants alleged that they were sexually harassed by their employer physician,*872 who made sexually harassing remarks and demands for sexual favors, and were ultimately forced to leave their employment. In holding that the women could plead a cause of action for wrongful discharge in contravention of public policy, the *Rojo* court relied on § 8 to find a California public policy against sex discrimination. *Id.* 276 Cal.Rptr. at 145-46, 801 P.2d at 388-89. "Regardless of the precise scope of its application, article 1, § 8 is declaratory of this state's fundamental public policy against sex discrimination, including sexual harassment, which ... is merely one form of sex discrimination...." *Id.* at

146,801 P.2d at 389. Continuing its discussion of public policy, but not clearly referring to § 8, the court stated: "No extensive discussion is needed to establish the fundamental *public* interest in a workplace free from the pernicious influence of sexism." *Id.* (emphasis in original). The court concluded that "defendant's discharges of plaintiffs on the grounds alleged contravened a fundamental, substantial public policy embodied in the state Constitution." *Id.*

[27] While containing broad language about the § 8 declaration against sexual harassment, *Rojo* was nonetheless a case in which the plaintiffs were claiming wrongful discharge. Indeed, in every case where plaintiffs have brought a claim directly under § 8 or relied on the section to demonstrate a public policy against sex discrimination, the claimants alleged that they were wrongfully discharged from their employment or threatened with discharge.FN16 The plain language of Article 1, § 8 indicates that "[a] person may not be *disqualified...* from entering or pursuing" a particular position.FN17 The provision does not use words such as "limited" or "restricted" which might indicate that discrimination in the conditions of employment are likewise prohibited. *Long* indicated that the predecessor to § 8 forbid the prohibition of a person of any sex from pursuing a profession, not *regulation* that excluded members of one sex from a particular position for justifiable reasons. While § 8 has been expanded to protect more classifications of people and to cover "employment," the word "disqualified" remains, indicating that § 8 governs actions which result in the complete exclusion of an individual from employment with a particular employer, and does not reach conduct affecting particular aspects of an individual's job.

> FN16. *See, e.g., Rankins,* 154 Cal.Rptr. at 911-12, 593 P.2d at 856-57 (finding that a teacher was wrongfully threatened with discharge for taking religious holidays and holding that "article 1, § 8 forbids disqualification of employees for religious prac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                          Page 19
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

tices unless reasonable accommodation by the employer is impossible without undue hardship"); *Badih v. Myers*, 36 Cal.App.4th 1289, 43 Cal.Rptr.2d 229, 232-33 (1995) (holding that a woman terminated because of pregnancy could maintain cause of action for wrongful discharge in contravention of public policy because § 8 prohibits pregnancy discrimination); *Blom v. N.G.K. Spark Plugs (U.S.A.), Inc.*, 3 Cal.App.4th 382, 387, 4 Cal.Rptr.2d 139, 141-42 (1992) (following *Rojo* in finding that plaintiff could bring wrongful discharge claim based on § 8 because of public policy against national origin discrimination); *Carmichael v. Alfano Temporary Personnel*, 233 Cal.App.3d 1126, 1131-1132, 285 Cal.Rptr. 143, 146-47 (1991) (following *Rojo* in finding wrongful termination claim based on policy against racial discrimination in § 8); *see also Merrell v. All Seasons Resorts, Inc.*, 720 F.Supp. 815, 819 (C.D.Cal.1989) (finding private cause of action under § 8 where pregnant woman with permanent position was offered temporary position with fewer fringe benefits and voluntarily resigned); *Froyd v. Cook*, 681 F.Supp. 669, 673 & n. 11, 676 (E.D.Cal.1988) (former police dispatcher alleging sexual harassment and retaliatory constructive discharge stated claim for discharge in violation of public policy articulated in § 8); *Smithberg v. Merico, Inc.*, 575 F.Supp. 80, 83 (C.D.Cal.1983) (finding that employee who was allegedly discharged for objecting to racial discrimination in the workplace stated claim under § 8).

FN17. Black's Law Dictionary defines "disqualify" as follows:

To divest or deprive of qualifications; to incapacitate; to render ineligible or unfit, as, in speaking of the "disqualification"

of a judge by reason of his interest in the case, of a juror by reason of his holding a fixed preconceived opinion, or of a candidate for public office by reason of non-residence, lack of statutory age, previous commission of crime, etc.

Black's Law Dictionary 472 (6th ed. 1990).

The continued use of the word "disqualified" in Article I, § 8 and the fact that all the cases construing § 8 involved plaintiffs who had been terminated, constructively discharged, or threatened with termination leads us to believe that the California Supreme Court would hold that Strother's allegations*873 of harassment and discriminatory appointments are insufficient to state a claim directly under § 8. The district court properly granted the defendants' motion for summary judgment on Strother's claims under Article I, § 8 of the California Constitution.

*V. The Unruh Act, Cal.Civ.Code § 51*

[28] Strother alleges that the district court erred in granting the Medical Group's motion for summary judgment on Strother's Unruh Act claim. The relevant portions of the Unruh Act read:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal.Civ.Code § 51 (West Supp.1995). Whether Strother is characterized as an employee or a bona fide partner in the Medical Group, she cannot assert a claim under the Unruh Act for the Medical Group's alleged discrimination.

In *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970), an African-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                     Page 20
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

American employee sought damages for wrongful termination under the Unruh Act. The California Supreme Court held that the employee could not recover under the Unruh Act because his employer's discrimination did not constitute discrimination "made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." *Id.* 86 Cal.Rptr. at 92, 468 P.2d at 220. California courts continue to exclude employees from Unruh Act coverage. *See e.g., Rojo,* 276 Cal.Rptr. at 137, 801 P.2d at 380 ("[T]he Unruh Civil Rights Act has no application to employment discrimination.").

In excluding employees from Unruh Act coverage, California courts have recognized that the Act and its predecessors have generally been designed to prevent proprietors of businesses from excluding anyone from frequenting their business because of race, national origin, sex, etc. The early common law prohibited discrimination against members of the public in their use of particularly important public enterprises such as bridges, ferryboats, and inns. *See Warfield v. Peninsula Golf & Country Club,* 10 Cal.4th 594, 42 Cal.Rptr.2d 50, 57, 896 P.2d 776, 783 (1995). Passed in 1897, and amended in 1919 and 1923, the California predecessor to the Unruh Act entitled all citizens of the state to "the full and equal accommodations, advantages, facilities and privileges" of numerous business enterprises. *Id.*FN18 In response to holdings that the law did not require "a private cemetery, a dentist's office, and a private school to make their facilities available to African-American patrons," the Unruh Act extended the prohibition on discrimination to "all business establishments" in 1959. *Id.* 42 Cal.Rptr.2d at 58, 896 P.2d at 784.

> FN18. The statute specifically forbid discrimination by "inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement." 1923 Cal.Stat. ch. 235, § 1.

Decisions subsequent to *Alcorn,* however, have allowed parties that are not "clients, patrons or customers" in the traditional sense to bring Unruh Act claims. For example, in *Isbister v. Boys' Club of Santa Cruz, Inc.,* 40 Cal.3d 72, 219 Cal.Rptr. 150, 707 P.2d 212 (1985), the California Supreme Court found that the nonprofit Boys' Club, which operated a community recreation center, violated the Unruh Act by enforcing a male-only membership policy. *Id.* 219 Cal.Rptr. at 153-63, 707 P.2d at 215-25. Interpreting its earlier statement in *Alcorn,* quoted above, the court explained that "[i]n context, the statement meant only that the *employer-employee* relationship was not covered by the Act, which was confined to discriminations against recipients of the 'business establishment's ... goods, services or facilities.' Discrimination in services and facilities is precisely what is alleged here." *Id.* at 157 n. 12, 707 P.2d at 219 n. 12.

In *O'Connor v. Village Green Owners Ass'n,* 33 Cal.3d 790, 191 Cal.Rptr. 320, 662 P.2d 427 (1983), the California Supreme **\*874** Court held that condominium owners could bring an Unruh Act claim against the owners' association for its attempt to prevent the condominium owners from living in the complex with their infant son, in violation of the covenants, conditions, and restrictions on the complex. *Id.* 191 Cal.Rptr. at 324-25, 662 P.2d at 431. While the owners' association attempted to characterize itself as little more than an organization that "mows lawns" for its members, the court noted that the association employed a property management firm, insured the property, repaired and maintained common areas, collected assessments from residences, and adopted and enforced rules for the residents. "In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders." *Id.*

In *Jackson v. Superior Court,* 30 Cal.App.4th 936, 36 Cal.Rptr.2d 207 (1994), an African-American

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

investment advisor, who accompanied two of his clients to a bank so that they could purchase a mutual fund, alleged that the bank manager told his clients that he was trying to scam them, called the police to investigate him, and verbally attacked Jackson until he and his clients were forced to leave. Jackson sued the bank, alleging, *inter alia,* a violation of the Unruh Act. Although Jackson himself was not a "customer" of the bank, the court of appeals noted:

> The bank accommodates the public in many ways peripheral to its main functions of providing banking services. For example, a bank ordinarily allows persons to accompany its customers and help them pursue their banking business. When it refuses to allow an African American this courtesy because of his or her race, the bank denies that person the "full and equal accommodations, advantages, privileges or services" of the bank.

*Id.* at 941, 36 Cal.Rptr.2d at 208-09. Thus, Jackson could bring an Unruh Act claim.

In *Rotary Club of Duarte v. Board of Directors,* 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986), *aff'd* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), the California Court of Appeals ruled that the national Rotary Club organization's attempt to expel a local chapter for admitting female members violated the Unruh Act. The court found that membership in the Rotary Club was "clearly an 'advantage' or 'privilege' under the Unruh Act," because of the numerous business advantages available through contacts with other members of the Club. 178 Cal.App.3d at 1059, 224 Cal.Rptr. at 227.

The cases described above have found that Unruh Act claims were appropriate where the plaintiff was in a relationship with the offending organization similar to that of the customer in the customer-proprietor relationship which the Act and its predecessors have most commonly covered. The plaintiffs in *Isbister* and *O'Connor* were involved in relationships substantially similar to those of health club owner-patron and landlord-tenant respectively. The plaintiff in *Jackson,* though not himself a customer, was allegedly denied access to the facilities of the bank which would have been available to someone of a different race. The substantial business benefits received by members in *Rotary Club* are similar to benefits received by patrons of dinner clubs or other business establishments where business is created.

Strother argues that she is protected by the Unruh Act because in her position at the Medical Group she is "entitled to receive economic benefits, the use of certain medical facilities, medical supplies and other goods, management courses, and a variety of privileges, advantages, and services, including opportunities for promotion and advancement." These benefits, however, are no different than those that would be received by any doctor who was, as she once was, a mere employee of the Medical Group. Being a "recipient" of these benefits does not entitle Strother to the protection of the Unruh Act any more than an employee's being the "recipient" of a paycheck gives him or her Unruh Act protection. Even if Strother were considered a bona fide partner rather than an "employee" for the purpose of FEHA, her relationship to the Medical Group is more like that of an employee than that of a "client, patron or customer." The district court properly granted the Medical Group's *875 motion for summary judgment on Strother's Unruh Act claims.

*VI. Cal.Civ.Code § 51.5*

[29] Strother likewise argues that the district court erred in dismissing her claim under Cal.Civ.Code § 51.5 on the grounds that she was not a "customer, client, or patron" of the Medical Group. Section 51.5 of the California Civil Code reads in relevant part:

> No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, refuse to buy from, sell to, or trade with any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                    Page 22
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

person in this state because of the race, creed, religion, color, national origin, sex, or disability of the person....

Cal.Civ.Code § 51.5 (West Supp.1996).

Few California cases have construed this provision, originally passed in 1976. On its face, § 51.5, like § 51, appears to be aimed only at discrimination in relationships similar to the proprietor/customer relationship. All the forbidden acts referred to except "discriminate" expressly refer to transactions of a proprietor/customer sort. Indeed, at least one California court has noted that § 51.5 is an expansion upon § 51. *See Roth v. Rhodes,* 25 Cal.App.4th 530, 537, 30 Cal.Rptr.2d 706, 709 (1994) ("Section 51.5 expands on section 51 by, inter alia, specifying forms of discrimination, including refusal to deal."). *Roth* refers to the Unruh Act as "§ 51 et seq." rather than simply as "§ 51," *id.,* 30 Cal.Rptr.2d at 709, and §§ 51 and 51.5 share the same penalty provision. *See* Cal.Civ.Code § 52(a) (West Supp.1996).[FN19] Interpreting this provision consistently with § 51, we hold that Strother, as either a partner or employee, cannot bring a claim under § 51.5. The district court properly granted the defendants' motion for summary judgment on Strother's claim under Cal.Civ.Code § 51.5.

> FN19. *See also Pines v. Tomson,* 160 Cal.App.3d 370, 384, 206 Cal.Rptr. 866, 874 (1984) (holding that "business establishment of every kind whatsoever" has the same meaning under § 51 and § 51.5).

*VII. 42 U.S.C. § 1981*

[30] Strother argues that the district court erred in granting the Medical Group's motion for summary judgment on her claims under 42 U.S.C. § 1981. Section 1981 currently reads in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981 (Supp. IV 1992). Subsection (b) of the provision was added by the Civil Rights Act of 1991 ("CRA 1991"). Claims arising out of acts occurring prior to the enactment of CRA 1991 on November 12, 1991, are governed by § 1981 as it was interpreted by the Supreme Court prior to its amendment. *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, ----, 114 S.Ct. 1510, 1519-20, 128 L.Ed.2d 274 (1994) (holding that because CRA 1991 did not clearly indicate retroactive effect, and because it "creates liabilities that had no legal existence before [it] was passed, [it] does not apply to preenactment conduct.")

[31] Under *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), employees can bring a claim under § 1981 for acts occurring prior to the enactment of CRA 1991 only if they allege discrimination in the *formation* of an employment contract, as opposed to claims based on discrimination while they are working in a particular position or discriminatory termination. *Id.* at 176-78,109 S.Ct. at 2372-73. We hold that none of the Medical Group's treatment of Strother or the alleged denial of promotions prior to November 12, 1991, the date of CRA 1991's enactment, gives rise to a § 1981 claim because none of the conduct amounted to discrimination in contract *formation.* However, because the district court failed to consider Strother's allegations of discriminatory treatment occurring after the passage of CRA 1991 on *876 November 12, 1991, we remand for a determination of whether Strother has presented a triable claim under revised 42 U.S.C. § 1981.

*A. Strother's Pre-November 12, 1991 Promotion Denials*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                Page 23
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

[32] For denials of promotions prior to November 12, 1991, "[o]nly where the [denied] promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981." *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. The Court cited *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), a Title VII case in which a law firm associate alleged that she was not accepted as a partner because of her sex, as an example of such a new and distinct relationship.

[33] In *Patterson,* an African-American woman employed at a credit union as a teller and file coordinator, brought a racial harassment and wrongful termination claim under § 1981. Some of her complaints were that "[her supervisor] gave her too many tasks, causing her to complain that she was under too much pressure; that among the tasks given her were sweeping and dusting, jobs not given to white employees; ... [and that her supervisor] criticized her in staff meetings while not similarly criticizing white employees." *Id.* at 178,109 S.Ct. at 2373. She also alleged "that she was passed over for promotion, not offered training for higher level jobs, and denied wage increases, all because of her race." *Id.* The Court found that with the possible exception of one particular denied promotion,[FN20] none of these allegations constituted "either a refusal to make a contract with her or the impairment of her ability to enforce her established contract rights." *Id.* at 179, 109 S.Ct. at 2374. It is clear from *Patterson* that none of Strother's pre-November 12, 1991 harassment claims not involving the Medical Group's denial of promotions and appointments can support a § 1981 claim.

> FN20. The Court noted that the only possible claim that Patterson could have under § 1981 would be for the credit union's failure to promote her to a position as an intermediate accounting clerk in another department, but declined to consider whether that would be a sufficient change in the

employee-employer relationship because the credit union had not challenged Patterson's right to bring a § 1981 claim for that failure to promote. *Id.* at 184-86,109 S.Ct. at 2377.

This Circuit has examined several claims alleging discrimination in denied promotions to determine whether they would have constituted a sufficient change in the employment relationship to give rise to a § 1981 claim. In *Sitgraves v. Allied-Signal, Inc.,* 953 F.2d 570 (9th Cir.1992), we found that "a simple change in position from supervised employee to supervisor is one that alters the contractual relationship sufficiently to fall within the purview of section 1981 protection even after *Patterson,*" and that the promotion need not be to a top policymaking position. *Id.* at 574. We also concluded "that the move from compensation based on hours worked to compensation based on an annual salary constitutes a sufficiently new and different contractual relationship to provide an actionable promotion claim." *Id.* We thus found that three employees who sought promotions from hourly-compensated, non-supervisory positions to a supervisory, salaried positions stated § 1981 claims. In contrast, two employees who merely sought promotion to more skilled positions with higher pay did not state claims because their current and desired positions were both non-supervisory and hourly-compensated. *Id.* We remanded for further factual findings regarding a sixth employee because we could not determine from the record whether the employee's denied promotion would have changed his position from supervised to supervisor, or merely moved him from one supervisory position to another, and "whether a change in the nature of his supervisory functions would have significantly altered the nature of his relationship to management." *Id.; see also Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1494 (9th Cir.1995) (holding that a laundry worker could not assert § 1981 claim for a refused transfer to two accounting positions, because both were non-supervisory and compensated hourly, but could assert a claim for a refused transfer to a pur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                                                              Page 24
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

chasing and receiving position that would have included supervisory duties); *877*Rodriguez v. General Motors Corp.*, 27 F.3d 396, 399-400 (9th Cir.1994) (employee not entitled to bring § 1981 claim where current job and job sought both involved supervision of other employees, both positions reported to same supervisor, new job would not entail significant new duties, and employee did not show that there would be an increase in pay).

We can easily dispose of Strother's claims that the Medical Group's failure to appoint her to handle physician recruitment, failure to hire her as Quality Assurance coordinator, and failure to appoint her to the Urgent Care Committee are actionable under § 1981. Even assuming that holding more positions within the Medical Group would entitle Strother to merit pay increases, this potential increase in pay alone is not enough to claim a violation of § 1981. Though Strother would have "supervised" certain aspects of the functioning of the Medical Group in these positions, none of them would have placed her in a position as superior to any of her partners or changed her relationship with the partnership; she would continue to be an ordinary partner, performing more duties.

Strother's claims that she was denied PIC positions at two other Medical Group clinics and denied a position as a Module Lead at the West Covina clinic demand closer examination. Strother states in her complaint that a PIC "acts as a manager or supervisor for defendant Medical Group and a supervisor and administrative superior of [other partners]." For its part, the Medical Group contends that the duties of the PIC have declined with the reorganization of the Medical Group, and have been spread more evenly among other physicians. The Partnership Agreement indicates that the PIC is appointed for a six-year term of office, that appointments are made by the Area Associate Medical Director and may be made with the advice of partners in a particular area, and that PICs may be reappointed at the expiration of their term. PIC's are given an additional stipend of $200-$500 a month.[FN21]

FN21. The duties of a Module Lead physician are more limited. The record reveals that there are several modules within each clinic, consisting of three to six physicians and supporting nurses. Each module has a Module Lead physician who is to "act as a role model and oversee the quality of the service provided within the module." April 18, 1994 Lulejian Decl. ¶ 5. The modules were apparently designed to make the administrative structure more "horizontal," *id.*, and perhaps to eliminate the necessity of having a PIC. May 2, 1994 Lulejian Decl. ¶ 11.

Neither the additional income that Strother would receive as a PIC or might receive as a Module Lead, nor the additional duties that Strother would acquire in either position would significantly alter Strother's contractual relationship with "management." The additional stipend for the PIC does not constitute a fundamental change in the way the doctor is compensated and does not indicate a change in her contractual relationship with the Medical Group. *See Sitgraves*, 953 F.2d at 574. While *Sitgraves* indicates that a denied change "from supervised employee to supervisor" would give rise to a § 1981 claim, and *Patterson* indicates that the same would be true for a denial of a partnership position to an employee, Strother's appointment to PIC or Module Lead would not be such a fundamental change in the relationship between Strother and the Medical Group. In a partnership like the Medical Group, "management" is the partnership itself, even though individuals and committees are appointed to conduct certain aspects of the partnership's affairs. Like the employee in *Rodriguez*, Strother, who had already "supervised" other doctors to some extent as APIC and in other administrative positions, would merely gain additional supervisory responsibilities if appointed PIC or Module Lead. An appointment to PIC or Module Lead would not have altered the contractual relationship between Strother and her partners sufficiently to give her a § 1981 claim under *Patterson*.[FN22]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

79 F.3d 859                                                              Page 25
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96
Daily Journal D.A.R. 2734

FN22. In light of our holding that none of the alleged conduct of the Medical Group or the other defendants prior to November 12, 1991, gives rise to a § 1981 claim, we need not address the Medical Group's contention that Strother's claims, insofar as they are based on actions occurring prior to September 15, 1991, are barred by the statute of limitations.

*B. Discrimination Claims After November 12, 1991*

In ruling on Strother's § 1981 claim, the district court based its decision entirely on *878 *Patterson* and the statute of limitations. The court did not address whether any of Strother's allegations of discrimination by the Medical Group after November 12, 1991, were sufficient to present a triable claim under revised 42 U.S.C. § 1981.

CRA 1991 expanded § 1981 to provide protection for employees in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (Supp.IV 1992). Strother has made numerous factual allegations concerning discrimination on the part of the Medical Group since November 12, 1991, including exclusion from Urgent Care Committee meetings, denial of appointment to the Quality Assurance Committee, and alleged ongoing harassment since May 1991, including the setting of heightened performance standards, the denial of secretarial support, and an increased workload. These allegations are relevant to Strother's claims of discrimination in the enforcement of the partnership agreement. We remand to the district court for a determination of whether Strother's allegations of post-November 12, 1991, conduct present a triable claim under the revised 42 U.S.C. § 1981.

CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of the Medical Group's 12(b)(6)

motion on the FEHA discrimination claim, the motion for summary judgment on the FEHA retaliation claim, and remand on Strother's claim under revised 42 U.S.C. § 1981 insofar as it is based on events occurring after November 12, 1991. We AFFIRM the district court's grant of summary judgment on the claims under the California Constitution, the Unruh Act, and Cal.Civ.Code § 51.5, and Strother's § 1981 claim insofar as it is based on actions of the Medical Group occurring prior to November 12, 1991. Each side is to bear its own costs on appeal.

C.A.9 (Cal.),1996.
Strother v. Southern California Permanente Medical Group
79 F.3d 859, 72 Fair Empl.Prac.Cas. (BNA) 905, 67 Empl. Prac. Dec. P 43,979, 96 Cal. Daily Op. Serv. 1610, 96 Daily Journal D.A.R. 2734

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



## Westlaw.

119 F.3d 982

119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

Page 1

▷

Serapion v. Martinez

C.A.1 (Puerto Rico),1997.

United States Court of Appeals,First Circuit.

Margarita SERAPION, Plaintiff, Appellant,

v.

Fred H. MARTINEZ, et al., Defendants, Appellees.

No. 96-2251.

Heard May 5, 1997.

Decided July 18, 1997.

Former law firm partner sued former partners and their new partnership for sex discrimination in violation of Title VII. The United States District Court for the District of Puerto Rico, Salvador E. Casellas, J., 942 F.Supp. 80, entered summary judgment against partner. Partner appealed. The Court of Appeals, Selya, Circuit Judge, held that partner was proprietor, rather than employee, and thus was not protected by Title VII.

Affirmed.

### West Headnotes

**|1| Statutes 361 ⚏223.2(1.1)**

361 Statutes

 361VI Construction and Operation

  361VI(A) General Rules of Construction

   361k223 Construction with Reference to Other Statutes

    361k223.2 Statutes Relating to the Same Subject Matter in General

    . 361k223.2(1) Statutes That Are in Pari Materia

     361k223.2(1.1) k. In General. Most Cited Cases

Title VII, ADEA, ERISA, and FLSA stand in pari passu and judicial precedents interpreting one such statute are instructive in decisions involving another. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Age Discrimination in Employment Act, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**|2| Federal Civil Procedure 170A ⚏2462**

170A Federal Civil Procedure

 170AXVII Judgment

  170AXVII(C) Summary Judgment

   170AXVII(C)1 In General

    170Ak2462 k. Purpose. Most Cited Cases

Summary judgment is means of determining whether trial is actually required. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**|3| Federal Civil Procedure 170A ⚏2544**

170A Federal Civil Procedure

 170AXVII Judgment

  170AXVII(C) Summary Judgment

   170AXVII(C)3 Proceedings

    170Ak2542 Evidence

     170Ak2544 k. Burden of Proof. Most Cited Cases

To defeat properly crafted summary judgment motion, party opposing it must demonstrate that trialworthy issue looms as to fact which could potentially affect outcome of suit. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**|4| Federal Civil Procedure 170A ⚏2543**

170A Federal Civil Procedure

 170AXVII Judgment

  170AXVII(C) Summary Judgment

   170AXVII(C)3 Proceedings

    170Ak2542 Evidence

     170Ak2543 k. Presumptions. Most Cited Cases

**Federal Civil Procedure 170A ⚏2546**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and Suffi-
ciency. Most Cited Cases
Trial or appellate court considering merits of sum-
mary judgment initiative must peruse record in light
most favorable to nonmovant and, while equation
must take into account all properly documented
facts, court may ignore unsupported conclusions,
rank speculation, and opprobrious epithets.
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⊙⟹2470**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to
Judgment
               170Ak2470 k. Absence of Genuine
Issue of Fact in General. Most Cited Cases
If evidence, viewed in light most favorable to non-
movant, reveals genuine dispute over material fact,
that is, if reasonable fact finder, examining evid-
ence and drawing all reasonable inferences in re-
quired manner, could resolve factual controversy
which is critical to outcome of case in favor of non-
moving party, then summary judgment will not lie.
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[6] Federal Courts 170B ⊙⟹776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most
Cited Cases
Where district court enters summary judgment,
court of appeals reviews its ruling de novo.
Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[7] Civil Rights 78 ⊙⟹1110**

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
   (Formerly 78k143)
Whether individual is employee under Title cannot
be decided solely on basis that partnership calls, or
declines to call that person a partner; rather, court
must peer beneath label and probe actual circum-
stances of person's relationship with partnership.
Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. §
2000e(f).

**[8] Civil Rights 78 ⊙⟹1110**

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
   (Formerly 78k143)
Partnerships cannot exclude individuals from pro-
tection of Title VII simply by draping them in gran-
diose titles which convey little or no substance.
Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. §
2000e(f).

**[9] Civil Rights 78 ⊙⟹1110**

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
   (Formerly 78k143)
To decide whether individual described as partner
actually bears close enough resemblance to employ-
ee to be afforded protections of Title VII requires
case-by-case analysis; form should not be permitted
to triumph over substance when important civil
rights are at stake. Civil Rights Act of 1964, §
701(f), 42 U.S.C.A. § 2000e(f).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982                                                                                    Page 3
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

|10| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
     (Formerly 78k143)
Whether individual is employee for purposes of Title VII is matter of federal law, and must be answered with reference to principles of federal law and derived through analysis of federal statutes, legislative history, judicial decisions, and common law understandings, not through local law. Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f).

|11| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
     (Formerly 78k143)
Considerations used to determine whether individual denominated as partner is employee under Title VII include ownership, remuneration, and management. Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f).

|12| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
     (Formerly 78k143)

Civil Rights 78 ☞1113

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1113 k. Individuals as "Employers".
Most Cited Cases

(Formerly 78k143)
Partner is more likely to be proprietor, rather than employer, for purpose of Title VII if partner has investment in firm, ownership of firm assets, and liability for firm debts and obligations. Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f).

|13| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
     (Formerly 78k143)

Civil Rights 78 ☞1113

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1113 k. Individuals as "Employers".
Most Cited Cases
     (Formerly 78k143)
Partner is more likely to be proprietor, rather than employer, for purpose of Title VII if partner's remuneration is subject to vagaries of firm's economic fortunes, or if partner receives benefits of a kind or in amount markedly more generous than similarly situated employees who possess no ownership interest. Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f).

|14| Civil Rights 78 ☞1110

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected
         78k1110 k. Nature and Existence of Employment Relationship. Most Cited Cases
     (Formerly 78k143)

Civil Rights 78 ☞1113

78 Civil Rights
   78II Employment Practices
      78k1108 Employers and Employees Affected

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

78k1113 k. Individuals as "Employers".
Most Cited Cases
  (Formerly 78k143)
Partner is more likely to be proprietor, rather than
employer, for purpose of Title VII if partner has
right to engage in policymaking, participates in and
has voting power with regard to firm governance,
has ability to assign work and to direct activities of
employees within firm, and has ability to act for
firm and its principals. Civil Rights Act of 1964, §
701(f), 42 U.S.C.A. § 2000e(f).

|15| Civil Rights 78 ☞1110

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected
      78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
  (Formerly 78k143)
In assessing whether partner is employee, for pur-
poses of Title VII, no single factor should be accor-
ded talismanic significance; rather, determination
must be founded on totality of circumstances which
pertain in particular case. Civil Rights Act of 1964,
§ 701(f), 42 U.S.C.A. § 2000e(f).

|16| Civil Rights 78 ☞1110

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected
      78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
  (Formerly 78k143)
Person with requisite attributes of proprietary status
is properly considered proprietor, not employee,
under Title VII, regardless of fact that others in
firm may wield more power. Civil Rights Act of
1964, § 701(f), 42 U.S.C.A. § 2000e(f).

|17| Civil Rights 78 ☞1110

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected

78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
  (Formerly 78k143)

Civil Rights 78 ☞1113

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected
      78k1113 k. Individuals as "Employers".
Most Cited Cases
  (Formerly 78k143)
Hegemony by one partner does not automatically
dislodge others in hierarchy from proprietary status
under Title VII. Civil Rights Act of 1964, § 701(f),
42 U.S.C.A. § 2000e(f).

|18| Civil Rights 78 ☞1110

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected
      78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
  (Formerly 78k143)
Law firm partner was proprietor, rather than em-
ployee, and thus was not protected by Title VII's
prohibition against sex discrimination; partner had
ownership interest in firm, her compensation de-
pended substantially on firm's fortunes, and she en-
joyed significant voting rights in firm's two princip-
al governing bodies. Civil Rights Act of 1964, §
701(f), 42 U.S.C.A. § 2000e(f).

|19| Civil Rights 78 ☞1113

78 Civil Rights
  78II Employment Practices
    78k1108 Employers and Employees Affected
      78k1113 k. Individuals as "Employers".
Most Cited Cases
  (Formerly 78k143)
First Circuit has not resolved issue of whether law
partners can be held individually liable as employ-
ers under Title VII. Civil Rights Act of 1964, §
701(a, b), 42 U.S.C.A. § 2000e(a, b).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

**[20] Federal Courts 170B ⬅️18**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
            170Bk18 k. Validity or Substantiality of Federal Claims and Disposition Thereof. Most Cited Cases
Once district court determined that law partner was not employee, and thus could not sue other partners for violating Title VII, court's decision to refrain from exercising jurisdiction over claims brought under local law was well within the encincture of its discretion. Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f); 28 U.S.C.(1994 Ed.) § 1367(c)(3).

*983 Judith Berkan, San Juan, PR, with whom Mary Jo Mendez and Rosalinda Pesquera were on brief, for appellant.
Graciela J. Belaval, Hato Rey, PR, with whom Alvaro R. Calderon, Jr. and Martínez, Odell & Calabria were on brief, for appellees.

*984 Before SELYA, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

SELYA, Circuit Judge.
This appeal requires us to explore a gray area in the emerging jurisprudence of Title VII, 42 U.S.C. §§ 2000e to 2000e-17 (1994). Having completed that task, we conclude that while Title VII's employment-related shelter might in certain circumstances extend to a person who is a partner in a law firm, plaintiff-appellant Margarita Serapión, a partner in the now-disbanded law firm of Martínez, Odell, Calabria & Sierra (the Firm), is not entitled to such shelter here. Consequently, we affirm the lower court's entry of summary judgment in the defendants' favor.

In explaining our rationale, we take a slightly unorthodox course. We begin with the facts, then shift

to a discussion of the statutory scheme, and then resume our historical account by describing the course of the litigation. In succession, we thereafter rehearse the summary judgment standard, limn the doctrinal parameters of the requisite Title VII inquiry, address the merits, iron out a procedural wrinkle, and at long last conclude.

## I. THE FACTUAL PREDICATE

Serapión earned a distinguished reputation as a certified public accountant before deciding to switch careers. After graduating from the University of Puerto Rico Law School with honors in 1982, she joined the San Juan law firm of Colorado, Martínez, Odell, Calabria & Sierra as an associate. She left in 1983 for a stint in government service but returned in 1985. In the interim, Colorado had departed and the partnership had been reconstituted. Approximately one year later, the appellant was admitted into the Firm as a "junior" partner (sometimes termed a "non-proprietary" partner). While this status did not give her any equity position, it did give her some profit distribution units (PDUs) [FN1] and enabled her to participate in meetings of the Board of Partners (a body which comprised all the partners, senior and junior-in the aggregate, roughly half the Firm's lawyers-and which had the ultimate responsibility for management and policymaking).

> FN1. Each partner received an allotment of PDUs, and the Firm's profits were distributed periodically to the partners in proportion to the number of PDUs which each partner held. These distributions were over and above the recipients' base salaries. At all times material hereto, the name partners held 100 PDUs apiece. The junior partners held varying amounts, ranging from 20 to 45 PDUs apiece.

In 1990, Serapión became what is variously described as a "senior" or "proprietary" partner. Theretofore the Firm's four name partners (all

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982

Page 6

119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

males) were the only other proprietary partners. They enjoyed equality among themselves in respect to compensation, PDUs, benefits, and equity, and they promised Serapión that she would be elevated to an equal partnership in three years. In the meantime, her status as a proprietary partner brought about several changes in her working conditions: she received a 4% equity interest in the Firm (ceded 1% by each name partner); she assumed *pro rata* liability for the Firm's debts, losses, and other obligations; and she became a voting member of the Executive Committee (a five-member group which was responsible for the Firm's day-to-day management). When the appellant became a proprietary partner, the Firm increased her allocation of PDUs to 75 units. Concomitantly, she began reaping a correspondingly larger share of the Firm's profits. Under the terms of the 1990 agreement, her allotment of PDUs (and, therefore, her share of the profits) was to continue to rise in increments until the end of 1992 when Serapión would achieve full parity with the four name partners.

Despite these emoluments, Serapión was not on an equal footing with the name partners. Each of them had a greater equity interest (24% apiece) and a more munificent compensation package (roughly one-third higher than hers in 1990, although the gap gradually closed). The difference in compensation was largely, if not entirely, a function of the disparate allocation of PDUs. Still, although her allotment of PDUs was less than that of the name partners, it was nonetheless significantly greater than that of even the most well-endowed junior partner.

Serapión alleges that three of her partners (Fred H. Martínez, Lawrence Odell, and José Luis Calabria) never intended that a woman *985 would achieve parity. These partners, she says, connived to prevent her from reaping the fruits of her bargain, eventually demanding that she sign an agreement which would have significantly diminished her authority within the Firm. When Serapión stood her ground, the trio caused the Firm to dissolve in 1992 (shortly before the expiration of the three-year phase-in period) and simultaneously forged a new partnership called "Martínez, Odell & Calabria." The nascent firm included the three men, as well as most of the Firm's other lawyers. The founders did not invite either Serapión or Sierra (the remaining proprietary partner) to join.

## II. THE STATUTORY SCHEME

We pause at this juncture to sketch the legal landscape. Title VII is one of the brightest stars in the firmament of this nation's antidiscrimination laws. Generally speaking, it bars certain employment-related actions undertaken on the basis of impermissible criteria (such as gender). *See, e.g., Smith v. F.W. Morse & Co.,* 76 F.3d 413, 420 (1st Cir.1996). In relevant part, Title VII provides:

> It shall be an unlawful employment practice for an employer-
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

The Firm is plainly an employer for Title VII purposes. After all, an employer is defined by statute as "a person engaged in an industry affecting commerce," and the statute makes clear that "a person" in this context can include a partnership. *Id.* at § 2000e(a)-(b). The rub is whether Serapión is an employee.

Although the language we have quoted speaks of "any individual," courts long ago concluded that Title VII is directed at, and only protects, employees and potential employees. *See, e.g., Vera-Lozano v. International Broad.,* 50 F.3d 67, 69 (1st Cir.1995); *Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1159 (5th Cir.1986); *see generally Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1026 (1st

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

Cir.1988) (noting that "Title VII does not presume to obliterate all manner of inequity"). We know, moreover, that a single individual in a single occupational setting cannot be both an employer and an employee for purposes of Title VII. *See, e.g., Devine v. Stone, Leyton & Gershman, P.C.,* 100 F.3d 78, 80-81 (8th Cir.1996), *cert. denied,*520 U.S. 1211, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997); *EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177, 1178 (7th Cir.1984); *Johnson v. Cooper, Deans & Cargill,* 884 F.Supp. 43, 44 (D.N.H.1994). Even so, the parameters of the term "employee" have proven elusive. Title VII defines an employee only as "an individual employed by an employer,"42 U.S.C. § 2000e(f), a turn of phrase which chases its own tail. *See Broussard,* 789 F.2d at 1160; *see also Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992) (terming nearly identical language in the ERISA statute, 29 U.S.C. § 1002(6), "completely circu- lar").

[1] Given the unhelpful nature of the supplied definition, we are compelled to look for assistance in other federal antidiscrimination statutes that contain similar definitions of "employee," such as the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (1994), the Employee Retirement and Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (1994), and the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (1994). We regard Title VII, ADEA, ERISA, and FLSA as standing *in pari passu* and endorse the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another. *See, e.g., Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071-72, 60 L.Ed.2d 609 (1979); *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Wheeler v. Hurdman,* 825 F.2d 257, 263 (10th Cir.1987); *Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793, 796 (2d Cir.1986).

Of course, we are not remitted solely to statutory parallels. There is a developing jurisprudence under

Title VII. In it, we detect precedential value not only in cases which actually involve partnerships, but also in decisions which have determined the status of individuals by analogy to a partnership *986 paradigm (even though the individuals involved were principals of entities other than partnerships). *See, e.g., Devine,* 100 F.3d at 80-81; *Fountain v. Metcalf, Zima & Co.,* 925 F.2d 1398, 1399-1401 (11th Cir.1991). We do not, however, hitch our wagon to cases deciding whether a particular individual is an employee as opposed to an independent contractor. That distinction is between those who are part of an employer's business and those who are running their own businesses, and the factors central to that inquiry are inapposite here. *See Wheeler,* 825 F.2d at 271-72.

There are also a few cases which deal directly with whether a partner in a professional practice should be regarded as an employee for the purpose of Title VII (and, therefore, entitled to its safeguards). The seminal case is *Burke v. Friedman,* 556 F.2d 867, 869-70 (7th Cir.1977), in which the court held that partners in an accounting firm were not employees vis-à-vis Title VII. This interpretation received a modicum of support in *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Although the *Hishon* Court answered a different question-holding that Title VII precluded a law firm from denying partnership consideration to an associate on the basis of her gender, *see id.* at 76-78, 104 S.Ct. at 2234-35-Justice Powell cautioned that the majority opinion did "not require that the relationship among partners be characterized as an 'employment' relationship to which Title VII would apply." *Id.* at 79, 104 S.Ct. at 2236 (Powell, J., concurring). Since *Hishon,* several appellate courts have followed Justice Powell's lead and declared, with varying nuances, that partners are not protected as employees under federal antidiscrimination laws. *See Simpson v. Ernst & Young,* 100 F.3d 436, 443 (6th Cir.1996), *cert. denied,*520 U.S. 1248, 117 S.Ct. 1862, 137 L.Ed.2d 1062 (1997); *Wheeler,* 825 F.2d at 263; *accord*EEOC Decision No. 85-4, 2 Empl. Prac. Guide (CCH) ¶ 6846, at 7040-41 & n. 4

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

(1985).

As we visualize it, the key inquiry is into the attributes of the relationship between the partnership and those whom it styles as partners. The method by which this inquiry is to be conducted-how a court determines whether an individual labelled as a partner is to be treated as an employee for purposes of Title VII-is an unresolved issue which lies at the epicenter of this appeal.

### III. THE LITIGATION

When her three former partners folded the Firm and dashed her expectations of proprietary parity, Serapión sued them and their new firm (Martínez, Odell & Calabria) in Puerto Rico's federal district court. She charged in her complaint that the defendants had violated both Title VII and local law. After the defendants' early attempt to obtain summary judgment misfired, [FN2] the parties engaged in pretrial discovery. Thereafter, the defendants renewed their quest for *brevis* disposition. Their new motion relied on alternative grounds. It averred that Serapión, as a partner in the Firm, was not an employee (and, therefore, had no recourse to Title VII). It also averred that Serapión had not adduced any competent proof that gender-based discrimination caused the Firm's disintegration (an event which the defendants attributed to irreconcilable differences between two warring factions of proprietary partners).

> FN2. When the defendants filed their initial motion for summary judgment, Chief Judge Cerezo denied it. The case was subsequently transferred to Judge Casellas' calendar as part of a redistribution of cases ancillary to his assumption of judicial office.

Judge Casellas granted the defendants' motion, holding that Serapión was not an employee as that term had been developed in federal jurisprudence and that she was thus ineligible for the prophylaxis

of Title VII. *See Serapión v. Martínez,* 942 F.Supp. 80, 84-85 (D.P.R.1996). The court held alternatively that Serapión had failed to make out a prima facie case of discrimination under Title VII. *See id.* at 85-87. Finally, the court refused to exercise supplemental jurisdiction over the pendent claim and dismissed that claim without prejudice to its pursuit in the courts of Puerto Rico. *See id.* at 88-89. This appeal followed.

### IV. THE SUMMARY JUDGMENT STANDARD

While the origins of the summary judgment standard may have been important in *987 the distant past, modern federal practice has reached a point at which the standard has achieved aphoristic acceptance, rendering the attribution of specific authorship superfluous. We thus present the standard without particularized citation, referring readers interested in further exposition to the long litany of decisions that have placed a gloss on the language of Fed.R.Civ.P. 56(c). *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995) (collecting cases); *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995) (same).

[2][3] Summary judgment is a means of determining whether a trial is actually required. It is appropriately granted when the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Thus, in order to defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit.

[4][5] A trial or appellate court considering the merits of a summary judgment initiative must peruse the record in the light most favorable to the nonmovant. While this equation must take into account all properly documented facts, the court may ignore unsupported conclusions, rank speculation, and opprobrious epithets. If the evidence, so viewed, reveals a genuine dispute over a material

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

fact-that is, if a reasonable factfinder, examining the evidence and drawing all reasonable inferences in the required manner, could resolve a factual controversy which is critical to the outcome of the case in favor of the nonmoving party-then summary judgment will not lie.

[6] Where, as here, the district court enters summary judgment, we review its ruling de novo.

## V. THE DOCTRINAL PARAMETERS

[7][8] Putting this appeal into proper perspective requires us to articulate the doctrinal parameters which inform an inquiry into a partner's status vis-à-vis Title VII. We divide our discussion into two segments.

### A.

Partnerships are mutable structures, and partners come in varying shapes and sizes. Consequently, attempting to delineate the circumstances in which a particular partner should be regarded as an employee for Title VII purposes is tricky business. Although one court has hinted at the desirability of a *per se* rule, saying in effect that all members of professional services corporations were employees for purposes of the antidiscrimination laws (there, the ADEA), no matter how significant a role they played in managing the affairs of the corporation, *see Hyland*, 794 F.2d at 797-98,[FN] we reject the notion that labels can conclusively resolve status inquiries. We hold instead that the Title VII question cannot be decided solely on the basis that a partnership calls-or declines to call-a person a partner. A court must peer beneath the label and probe the actual circumstances of the person's relationship with the partnership. *See Devine*, 100 F.3d at 80-81; *Fountain*, 925 F.2d at 1400-01; *see also Hishon*, 467 U.S. at 79 n. 2, 104 S.Ct. at 2236 n. 2 (Powell, J., concurring) ("Of course, an employer may not evade the strictures of Title VII simply by labelling its employees as 'partners.' "); *see generally Board of Trade of Hammond Elevator Co.*, 198

U.S. 424, 437-38, 25 S.Ct. 740, 743-44, 49 L.Ed. 1111 (1905) (holding that the manner in which the parties to an agreement designate their relationship is not controlling). In other words, partnerships cannot exclude individuals from the protection of Title VII simply by draping them in grandiose titles which convey little or no substance.

> FN3. We note that the Second Circuit appears to have retreated somewhat from this position. *See EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1538-39 (2d Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3755 (U.S. May 1, 1997) (No. 96-1743).

[9] In our judgment, the correct course is to undertake a case-by-case analysis aimed at determining whether an individual described as a partner actually bears a close enough resemblance to an employee to be afforded the protections of Title VII. *See *988Strother v. Southern Cal. Permanente Med. Group.* 79 F.3d 859, 867-68 (9th Cir.1996) (reversing grant of summary judgment where the trial court based its status determination principally on the fact that the plaintiff was called a partner); *see also Devine*, 100 F.3d at 81 (holding, in a case involving a professional services corporation, that a court should not treat either the individual's title or the entity form as determinative). After all, form should not be permitted to triumph over substance when important civil rights are at stake.

We also reject a variation on the *per se* theme advanced by the appellant. She asseverates that, due to the peculiarities of Puerto Rico's civil law structure, all partners in all Puerto Rico partnerships must be considered employees for purposes of Title VII. In a civil law system, this theory goes, a partnership is not merely a banding together of individual partners but a separate entity which must itself be considered the employer of all the individual partners.

[10] We need not delve too deeply into the hotly disputed question of whether the appellant's con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982

119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

struct is sound as a matter of Puerto Rico law. It is enough for our purposes that the construct is unsound as a matter of *federal* law. The appellant cites no apposite authority for the novel proposition that the status of an individual under Title VII should vary depending on the law of the state in which a partnership entity is chartered or in which a claim arises. We think that the reverse is true: whether an individual is an employee for purposes of Title VII is a matter of federal law, and the question must be answered with reference to principles of federal law. *Accord Broussard*, 789 F.2d at 1159-60; *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339 (11th Cir.1982); *Lambertsen v. Utah Dep't of Corrections*, 922 F.Supp. 533, 536 (D.Utah 1995), *aff'd,*79 F.3d 1024 (10th Cir.1996).[FN4] This determination is grounded in both Supreme Court case law and strong federal policies of uniformity and fairness.

> FN4. The *Broussard* decision is of particular interest because the claim which was considered there arose in Louisiana-a jurisdiction which, like Puerto Rico, has a civil law tradition.

In *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), the Court decided that the word "employee," as used in the antiretaliation section of Title VII, 42 U.S.C. § 2000e-3(a), included former as well as current employees. *See id.* at ----, 117 S.Ct. at 849. In resolving this issue, the Court ignored state law, concentrating instead on the statute itself and on federal jurisprudence. *See id.* at ---- - ----, 117 S.Ct. at 846-48. The Court took a similar approach in *Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, ---- - ----, 117 S.Ct. 660, 663-66, 136 L.Ed.2d 644 (1997), resolving the scope of the words "employee" and "employer" under Title VII by reference solely to federal statutes and judicial opinions. So, too, in *Darden*, 503 U.S. at 322-23 & n. 3, 112 S.Ct. at 1347-48 & n. 3, the Court determined the meaning of "employee" under ERISA through the application of established common law prin-

ciples (rejecting the idea that the term incorporated the law of any particular state).

These cases are merely specific applications of the widely accepted principle that, in the absence of plain indication of a contrary intent, courts ought to presume that the interpretation of a federal statute is not dependent upon state law.[FN5] *See, e.g., Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43, 109 S.Ct. 1597, 1605-06, 104 L.Ed.2d 29 (1989); *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983); *United States v. De Luca*, 17 F.3d 6, 8-9 (1st Cir.1994).

> FN5. We are unimpressed by the appellant's attempted analogy to a line of cases involving the federal tax laws. *See, e.g., Morgan v. Commissioner*, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940). The appellant has not called to our attention any court which has accepted those cases as persuasive in the Title VII context, and we decline to be the first.

Our refusal to give state law controlling weight on this question not only comports with the case law but also makes common sense. Linking status determinations to local law would make an important federal statute mean different things in different states. This sort of checkerboarding would undermine Congress' easily discerned intent *989 that Title VII stand as a national code of conduct in the struggle to ensure equality of treatment in the workplace. *See*110 Cong. Rec. 13,088-13,091 (1964). Moreover, since the United States is home to in excess of 1,000,000 operating partnerships, numbering over 13,000,000 individual partners, *see U.S. Bureau of the Census, Statistical Abstract of the United States* 535 (116th ed.1996), relegating status determinations to local law would create enormous confusion and widespread uncertainty.

In regard to Title VII, there is no basis for departing from the precept that "federal statutes are generally intended to have uniform nationwide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

*Mississippi Band of Choctaw Indians,* 490 U.S. at 43, 109 S.Ct. at 1605-06, and there is every reason for adhering to it. Here, moreover, the possibility that defining the term "employee" by reference to local law would open the door for state legislatures to adopt restrictive definitions and thereby defeat Title VII's broad remedial purposes militates strongly in favor of a uniform national standard. *Cf. United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (suggesting that, in cases in which the application of state law would frustrate the specific objectives of a federal program, establishing uniform federal rules is appropriate). Thus, we hold that the meaning of the term "employee," as that term is used in Title VII, must be derived through an analysis of federal statutes, legislative history, judicial decisions, and common law understandings, not through the law of Puerto Rico.

### B.

Having determined that federal law controls the question of the appellant's status, we turn next to an analysis of those attributes of a partner's relationship to the partnership which may influence the decisional calculus. In this endeavor, we do not write on a pristine page. Two other courts of appeals have tried their hands at plotting the line which divides partners who may be treated as employees under federal antidiscrimination statutes from those who may not.

In *Simpson,* the Sixth Circuit considered the status for ADEA purposes of an individual denominated a partner by an international accounting firm. In attempting to ascertain whether the plaintiff, notwithstanding his title, qualified as a person protected by the ADEA, the court weighed factors such as:

the right and duty to participate in management; the right and duty to act as an agent of other partners; exposure to liability; the fiduciary relationship among partners ... participation in profits and losses; investment in the firm; partial owner-

ship of firm assets; voting rights; the aggrieved individual's ability to control and operate the business; the extent to which the aggrieved individual's compensation was calculated as a percentage of the firm's profits; the extent of that individual's employment security; and other similar indicia of ownership.

*Simpson,* 100 F.3d at 443-44. Concluding that the plaintiff more closely resembled an employee than a proprietor-the court noted particularly that the plaintiff had no right either to participate in the partnership's management decisions or to vote for those who did, and that his compensation was not determined on the basis of the firm's profits-the court allowed the plaintiff to sue under the ADEA. *See id.* at 441-43.

The Tenth Circuit grappled with the same sort of conundrum in *Wheeler,* a case which also involved a partner in an accounting firm. In determining that the plaintiff was not an employee for purposes of either Title VII or the ADEA, the *Wheeler* court focused on her participation in firm profits and losses, her exposure to liability, her investment in the firm, and her voting rights under the partnership agreement. *See Wheeler,* 825 F.2d at 276.

Other cases, though not involving partnerships, are useful in our analysis. In *Devine,* for example, the Eighth Circuit, in deciding whether attorneys who were shareholders and directors in a professional services corporation were employees for Title VII purposes, stated that courts should "look to the extent to which [the attorneys] manage and own the business." *Devine,* 100 F.3d at 81. The court proceeded to consider factors such as the attorneys' ability to participate in setting firm policy, the extent of their contributions*990 to firm capital, their liability for firm debts, and the correlation (or lack of correlation) between their compensation and the firm's profits. *See id.*

In a comparable situation, the Eleventh Circuit evaluated the ADEA claim of a member-shareholder of an accounting firm by weighing elements

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

such as the plaintiff's ability to share in firm profits and whether his compensation was a function of those profits; the plaintiff's liability for the firm's losses, debts, and obligations; and the extent of the plaintiff's right to vote on major firm decisions. *See Fountain,* 925 F.2d at 1401. The court dismissed an assertion that the "autocratic" actions of the firm's president constituted a reasonable basis for concluding that the plaintiff was an employee. "Domination by an 'autocratic' partner over others is not uncommon and does not support a finding that the others are 'employees.' " *Id.*

[11] We think that these cases provide valuable guidance concerning the factors which courts must consider in making status determinations under Title VII. In large, the critical attributes of proprietary status involve three broad, overlapping categories: ownership, remuneration, and management. Within these categories, emphasis will vary depending on the circumstances of particular cases. Nonetheless, although myriad factors may influence a court's ultimate decision in a given case, we recount a non-exclusive list of factors that frequently will bear upon such determinations.

[12] Under the first category, relevant factors include investment in the firm, ownership of firm assets, and liability for firm debts and obligations. To the extent that these factors exist, they indicate a proprietary role; to the extent that they do not exist, they indicate a status more akin to that of an employee.

[13] Under the second category, the most relevant factor is whether (and if so, to what extent) the individual's compensation is based on the firm's profits. To the extent that a partner's remuneration is subject to the vagaries of the firm's economic fortunes, her status more closely resembles that of a proprietor; conversely, to the extent that a partner is paid on a straight salary basis, the argument for treating her as an ordinary employee will gain strength. A second potentially relevant factor in this regard relates to fringe benefits. An individual who receives benefits of a kind or in an amount

markedly more generous than similarly situated employees who possess no ownership interest is more likely to be a proprietor.

[14] Under the third category, relevant factors include the right to engage in policymaking; participation in, and voting power with regard to, firm governance; the ability to assign work and to direct the activities of employees within the firm; and the ability to act for the firm and its principals. Once again, to the extent that these factors exist, they indicate a proprietary role.

[15] We add a note of caution. Status determinations are necessarily made along a continuum. The cases that lie at the polar extremes will prove easy to resolve. The close cases, however, will require a concerned court to make a case-specific assessment of whether a particular situation is nearer to one end of the continuum or the other. In performing this assessment, no single factor should be accorded talismanic significance. Rather, a status determination under Title VII must be founded on the totality of the circumstances which pertain in a particular case. Given these verities, any effort to formulate a hard-and-fast rule would likely result in a statement that was overly simplistic, or too general to be of any real help, or both.

## VI. THE MERITS

[16] To complete our journey, we must undertake a particularized analysis aimed at determining whether the lower court, *at the summary judgment stage,* appropriately could conclude that Serapión was not an employee of the Firm within the purview of Title VII. Consistent with the summary judgment protocol, we focus only on uncontested documentary proof, such as the provisions of the partnership agreement and the minutes of the Firm's Executive Committee meetings (every page of which bears the appellant's *991 initials), supplemented by facts asserted by the appellant and those conceded by her.

The factors relevant to ownership and remuneration

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

provide powerful indications that the appellant should not be treated as an employee for Title VII purposes. It is undisputed that Serapión received an equity interest in the Firm upon being named a proprietary partner. Her compensation was predicated in substantial measure on the Firm's profits,[FN6] and she would have been liable had the Firm sustained losses. In the ensuing months, she made substantial capital contributions to the Firm. She also received very generous fringe benefits, e.g., a car allowance in excess of $10,000 per annum and a discretionary expense allowance of $16,400 yearly. These benefits were comparable to those received by the other proprietary partners, but more extravagant than the benefits available to junior partners and associates.

> FN6. Whereas associates in the Firm received fixed compensation (plus an occasional bonus based on performance), all partners (senior and junior) received a base salary supplemented by a share of the Firm's profits paid out periodically in proportion to each partner's allotment of PDUs. For example, when the appellant first ascended to proprietary partnership, her overall compensation was composed of a base salary ($60,183 per annum) plus a share of the firm's profits (amounting to approximately $30,000 during her first year as a proprietary partner). Her total compensation was pegged to 75% of what the four name partners received (resulting in gross remuneration appreciably higher than that earned by any non-proprietary partner). Her percentage allocation increased steadily during the period that followed, so that, at the time the Firm dissolved in 1992, her total compensation equalled 92% of the total compensation paid to each of the name partners.

The picture is only slightly less clear as to the management prong of the test. As a proprietary partner, the appellant participated meaningfully in the Firm's governance. Unlike non-proprietary partners (who were allowed to attend Board of Partners' meetings but could vote only on matters affecting their own interests), proprietary partners were guaranteed a vote in all matters brought before the Board. The partnership agreement describes this tribunal as "the highest policy and decision making body of the Firm."Furthermore, the appellant's vote had added significance: if an impasse developed between a majority of the Board and 4/5ths of the proprietary partners, the decision of the proprietary partners controlled. While the appellant belittles Board membership, voting status in a law firm's highest decisionmaking body is no small thing. The fact that the membership consisted of roughly half the lawyers in the Firm dilutes, but does not dispel, the significance of such membership.[FN7]

> FN7. We take judicial notice of the fact that many law firms have partner/associate ratios near one-to-one, yet few lawyers working for these firms would deny that the partners enjoy a status fundamentally different from that of the associates.

Serapión's involvement in management went well beyond membership in the Board of Partners. She served as one of five voting members of the Executive Committee, which managed the Firm's day-to-day operations and regularly decided matters relating to salaries, finances, fee schedules, office space, employee performance, recruitment, admission of new partners, acceptance of business, work assignments, and the staffing of cases. In a period of about two years, the appellant attended no fewer than sixteen of these meetings and wrote up the minutes. A review of Serapión's handiwork shows her to have been a robust participant in important policy decisions; for example, the minutes reflect that she made several motions anent the admission of new partners. The Executive Committee was the nerve center of the Firm. The appellant's membership on it, coupled with her degree of involvement in management generally, strongly suggests that she was not an employee. So, too, does the fact that she

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982

119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

had authority to act as an agent for the Firm and its partners; one manifestation of this authority was that, after she became a senior partner, the Firm empowered her to sign checks drawn on its accounts.

The appellant does not go gently into this dark night. For the most part, she strives to refocus our attention on the ways in which she possessed less power than the four name partners. She complains that her name was never added to the Firm's name; that neither her compensation nor her equity interest*992 ever equalled that of the name partners; that she had less authority to assign matters within the Firm; and that she did not head any of the Firm's departments. But this constellation of complaints assumes that all partners except those equivalent in stature and authority to the most powerful partners of a law firm are employees for Title VII purposes. The assumption lacks any solid legal underpinning. A person with the requisite attributes of proprietary status is properly considered a proprietor, not an employee, regardless of the fact that others in the firm may wield more power. See *Fountain,* 925 F.2d at 1401.

[17] The appellant also makes a closely related argument, noting that she rarely got her way on disputed matters and that she dissented from many decisions.[FN8] But focusing on the fact that her views sometimes did not prevail confuses participation with control. Insofar as the management prong of the test is concerned, the hallmarks of proprietary status are the right to participate in decisionmaking and the right to have a meaningful say in governance. Within the structure of any organization, certain individuals tend to dominate others, and the dominators' viewpoints will more often be adopted. *See id.* This phenomenon often occurs among equals (Adams reportedly wrote to Jefferson on November 12, 1813, describing Dickinson as "primus inter pares, the bellwether, the leader of the aristocratical flock") and, in all events, the exercise of hegemony by one partner does not automatically dislodge others in the hierarchy from proprietary

status. Elsewise, all the partners in a law firm or an accounting practice, save only the managing partner(s), would be treated as employees for Title VII purposes regardless of the extent of their ownership or the correlation between their remuneration and the entity's profits. The law is to the contrary: it is not a necessary corollary of proprietary status that the views of the partner in question will always-or even usually-prevail.

> FN8. It is disingenuous for the appellant to focus on the number of recorded votes taken by the Executive Committee as proof of her alleged powerlessness, especially since the minutes of those meetings indicate that the vast majority of policy decisions were reached by consensus. General agreement on a matter is certainly tantamount to a vote, and it cannot be gainsaid that numerous policy decisions were made, often by unanimous consent, during the time the appellant was a member of the Executive Committee.

[18] In this case, all roads lead to Rome. The evidence is uncontradicted that the appellant had an ownership interest in the Firm; that her compensation depended substantially on the Firm's fortunes; and that she enjoyed significant voting rights in the Firm's two principal governing bodies. Given these undisputed facts, no reasonable factfinder could conclude that Margarita Serapión was other than a bona fide equity partner, and, as such, a person ineligible to claim the protection which Title VII reserves for those who are employees. Consequently, the district court did not err in granting summary judgment in the defendants' favor on the Title VII claim.[FN9]

> FN9. Because this ground is dispositive of the federal claim, we take no view of the district court's alternative holding that Serapión failed to make out a prima facie case of gender-based discrimination.

## VII. THE IDENTITY OF THE DEFENDANTS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

119 F.3d 982
119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

[19] Before closing, we note a procedural anomaly. For reasons best known to her, the appellant elected to sue three of her former partners and their fledgling partnership, but not the Firm. This tactic raises questions about whether the new partnership can be held liable as a successor to the Firm and whether law partners can be held individually liable as "employers" under Title VII. The last question, in particular, is potentially difficult. *Compare Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314-17 (2d Cir.1995) (dismissing the possibility of individual liability under Title VII) *with Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 184-85 (6th Cir.1992) (suggesting that individual liability exists). This circuit has not resolved the issue. *See Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 951-52 (1st Cir.1995) (leaving the question open).

We need not enter this thicket today. It is crystal clear that the liability (if any) of the *993 individual defendants and the new partnership cannot possibly exceed that of the actual employer. Because Serapión was not an employee, her suit cannot proceed under Title VII against any of the individual defendants or against the new partnership.

## VIII. CONCLUSION

[20] We need go no further. Once it had determined that the federal claim could not go forward, the district court had substantial discretion under 28 U.S.C. § 1367(c)(3) (1994) either to retain or to relinquish jurisdiction over the supplemental claim which the appellant had brought under local law. *See, e.g., McIntosh v. Antonino,* 71 F.3d 29, 33 n. 3 (1st Cir.1995); *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1176-77 (1st Cir.1995). In this instance, the court's decision to refrain from exercising jurisdiction was well within the encincture of its discretion.

*Affirmed.*

C.A.1 (Puerto Rico),1997.
Serapion v. Martinez

119 F.3d 982, 74 Fair Empl.Prac.Cas. (BNA) 601, 71 Empl. Prac. Dec. P 44,887

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

266 F.3d 979                                                                                                Page 1
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

▷

Sprewell v. Golden State Warriors
C.A.9 (Cal.),2001.

United States Court of Appeals,Ninth Circuit.
Latrell F. SPREWELL, Plaintiff-Appellant,
v.
GOLDEN STATE WARRIORS; National Basket-
ball Association, Defendants-Appellees.
Latrell F. Sprewell, Plaintiff,
andRobert Thompson, Jr.; Gordon J. Rose; Stephen
G. Weizenecker; Thompson & Associates; Robert
A. Gist; Paul F. Utrecht; Gist, Kennedy & Asso-
ciates, Appellants,
v.
Golden State Warriors; National Basketball Associ-
ation, Defendants-Appellees.
Nos. 99-15602, 99-17186.

Argued and Submitted Oct. 4, 2000
Filed Sept. 14, 2001

Professional basketball player brought action
against his former team and professional basketball
association challenging punishments imposed on
him for his physical attack on team's head coach.
The United States District Court for the Northern
District of California, Vaughn R. Walker, J., 1999
WL 179682, dismissed action. Player appealed. On
rehearing, the Court of Appeals, Trott, Circuit
Judge, held that: (1) arbitrator's award upholding
punishments drew its essence from collective bar-
gaining agreement (CBA); (2) arbitrator did not ex-
ceed scope of his authority in fashioning originative
remedy; (3) California's public policy against race
discrimination did not require vacatur of award; (4)
player failed to state cause of action under statute
guaranteeing equal rights to make and enforce con-
tracts; (5) player failed to state cause of action for
conspiracy to deprive of rights or privileges; (6)
California's Unruh Civil Rights Act did not apply to
player's punishments; (7) team and association did
not violate player's common law right to fair pro-
cedure; (8) claims for intentional interference with

contract and business relations were preempted by
Labor Management Relations Act (LMRA) only to
extent they were based upon alleged violations of
collective bargaining agreement (CBA); and (9)
claim under California's Unfair Practices Act was
not preempted by LMRA to extent it was premised
on alleged instigation of media campaign designed
to portray player in false and negative light.

Affirmed in part, reversed in part, and remanded.

Opinion, 231 F.3d 520, withdrawn.

West Headnotes

[1] Labor and Employment 231H ⟺1604

231H Labor and Employment
  231HXII Labor Relations
    231HXII(H) Alternative Dispute Resolution
      231HXII(H)5 Judicial Review and En-
forcement
        231Hk1603 Decisions Reviewable or
Enforceable
          231Hk1604 k. In General. Most
Cited Cases
    (Formerly 232Ak477 Labor Relations)
The LMRA section governing suits by and against
labor organizations empowers the Court of Appeals
to review an arbitration conducted under the terms
of a collective bargaining agreement (CBA). Labor
Management Relations Act, 1947, § 301, 29
U.S.C.A. § 185.

[2] Labor and Employment 231H ⟺1619

231H Labor and Employment
  231HXII Labor Relations
    231HXII(H) Alternative Dispute Resolution
      231HXII(H)5 Judicial Review and En-
forcement
        231Hk1618 Scope of Inquiry
          231Hk1619 k. In General. Most
Cited Cases
    (Formerly 232Ak483 Labor Relations)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                    Page 2
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

Judicial scrutiny of an arbitrator's decision in a labor dispute is extremely limited.

**[3] Labor and Employment 231H ⟜1609(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and Enforcement
                231Hk1607 Grounds for Impeachment or Enforcement
                    231Hk1609 Public Policy
                        231Hk1609(1) k. In General.
Most Cited Cases
    (Formerly 232Ak479 Labor Relations)

**Labor and Employment 231H ⟜1610(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and Enforcement
                231Hk1607 Grounds for Impeachment or Enforcement
                    231Hk1610 Fraud
                      231Hk1610(1) k. In General.
Most Cited Cases
    (Formerly 232Ak479 Labor Relations)

**Labor and Employment 231H ⟜1623(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and Enforcement
                231Hk1618 Scope of Inquiry
                    231Hk1623 Interpretation of Collective Bargaining Agreement
                      231Hk1623(1) k. In General.
Most Cited Cases
    (Formerly 232Ak479 Labor Relations)
Vacatur of an arbitration award is warranted under the LMRA: (1) when the award does not draw its

essence from the collective bargaining agreement (CBA); (2) when the arbitrator exceeds the scope of the issues submitted; (3) when the award runs counter to public policy; and (4) when the award is procured by fraud. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[4] Labor and Employment 231H ⟜1595(8)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)4 Proceedings
                231Hk1590 Award
                    231Hk1595 Particular Awards in General
                      231Hk1595(8) k. Discipline.
Most Cited Cases
    (Formerly 232Ak462 Labor Relations)
Labor arbitrator's award upholding punishments of professional basketball player by both basketball team and basketball association drew its essence from collective bargaining agreement (CBA) subjecting players "to disciplinary action for just cause by his Team or by the Commissioner"; arbitrator's detailed explanation of why he read "or" in conjunctive rather than disjunctive indicated he was, at the very least, arguably construing or applying CBA.

**[5] Labor and Employment 231H ⟜1595(8)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)4 Proceedings
                231Hk1590 Award
                    231Hk1595 Particular Awards in General
                      231Hk1595(8) k. Discipline.
Most Cited Cases
    (Formerly 232Ak463 Labor Relations)
Labor arbitrator did not exceed scope of his authority in fashioning originative remedy rather than upholding or rejecting professional basketball player's suspension for misconduct in its entirety; no lan-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                                                    Page 3
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA) 1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

guage in collective bargaining agreement (CBA) supported conclusion that he exceeded his author- ity.

**[6] Labor and Employment 231H €═ 1609(2)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and En-
forcement
                231Hk1607 Grounds for Impeachment
or Enforcement
                   231Hk1609 Public Policy
                      231Hk1609(2) k. Particular· De-
cisions. Most Cited Cases
    (Formerly 232Ak479 Labor Relations)
California's public policy against race discrimina-tion did not require vacatur of arbitration award up-holding discipline of professional basketball player by both team and basketball association for his physical attack on team's head coach.

**[7] Labor and Employment 231H €═ 1609(1)**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and En-
forcement
                231Hk1607 Grounds for Impeachment
or Enforcement
                   231Hk1609 Public Policy
                     231Hk1609(1) k. In General.
Most Cited Cases
    (Formerly 232Ak479 Labor Relations)
To vacate a labor arbitration award on public policy grounds, the Court of Appeals must find that: (1) an explicit, well defined, and dominant policy exists and (2) the policy is one that specifically militates against the relief ordered by the arbitrator.

**[8] Labor and Employment 231H €═ 1619**

·231H Labor and Employment
    231HXII Labor Relations

        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and En-
forcement
                231Hk1618 Scope of Inquiry
                   231Hk1619 k. In General. Most
Cited Cases
    (Formerly 232Ak483 Labor Relations)
Court of Appeals would not revisit issue whether professional basketball association and team intro-duced false statements and doctored pictures of head coach's injuries, so as to require vacatur of ar-bitration award upholding player's punishment for physically attacking coach, where such fraud claim had been presented in its entirely to arbitrator and ruled upon by him.

**[9] Labor and Employment 231H €═ 1616**

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)5 Judicial Review and En-
forcement
                231Hk1616 k. Presentation of Objec-
tions in Original Proceeding. Most Cited Cases
    (Formerly 232Ak481 Labor Relations)
Where the fraud or undue means allegedly requir-ing vacatur of a labor arbitration award is not only discoverable, but discovered and brought to the at-tention of the arbitrators, a disappointed party will not be given a second bite at the apple.

**[10] Federal Courts 170B €═ 776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
A dismissal for failure to state a claim is reviewed de novo. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[11] Federal Courts 170B €═ 752**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                    Page 4
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk752 k. Matters or Evidence Considered. Most Cited Cases
Review of a dismissal for failure to state a claim is limited to the contents of the complaint. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

|12| **Federal Civil Procedure 170A** ☞1829

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1829 k. Construction of Pleadings. Most Cited Cases

**Federal Civil Procedure 170A** ☞1835

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
In deciding whether to dismiss for failure to state a claim, a court takes all allegations of material fact as true and construes them in the light most favorable to the nonmoving party. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

|13| **Federal Civil Procedure 170A** ☞1835

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
In deciding whether to dismiss for failure to state a claim, a court need not accept as true allegations

that contradict matters properly subject to judicial notice or by exhibit. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

|14| **Federal Civil Procedure 170A** ☞1835

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
In deciding whether to dismiss for failure to state a claim, a court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

|15| **Federal Civil Procedure 170A** ☞1773

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1773 k. Clear or Certain Nature of Insufficiency. Most Cited Cases
A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

|16| **Civil Rights 78** ☞1395(8)

78 Civil Rights
   78III Federal Remedies in General
      78k1392 Pleading
         78k1395 Particular Causes of Action
            78k1395(8) k. Employment Practices. Most Cited Cases
      (Formerly 78k235(3))
Complaint alleging that professional basketball association and team engaged in racial discrimination in disciplining basketball player for physically at-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                    Page 5
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

tacking his head coach failed to state cause of action under statute guaranteeing equal rights to make and enforce contracts, inasmuch as arbitration award attached to complaint established that disciplinary actions were motivated solely by player's misconduct and not racial discrimination. 42 U.S.C.A. § 1981.

[17] Conspiracy 91 ⇔18

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k18 k. Pleading. Most Cited Cases
Complaint alleging that professional basketball association and team engaged in racial discrimination in disciplining basketball player for physically attacking his head coach failed to state cause of action for conspiracy to deprive of rights or privileges, inasmuch as arbitration award attached to complaint established that disciplinary actions were motivated solely by player's misconduct and not racial discrimination. 42 U.S.C.A. § 1985(3).

[18] Civil Rights 78 ⇔1120

78 Civil Rights
    78II Employment Practices
        78k1120 k. Particular Cases. Most Cited Cases
        (Formerly 78k142)
California's Unruh Civil Rights Act did not apply to any racial discrimination that occurred when professional basketball association and team disciplined player for physically attacking his head coach, inasmuch as player's punishments stemmed from his employment relationship with team and association. West's Ann.Cal.Civ.Code § 51.

[19] Civil Rights 78 ⇔1044

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1044 k. In General. Most Cited Cases

(Formerly 78k119.1)

Civil Rights 78 ⇔1049

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1049 k. Place of Business or Public Resort. Most Cited Cases
            (Formerly 78k123)
In general terms, California's Unruh Civil Rights Act provides that all persons are entitled to free and equal accommodations, privileges, facilities and services in all business establishments, and secures equal access to public accommodations and prohibits discrimination by business establishments. West's Ann.Cal.Civ.Code § 51.

[20] Civil Rights 78 ⇔1103

78 Civil Rights
    78II Employment Practices
        78k1102 Constitutional and Statutory Provisions
            78k1103 k. In General. Most Cited Cases
            (Formerly 78k141)
California's Unruh Civil Rights Act has no application to employment discrimination. West's Ann.Cal.Civ.Code § 51.

[21] Labor and Employment 231H ⇔832

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk828 Procedural Requirements for Adverse Action; Prerequisites
                231Hk832 k. Investigations. Most Cited Cases
            (Formerly 232Ak2 Labor Relations)
Under California law, professional basketball team and association did not violate player's common law right to fair procedure when disciplining him for physically attacking team's head coach, inasmuch as arbitration award attached to player's com-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                              Page 6
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

plaint conclusively demonstrated that association's investigation complied with industrial due process and that player received full and fair hearing.

**[22] Federal Courts 170B ⬤➞794**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)3 Presumptions
            170Bk794 k. Pleadings. Most Cited Cases
The Court of Appeals is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.

**[23] Labor and Employment 231H ⬤➞1967**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(K) Civil Liabilities
         231Hk1967 k. Preemption. Most Cited Cases
   (Formerly 232Ak773.1, 232Ak758.1 Labor Relations)

**States 360 ⬤➞18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In General. Most Cited Cases
A state law claim is preempted by the LMRA when it is substantially dependent on analysis of a collective bargaining agreement (CBA). Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[24] Labor and Employment 231H ⬤➞1967**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(K) Civil Liabilities
         231Hk1967 k. Preemption. Most Cited Cases

   (Formerly 232Ak773.1, 232Ak758.1 Labor Relations)

**States 360 ⬤➞18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In General. Most Cited Cases
If a plaintiff's state law claim cannot be resolved without interpreting the applicable collective bargaining agreement (CBA) it is preempted. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[25] Labor and Employment 231H ⬤➞1967**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(K) Civil Liabilities
         231Hk1967 k. Preemption. Most Cited Cases
   (Formerly 232Ak773.1, 232Ak758.1 Labor Relations)

**States 360 ⬤➞18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In General. Most Cited Cases
The bare fact that a collective bargaining agreement (CBA) will be consulted in the course of state-law litigation does not require that the state claim be extinguished as preempted by the LMRA. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[26] Labor and Employment 231H ⬤➞1967**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(K) Civil Liabilities

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                           Page 7
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

231Hk1967 k. Preemption. Most Cited Cases
(Formerly 232Ak773.1, 232Ak758.1 Labor Relations)

**States 360 ⇐═18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In General. Most Cited Cases
A state-law claim is not preempted by the LMRA merely because the defendant has raised a defense based on the terms of a collective bargaining agreement (CBA). Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[27] Labor and Employment 231H ⇐═913**

231H Labor and Employment
   231HIX Interference with the Employment Relationship
      231Hk912 Procurement of Discharge
         231Hk913 k. In General. Most Cited Cases
   (Formerly 255k341 Master and Servant)

**Torts 379 ⇐═241**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
   (Formerly 379k10(3))

**Torts 379 ⇐═242**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k242 k. Contracts in General. Most Cited Cases

(Formerly 379k10(3))
Under California law, conduct of professional basketball team and association alleged in player's complaint, i.e., instigating media campaign designed to portray player in false and negative light, if proven, constituted "wrongful conduct" upon which claims of intentional interference with contract and business relations could be based.

**[28] Labor and Employment 231H ⇐═902**

231H Labor and Employment
   231HIX Interference with the Employment Relationship
      231Hk902 k. Preemption. Most Cited Cases
   (Formerly 255k341 Master and Servant)

**States 360 ⇐═18.15**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases

**Torts 379 ⇐═203**

379 Torts
   379III Tortious Interference
      379III(A) In General
         379k203 k. Preemption. Most Cited Cases
   (Formerly 379k10(3))
Professional basketball player's California law claims, that team and basketball association intentionally interfered with contract and business relations, through instigating media campaign designed to portray player in false and negative light, were preempted by LMRA to extent they were based upon alleged violations of collective bargaining agreement (CBA), but were not preempted insofar as they were predicated on alleged violations of California law. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[29] Labor and Employment 231H ⇐═902**

231H Labor and Employment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                              Page 8
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

231HIX Interference with the Employment Relationship
    231Hk902 k. Preemption. Most Cited Cases
(Formerly 255k341 Master and Servant)

**States 360 ☞18.15**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.15 k. Particular Cases, Preemption or Supersession. Most Cited Cases

**Torts 379 ☞203**

379 Torts
    379III Tortious Interference
        379III(A) In General
            379k203 k. Preemption. Most Cited Cases
        (Formerly 379k10(3))
Professional basketball team and association would not be able to bring player's California law claims that team and association intentionally interfered with contract and business relations into preemptive scope of LMRA merely by mounting defense in reliance on collective bargaining agreement (CBA), and such conclusion would hold true even if association and team were to allege that player's union bargained away his state law right to contest veracity of statements to media that gave rise to claim. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[30] Antitrust and Trade Regulation 29T ☞ 252**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(D) Particular Relationships
            29Tk252 k. Employer and Employee. Most Cited Cases
    (Formerly 382k862.1 Trade Regulation)
To state claim under California's Unfair Practices Act, professional basketball player was required to demonstrate that team and basketball association

engaged in business practice that was unlawful or unfair. West's Ann.Cal.Bus. & Prof.Code §§ 17200, 17500.

**[31] Conspiracy 91 ☞1.1**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k1 Nature and Elements in General
                91k1.1 k. In General. Most Cited Cases
To sustain claim of civil conspiracy under California law, professional basketball player was required to prove that team and association had committed underlying tort.

**[32] States 360 ☞18.84**

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.83 Trade Regulation; Monopolies
                360k18.84 k. In General. Most Cited Cases

**Antitrust and Trade Regulation 29T ☞132**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and Consumer Protection
        29TIII(A) In General
            29Tk132 k. Preemption. Most Cited Cases
    (Formerly 382k862.1 Trade Regulation)
Professional basketball player's claim under California's Unfair Practices Act was not preempted by LMRA to extent it was premised upon team's and association's alleged instigation of media campaign designed to portray player in false and negative light, rather than being premised upon collective bargaining agreement (CBA). Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; West's Ann.Cal.Bus. & Prof.Code §§ 17200, 17500.

*983 Paul F. Utrecht,Law Offices of Paul F. Utrecht, San Francisco, California, for plaintiff-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                    Page 9
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

appellant Sprewell.

Richard R. Dale, Law Offices of Richard R. Dale, Mill Valley, California for plaintiffs-appellants Thompson, et al.

Jeffrey A. Mishkin (Argued), Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for the defendant-appellees.

Frank Rothman (On the Briefs) and Marie L. Hurabiell (On the Briefs), Skadden, Arps, Slate, Meagher & Flom LLP, Los *984 Angeles, California, for defendant National Basketball Association.

Martin P. Moroski (On the Briefs), Sinsheimer, Schiebelhut & Baggett, San Luis Obispo, California, for the defendants-appellees.

Appeals from the United States District Court for the Northern District of California; Vaughn R. Walker, District Judge, Presiding. D.C. No. CV-98-02053-VRW.

Before: D.W. NELSON, THOMPSON, and TROTT, Circuit Judges.

## ORDER

TROTT, Circuit Judge:

The Opinion filed on November 7, 2000, and reported at 231 F.3d 520 (9th Cir.2000), is withdrawn.

The panel as constituted above has voted to grant the petition for rehearing without further oral argument and to issue a new opinion. With this decision and action, the previous opinion filed November 7, 2000, becomes inoperative, and the pending petition for rehearing en banc becomes moot. The parties, should they so choose, are at liberty to file new petitions with respect to the new opinion.

So ORDERED.

## OPINION

Latrell F. Sprewell ("Sprewell") challenges the district court's dismissal of his claims against the National Basketball Association ("NBA") and the

Golden State Warriors ("the Warriors") pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Fed.R.Civ.P. 12(b)(6)"). Sprewell's attorneys dispute the district court's imposition of sanctions under Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). Sprewell raises numerous state and federal claims challenging the validity of the punishments meted out by the NBA and the Warriors in response to Sprewell's physical attack on the head coach of the Warriors in 1997. The district court dismissed Sprewell's federal claims as frivolous, and found Sprewell's state claims to be preempted by section 301 of the Labor Management Relations Act ("section 301"). We have jurisdiction over this matter pursuant to 28 U.S.C. § 1291. We AFFIRM in part, REVERSE in part, and REMAND.

I

## BACKGROUND

Sprewell joined the NBA in 1992 as a guard for the Golden State Warriors. During Sprewell's tenure with the Warriors, he played under four different head coaches, the last of whom was P.J. Carlesimo. Sprewell's star-crossed relationship with Carlesimo, while amicable upon its inception in June of 1997, quickly deteriorated over the ensuing six months to the point that both Sprewell and the Warriors openly entertained the possibility of trading Sprewell to another team.

Tensions between Sprewell and Carlesimo climaxed during a closed-door practice on December 1, 1997, during which Carlesimo told Sprewell to pass the ball to a teammate for a quick shot. Despite Sprewell's contention that he passed the ball "admirably, as one would expect of an All-Star," Carlesimo rebuked Sprewell for not putting more speed on his pass. When Carlesimo subsequently repeated his criticism, Sprewell slammed the ball down and directed several expletives at Carlesimo. Carlesimo responded with a similar showing of sophistication. Sprewell immediately either walked

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979 Page 10
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA) 1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

or lunged at Carlesimo and wrapped his hands around Carlesimo's neck. With his arms fully extended, Sprewell moved Carlesimo backwards, saying *985 "I will kill you." Carlesimo offered no resistance. Sprewell grasped Carlesimo's neck for approximately seven to ten seconds-the time it took for other players and coaches to restrain Sprewell. Sprewell then left the practice floor, saying "trade me, get me out of here, I will kill you," to which Carlesimo countered, "I am here."

After showering and changing, Sprewell returned to the practice facility to again confront Carlesimo. Despite the efforts of two assistant coaches to restrain him, Sprewell was able to approach Carlesimo and throw an overhand punch that grazed Carlesimo's right cheek. Sprewell landed a subsequent blow to Carlesimo's shoulder, but it is uncertain whether it was intentional or the product of Sprewell's attempt to free himself from those restraining him. As Sprewell left the facility, he again told Carlesimo, "I will kill you."

That evening the Warriors suspended Sprewell for a minimum of ten games and expressly reserved its right to terminate Sprewell's contract. Two days later, the Warriors exercised that right and ended Sprewell's reign as a Warrior. The NBA subsequently issued its own one-year suspension of Sprewell after conducting an independent investigation of the matter.

On December 4, 1997, Sprewell invoked the arbitration provisions of his collective bargaining agreement ("CBA") by filing a grievance challenging both his suspension by the NBA and the Warriors' termination of his contract. The arbitrator held nine days of hearings, received testimony from twenty-one witnesses, accepted over fifty exhibits, and was presented with over 300 pages of pre and post-hearing briefs. The arbitrator found that the dual punishments issued by the NBA and the Warriors were permissible under the CBA, but found that: (1) the Warriors' termination of Sprewell's contract was not supported by just cause because after the Warriors' initial suspension of Sprewell, any resid-

ual interest of the Warriors was absorbed by the NBA's investigation of the matter; and (2) the NBA's suspension should be limited to the 1997-98 season.

On May 20, 1998, Sprewell filed the instant suit. The district court dismissed Sprewell's complaint without prejudice pursuant to Fed.R.Civ.P. 12(b)(6), and instructed Sprewell's counsel to sign any subsequently filed amended complaint in accordance with Rule 11. Failing to heed the admonitions of the district court, Sprewell filed an amended complaint that paralleled the original. The district court found the amended complaint to consist of "the same baseless claims previously dismissed by the court" and ordered Sprewell's attorneys to pay the NBA's and the Warriors' attorneys' fees pursuant to Rule 11. Sprewell asks that we reverse the ruling of the district court.

II

ANALYSIS

In his complaint, Sprewell leveled a multitude of claims against the NBA and the Warriors, including: (1) a request for vacatur of the arbitrator's opinion pursuant to section 301 of the Labor Management Relations Act; (2) intentional interference with freedom to make and enforce contracts pursuant to 42 U.S.C. § 1981; (3) conspiracy to violate freedom to make and enforce contracts pursuant to 42 U.S.C. § 1985(3); (4) conspiracy to interfere with the arbitral process by producing false evidence; (5) violation of common law right to fair procedure; (6) interference with prospective economic advantage; (7) interference with contractual relations; (8) violation of California's Unruh Act; (9) civil conspiracy; and (10) unfair business practices pursuant to *986California Business and Professional Code §§ 17200 and 17500. The NBA and the Warriors maintain that their actions were justified under the CBA and that Sprewell's state law claims fall within the preemptive penumbra of section 301.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                    Page 11
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

**A. Count 1: Vacating the Arbitration Award**

[1] Sprewell seeks to vacate the arbitration award pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185*et seq.* ("section 301"). Section 301 empowers this court to review an arbitration conducted under the terms of a collective bargaining agreement. *See United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

[2] Judicial scrutiny of an arbitrator's decision in a labor dispute "is extremely limited." *Sheet Metal Workers Int'l Ass'n, Local No. 359 v. Arizona Mechanical & Stainless, Inc.,* 863 F.2d 647, 653 (9th Cir.1988). The Supreme Court has instructed that "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). We have followed suit in holding that "so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him, because their interpretation of the contract is different than his." *San Francisco-Oakland Newspaper Guild v. Tribune Pub. Co.,* 407 F.2d 1327, 1327 (9th Cir.1969) (per curiam).

[3] Notwithstanding the foregoing, we have identified four instances in which the vacatur of an arbitration award under section 301 is warranted: (1) when the award does not draw its essence from the collective bargaining agreement; (2) when the arbitrator exceeds the scope of the issues submitted; (3) when the award runs counter to public policy; and (4) when the award is procured by fraud. *See SFIC Properties, Inc. v. International Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94,* 103 F.3d 923, 925 (9th Cir.1996) (internal quotations omitted); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1134 (9th Cir.2000). Sprewell seeks refuge under each of the four exceptions.

**1. The Arbitration Award Draws its Essence from the CBA**

[4] Sprewell contends that the arbitrator's approval of Sprewell's "multiple punishments"-the disciplinary actions taken by *both* the NBA *and* the Warriors in response to Sprewell's misconduct-did not draw its essence from the CBA. The thrust of Sprewell's argument is that the arbitrator improperly ascribed a conjunctive meaning to the word "or" in the CBA provision that subjects players "to disciplinary action for just cause by his Team or by the Commissioner." Sprewell alleges that by failing to read the word "or" in the disjunctive, the arbitrator not only discarded the "plain and unambiguous" language of the CBA, but actually rewrote it. Sprewell additionally argues that the arbitrator's award does not draw its essence from the CBA because "the Arbitrator relied upon the [National Football League's] collective bargaining agreement, which uses different language, i.e., the word 'and' instead of 'or.' " Sprewell's claims are legally untenable.

We have held that an arbitration award will only be set aside for failing to draw its essence from the contract in "those egregious cases in which a court determines that the arbitrator's award ignored the *987 plain language of the contract." *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200, 1205-06 n. 6 (9th Cir.1989). This is not such a case. In the arbitration award, the arbitrator explained in detail the logic underlying his conclusion, including why he read the word "or" in the conjunctive rather than the disjunctive. Specifically, the arbitrator found that: (1) the CBA provision upon which Sprewell relies was not intended to deal with the issue of multiple disciplines, but rather was designed to emphasize "the imperative of just cause in reviewing the matters of discipline"-thus illustrating that the word "or" was likely chosen without careful consideration of its implications; (2) the CBA does not include the word "either," which would have supported the conclusion that the penalties were intended to be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                                                   Page 12
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

mutually exclusive; and (3) as demonstrated by the NFL's CBA, "[h]ad the parties here intended by contract to limit discipline with respect to the same matter to a team or the Commissioner, but not both, one would have expected some expression in the CBA as to which has primacy." Regardless of whether we would reach the same conclusion advanced by the arbitrator, we must defer to the arbitrator's decision on the grounds that he was, at the very least, "arguably construing or applying the contract." *Misco,* 484 U.S. at 38, 108 S.Ct. 364.

**2. The Arbitrator Did Not Exceed the Scope of his Authority**

[5] Sprewell argues that the arbitrator "exceeded the scope of his authority" because he was required either to uphold or to reject the suspension in its entirety. Sprewell does not, however, attempt to cite language-nor is there any-in the CBA supporting this conclusion. The Supreme Court has held that an arbitrator should be given substantial latitude in fashioning a remedy under a CBA. *See Enterprise Wheel,* 363 U.S. at 596-97, 80 S.Ct. 1358. Sprewell has failed to demonstrate why the above rule should not be applied with full vigor in the instant case. Accordingly, we reject Sprewell's contention that the arbitrator exceeded the scope of his authority by fashioning an originative remedy.

**3. The Award Does Not Run Counter to Public Policy**

[6][7] Sprewell alleges that the arbitration award should be vacated on the ground that it contravenes California's public policy against race-discrimination. The crux of Sprewell's argument is that by upholding the dual punishments issued by the NBA and the Warriors, the arbitrator simultaneously spread the virus of racial animus plaguing those penalties. "To vacate an arbitration award on public policy grounds, we must (1) find that 'an explicit, well defined and dominant policy' exists here and (2) that 'the policy is one that specifically mil-

itates against the relief ordered by the arbitrator.' " *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms,* 74 F.3d 169, 174 (9th Cir.1995) (citation omitted). The latter element is dispositive of Sprewell's claim. The arbitrator held that Sprewell's punishments were wholly justified by the language of the CBA and by virtue of the uniquely egregious nature of Sprewell's misconduct. Therefore, Sprewell has failed to demonstrate that the public policy of California militates against the enforcement of the arbitration award.

**4. The Arbitration Award Was Not Procured by Fraud**

[8][9] Finally, Sprewell claims that the NBA and the Warriors tainted the arbitral process by introducing false statements and doctored pictures of Carlesimo's injuries, thus requiring that the award be vacated*988 on account of fraud. This claim can be summarily dismissed under the rule that "where the fraud or undue means is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple." *A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1403 (9th Cir.1992). Sprewell's fraud claim was presented in its entirety to, and ruled upon by, the arbitrator. Thus, we do not find it necessary to revisit this issue.

**B. Sprewell Fails to Plead Facts Sufficient to Sustain His Federal Claims for Racial Discrimination**

[10][11][12][13][14][15] A dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is reviewed *de novo. See Monterey Plaza Hotel, Ltd. v. Local 483,* 215 F.3d 923, 926 (9th Cir.2000). Review is limited to the contents of the complaint. *See Enesco Corp. v. Price/Costco, Inc.,* 146 F.3d 1083, 1085 (9th Cir.1998). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See id.*

\

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                                      Page 13
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. *See Mullis v. United States Bankr.Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987). Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *See Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999).

### 1. Claim II: 42 U.S.C. § 1981

[16] Section 1981 provides, "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." Sprewell contends that he has adequately pleaded that his punishments by the NBA and the Warriors were the product of his race in violation of 42 U.S.C. § 1981. In his complaint he alleged that black NBA players (1) are punished more frequently and severely than white players, and (2) have less favorable termination and compensation clauses in their player contracts. However, the pleading problem in this case arises not from the substance of his averments, but from the rest of his complaint.

In dismissing Sprewell's section 1981 claim, the district court noted that the arbitration award was attached to Sprewell's complaint and that it contained extensive factual allegations that fatally undermined Sprewell's section 1981 claim. Our examination of the pleadings confirms that Sprewell's attachment of the arbitration award to his complaint justified both the district court's consideration in connection with a Rule 12(b)(6) motion of the factual findings contained therein as well as the conclusion the court drew from it. *See Branch v. Tunnell,* 14 F.3d 449, 453-54 (9th Cir.1994) ( "[W]e hold that documents whose contents are alleged in a

complaint and whose authenticity no party questions ... may be considered in ruling on a Rule 12(b)(6) motion to dismiss."). We have held that a plaintiff can-as Sprewell has done here-plead himself out of a claim by including unnecessary details contrary to his claims. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295-96 (9th Cir.1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *cf. Soo Line R.R. v. St. Louis Southwestern Ry., Co.,* 125 F.3d 481, 483 (7th Cir.1997) ("A plaintiff can plead *989 himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts.").

The arbitration award annexed to Sprewell's complaint contains the arbitrator's findings that Sprewell's punishment was justified by virtue of both the "singularity of his misconduct" and the fact that Sprewell attacked his head coach, which the arbitrator found to strike "at the very core of a structure that provides stability for a team and an organized sport." The arbitration award effectively and persuasively fleshes out the fact that the actions taken by the NBA and the Warriors were motivated solely by Sprewell's misconduct and were not, as Sprewell states, the product of America's "fear of the black man's physicality and rage, and the fear and resentment of the black man's success, along with the corresponding anger that the black man is not grateful for what he has been 'given.' "

Sprewell contends that the district court's reliance on the arbitration award was erroneous because the court gave "preclusive effect to the arbitration award" in violation of the Supreme Court's mandate that race discrimination claims not be foreclosed by way of a previous arbitration. *See Alexander v Gardner-Denver Co.,* 415 U.S. 36, 55-60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *see also, Bowers v. Campbell,* 505 F.2d 1155, 1160 (9th Cir.1974). Sprewell's reliance on *Alexander* and its progeny is misplaced. Because the attachments to Sprewell's complaint prove fatal to his claims, we affirm the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                          Page 14
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

district court's disposition of Sprewell's section 1981 cause of action.

## 2. Count III: 42 U.S.C. § 1985(3)

[17] Count III of Sprewell's amended complaint fails to state a claim for racial discrimination under section 1985(3). We have held that "[a]n indispensable element of a claim under 42 U.S.C. § 1985(3) is some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action...." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000) (internal quotations omitted). As explained above, Sprewell pleaded himself out of court by attaching the arbitration award to his complaint. The district court therefore properly concluded that Sprewell failed to adequately plead a claim under section 1985(3).

## C. State Law Claims

Sprewell asserts several state law claims against the NBA and the Warriors, including: (1) violation of California's Unruh Act; (2) violation of his common law right to fair procedure; (3) intentional interference with contract and business relations; (4) civil conspiracy; and (5) violation of California's Unfair Practices Act. We address each claim in turn below.

## 1. Unruh Act

[18][19][20] The district court properly concluded that Sprewell's claim under the Unruh Act is meritless. In general terms, the Unruh Act provides that "all persons are entitled to free and equal accommodations, privileges, facilities and services in all business establishments. It secures equal access to public accommodations and prohibits discrimination by business establishments." *Black v. Dep't of Mental Health*, 83 Cal.App.4th 739, 100 Cal.Rptr.2d 39, 43 (2000). The Unruh Act, however, "has no application to employment discrimination." *Rojo v. Kliger*, 52 Cal.3d 65, 276 Cal.Rptr. 130, 801 P.2d 373, 380 (1990). Sprewell's

punishments stemmed from his employment relationships with the NBA and the Warriors. Sprewell therefore has failed to plead facts sufficient to invoke the protections afforded by California's Unruh Act.

## *990 2. Common law right to fair procedure

[21][22] Sprewell contends that the NBA and the Warriors violated his common law right to fair procedure by failing to give him adequate notice that they were "considering the imposition of discipline before he was disciplined and he was not given an opportunity to be heard about the appropriateness of discipline." The arbitration award attached to Sprewell's complaint conclusively demonstrates that the NBA's investigation "complied with industrial due process" and that Sprewell received a full and fair hearing. Because "we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," *Steckman*, 143 F.3d at 1295-96, we reject Sprewell's fair procedure claim.

## 3. Intentional Interference with Contract and Business Relations

Sprewell alleges that the NBA and the Warriors intentionally interfered with his contractual and business relationships with third parties. To prevail on these claims, Sprewell states he must prove that the NBA and the Warriors engaged in *wrongful conduct* designed to interfere or disrupt an economic relationship between himself and a third party. The "wrongful conduct" alleged by Sprewell to have interfered with his economic relationships was the NBA's and the Warriors' instigation of a negative and false media campaign "intended to vilify Mr. Sprewell and prevent him from making and enforcing contracts with others because of his race." The district court concluded that it could not determine whether the media communications of the NBA and the Warriors were "wrongful" without interpreting the CBA, and therefore dismissed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                Page 15
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

Sprewell's interference claims as being preempted by section 301. Sprewell challenges this conclusion by the district court.

[23][24][25][26] We begin our analysis by reviewing the section 301 preemption doctrine. The Supreme Court has held that federal law exclusively governs suits for breach of a CBA, while concomitantly preempting state law claims predicated on such agreements. *See Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). The Court has expanded the preemptive reach of section 301 beyond contract claims, holding that section 301 "also preempts tort claims which, 'as applied, would frustrate the federal labor-contract scheme established in § 301.' " *Bale v. Gen'l Tel. Co. of California,* 795 F.2d 775, 779 (9th Cir.1986) (quoting *Allis-Chalmers,* 471 U.S. at 209, 105 S.Ct. 1904). A state law claim is preempted by section 301 when it is "substantially dependent" on analysis of a CBA. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (internal quotations omitted); *see also Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 409-10, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Stated alternatively, "[i]f the plaintiff's claim cannot be resolved without interpreting the applicable CBA ... it is preempted." *Cramer v. Consolidated Freightways, Inc.,* 255 F.3d 683, 691 (9th Cir.2001); *amended* August 27, 2001 (en banc). "[T]he bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation," however, does not require that the state-claim be extinguished. *See Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). Nor is a state-law claim preempted merely because the defendant has raised a defense based on the terms of a CBA. *See Cramer,* 255 F.3d at 688-89.

The NBA and the Warriors argue that Sprewell's interference claims are "substantially*991 dependent" on analysis of the CBA, and therefore were properly dismissed by the district court pursuant to section 301. The NBA and the Warriors premise this argument on the assumption that the district court could not have determined whether the NBA's and the Warriors' media communications about Sprewell constituted "wrongful conduct" without first ascertaining whether such communications were prohibited by the CBA. As stated by the district court:

[Sprewell's] interference claims are predicated upon the alleged impropriety of his suspension and contract termination and defendants' alleged conduct in connection therewith. These subjects are within the scope of the CBA's grievance and arbitration provisions. In order to adjudicate these claims, the court would be required to determine what types of media communications are authorized in connection with the prosecution of an arbitration and the administration of player discipline. Defendants' statements with respect to plaintiff's discipline are central rather than tangential to the rights and procedures provided under the [CBA].

[27] The NBA and the Warriors, like the district court, labor under the mistaken assumption that their statements to the media can *only* be deemed "wrongful" for purposes of Sprewell's interference claims if such communications are prohibited by the CBA. This premise is belied by California law. The phrase "wrongful conduct" has been defined by California courts as encompassing "unethical business practices" such as defamation. *See PMC, Inc. v. Saban Entm't, Inc.,* 45 Cal.App.4th 579, 52 Cal.Rptr.2d 877, 891 (1996) ("Defendant's liability may arise from improper motives or from the use of improper means. [The defendant's actions] may be wrongful by reason of a statute or other regulation, or a recognized rule of common law or perhaps an established standard of a trade or profession. Commonly included among improper means are actions which are independently actionable, violations of federal or state law or unethical business practices, e.g., ... misrepresentation, ... defamation ...." (internal quotations omitted)). The conduct of the NBA and the Warriors alleged by Sprewell to have interfered with his economic relationships-i.e., the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                           Page 16
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA)
1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

instigation of a media campaign designed to portray Sprewell "in a false and negative light"-clearly falls within this definition. Accordingly, the alleged actions of the NBA and the Warriors, if proven true, would qualify as "wrongful conduct" under California law independent of the rights and responsibilities set forth in the CBA.

[28] Therefore, to the extent Sprewell's interference claims are based upon alleged violations of the CBA, the district court properly dismissed those claims. That is, any allegation by Sprewell that the NBA's and the Warriors' alleged media communications were "wrongful" because they violated the CBA would necessarily require an interpretation of that agreement, and thus would be preempted by section 301. Insofar as Sprewell's interference claims are predicated on the NBA's and the Warriors' alleged violations of California law, however, those claims can "be litigated without reference to the rights and duties established in a CBA," and therefore are *not* preempted by section 301. *Cramer,* 255 F.3d at 691.

[29] Any attempt by the NBA and the Warriors to pull Sprewell's interference claims into the preemptive scope of section 301 by mounting a defense in reliance on the CBA would be fruitless. This conclusion is compelled by our recent en banc opinion in *Cramer,* in which we held that "[t]he plaintiff's claim is the touchstone for this analysis; the need to interpret the *992 CBA must inhere in the nature of the plaintiff's claim. If the claim is plainly based on state law, *§ 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense.*" *Id.* (emphasis added). This conclusion would hold true even if the NBA and the Warriors were to allege that Sprewell's union bargained away his state law right to contest the veracity of the NBA's and the Warriors' statements to the media. We have previously held that "[w]here a party defends a state cause of action on the ground that the plaintiff's union has bargained away the state law right at issue, the CBA must include clear and unmistakable language

waiving the covered employees' state right for a court even to consider whether it could be given effect." *Id.* at 692 (internal quotations omitted). The NBA and the Warriors have failed to cite *any* language, let alone "clear and unmistakable language," in the CBA waiving Sprewell's state law right to assert intentional interference claims against the NBA and the Warriors.

Finally, Sprewell has not pled himself out of his intentional interference claims by attaching the arbitration award to his complaint. The arbitration award does not address in any way the media communications engaged in by the NBA and the Warriors following Sprewell's suspension, and therefore does not contradict the allegations of intentional interference pled in Sprewell's complaint.

We conclude that to the extent Sprewell's claims of intentional interference are premised on the NBA's and the Warriors' alleged violations of California state law, the district court erred in dismissing those claims.

### 4. Unfair Practices Act and Civil Conspiracy

[30][31] To state a claim under the Unfair Practices Act, Sprewell must demonstrate that the NBA and the Warriors engaged in a business practice that was unlawful or unfair. *See*CAL. BUS. & PROF. CODE §§ 17200*et. seq.* (West 2000); *Klein v. Earth Elements, Inc.,* 59 Cal.App.4th 965, 69 Cal.Rptr.2d 623, 626 (1997). Similarly, to sustain a claim of civil conspiracy, Sprewell must prove that the NBA and the Warriors have committed an underlying tort. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454, 457 (Cal.1994) (holding that conspiracy is not a legal cause of action independent of underlying tort). The alleged unlawful acts of the NBA and the Warriors cited by Sprewell in support of his claims for unfair business practices and civil conspiracy include, *inter alia,* intentional interference with contract and business relations.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

266 F.3d 979                                                                                  Page 17
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA) 1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

[32] The district court concluded that Sprewell's unfair business practices claims were preempted by section 301, stating that each allegation requires an interpretation of the disciplinary provisions of the CBA. As noted above, however, Sprewell's intentional interference claims do not necessarily require an interpretation of the CBA. Therefore, Sprewell's claim under California's Unfair Practices Act is not preempted to the extent it is premised on the NBA's and the Warriors' instigation of a media campaign designed to portray Sprewell "in a false and negative light."

The district court dismissed Sprewell's civil conspiracy claim after concluding that Sprewell had failed to successfully allege any underlying tort committed by the NBA and the Warriors. Because we conclude that Sprewell's intentional interference claims survive the NBA's and the Warrior's motions to dismiss, we reverse the district court's dismissal of Sprewell's claim for civil conspiracy.

*993 D. Sanctions

We remand the issue of sanctions to the district court for further consideration in light of this opinion.

III

CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Sprewell's claims alleging violations of section 301, section 1981, section 1985(3), the Unruh Act, and his common law right to fair procedure. We REVERSE, however, the district court's dismissal of Sprewell's state law claims for intentional interference with contract, intentional interference with business relations, civil conspiracy, and unfair business practices, and REMAND this case for further proceedings. The parties shall bear their own costs on appeal.

C.A.9 (Cal.),2001.
Sprewell v. Golden State Warriors
266 F.3d 979, 168 L.R.R.M. (BNA) 2225, 86 Fair Empl.Prac.Cas. (BNA) 1121, 87 Fair Empl.Prac.Cas. (BNA) 1844, 144 Lab.Cas. P 11,115, 01 Cal. Daily Op. Serv. 8123, 2001 Daily Journal D.A.R. 10,021

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Westlaw.

825 F.2d 257                                                                                    Page 1
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

▷
Wheeler v. Hurdman
C.A.10 (Colo.),1987.

United States Court of Appeals,Tenth Circuit.
Marilyn WHEELER, Plaintiff-Appellee,
v.
Main HURDMAN, Defendant-Appellant.
No. 85-2601.

July 27, 1987.

Dismissed general partner brought suit under various federal antidiscrimination laws against accounting firm, which moved to dismiss. Treating motion as one for summary judgment, the United States District Court for the District of Colorado, Jim R. Carrigan, J., denied motion and certified question for immediate appeal. The Court of Appeals, Stephen H. Anderson, Circuit Judge, held that: (1) motion was appropriately characterized, and (2) partner was not "employee" entitled to bring suit under Title VII, Age Discrimination in Employment Act, or Equal Pay Act.

Reversed and remanded.

West Headnotes

|1| Federal Civil Procedure 170A ⬤⟹2533.1

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2533 Motion
170Ak2533.1 k. In General. Most Cited Cases
(Formerly 170Ak2533)
Motion to dismiss for lack of subject matter jurisdiction cannot generally be converted into motion for summary judgment, except if jurisdictional question is "intertwined" with merits of case, i.e., subject matter jurisdiction is dependent upon same statute which provides substantive claim in case.

Fed.Rules Civ.Proc.Rules 12(b)(1, 6), 56, 28 U.S.C.A.

|2| Federal Civil Procedure 170A ⬤⟹2533.1

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2533 Motion
170Ak2533.1 k. In General. Most Cited Cases
(Formerly 170Ak2533)
In suit under federal antidiscrimination laws, defendant's motion to dismiss for want of subject matter jurisdiction was appropriately characterized as motion for summary judgment; determination of whether plaintiff qualified as "employee" under those statutes was both jurisdictional question and aspect of her substantive claim, and both parties submitted additional evidence beyond pleadings which was relied on by district court. Fed.Rules Civ.Proc.Rules 12(b)(1, 6), 56, 28 U.S.C.A.; Civil Rights Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f); Age Discrimination in Employment Act of 1967, § 11(f), 29 U.S.C.A. § 630(f); Fair Labor Standards Act of 1938, § 3(e)(1), as amended, 29 U.S.C.A. § 203(e)(1).

|3| Federal Courts 170B ⬤⟹776

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)I In General
170Bk776 k. Trial De Novo. Most Cited Cases

Federal Courts 170B ⬤⟹802

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)3 Presumptions
170Bk802 k. Summary Judgment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                               Page 2
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

Most Cited Cases
In reviewing district court's grant or denial of sum-
mary judgment, Court of Appeals applies de novo
standard of review to legal determinations and its
view of facts must generally indulge all reasonable
inferences in favor of opposing party.

[4] Civil Rights 78 ⬅═1004

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1002 Constitutional and Statutory Provi-
sions
            78k1004 k. Purpose and Construction in
General. Most Cited Cases
    (Formerly 78k102.1, 78k102, 78k2)
In review of antidiscrimination laws, Court of Ap-
peals must be mindful of their remedial purposes
and must liberally interpret their provisions to that
end, though interpretation cannot be used as justi-
fication for rewriting statutes.

[5] Civil Rights 78 ⬅═1110

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1110 k. Nature and Existence of Em-
ployment Relationship. Most Cited Cases
    (Formerly 78k169, 78k9.15, 78k143, 78k9.10)

Labor and Employment 231H ⬅═2458

231H Labor and Employment
    231HXIII Wages and Hours
        231HXIII(C) Equal Pay
            231Hk2458 k. Persons and Employments
Within Regulations. Most Cited Cases
    (Formerly 232Ak1333 Labor Relations)
Bona fide general partner in accounting firm was
not "employee" entitled to sue under Title VII, Age
Discrimination in Employment Act, or Equal Pay
Act; control and economic realities tests framed by
employee and EEOC ignored or unacceptably di-
minished essential attributes of partnership and

were incapable of rational application, and suscept-
ibility to discrimination did not define coverage un-
der federal antidiscrimination laws. Civil Rights
Act of 1964, § 701(f), 42 U.S.C.A. § 2000e(f); Age
Discrimination in Employment Act of 1967, §
11(f), 29 U.S.C.A. § 630(f); Fair Labor Standards
Act of 1938, § 3(e)(1), as amended, 29 U.S.C.A. §
203(e)(1).

*258 Tim Correll (Mark P. Field, with him, on
brief), The Correll Law Offices, P.C., Denver,
Colo., for plaintiff-appellee.
Jacques M. Wood, Berkman Ruslander Pohl Lieber
& Engel (Jim Clark, Baker & Hostetler, George W.
Mueller, Burns, Wall, Smith & Mueller, with him,
on briefs), Denver, Colo., for defendant-appellant.
Vella M. Fink (Johnny J. Butler and Gwendolyn
Young Reams, with her on briefs), Washington,
D.C., for amicus curiae E.E.O.C.

Before BARRETT, LOGAN and ANDERSON, Cir-
cuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.
This appeal pursuant to 28 U.S.C. § 1292(b)
presents a single substantive issue: whether federal
antidiscrimination laws protecting employees ap-
plied to the plaintiff, Marilyn Wheeler, during the
time she was a general partner of the accounting
firm of Main Hurdman, a general partnership.

Marilyn Wheeler, a certified public accountant, was
employed as an accountant by Main Hurdman, in
progressively responsible positions, for nine years,
following which she was made a partner in the
firm. Seventeen months later, at age forty-seven,
she was expelled from the firm. She sued Main
Hurdman alleging that the partnership discrimin-
ated against her in compensation and work assign-
ments, and expelled her because of her age or sex,
in violation of: Title VII of the Civil Rights Act of
1964, ("Title VII") 42 U.S.C. §§ 2000e to
2000e-17; the Age Discrimination in Employment
Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634; and
the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d), a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                          Page 3
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

subpart of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219.[FN1]

> FN1. For convenience these statutes are sometimes collectively referred to herein as the Acts or the Antidiscrimination Acts, laws, or statutes.

Main Hurdman moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b) and 12(h)(3), for want of subject matter jurisdiction. It alleged that Wheeler's complaint did not state a claim under Title VII, the ADEA, or the Equal Pay Act "because as a partner of the Firm she was not an employee" within the definitions of those Acts. The motion was treated as one for summary judgment by the district court because affidavits were submitted, and was denied. In its order denying the motion the district court concluded that although a partner, Wheeler was also an employee for purposes of each of the Acts. It stated that it was bound by *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961), to apply an "economic realities" test which, in turn, dictated the conclusion reached. The court then certified the question of coverage of the Acts for immediate appeal pursuant to 28 U.S.C. § 1292(b), as a controlling question of law as to which there is substantial ground for difference of opinion.[FN2] We reverse.

> FN2. On appeal, the United States Equal Employment Opportunity Commission ("EEOC") was granted permission to appear as Amicus Curiae. It has filed a brief and orally argued the case.

## NATURE OF THE MOTION UNDER REVIEW

[1] As a preliminary matter, this court must decide whether it was appropriate for the district court to "convert" the defendant's motion to dismiss into a motion for summary judgment.[FN3] Main Hurdman asserts that its motion was a Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and that it was inappropriate*259 to convert it into a motion for summary judgment absent no-

tice to the parties.

> FN3. The district court stated that "[b]ecause both parties have submitted affidavits in support of their positions, I will treat the defendant's motion as one for summary judgment under Fed.R.Civ.P. 56." *Wheeler v. Main Hurdman*, Civ. No. 85-C-163, slip. op. at 1 (D.Colo. Aug. 13, 1985).

The appellant's motion does appear to be a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[FN4] As a general rule, a 12(b)(1) motion cannot be converted into a motion for summary judgment under Rule 56. *Nichols v. United States*, 796 F.2d 361, 366 (10th Cir.1986) (quoting 5 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1366 (Supp.1986)). *See also Crawford v. United States*, 796 F.2d 924 (7th Cir.1986); *Stanley v. CIA*, 639 F.2d 1146, 1157-58 (5th Cir. Unit B Mar. 1981).[FN5] There is, however, a widely recognized exception to this rule. If the jurisdictional question is intertwined with the merits of the case, the issue should be resolved under 12(b)(6) or Rule 56. *Timberlane v. Bank of America*, 749 F.2d 1378 (9th Cir.1984) ("*Timberlane II*"); *Sun Valley Gas*, 711 F.2d at 139; *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982); *Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 733 (11th Cir.1982); *Black v. Payne*, 591 F.2d 83, 86 n. 1 (9th Cir.1979); *see also* J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07[2.-1] at 12-51 (1986).

> FN4. Main Hurdman's Motion to Dismiss states: "[P]ursuant to Rules 12(b) and 12(h)(3) of the Federal Rules of Civil Procedure, [the defendant] moves this Court to dismiss the Complaint filed in this action for lack of subject matter jurisdiction...." Defendant's Motion to Dismiss at 1.

> FN5. Unlike the strict limitations under 12(b)(6) against considering matters outside the complaint, a 12(b)(1) motion is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                    Page 4
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

considered a "speaking motion" and can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion. *Crawford v. United States,* 796 F.2d 924 (7th Cir.1986); *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986); *Indium Corp. of America v. Semi-Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985); *Sun Valley Gas v. Ernst Enterprises, Inc.,* 711 F.2d 138, 139 (9th Cir.1983); *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982); *Timberlane v. Bank of America,* 549 F.2d 597, 601-03 (9th Cir.1976) ("*Timberlane I* "). A court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts under 12(b)(1). Frequently, courts look to Rule 56 for guidance in ruling upon evidentiary matters under 12(b)(1). *Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1131 (2nd Cir.1976). The primary difference is not in the procedures used but in the effect the ruling will have upon the parties: a dismissal under 12(b)(1) allows for the possibility of repleading the action to bring it within the subject matter jurisdiction of the court. A grant of summary judgment resolves the issue on the merits and thus is with prejudice. *Indium,* 781 F.2d at 883; J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07[2.-1] (1986).

When subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined. *Clark v. Tarrant County,* 798 F.2d 736, 742 (5th Cir.1986) (Title VII) (determination of whether defendant was an "employer"); *Timberlane II,* 749 F.2d at 1381-82; *Sun Valley Gas,* 711 F.2d at 139; *Timberlane I,* 549 F.2d at 602; *McConnell v. Frank Howard Allen & Co.,* 574 F.Supp. 781, 783-84 (N.D.Cal.1983). Courts have invoked this rule when subject matter jurisdiction has turned on

whether a particular investment was a "security" under the federal securities statutes. *Odom v. Slavik,* 703 F.2d 212, 215-16 (6th Cir.1983); *Mason v. Unkeless,* 618 F.2d 597, 598 (9th Cir.1980); *Smith v. Gross,* 604 F.2d 639, 641 (9th Cir.1979); *Black v. Payne,* 591 F.2d 83 (9th Cir.1979); *Roark v. Belvedere, Ltd.,* 633 F.Supp. 765, 770 (S.D.Ohio 1985); *McConnell,* 574 F.Supp. at 783-84.

[2] We find that the determination of whether Wheeler qualifies as an employee under the federal discrimination statutes is both a jurisdictional question and an aspect of the substantive claim in her discrimination action. Since both parties have submitted additional evidence beyond the pleadings, and since the district court relied on this information, the motion was appropriately characterized as a motion for summary judgment.

Main Hurdman argues that it was not given the notice to which it was entitled prior to the court converting and ruling on the motion as a motion for summary judgment. The Tenth Circuit does require notice under such circumstances to prevent "unfair surprise." *260Nichols,* 796 F.2d at 364. In this case, however, there is no unfair surprise. Both parties submitted material beyond the pleadings. We have previously held that when a party submits material beyond the pleadings in support of or opposing a motion to dismiss, the prior action on the part of the parties puts them on notice that the judge may treat the motion as a Rule 56 motion. *Id.* The fact that Main Hurdman characterizes its motion as a Rule 12(b)(1) motion does not change our analysis. Main Hurdman identified its motion only as a 12(b) motion without specifying a particular subsection. Although the motion was made on the ground that there was a lack of subject matter jurisdiction, it was also based on the ground that Wheeler "does not and cannot state a claim" upon which relief could be granted. Main Hurdman's Motion to Dismiss at ¶¶ 8, 10, 12. Under these circumstances, it was appropriate for the court to consider the motion as a motion in the alternative under 12(b)(1) and 12(b)(6) and to convert the motion to a Rule 56

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                 Page 5
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

motion when extraneous evidence was submitted in the form of affidavits by both parties. We find that it was not error for the district court to convert the motion and we will review it as a motion for summary judgment.

## STANDARD OF REVIEW

[3] In reviewing a district court's grant or denial of summary judgment, we apply a *de novo* standard of review to legal determinations. *See Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir.1987); *see also Hydro Conduit Corp. v. American-First Title & Trust Co.*, 808 F.2d 712, 714 (10th Cir.1986) ("When a district court has granted summary judgment, the court of appeals applies a de novo standard of review."); *Baker v. Penn Mutual Life Ins. Co.*, 788 F.2d 650, 653 (10th Cir.1986); *Morgan v. Mobil Oil Corp.*, 726 F.2d 1474, 1477 (10th Cir.1984). As for allegations of fact by the parties, the general rule is that our view of the facts must indulge all reasonable inferences in favor of the party opposing a motion for summary judgment. *Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir.1986); *Baker*, 788 F.2d at 653; *Lindley v. Amoco Prod Co.*, 639 F.2d 671, 672 (10th Cir.1981). In this case, the essential facts governing our disposition on appeal (as opposed to how those facts are characterized or legal conclusions argued from them by the parties) are uncontested.

## BACKGROUND

Wheeler's credentials, including professional activities and affiliations, are substantial. Her employment experience with Main Hurdman was characterized by steady advancement as an employee-accountant. She was made a partner of Main Hurdman in April 1982. At that time approximately 14%, or 502 of Main Hurdman's 3570 personnel were partners.

Partnership consisted at least of the following: election to the partnership and execution of the Firm's partnership agreement; [FN6] change in compensa-

tion from salary to a share of the Firm's profits, paid by draw and an allocation of profits based on points; a contribution to capital; establishment of a capital account; unlimited personal liability for the debts and obligations of the partnership; rights under the partnership agreement to vote on such matters as amendments of the partnership agreement, approval of mergers with other accounting firms of a certain size, admission of new partners, termination of a partner's interest, approval of draws, shares of net profits, special distributions, and any other income to be allocated to any partners, and dissolution of the firm. In addition, Wheeler became eligible for certain rights and privileges which were enjoyed only by partners of the firm, such as the right to sign audit reports and tax returns and the right to be reimbursed for membership dues in certain clubs; [FN7] and, she was subject to *261 involuntary termination of her interest in the partnership only by either: (1) a unanimous vote of the firm's policy board, or (2) an affirmative vote of no less than 75% of the members of the firm's advisory board, or (3) an affirmative vote of no less than 75% of all partners casting votes. Furthermore, by becoming a partner Wheeler surrendered certain employee benefits including prepaid health insurance and life insurance.

> FN6. The partnership agreement is not included in the record, but various of its terms are referred to by the parties in their affidavits, and are argued at length in the briefs.

> FN7. There is a conflict in the affidavits on these particulars. Wheeler asserts that she signed tax returns and was reimbursed for certain club dues while still an employee.

Wheeler and the EEOC effectively concede that under laws governing partnerships Wheeler was a bona fide and general partner of Main Hurdman. They similarly concede that Main Hurdman is a bona fide general partnership. It is undisputed that the foregoing facts relating to Wheeler's admission to partnership are not a sham, and have legal sub-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                              Page 6
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

stance. Consonant with those facts, there is no allegation that Wheeler was made a partner, or denominated as such and was continued in that status, as a device for avoiding the Acts in question.

However, Wheeler and the EEOC, while not contesting Wheeler's partnership status, point to other facts which they contend portray the economic reality of employee status co-existing with partner status. After being made a partner Wheeler's work remained unchanged. She had the same client load, same duties and responsibilities, same support staff, and was supervised in her work and work assignments, by the same department head. A personnel file was maintained with respect to her and all other personnel, including partners. The amounts charged for her services were established by managing partners. The number of partnership points allocated to her for income purposes was, as a practical matter, determined by the managing partner of her office.FN8 Also as a practical matter, a recommendation by the same managing partner that she or any other partner of that office be expelled from the partnership was the final word, since such recommendations, according to Wheeler, were routinely adopted and appeals of such decisions pursuant to terms of the partnership agreement were unavailing. Wheeler Aff. para. 14.

> FN8. With respect to compensation, partners received a guaranteed draw plus an allocation of profits. The profits are allocated through a process of point distribution. The managing partner and policy board first decide on the amount of points to be allocated to each local office; this decision is ratified by the partners at the annual meeting. The regional or local partner in charge then allocates points to each individual partner, in part according to the number of clients he or she managed. The allocation of points to individuals is not reviewed by other partners. Therefore, according to Wheeler, "the local partner in charge has direct control over the amount

of compensation to be paid ... to 'partners.' " Wheeler Aff. para. 11.

Wheeler and the EEOC also emphasize that Main Hurdman is a large firm, with eighty offices nationwide. They portray it as a highly organized, centrally managed, business institution of indefinite and ongoing duration; in other words, it looks like a corporation. The operating structure of the partnership, within which Wheeler functioned, is set forth on an exhibit to Wheeler's affidavit in the district court. That exhibit shows the partners of Main Hurdman as the governing body, below which is a policy board and an advisory board to which partners are elected. Below those two boards there is a managing partner/CEO and a chairman who, presumably, are responsible for the day-to-day operations of the partnership. Thereafter, there appear on the organizational chart a myriad of assignments, including international, marketing, human resources, management consulting, professional standards, tax services, finance, and so on. The chart also shows a partner in charge of operations and under that partner six geographical regions with a partner in charge of each. Within each region the location of Main Hurdman offices is identified, with a local "partner in charge" of each office. The local partner in charge oversees assignment of department heads, allocation of partner credit for client hours managed, the establishment of performance goals for all personnel, assignment of CPAs to clients, the amount to be charged for services, and the hours, dates and places when and where work is to be performed. It is contended that although each partner is *262 entitled to vote at annual or special meetings, the votes are primarily for the purpose of ratifying decisions made by the managing partner, policy board or "nominating" committee.

Finally, Wheeler and the EEOC make much of the fact that as a partner Wheeler's initial contribution to capital was just $4,000, representing only a .000058 share of the firm's total capital account.FN9 It is also a fact, however, that thirteen months later Wheeler signed a letter of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                 Page 7
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

"withdrawal" from the partnership in which reference was made to her capital account containing a minimum of $15,000 plus an unspecified additional balance, plus additional profit allocations to be determined twelve months from the date of termination-all of which was to be paid to Wheeler as a terminating general partner. West Aff., Ex. B. Thus, whatever the true percentage of Wheeler's partnership interest, it translated into sums of money which were not insignificant.

> FN9. There is a factual dispute on the question of capital contribution which we do not pursue, given the applicable standard of review here.

In April 1983, one year after being made a partner, Wheeler was informed by Richard West, Manager of the Denver office, that she would be severed from the Firm as of September 30 of that year. A letter of "withdrawal" signed by West and Wheeler set forth certain financial and other terms relating to the severance, all of which apparently were honored by the parties. Official severance occurred on September 30, 1983. Following expulsion, Wheeler filed, in January 1984, a charge of discrimination with the EEOC. On October 22, 1984, the EEOC issued to Wheeler a Notice of Right to Sue. This suit, filed on January 22, 1985, followed.

## I.

### GENERAL STANDARDS GOVERNING REVIEW OF ANTIDISCRIMINATION ACTS

[4][5] In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end. *Martinez v. Orr,* 738 F.2d 1107, 1110 (10th Cir.1984) (Title VII) (quoting *Davis v. Valley Distributing Co.,* 522 F.2d 827, 832 (9th Cir.1975), *cert. denied,*429 U.S. 1090, 97 S.Ct. 1099, 51 L.Ed.2d 535 (1977)); *see also Owens v. Rush,* 636 F.2d 283, 287 (10th Cir.1980) (Title VII). Such interpretation,

however, cannot be used as a justification for rewriting the statutes. Legislative ends are circumscribed by statutory means. Thus, while the case before us deals with a charge of discrimination, the root of our inquiry is one of statutory interpretation.

## II.

### PARTNER AS COVERED EMPLOYEE UNDER THE ANTIDISCRIMINATION ACTS

*A. The Controlling Statutory Language.*

Title VII provides:

(a) It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The language of the ADEA is nearly identical.[FN10] The Equal *263 Pay Act of the FLSA, 29 U.S.C. § 206(d)(1) provides:

> FN10. 29 U.S.C. § 623(a) provides:
>
> It shall be unlawful for an employer-
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, be-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                 Page 8
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

cause of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

The statutory definition of employee under each of these Acts is virtually identical,[FN11] and circular in its description. Title VII defines employee as "an individual employed by an employer." It defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). The ADEA definition is identical except that it requires an employer to employ twenty or more employees. See 29 U.S.C. § 630(b). The definition of employer under the FLSA is equally circular: " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Under each act, a "person" is defined to include partnerships. 29 U.S.C. § 203(a); 29 U.S.C. § 630(a); 42 U.S.C. § 2000e(a).[FN12]

> FN11. There are only minor variations among the statutes. See 42 U.S.C. § 2000e(f) (Title VII) ("an individual employed by an employer"); 29 U.S.C. §

630(f) (ADEA) ("an individual employed by any employer"); 29 U.S.C. § 203(e)(1) (FLSA) ("any individual employed by an employer").

> FN12. There is no dispute that Main Hurdman is an employer under the Acts.

All parties acknowledge that nothing in the legislative history of these Acts explicitly addresses the definition of employee.[FN13] In general, cases construing definitions of one of the Acts are to be viewed as persuasive authority when interpreting the others. See Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); Hyland v. New Haven Radiology Assocs., 794 F.2d 793 (2nd . Cir.1986).

> FN13. Senator Hugo Black stated during debates on the FLSA that the term "employee" in the Act was given the "broadest definition that has ever been included in any one Act." (81 Cong.Rec. 7657 (1938) (quoted in United States v. Rosenwasser, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 296 n. 3, 89 L.Ed. 301 (1945)). During the Senate debate on Title VII, Senator Joseph Clark of Pennsylvania stated that the term "employer" was "intended to have its common dictionary meaning except as qualified by the Act." 110 Cong.Rec. 7216 (daily ed., Apr. 8, 1964). In Hishon v. King & Spaulding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Supreme Court referred to Senator Cotton's colorful comment that selecting a partner was like selecting a spouse. The Court observed that "it is unclear to what extent Congress shared his concerns about selecting partners" but "[i]n any event, his views hardly conflict with our narrow holding today...." Id. at 78-79 n. 10, 104 S.Ct. at 2235 n. 10.

B. Judicial and Agency Postures.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                    Page 9
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

1. *Judicial Interpretation.*

To date, courts have shown no disposition to extend
these statutory employee protections to general
partners.[FN14] The most widely recognized recent
case is *Hishon v. King & Spaulding,* 678 F.2d 1022
(11th Cir.1982), *rev'd on other grounds,*\*264 467
U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).
That case involved a Title VII claim asserted by a
female lawyer-associate with respect to her firm's
alleged refusal to consider her for partnership. In
reversing the Eleventh Circuit the Supreme Court
concluded "that in appropriate circumstances part-
nership consideration may qualify as a term, condi-
tion, or privilege of a person's employment" for
purposes of Title VII coverage. *Hishon,* 467 U.S. at
78 n. 10, 104 S.Ct. at 2235 n. 10. However, the
Court did not reach the question of application of
Title VII to partners themselves. Thus, the views of
the Eleventh Circuit on that subject remain as stated
in its opinion in *Hishon.* There, the circuit court
expressed reluctance to equate partners with em-
ployees, stating "the partners own the partnership;
they are not its 'employees' under Title VII. We
find a clear distinction between employees of a cor-
poration and partners of a law firm." *Hishon,* 678
F.2d at 1028.

> FN14. Both Wheeler and the EEOC place
> heavy reliance on *EEOC v. Peat, Marwick,
> Mitchell & Co.,* 775 F.2d 928 (8th
> Cir.1985), *cert. denied,*475 U.S. 1046, 106
> S.Ct. 1263, 89 L.Ed.2d 572 (1986). We do
> not read similar import and meaning into
> that decision. The holding permitted· en-
> forcement of an EEOC subpoena issued to
> a partnership to investigate whether part-
> ners were employees for purposes of the
> ADEA. But the court was obviously focus-
> ing on the preliminary and procedural, not
> substantive, aspects of the matter. The law
> being examined was that pertaining to sub-
> poena enforcement, not the ADEA. The
> court made clear that: "It can no longer be
> disputed that 'a subpoena enforcement pro-

ceeding is not the proper forum in which to
litigate the question of coverage under a
particular federal statute.' " *Id.* at 930
(quoting *Donovan v. Shaw,* 668 F.2d 985,
989 (8th Cir.1982)).

The Seventh Circuit expressed similar views in
*Burke v. Friedman,* 556 F.2d 867 (7th Cir.1977),
which involved an accounting firm. The question in
*Burke* was whether individual partners of the part-
nership could be counted as employees for purposes
of the fifteen-employee minimum for Title VII cov-
erage. The Seventh Circuit held they could not, un-
der the facts of that case. In reaching its holding,
the court said:

Partners manage and control the business and share
in the profits and losses. *See Commissioner of In-
ternal Revenue v. Tower,* 327 U.S. 280, 66 S.Ct.
532, 90 L.Ed. 670 (1946); *Wilson v. Commissioner
of Internal Revenue,* 161 F.2d 661, 664 (7th
Cir.1947). In light of the foregoing, we do not see
how partners can be regarded as employees rather
than as employers who own and manage the opera-
tion of the business.

[Section] 2000e(f) does not expand the definition of
employee to include a partner.

*Id.* at 869-70 (footnote omitted).

The reasoning in *Burke* was reconfirmed by an en
banc panel of the Seventh Circuit in 1984 in *EEOC
v. Dowd & Dowd, Ltd.,* 736 F.2d 1177 (7th
Cir.1984). In *Dowd,* it was held that lawyer/
shareholders of a professional corporation were not
employees for purposes of Title VII coverage be-
cause they were, in essence, partners in a partner-
ship. Within the past year the Second Circuit has
taken an opposite view with respect to professional
corporations, holding that radiologist/shareholders
in a professional corporation were employees of the
corporation, rather than partners, for purposes of
ADEA coverage. *Hyland v. New Haven Radiology
Assocs.,* 794 F.2d 793 (2nd Cir.1986). *See also*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                  Page 10
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

*Reiver v. Murdoch & Walsh,* 625 F.Supp. 998 (D.Del.1985). But the Second Circuit stressed the importance of the chosen form of business entity, stating: "While those who own shares in a corporation may or may not be employees, they cannot under any circumstances be partners in the same enterprise because the roles are mutually exclusive." *Id.* at 798. As to partnerships themselves the court stated:

It is generally accepted that the benefits of the anti-discrimination statutes ... do not extend to those who properly are classified as partners.

The fact that certain modern partnerships and corporations are practically indistinguishable in structure and operation, however, is no reason for ignoring a form of business organization freely chosen and established.

*Id.* at 797-98.

Two federal district courts have recently held that partners are not employees for purposes of the ADEA. *Maher v Price Waterhouse,* Civ. No. 84-1522 C (2) (E.D.Mo. April 8, 1985) [Available on WESTLAW, DCT detabase]; *Holland v. Ernst & Whinney,* 35 Empl.Prac.Dec. (CCH) ¶ 34,653 (N.D.Ala. August 17, 1984). Both cases involved partners in "Big Eight" accounting firms.

Finally, in his much-quoted concurring opinion in *Hishon,* Justice Powell stated:

I write to make clear my understanding that the Court's opinion should *265 not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an 'employment' relationship to which Title VII would apply.

467 U.S. at 79, 104 S.Ct. at 2236. The significance of Justice Powell's observation must, of course, be tempered by the fact that no other justice joined the concurring opinion, and by allusions to a highly interactive partnership characterized by common agreement or consent among the partners.

2. *Agency Interpretation.*

Turning from cases to the question of relevant agency interpretation of these Acts we are aided but little. The EEOC refers us to no directly relevant published agency positions regarding the ADEA and FLSA. Two references, twenty years apart, are cited pertaining to Title VII coverage of partners. Both sides rely on them. The first is a 1965 General Counsel opinion letter, which the Commission apparently cannot find, Brief of EEOC at 24 n. 20, but which is asserted by Main Hurdman to rule that partners of a law firm may not be employees. In support of its view, Main Hurdman refers to a listing of the opinion published in a quarterly digest, "Digest of Legal Interpretations Issued or Adopted by the Commission," October 9, 1965 through December 31, 1965, § I(B)(6) at 2-3. In contrast, the EEOC refers to the annual Digest listing of the same opinion, which states that although the specific ruling found that partners were not employees, "the determination of whether partners of the [law] firm are 'employees' within the meaning of Title VII must be determined on a case-by-case basis." EEOC, First Annual Digest of Legal Interpretations, July 2, 1965 through July 1, 1966, § I(B)(5) at 6. Neither reference is sufficiently explanatory to be helpful; they are so scanty and open to argument in almost every respect that they fall short of agency interpretation which guides us.

The second and only other reference on point given to us by the EEOC is a 1985 EEOC decision that partners in an eight-partner, twelve-employee law firm were *not* employees for Title VII purposes. EEOC Decision No. 85-4, 2 Empl.Prac.Guide (CCH) ¶ 6846 at 7040-41 (1985). The EEOC contends the decision is not inconsistent with its position that partners can be employees under Title VII, and that a case-by-case determination is required. Such argument is based on two considerations. First, a footnote in the decision refers to factors to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                     Page 11
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

be considered in determining whether an individual is a partner or an employee in a particular case. Second, the decision itself was based on its own facts. We do not view the decision, however, as squarely supporting the present EEOC position. The decision displays no agency inclination whatsoever to pursue an aggressive inquiry into whether or not, as a matter of economic reality, any of the partners involved in that case were dominated in their work, in management or control of partnership affairs, in decisions on sharing profits, or in any other respect. Yet that is the approach urged upon us by the EEOC in this case. In the 1985 decision all such factors were essentially decided by the Commission by reference to the written terms of the partnership agreement, with only a passing reference to an absence of evidence that the "business is carried out in any other way than as indicated in the partnership agreement." *Id.* at 7040. The accompanying footnote, emphasized here by the EEOC, refers first to Justice Powell's language in *Hishon* that "an employer may not evade the strictures of Title VII *simply by labeling* its employees as 'partners.' " *Id.* at 7041 n. 4 (emphasis added). Following that quote the Commission states: "The Commission recognizes that there *may* be *a* case where an individual is called a partner, but who may really be an employee." *Id.* (emphasis added). Only then is there reference to factors which may be relevant in making such a determination. It is evident from both the language and tone of that footnote that even as recently as 1985 the Commission *266 did not envision the wholesale inquiries proposed here.[FN15]

FN15. The Seventh Circuit noted in *Burke v. Friedman* that the EEOC had dismissed the plaintiff's Title VII complaint against the law firm partnership *for want of subject matter jurisdiction.* No factual inquiry, as urged here, was indicated. *Burke,* 556 F.2d at 868.

It is apparent that the EEOC has not historically espoused the stand it takes here. To the contrary, for many years following its creation under Title VII in 1964, the Commission by its relative silence and inaction, and its approach to the issue when raised, made it seem likely that it doubted any general coverage of partners by Title VII, excluding obvious sham situations. Thus, we accord less weight to the arguments of the EEOC in this case/ than if the Agency's position had been clearly developed proximate in time to passage of Title VII or to the transfer of responsibility for the ADEA and the Equal Pay Act from the Department of Labor to the EEOC in 1979, and consistently applied thereafter.

Although not one court has applied the Acts to a bona fide general partner against his or her partners or partnership, it is not surprising that Wheeler and the EEOC press the issue now. In recent years, literally dozens of articles touching on the reach of the antidiscrimination statutes have been solidly in favor of definitions which would be broad enough to include general partners.[FN16] Peripherally relevant extensions of coverage by the courts have occurred, *Hishon* being the most visible. *See Lucido v. Cravath, Swaine & Moore,* 425 F.Supp. 123 (S.D.N.Y.1977); *EEOC v. Rinella & Rinella,* 401 F.Supp. 175 (N.D.Ill.1975). *See also EEOC v. Peat, Marwick, Mitchell & Co.,* 775 F.2d 928 (8th Cir.1985), *aff'g.*589 F.Supp. 534 (E.D.Mo.1984), *cert. denied,*475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

FN16. *See* for example: Bartholet, *Application of Title to Jobs in High Places,* 95 Harv.L.Rev. 5, 947 (1982); Dowd, *The Test of Employee Status: Economic Realities and Title VII,* 26 Wm. & Mary L.Rev. 75 (1984); Newcomb, *Hishon v. King & Spaulding: Discrimination in Professional Partnerships,* 62 Den.U.L.Rev. 2, 485 (1985); Note, *Civil Rights: Law Partners as Employees for Title VII Purposes?,*35 U.Fla.L.Rev. 201, (1983); Note, *Hishon v. King & Spaulding: Implications for the Private Partnership,* 14 Cap.U.L.Rev. 151 (1984); Note, *EEOC Subpoena Enforce-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257

825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249, 107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

ment to Determine ADEA Coverage of Partnership Retirement Policy-EEOC v. Peat Marwick Mitchell & Co., 19 Creighton L.Rev. 967 (1986); Note, Tenure and Partnership as Title VII Remedies, 94 Harv.L.Rev. 2, 457 (1980); Note, Applicability of Federal Antidiscrimination Legislation to the Selection of a Law Partner, 76 Mich.L.Rev. 282 (1977); Note, The Application of Title VII to Law Firm Partnership Decisions: Women Struggle to Join the Clubs, 44 Ohio St.L.J. 841 (1983); Note, The Age Discrimination in Employment Act and Mandatory Retirement of Law Firm Partners, 53 S.Cal.L.Rev. 1679 (1980).

Furthermore, there are so many partnerships engaged in day to day commerce in this country in ever expanding numbers that the statistical chance of discrimination claims has increased as a result of growth alone.[FN17] Then too, the changing status of women and minorities figures significantly in the equation. While partnerships of professionals have been common throughout the history of this country, as recently as twenty years ago relatively few women and minorities were represented, which may account for the early absence of discrimination suits against partnerships. Over the past two decades ever increasing numbers of women and minorities have been admitted into professional schools, thence into the professions.[FN18] Additional years have been required for their advancement to partnership status. Finally, growing experience under and familiarity with these Acts is producing an increase in discrimination claims against partner-ships.

FN17. The statistical abstract, for example, shows total United States partnerships in the service area as growing from 239,000 in 1979 to 306,000 in 1983. Bureau of Census, U.S. Dept. of Commerce, Statistical Abstract of the U.S., 506 (107th ed. 1987) [hereinafter Statistical Abstract].

Lawyers practicing as partners grew from 92,442 in 1970 to 190,187 in 1980. Statistical Abstract at 167 (107th ed. 1987).

FN18. For example, according to the statistical abstract of the United States, women comprised only 17% of all accountants in 1960 but by 1985 they comprised 44% of all accountants. Statistical Abstracts at 361-63 (96th ed. 1975); Statistical Abstracts at 385 (107th ed. 1987). Furthermore, only 230 law degrees were conferred upon women in 1960, comprising 2.5% of the total, compared to 13,630 degrees in 1984, amounting to 36.8% of the total. Statistical Abstract at 148 (107th ed. 1987).

*267 These facts may provide a better or more complete explanation for the history of judicial and agency actions, omissions, or silence since 1964 concerning the merits of the issue of partners as employees under the Antidiscrimination Acts. Therefore, absence of a long-standing and reliable EEOC position is no surprise. Nonetheless, a disposition on the merits is made more difficult by its absence.

C. Partnership Attributes and Proposed Tests for Determining Employee Status.

Predictably both sides attempt to control the focus of our inquiry. Main Hurdman dwells largely on characteristics of partnerships, while Wheeler and the EEOC concentrate on traits associated with employment. With respect to employment, various tests and factors which have been judicially created and applied in other situations are proposed. The remedial nature of the Acts is stressed both in conjunction with tests for employee status, and as a justification of its own.

We address the parties' positions first by reviewing aspects of partnerships generally, then by reviewing the proposed employee tests, then by analyzing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                   Page 13
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

them together.

*1. Partnership Status Generally.*

While there may be no federal partnership law, as Wheeler argues, partnerships are firmly embedded in our jurisprudence and commonly referred to in universally understood ways by Congress and the courts without the necessity of dissecting the partnership law of each state in order to derive meaning. By the time the FLSA was first enacted in 1938, the Uniform Partnership Act ("UPA") had been adopted by eighteen states.[FN19] When Title VII was enacted in 1964 and the ADEA in 1967, forty states had adopted the UPA as the governing body of partnership law. As of 1984, forty-eight states, several territories, and the District of Columbia had adopted the UPA. Only Georgia and Louisiana have not adopted the uniform act. 6 Unif.Laws Ann. 1 (Supp.1984) (table). Despite some differences in partnership law between states, the general indicia of partners and partnership are very similar across state lines. The UPA sets forth, among others, the following characteristics of a partner: (1) unlimited liability (§ 15); (2) the right to share in profits and participate in management subject to agreement between partners (§ 18(a), (e)); (3) the right and duty to act as an agent of the other partners (§ 9); and (4) shared ownership (§ 6). In *Freese v. United States,* 455 F.2d 1146, 1150-51 (10th Cir.1972), *cert. denied,*409 U.S. 879, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972), we stated that the parties' intent was the touchstone for finding a partnership relationship.

> FN19. In the United States, work began on a UPA in 1902, but it was not completed until 1914. A brief but thorough account of the drafting of the UPA is found in 6 Unif.Laws Ann. at 5-8 (1969).

Citing those indicia of partnership, Main Hurdman contends that a partner *by definition* is not an employee under traditional common law principles. Status as a co-owner precludes simultaneous status

as an employee.

Multiple rebuttals are offered to that argument. Owners in other contexts can be employees. *See Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (members/owners of a knitting cooperative considered employees); *Zimmerman v. North American Signal Co.,* 704 F.2d 347 (7th Cir.1983) (corporate vice-president and shareholder considered employee); *EEOC v. First Catholic Slovak Ladies Ass'n,* 694 F.2d 1068 (6th Cir.1982), (officers-directors considered employees), *cert. denied,*464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983); *Hay v. Progress Pattern Co.,* 217 F.2d 701 (6th Cir.1954) (shareholder, vice-president, director and chairman of board considered employee). *Cf. Bonilla v. Oakland Scavenger Co.,* 697 F.2d 1297 (9th Cir.1982) (sale of corporate stock subject to Title VII where employment status is tied to stock ownership), *cert. denied,*467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984); *Marshall v. R. & M. Erectors, Inc.,* 429 F.Supp. 771 (D.Del.1977) (worker considered an employee and not a partner where there was no written *268 partnership agreement or evidence of partner attributes). For many purposes evolving law now classifies partnerships as separate entities rather than an aggregate of partners; thus, partners can be classed as employees of the partnership entity.[FN20] Furthermore, ownership in very large partnerships is de minimus on an individual basis (Wheeler as one of 500, for instance). Finally, big partnerships are like corporations: "Wall Street law firms and stock brokerage firms provide significant examples. These are often large, impersonal, highly structured enterprises of essentially perpetual duration." *Bellis v. United States,* 417 U.S. 85, 93-94, 94 S.Ct. 2179, 2185-86, 40 L.Ed.2d 678 (1974).FN21

> FN20. *See generally* J. Crane and A. Bromberg, *Law of Partnership,* sections 68-70 (1968). In *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974) the Supreme Court applied the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257     Page 14
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

entity theory of partnerships to support its holding that a member of a three-partner law firm could not claim his Fifth Amendment privilege against self incrimination in order to avoid compliance with a grand jury subpoena ordering production of the partnership's financial records. In *Armstrong v. Phinney*, 394 F.2d 661 (5th Cir.1968), a partner who managed a ranch owned by the partnership was classified for tax purposes as an employee of the partnership entity.

FN21. *See generally* discussion in Note, *Applicability of Federal Antidiscrimination Legislation to the Selection of a Law Partner*, 76 Mich.L.Rev. 282, 286-92 (1977).

Considering the many exceptions in the law we must agree with Wheeler and the EEOC that categorical absolutes are difficult to sustain in this area. However, there is no discernable trend to erase the traditional line between partners and employees. For instance, state courts defining "employee" for purposes of workmen's compensation laws have usually refused to classify partners as employees absent express statutory authority. "With the exception of Oklahoma and Louisiana, every state that has dealt judicially with the status of 'working partners' or joint venturers has held that they cannot be employees." 1C A. Larson, *The Law of Workmen's Compensation* § 54.30 (1986) (footnotes omitted). In *Robertson v. Alexander Grant & Co.*, 798 F.2d 868 (5th Cir.1986), *cert. denied*,479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987), the Fifth Circuit found that the Employee Retirement Income Security Act ("ERISA") did not apply to partners.FN22 For purposes of ERISA, the Secretary of Labor has issued the following regulation: "A partner in a partnership and his or her spouse shall not be deemed to be employees with respect to the partnership." 29 C.F.R. § 2510.3-3(c)(2) (1986). In *United States v. Empey*, 406 F.2d 157 (10th Cir.1969), this court found that a partner was not an employee for the purpose of

certain tax statutes; therefore, it was necessary under the tax laws for professionals to incorporate in order to obtain retirement plan benefits available to corporate employees.FN23

FN22. The ERISA definition of "employee" is identical to the FLSA definition.

FN23. The EEOC points out that in *Clarkson Constr. Co. v. Occupational Safety & Health Rev. Comm.*, 531 F.2d 451, 457 (10th Cir.1976), we stated generally that common law standards are not dispositive in defining an employee for OSHA purposes. More to the point, the Bureau of Labor statistics has indicated that partners are not considered employees under OSHA. 1 Empl.Safety & Health Guide (CCH) ¶ 3039.68 (1978) (citing question 37, Bureau of Labor Statistics Report 412.2 (1975)).

2. *The Economic Realities Test For Determining Employee Status.*

Wheeler and the EEOC urge adoption of an "economic realities" test for discerning employees among partners, on a case-by-case basis.FN24 Economic reality to them *269 translates into a condition of domination: Is the individual so dominated in or by the organization that he or she is really like an employee, with corollary susceptibility to discrimination?FN25

FN24. The "economic realities" test, urged upon us by the plaintiff, was originally developed by the Supreme Court in the 1940s to distinguish independent contractors from employees of an employer for purposes of broadly applying social legislation. The common law "right to control" tests such as those found in the definition of servant in section 220, *Restatement (Second) of Agency*, were rejected. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                    Page 15
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

64 S.Ct. 851, 88 L.Ed. 1170 (1944) (determining whether newsboys were independent contractors or employees under the National Labor Relations Act ("NLRA")); *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (determining whether truck drivers and unloaders of coal were independent contractors or employees under the NLRA); *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) (determining whether dance bands were independent contractors or employees of dance halls under the Social Security Act ("SSA")). Although many of the early cases involved interpretations under the NLRA and the SSA, the Supreme Court held that these decisions were persuasive in defining the coverage under the FLSA. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 723, 67 S.Ct. 1473, 1474, 91 L.Ed. 1772 (1947). *See also Hyland v. New Haven Radiology Assocs.,* 794 F.2d 793, 796 (2nd Cir.1986) ("cases construing the definitional provisions of [the FLSA, Title VII or the ADEA] are persuasive authorities when interpreting the others"); *Armbruster v. Quinn,* 711 F.2d 1332, 1336 (6th Cir.1983) (NLRA provides guidance for Title VII). Subsequent to *Hearst, Silk,* and *Bartels,* Congress amended the NLRB and SSA to restore common law definitions to employee/independent contractor distinctions, but made no similar amendment to the FLSA. Writers urging a holistic approach to the legislative history of Title VII and the ADEA point out that by omitting the type of exclusions found in the NLRA and SSA Congress intended the broad definitions under and application of the FLSA to apply. *See, e.g.,* Dowd,*The Test of Employee Status: Economic Realities in Title VII,* 26 Wm. & Mary L.Rev. 75, 89-96 (1984).

FN25. The relationship is described as one of inequality of bargaining power and economic dependence. Dowd, *supra* note 24, at 85-86.

> Control of employment opportunities is the linchpin of the economic realities test, viewed from the perspective of the employee's dependency on the employer and vulnerability to discriminatory conduct.

> [T]he focus of the analysis must be on whether the employer controls employment opportunities because of its position in the employment marketplace or because of its ability to determine the terms and conditions of employment. This requires an economic analysis of institutional and societal patterns of discrimination that affect the employment marketplace....

> *Id.* at 112-13 (footnote omitted).

Wheeler's brief also emphasizes that employee is defined in terms of the remedial purposes of the statute. Brief of Plaintiff/Appellee at 9-10. "The goal is to rid from the world of work the evil of discrimination." *Id.* at 10 (quoting in part from *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.1983)). Wheeler states: "It is the nature of the work performed, and the independence or lack of independence that makes an individual an employee for purposes of the statutes." Brief of Plaintiff/Appellee at 20. The EEOC echoes the independence versus domination theme, stating that status as an employee "depends in large part on that individual's ability *actually to control* factors such as the management of the firm and critical elements of his or her work." Brief of EEOC at 25 (emphasis added).

Wheeler and the EEOC are not united, however, on what factors best express the domination principle. The district court based its decision on three: power to hire and fire; supervision of work schedules and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249, 107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

conditions of employment; and control of compensation. *Wheeler v. Main Hurdman,* No. 85-C-163, slip op. at 2-3 (D.Colo. Aug. 13, 1985). Although the EEOC included these same factors as well as others in its argument, it ignores any defense of or express reliance on the district court's ruling; Wheeler refers to it more as an afterthought at the conclusion of her main arguments respecting the economic reality test.

The EEOC, "for purposes of this brief" assumes the existence of a hybrid economic reality/common law control test, asserting that most courts have been using that "restrictive" approach. Brief of EEOC at 15, 16, 18 n. 14. It cites at length from *Spirides v. Reinhardt,* 613 F.2d 826, 831-32 (D.C.Cir.1979), indicating approval of the hybrid standard set forth in that case, which included the right to control the means and manner of the worker's performance, plus eleven additional factors. In *Spirides,* the court stated:

*[D]etermination of whether an individual is an employee or an independent contractor for purposes of the Act involves, as appellant suggests, analysis of the "economic realities" of the work relationship.* This test calls for application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is *270 determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law and in the context of several other federal statutes. If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

Additional matters of fact that an agency or reviewing court must consider include, among others, (1) the kind of occupation, with reference to whether the work usually is done under the direction of a su-

pervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 831-32 (footnotes omitted) (emphasis added). The EEOC, in a 1985 decision, classified as relevant factors "the individual's ability to control and operate the business and to determine compensation and the administration of profits and losses." EEOC Decision No. 85-4, 2 Empl.Prac.Guide (CCH) ¶ 6846, 7041 n. 4 (1985).

Wheeler places no such reliance on *Spirides.* Her brief quotes at length from *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961).[FN26] *Goldberg,* in turn, is not similarly relied upon by the EEOC.

> FN26. In *Goldberg* the Supreme Court found that for purposes of the FLSA certain homeworkers were employees as well as members of a cooperative, which they had each paid three dollars to join. The Court first outlined the long regulatory history dealing specifically with prohibitions against homework, and stated:
>
> We think we would be remiss, in light of this history, if we construed the Act loosely so as to permit this homework to be done in ways not permissible under the Regulations. By § 3(d) of the Act an "employer" is any person acting "in the interest of an employer in relation to an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257

825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249, 107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

Page 17

employee." By ¶ 3(g) the term employ "includes to suffer or permit to work." We conclude that the members of this cooperative are employees within the meaning of the Act.

It is the cooperative that is affording them "the opportunity to work, and paying them to do it," to use the words of Judge Aldrich, dissenting below. 275 F.2d, at 366. However immediate or remote their right to "excess receipts" may be, they work in the same way as they would if they had an individual proprietor as their employer. The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates. Apart from formal differences, they are engaged in the same work they would be doing whatever the outlet for their products. The management fixes the piece rates at which they work; the management can expel them for substandard work or for failure to obey the regulations. The management, in other words, can hire or fire the homeworkers. Apart from the other considerations we have mentioned, these powers make the device of the cooperative too transparent to survive the statutory definition of "employ" and the Regulations governing homework. In short, if the "economic reality" rather than "technical concepts" is to be the test of employment (*United States v. Silk,* 331 U.S. 704, 713 [67 S.Ct. 1463, 1468, 91 L.Ed. 1757]; *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729 [67 S.Ct. 1473, 1476, 91 L.Ed. 1772], these homeworkers are employees.

366 U.S. at 31-33, 81 S.Ct. at 935-36 (1961) (footnotes omitted).

The EEOC points out that the liberal definitions given to the term "employee" under early Supreme Court cases applying the FLSA, *see supra* note 24, still apply, and therefore argues that our opinion in *Doty v. Elias,* 733 F.2d 720 (10th Cir.1984), is relevant.[FN27] In *Doty* we held that certain *271 waiters and waitresses were employees, rather than independent contractors as claimed by the owner of the restaurant where they worked. We said:

> FN27. The EEOC states:
>
> With respect to the Equal Pay Act, the FLSA test, endorsed by this Court in *Doty v. Elias,* is applicable. However, for convenience we will use the hybrid test to analyze Ms. Wheeler's status under all three statutes inasmuch as the tests are not significantly different when applied to the facts of this case. A primary difference between the FLSA test and the hybrid approach taken under Title VII and the ADEA is that the FLSA test accords much less weight to an employer's lack of control over work performance. However, as discussed *infra,* in this case Ms. Wheeler's superiors at Main Hurdman controlled the significant aspects of her work.
>
> Brief of EEOC at 18 n. 14.

In determining whether an individual is an "employee" within the meaning of the FLSA, we must look to the economic realities of the relationship. *Castillo v. Givens,* 704 F.2d 181, 188 (5th Cir.), *cert. denied,* [464] U.S. [850], 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service, *see Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947), or is, as a matter of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                        Page 18
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

economic fact, in business for himself. *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir.1981). In applying this test, the courts generally focus on five factors: (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work. *Trustees of Sabine Area Carpenters' Health & Welfare Fund v. Don Lightfoot Home Builder, Inc.*, 704 F.2d 822, 825 (5th Cir.1983). *Id.* at 722-23.

The foregoing survey of tests and factors offered by the proponents has been set forth in detail partly for purposes of our analysis, and partly to show the absence, rather than the presence, of any coherent standard of "economic reality" for supposed application to partners.

### 3. *Application of the Proposed Economic Realities Test and Factors to Partnerships.*

This court is committed to use of an economic realities test in applying remedial social legislation but only where and to the extent appropriate. *See Doty v. Elias*, 733 F.2d 720 (10th Cir.1984).[FN28] We disagree with Main Hurdman's position that an economic realities test is categorically inapplicable to partnerships, but we also reject the form proposed by Wheeler and the EEOC as incomplete when applied to partnerships for several reasons.

> FN28. Even from the EEOC standpoint the economic realities test is not an overarching principle. The EEOC surely would not entertain the notion, for instance, that a corporate employee was *not* covered under the Acts even if a compelling set of facts revealed that the employee completely dominated the work environment and compensation within the corporation. Within the past year the Second Circuit rejected entreaties of a physicians' group to apply

an economic realities test to their professional corporation, and reversed the district court which did. It held that the plaintiff/ doctor, who in most accepted senses was only technically an "employee" of the corporation, was an employee under the ADEA, stating that "use of the corporate form precludes any examination designed to determine whether the entity is in fact a partnership." *Hyland v. New Haven Radiology Assocs.*, 794 F.2d 793 (2nd Cir.1986). Addressing the type of factors urged here, the court said:

> NHRA urges us to "develop a ... list of factors to be considered in determining if an individual is a 'partner' or a covered 'employee.' " There is no need to develop such a list of factors where the individual involved is a corporate employee, for we hold that every such employee is "covered" for purposes of the ADEA and that any inquiry respecting partnership status would be irrelevant.

> *Id.* at 798 (ellipses original).

The first difficulty with the many economic reality factors proffered to us is that they largely arise from cases involving alleged independent contractors.[FN29] The line-*272 drawing exercise in those cases was between those who were really part of a business (employees) and those who were running a separate business (independent contractors). Factors employed for that purpose are useless for drawing lines between people who are part of the same enterprise. For example, in *Doty* we stated that: "The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself." 733 F.2d at 722-23. Such an inquiry fails as a means of distinguishing among partners. Every general partner, at least in professional partnerships, is "dependent on the business," and does not pretend to be "in business for himself."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Id.* Yet, such an inquiry is the central theme of virtually every "economic realities" case cited. Similarly unhelpful factors include: whether the employer "furnishes the equipment used and the place of work,""length of time during which the individual has worked," and, payment by time or "by the job," *Spirides,* 613 F.2d at 832. It is also irrelevant in a partnership context to inquire whether the occupation requires skill, *id.* Any professional partner would be considered skilled under any circumstance. Inquiries into annual leave and retirement benefits, *id.,* are also inapplicable since such matters could include all general partners. In short, the specific independent contractor/employee factors cited to us are largely useless in a general partnership context.

> FN29. The EEOC cites the following cases in support of its "hybrid" test which it urges us to adopt: *Spirides v. Reinhardt,* 613 F.2d 826 (D.C.Cir.1979) (further factual inquiry required to determine whether foreign language radio broadcaster was an employee or an independent contractor); *Garrett v. Phillips Mills, Inc.,* 721 F.2d 979 (4th Cir.1983) (salesman was independent contractor, not employee, under ADEA); *EEOC v. Zippo Manufacturing Co.,* 713 F.2d 32 (3rd Cir.1983) (salesmen were independent contractors, not employees under ADEA); *Cobb v. Sun Papers, Inc.,* 673 F.2d 337 (11th Cir.) (janitor/custodian was independent contractor, not employee, under Title VII), *cert. denied,*459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982); *Unger v. Consolidated Foods Corp.,* 657 F.2d 909 (7th Cir.1981) (salesman was employee, not independent contractor under Title VII), *vacated on other grounds,*456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982); *Lutcher v. Musicians Local 47,* 633 F.2d 880 (9th Cir.1980) (musicians were independent contractors, not employees, under Title VII).

Similarly with respect to cases cited by the EEOC as supporting a pure economic realities test under Title VII: *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983) (manufacturer's representative was employee, not independent contractor, under Title VII); and under FLSA: *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (fact situation involved purported members of cooperative as employees, but decision covered underlying independent contractor controversy); *Doty v. Elias,* 733 F.2d 720 (10th Cir.1984) (waiters and waitresses were employees, not independent contractors, under Title VII); *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376 (3rd Cir.) (home researchers for a telephone soliciting organization found to be employees, not independent contractors), *cert. denied,*474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); *Carter v. Dutchess Community College,* 735 F.2d 8 (2nd Cir.1984) (prison inmates working as teaching assistants in college courses offered at prison may qualify as employees); *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465 (9th Cir.1983) (domestic "chore workers" were employees of state and county governments); *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139 (6th Cir.1977) (voluntarily separated former employee considered an employee under FLSA); *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308 (5th Cir.) (operators of laundry pick-up stations were employees not independent contractors), *cert. denied,*429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297 (5th Cir.1975) (hotel cardroom operator was an employee not an independent contractor). Wheeler's cases involving reli-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                    Page 20
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

ance on early Supreme Court cases are to the same effect. *See NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (newsboys were employees not independent contractors under the NLRA); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (slaughterhouse workers were employees under the FLSA); *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) (truck drivers and unloaders of coal were employees not independent contractors).

The second difficulty with the proffered tests is that they purport to, but in fact do not, encompass reasonable limits. We are assured that these tests would not result in every partner falling under the Acts.FN30 Brief of Plaintiff/Appellee at 14. Size is suggested to be an underlying criterion; presumably because according to Wheeler, *273 "[b]eing a 'partner' in a four partner firm is significantly different than being a 'partner' in a 500+ partner firm. The economic realities are markedly different." *Id.*FN31 That is not necessarily so. The heart of the standard proposed to us is a theory that any individual who is organizationally or economically dominated is an employee. In applying the domination theory to partnerships, there is an underlying assumption by its proponents that a "true" general partnership operates like a New England town meeting; that "true" general partners are not employees because they personally control management of the business and their own affairs within the business; that "true" general partners are not "dominated;" they are not controlled; they enjoy equality of bargaining power. Presumably, a "true" partner is not only heard at partnership meetings but actually controls the result as it affects that partner.

FN30. Wheeler and the EEOC attempt to distinguish *Burke v. Friedman,* 556 F.2d 867 (7th Cir.1977), and *EEOC v. Dowd,*

736 F.2d 1177 (7th Cir.1984), for instance, on the ground that there were just a few partners in each partnership and that, therefore, all were active participants in managing their own affairs. There is not the slightest evidence in those cases that such participation was the fact.

FN31. One writer classifies "very large firms" as "those with twenty or more partners." Note, *The Age Discrimination in Employment Act and Mandatory Retirement of Law Firm Partners,* 53 S.Cal.L.Rev. 1679, 1704 (1980).

With due respect, those arguments and assumptions are not likely to translate to the real world with any discernible limits. Partnerships, as Justice Powell so aptly stated in his concurring opinion in *Hishon,* embody very special relationships and sensitive management concerns *inter se;* however, de facto "domination" or "control" of work, clients, billings, and compensation by key partners may be more common than not, and size of the partnership is not necessarily the determinative factor. Indeed, large partnerships may operate more democratically overall than small partnerships, which are frequently vulnerable to domination by a single partner or a small group of partners. "Domination" of a partner in assignment and supervision of work, billing, share of profits, and other matters can result from a myriad of wholly practical reasons existing from time to time in any partnership. Furthermore, a certain amount of "domination" may flow from the necessity of an organizational structure even in the smallest partnership. When the EEOC asserts that status depends upon the "individual's ability *actually to control* factors such as the management of the firm and critical elements of his or her work," Brief of the EEOC at 25 (emphasis added), we must wonder just how many partners the "actual control" requirement describes in the real world, and if *any* partnership of any duration would not have employee partners. What the EEOC and Wheeler are describing as true partners are sole

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                    Page 21
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

proprietors and a limited number of dominant partners nationwide.

Thus, as stated, there is no way of applying the "domination" standard of reality urged upon us without including virtually every partnership in the United States,[FN32] with the burden shifting to the partnerships to prove some sort of parity of influence and day-to-day independence between and among the partners, free of "control" by the partnership as a whole. Perhaps, proponents would see this as unobjectionable, and a wholly appropriate interpretation and application of the Acts, but such wholesale application is not the way this case was argued.

FN32. The fifteen and twenty covered person minimum, respectively, under Title VII and the ADEA, would implicate even a two-person partnership with fourteen, or nineteen, staff personnel. Furthermore, as pointed out by one commentator:

The issue of whether partners are counted as employees under Title VII is important in light of the fact that many state civil rights statutes often have lower jurisdictional requirements than Title VII. Most state civil rights statutes encompass the protections of Title VII, and many also prohibit discrimination on the basis of age and handicap.

The footnote supporting that text states:

Of the states constituting the Tenth Circuit, Colorado, Kansas, New Mexico, and Wyoming have statutes prohibiting discrimination by employers with fewer than fifteen employees. *See*Colo.Rev.Stat. § 24-34-401(3) (two or more employees); Kan.Stat.Ann. § 44-1002(b) (four or more employees); N.M.Stat.Ann. § 28-1-2(B) (four or more employees); Wyo.Stat. § 27-9-102 (two or more employees).

Newcom, *Hishon v. King & Spaulding: Discrimination in Professional Partnerships*, 62 Den.U.L.Rev. 2, 485, 492 (1985) (other footnote omitted).

Indeed, inequality of bargaining power, the dominant ability to perpetuate or terminate*274 a business relationship and otherwise to dictate terms, probably characterizes most dealings between large corporations and independent contractors. Yet, no one has yet suggested that de facto economic domination alone is enough to constitute the standard for defining all such independent contractors as employees-even though actual discrimination may occur.

The "realities" factors present yet another set of problems when applied to partners. Partner status is supported by agreement-written, oral, or implied-and statutes. Thus, "domination" of a partner may consist not of an absence of rights, as with an independent contractor, but of an abdication of rights, which may or may not be a temporary submissiveness. Accusations of de facto "control" of an individual will be met, as here, with recitations of legal rights. Breach of contract may have to be established before true "control" can be established.

Further, the status of partner is permanent while the envisioned "employee" status is a transient overlay. In the independent contractor cases the essential question was whether or not an individual was part of an enterprise (an employee) or running a separate enterprise. There is no such dividing line here. A potentially chaotic situation is presented with partners drifting into and out of covered "employee" status, remaining partners all the while, with no one ever quite knowing who is an employee/partner and who is a "pure" partner. The situation is rendered even more confusing when, as here, the complaint runs more to a regional office of the partnership than to the partnership and its governing agreement. Thus, because of an autocratic partner in charge of an office, the partners may be employees until the local partner is changed; but in other offices of the partnership, the partners with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                    Page 22
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

a less autocratic administrative partner are not employees. The EEOC and Wheeler depart entirely from any consideration of a legal or contractual right to control or share in control and look at drifting expressions of autocracy or democracy from place to place and person to person.

The central problem with the approach by Wheeler and the EEOC, however, is that it either ignores or relegates to insignificance the economic reality of partnership status itself. We view that as a fatal flaw. Status as a general partner carries important economic reality as well. Employees do not assume the risks of loss and liabilities of their employers; partners do. It is no small thing to be exposed to unlimited liability, to be personally at risk for a partner's mistakes, and to have one's share of profits always potentially conditional upon the outcome of claims, suits, and obligations generated by another partner. Partnership size, such as Main Hurdman's, guarantees no safety from liability. Nor does insurance. Numerous partners multiply risk. Firm size also makes a tempting litigation target. Large firms deal with large clients and with transactions and engagements involving enormous sums of money. Risk and potential liability are proportional. It is not unusual to see prayers of complaints in the hundreds of millions of dollars, especially in cases of spectacular business failures. Settlements of suits over one matter can run into the tens of millions of dollars. Even if the partnership is viewed as an entity separate from the partners for some purposes, it cannot shield the partners from risk, including liabilities arising from suits by other partners. There is simply no equivalent to unlimited liability in *any* case dealing with the definition of employee, nor is there any equivalent in any understood definition of the term.

Other common characteristics of partnerships are profit sharing; contributions to capital; part ownership of partnership assets, including a share of assets in dissolution of the enterprise; and the right to share in management subject to agreement among the partners.[FN33] These are economic realities,

and no definition of "employee" is co-extensive. Additionally, as previously indicated, an entirely different body of statutes and case law applies to partners and *275 partnerships, conferring rights and imposing obligations wholly foreign to, for instance, a corporate employee. When individuals combine to carry on business as partners all these factors introduce complexities and economic realities which are not consonant with employee status.

FN33. UPA §§ 6, 9, 15 and 18(a), (e).

This conclusion is not inconsistent with the various cases cited by Wheeler and the EEOC, including the Supreme Court decision in *Goldberg v. Whitaker,* relied upon by the district court. The homeworkers in *Goldberg,* for example, bore no risk of liability or risk of loss of the business, or real opportunity to share in the profits of the business; FN34 nor did the foreign language broadcaster in *Spirides,* the janitor in *Cobb,* or the plaintiffs in any of the other cited cases. *See supra* note 29. Nor did any of those plaintiffs enjoy the substantive economic and legal rights enjoyed by partners with respect to their businesses, including rights possessed by Wheeler in this case. Of the five factors listed by us in *Doty,* two (opportunity for profit and loss, and investment in the business) are regarded as inconsistent with employee status, and are fundamental to partnerships.

> FN34. There are many additional distinctions between *Goldberg* and this case. *Goldberg* dealt with a cooperative. Cooperatives are typically viewed as a form of corporate organization; their existence is dependent upon state cooperative incorporation laws or general incorporation laws. *See* I. Packel, *The Organization and Operation of Cooperatives* § 9 (4th ed. 1970). They are typically referred to as "cooperative corporations." *See* I W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 68 (rev. perm. ed. 1983) [hereinafter "Fletcher"]; 1A Fletcher § 109 (rev. perm. ed. 1983); 16A Fletcher §§

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                                          Page 23
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

3285, 3286 (rev. perm. ed. 1979). Further, "[a] cooperative incorporated under a cooperative statute is still a corporation and, as such, is affected by statutes that are applicable to corporations in general." I. Packel, *The Organization and Operation of Cooperatives*§ 6(b)(3) at 36 (footnotes omitted). A number of years before *Goldberg* came before the courts, the Administrator of the Wage and Hour Division of the U.S. Department of Labor stated that a cooperative is more like a corporation than a partnership and that generally members of a cooperative are employees of the cooperative for purposes of the FLSA. 1941 Wage & Hour Manual at 58 (quoted in *Mitchell v. Whitaker House Coop.*, 275 F.2d 362, 365 n. 1 (1st Cir.1960), *rev'd sub nom. Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).

All of the foregoing reasons are answers to the declaration by the EEOC that "there is no rational basis for treating a partner differently than any other working individual." Brief of the EEOC at 22. There, of course, is a rational basis, as explained above.

In summary, while we do not reject invocation of any economic realities test in this case, we reject as incomplete the version used by Wheeler and the EEOC. That version itself fails to reflect economic reality.

4. *Limitations on Remedial Goals of the Legisla- tion.*

As we stated at the outset, this is a case of statutory interpretation. There are statutory limitations to the argument that the remedial ends of the Acts justify as means any definition of employee which results in coverage. The underlying theme of the Wheeler/ EEOC arguments is that discrimination itself defines the application of the Acts. Thus, all part-

nerships must be under the Acts. A "pure" partner is one who has enough power to avoid or defeat any act of discrimination. Any partner who can be discriminated against is, ipso facto, an employee. The problem with that reasoning is that it must include independent contractors and every other business relationship as well. If Congress had intended the Acts to apply to the performance of all services, subject to stated exceptions, it would have said so. To suggest that Congress intended the provisions of Title VII, the ADEA, and the FLSA to reach all situations where discrimination may arise in a business setting is to suggest that it enacted these statutes with the intent that they cover all individuals having an economic relationship with a business. This would make employee status largely irrelevant · and would essentially transform the employment discrimination statutes into *business* discrimination statutes. *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir.1983). If this were the case, then we must question why Congress bothered to *276 limit each statute's reach to employment practices. The requirement that the statutes cover only employment situations suggests that Congress perceived a need to limit the application of these statutes. *Id.; see also Hishon v. King & Spaulding,* 467 U.S. 69, 79, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (Powell, J., concurring).[FN35]

FN35. Other statutes, apart from those involved in this case, may provide a remedy for discrimination in the business setting. For example, this court recently held that a black employee's claim of employment discrimination under 42 U.S.C. § 1981 was not preempted by Title VII. *See Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124 (10th Cir.1987). Claims under § 1981 or other statutes may not have the same statutory limitations that constrain us here.

The word "employee," however broadly defined, is still "employee," and circumscribed by meanings reasonably related to that word. Drafters of the statute gave no indication that they were departing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                    Page 24
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

from the common discourse of the republic when fashioning a law to be understood by and applied to its citizens. In shaping the economic realities test, the Supreme Court made just that point in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944):

Congress, on the one hand, was not thinking solely of the immediate technical relation of employer and employee. It had in mind at least some other persons than those standing in the proximate legal relation of employee to the particular employer involved in the labor dispute. It cannot be taken, however, that the purpose was to include all other persons who may perform service for another or was to ignore entirely legal classifications made for other purposes. Congress had in mind a wider field than the narrow technical legal relation of "master and servant," as the common law had worked this out in all its variations, and at the same time a narrower one than the entire area of rendering service to others.

*Id.* at 124, 64 S.Ct. at 857 (footnote omitted).

Such reasoning and authority answer the argument that Congress did not specifically exempt partners in the Acts, but did so with other groups [FN36] and, therefore, partners must be covered. Use of "employee" instead of a broader designation provides its own exclusion of bona fide general partners.

> FN36. Title VII and the ADEA contain certain exemptions for elected government officials and policymakers. *See* 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f); *see also* 29 U.S.C. § 631(c).

D. *Summary.*

There may be many aspects of a partner's work environment in a partnership which are indistinguishable from that of a corporate employee. But in general the total bundle of partnership characteristics sufficiently differentiates between the two to re-

move general partners from the statutory term "employee." The case before us, which we regard as a "best case" presentation of the EEOC/Wheeler arguments, illustrates the point. Wheeler's circumstances as a partner are portrayed as indistinguishable from her prior employee status. Yet they are distinguishable, and substantially so. Her participation in profits and losses, exposure to liability, investment in the firm, partial ownership of firm assets, and her voting rights-plus her position under the partnership agreement and partnership laws-clearly placed her in a different economic and legal category. Evidence of that conclusion is found in the fact that only a small percentage of Main Hurdman personnel were admitted to the partnership. Similarly the characteristics of general partnership are different from that of a small, voting shareholder/director or officer of a large corporation.

For these reasons we reject both the "control" test and the economic realities test framed by Wheeler and the EEOC, for use in bona fide general partner situations. Such tests ignore or unacceptably diminish the essential attributes of partnership, as well as being incapable of rational application. We also reject the essential thrust of the Wheeler/EEOC position that susceptibility to discrimination defines coverage under the Acts. There is no statutory support for such a broad test.

*277 Our review of the statutes, the legislative history, agency position, the applicable cases, and the proferred tests leads inevitably to the conclusion that bona fide general partners are not employees under the Antidiscrimination Acts. If Congress amends the Acts to include partners it will be in a position through the hearing and debate process to fashion restrictions appropriate to partnerships. More importantly, by categorical inclusion or exclusion of partners Congress will allow administration of the Acts without resort to a case-by-case approach based on illogical, unsatisfactory types of tests such as those proposed here.

Pending examination of the question by Congress, partnerships do not remain free of the remedial ef-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257                                                                                          Page 25
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

fects of the Acts. The Supreme Court decision in *Hishon* requires a non-discriminatory open door to partnership consideration. Furthermore, partnerships obviously cannot without impunity admit one to the partnership merely as a device for avoiding application of the Acts, for then the bona fides of partnership status would be in question.[FN37]

> FN37. It is argued that the Acts would have no meaning if they cover consideration for partnership but can be ignored after partnership. In *Hishon* the Supreme Court said: "It is also of no consequence that employment as an associate necessarily ends when an associate becomes a partner." 467 U.S. at 69, 104 S.Ct. at 2229. *See also Golden State Bottling Co., Inc. v. NLRB.* 414 U.S. 168, 188, 94 S.Ct. 414, 427, 38 L.Ed.2d 388 (1973):
>
> > It is undisputed that when [the employee] was discriminatorily discharged he was an ordinary employee. The Act's remedies are not thwarted by the fact that an employee who is within the Act's protections when the discrimination occurs would have been promoted or transferred to a position not covered by the Act if he had not been discriminated against.

III.

## WHEELER'S CLAIM OF EMPLOYEE STATUS

There may be circumstances not fairly covered by our holding excluding bona fide general partners from coverage under the Acts. The bundle of partnership characteristics we have identified may be lacking in important particulars, or there may be some deception which compromises the actuality of those characteristics.[FN38] As Justice Powell noted: "an employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.' " *Hishon,* 467 U.S. at 79 n. 2, 104 S.Ct.

at 2236 n. 2. Those and similar circumstances expose the basic status of "bona fide general partner" to question and examination.

> FN38. For example, when the FLSA was originally enacted in 1938, some employers reorganized all of their employees into cooperatives or partnerships in an attempt to avoid compliance with FLSA provisions. *See, e.g., Mitchell v. Whitaker House Coop.,* 170 F.Supp. 743 (D.Maine 1959), *aff'd,*275 F.2d 362 (1st Cir.1960), *rev'd sub nom, Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (cooperative); *Walling v. Plymouth Mfg. Co.,* 46 F.Supp. 433 (N.D.Ind.1942), *aff'd,*139 F.2d 178 (7th Cir.1943) (partnership); *Fleming v. Palmer,* 123 F.2d 749 (1st Cir.1941) (cooperative).

Wheeler pleads no such facts, and our examination of the complaint and Wheeler's affidavit reveals nothing which would avoid our holding as to partners generally. We conclude, therefore, that the district court erred in its decision that Wheeler was an employee of Main Hurdman at the time of the acts and events of which she complains.

## CONCLUSION

We have considered all of the arguments raised by Wheeler and the EEOC, and consider them insufficient to sustain the ruling by the district court. For the reasons stated above, we hold that bona fide general partners are not employees under the Anti-discrimination Acts. We also hold that Wheeler, as an acknowledged general partner of Main Hurdman, was not covered by the Acts and that the district court erred in its ruling that she was. The decision of the district court is REVERSED and the case REMANDED to the district court with instructions to enter judgment in favor of Main Hurdman, dismissing the complaint.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

825 F.2d 257 Page 26
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707, 28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac. Dec. P 37,249,
107 Lab.Cas. P 34,949, 8 Fed.R.Serv.3d 683

C.A.10 (Colo.),1987.
Wheeler v. Hurdman
825 F.2d 257, 44 Fair Empl.Prac.Cas. (BNA) 707,
28 Wage & Hour Cas. (BNA) 280, 43 Empl. Prac.
Dec. P 37,249, 107 Lab.Cas. P 34,949, 8
Fed.R.Serv.3d 683

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.