# EXHIBIT 60



1  SARAH E. ROBERTSON #142439  ORIGINAL
   MARK A. DELGADO #215618
2  FITZGERALD ABBOTT & BEARDSLEY LLP
   1221 Broadway, 21st Floor
3  Oakland, California 94612
   Telephone: (510) 451-3300
4  Facsimile: (510) 451-1527
   Email: srobertson@fablaw.com
5        mdelgado@fablaw.com

6  Attorneys for Defendants
   CALIFORNIA EMERGENCY
7  PHYSICIANS MEDICAL GROUP,
   MARK ALDERDICE, M.D.,
8  and ROBERT BUSCHO, M.D.

FILED
ALAMEDA COUNTY

SEP 2 5 2009

Graca Baner

9         SUPERIOR COURT OF CALIFORNIA

10      COUNTY OF ALAMEDA - RENE C. DAVIDSON COURTHOUSE

11  DONALD GOLDEN, M.D.,              Case No.: RG08388602

12         Plaintiff,                 ASSIGNED FOR ALL PURPOSES TO
                                      JUDGE STEPHEN DOMBRINK
13                                    DEPARTMENT 19

14      vs.                          **EVIDENCE IN SUPPORT OF MOTIONS
                                     BY ALL DEFENDANTS FOR SUMMARY**
15                                   **JUDGMENT, OR, IN THE
                                     ALTERNATIVE, FOR SUMMARY**
16  CALIFORNIA EMERGENCY             **ADJUDICATION OF ISSUES**
    PHYSICIANS MEDICAL GROUP;
17  MEDAMERICA; MARK ALDERDICE;      Date:          December 10, 2009
    ROBERT BUSCHO; AND DOES 1        Time:          8:30 am
18  THOUGH 1000, AND EACH OF THEM,   Dept.:         19
    INCLUSIVE,                       Judge:         Stephen Dombrink
19                                   Reservation Nos.: 986935 & 986983
           Defendants.
20

21

22         Pursuant to California Rules of Court, Rule 3.1350(g), Defendants California

23  Emergency Physicians Medical Group, Mark Alderdice, M.D., and Robert Buscho, M.D.

24  (collectively "Defendants") hereby submit the following Evidence in Support of Motions by All

25  Defendants for Summary Judgment, or, in the Alternative, for Summary Adjudication of Issues.

26  / / /

27  / / /

28  / / /

# TABLE OF CONTENTS

**EXHIBIT 1**  Declaration of Sarah E. Robertson in Support of Motions for Summary Judgment or, in the Alternative, for Summary Adjudication of Issues Submitted by Defendants California Emergency Physicians Medical Group, Mark Alderdice, M.D. and Robert Buscho, M.D.

Exhibit A:  Excerpts of Plaintiff Donald Golden, M.D.'s depositions taken February 4, 2009 and June 29, 2009

Exhibit B:  Exhibit 73 to Plaintiff Donald Golden, M.D.'s deposition taken February 4, 2009

Exhibit C:  Excerpts of Defendant Robert Buscho, M.D.'s deposition taken May 13, 2009

Exhibit D:  Excerpts of Marcia Shaikin's deposition taken October 2, 2008

Exhibit E:  Exhibit 1 to Marcia Shaikin's deposition taken October 2, 2008

Exhibit F:  Exhibit 2 to Marcia Shaikin's deposition taken October 2, 2008

Exhibit G:  Excerpts of Defendant Mark Alderdice, M.D.'s deposition taken May 22, 2009

Exhibit H:  Excerpts of Bernadette Smith's deposition taken January 15, 2009

**EXHIBIT 2**  Declaration of Mark Spiro, M.D. in Support of Motions for Summary Judgment or, in the Alternative, for Summary Adjudication of Issues Submitted by Defendants California Emergency Physicians Medical Group, Mark Alderdice, M.D. and Robert Buscho, M.D.

Exhibit A:  January 1, 2004 Partnership Agreement (14th amended Agreement)

Exhibit B:  Plaintiff Donald Golden, M.D.'s signature to the Partnership Agreement (13th amended Agreement)

Dated: September 25, 2009

FITZGERALD ABBOTT & BEARDSLEY LLP

By _Sarah E. Robertson_

Sarah E. Robertson
Attorneys for Defendants
CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, MARK ALDERDICE,
M.D., and ROBERT BUSCHO, M.D.

EVIDENCE IN SUPPORT OF ALL DEFENDANTS' SUMMARY JUDGMENT MOTIONS
9/25/09 (25615) #348064.1

EXHIBIT 1

1  SARAH E. ROBERTSON #142439
   MARK A. DELGADO #215618
2  FITZGERALD ABBOTT & BEARDSLEY LLP
   1221 Broadway, 21st Floor
3  Oakland, California 94612
   Telephone: (510) 451-3300
4  Facsimile: (510) 451-1527
   Email: srobertson@fablaw.com
5         mdelgado@fablaw.com

6  Attorneys for Defendants
   CALIFORNIA EMERGENCY
7  PHYSICIANS MEDICAL GROUP,
   MARK ALDERDICE, M.D.,
8  and ROBERT BUSCHO, M.D.

9              SUPERIOR COURT OF CALIFORNIA

10      COUNTY OF ALAMEDA - RENE C. DAVIDSON COURTHOUSE

11 DONALD GOLDEN, M.D.,                Case No.: RG08388602

12                                     ASSIGNED FOR ALL PURPOSES TO
              Plaintiff,                 JUDGE STEPHEN DOMBRINK
13                                          DEPARTMENT 19

14      vs.                            **DECLARATION OF SARAH E.
                                       ROBERTSON IN SUPPORT OF
15                                     MOTIONS FOR SUMMARY JUDGMENT
                                       OR, IN THE ALTERNATIVE, FOR
16                                     SUMMARY ADJUDICATION OF ISSUES
                                       SUBMITTED BY DEFENDANTS
17 CALIFORNIA EMERGENCY               CALIFORNIA EMERGENCY
   PHYSICIANS MEDICAL GROUP;          PHYSICIANS MEDICAL GROUP,
18 MEDAMERICA; MARK ALDERDICE;        MARK ALDERDICE, M.D. AND
   ROBERT BUSCHO; AND DOES 1          ROBERT BUSCHO, M.D.**
19 THOUGH 1000, AND EACH OF THEM,
   INCLUSIVE,                         Date:        December 10, 2009
20                                     Time:        8:30 am
                                       Dept.:       19
21            Defendants.              Judge:       Stephen Dombrink
                                       Reservation No.:  986935 & 986983
22

23      I, Sarah E. Robertson, declare as follows:

24      1.    I am a partner at the law firm of Fitzgerald Abbott & Beardsley LLP, which

25 represents all Defendants in this action. This declaration supports Defendants' Motions for

26 Summary Judgment, or, in the Alternative, Summary Adjudication. Except as to the matters

27 stated on information and belief, I have personal knowledge of these facts and would, if called,

28 competently testify to them.

                                   1
ROBERTSON DECLARATION IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT MOTIONS
9/25/09 (25615) #348051.1

1      2.      On February 14, 2009, February 16, 2009, March 10, 2009 and June 29, 2009, I

2 conducted the deposition of Plaintiff Donald Golden, M.D. ("Plaintiff"). A true and correct

3 copy of excerpts from the transcript of Plaintiff's deposition is attached hereto as Exhibit A.

4 Attached hereto as Exhibit B is a true and correct copy of Exhibit 73 to Plaintiff's deposition

5 transcript.

6      3.      On May 13, 2009, I attended the deposition of Defendant Robert Buscho, M.D.

7 A true and correct copy of excerpts from the transcript of Dr. Buscho's deposition is attached

8 hereto as Exhibit C.

9      4.      On October 2, 2008, I attended the deposition of Marcia Shaikin. A true and

10 correct copy of excerpts from the transcript of Ms. Shaikan's deposition is attached hereto as

11 Exhibit D. Attached hereto as Exhibit E is a true and correct copy of Exhibit 1 to Ms. Shaikin's

12 deposition transcript. Attached hereto as Exhibit F is a true and correct copy of Exhibit 2 to

13 Ms. Shaikin's deposition transcript.

14      5.      On May 22, 2009 and June 29, 2009, I attended the deposition of Defendant

15 Mark Alderdice, M.D. A true and correct copy of excerpts from the transcript of Dr.

16 Alderdice's deposition is attached hereto as Exhibit G.

17      6.      On January 5, 2009, I attended the deposition of Bernadette Smith. A true and

18 correct copy of excerpts from the transcript of Ms. Smith's deposition is attached hereto as

19 Exhibit H.

20      I declare under penalty of perjury under the laws of the State of California, that the

21 foregoing is true and correct, and this declaration was executed on September 25, 2009, at

22 Oakland, California.

23

24 Sarah E. Robertson

25

26

27

28

ROBERTSON DECLARATION IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT MOTIONS
9/25/09 (23903) #295788.1



SUPERIOR COURT OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA


DONALD GOLDEN, M.D.,

       Plaintiff,

-vs-                            CASE NO. RG08388602

CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, MEDAMERICA, MARK
ALDERDICE, ROBERT BUSCHO, and DOES
1-100, inclusive,

       Defendants.
_____/

**COPY**


DEPOSITION OF DONALD GOLDEN, M.D.

VOLUME I (pages 1 - 180)

Taken before KAREN A. CRANGLE
Certified Shorthand Reporter
State of California
C.S.R. License No. 3816

February 4, 2009

1  administrative hearing of any kind?

2          MR. GREEN:  Give me just a moment.

3          (Discussion off the record between Dr. Golden and

4  Mr. Green.)

5          THE WITNESS:  Yes.

6          MS. ROBERTSON:  Q.  What was that hearing or

7  proceeding?

8          A. Grievance.

9          Q. Was that the grievance that you filed with

10  CPAC, C-P-A-C?

11          A. Yes.

12          Q. Have you testified in any other setting besides

13  the CPAC grievance?

14          A.  No.

15          Q. And when I say the CPAC grievance, I'm

16  referring to the one that you filed with CEP relating to

17  your removal from the schedule at Seton Coastside.  Is

18  that the same thing you're referring to?

19          A. Yes.

20          Q. Okay.  Where are you currently working?

21          A. Um, I'm working at a couple of clinics.

22          Q. What clinics are those?

23          A. At the Berkeley Health Clinic, Occupational

24  Medicine Clinic, and a primary care clinic.  And Doctors

25  Medical Center.

1    MS. ROBERTSON: Q. Okay. So when the DMC Pinole

2  site closed in roughly 2001, obviously you stopped working

3  there, with what CEP site did you work next?

4    A. I think that was, um, Gilroy. I think.

5    Q. Okay.

6    A. South Valley.

7    Q. Have you ever applied to work with Doctors

8  Medical Center in San Pablo?

9    A. Um, yes, but I have to speak to my lawyer.

10    MS. ROBERTSON: Okay.

11    (Recess.)

12    THE WITNESS: Okay. So could you please ask me

13  that last question again?

14    MS. ROBERTSON: Yes. Let me carve something out,

15  though.

16    Q. I know you've told me you have been working

17  recently at DMC in San Pablo as a hospitalist.

18    A. Right.

19    Q. Okay. So I'm talking about before that time,

20  did you ever seek to work at DMC San Pablo through CEP as

21  opposed to this hospitalist work you're doing now?

22    A. Uh, I -- at some time after the Pinole --

23    Q. After Pinole shut down.

24    A. -- or right after Pinole shut down?

25    Q. At any time after Pinole shut down.

1    MS. ROBERTSON: Q. Okay. So when the DMC Pinole

2    site closed in roughly 2001, obviously you stopped working

3    there, with what CEP site did you work next?

4    A. I think that was, um, Gilroy. I think.

5    Q. Okay.

6    A. South Valley.

7    Q. Have you ever applied to work with Doctors

8    Medical Center in San Pablo?

9    A. Um, yes, but I have to speak to my lawyer.

10    MS. ROBERTSON: Okay.

11    (Recess.)

12    THE WITNESS: Okay. So could you please ask me

13    that last question again?

14    MS. ROBERTSON: Yes. Let me carve something out,

15    though.

16    Q. I know you've told me you have been working

17    recently at DMC in San Pablo as a hospitalist.

18    A. Right.

19    Q. Okay. So I'm talking about before that time,

20    did you ever seek to work at DMC San Pablo through CEP as

21    opposed to this hospitalist work you're doing now?

22    A. Uh, I -- at some time after the Pinole --

23    Q. After Pinole shut down.

24    A. -- or right after Pinole shut down?

25    Q. At any time after Pinole shut down.

1        MR. GREEN:  Tell us when you need to go.

2    Five-minute warning.

3        THE WITNESS:  12:45 would be great.

4        MS. ROBERTSON:  Okay.  And it's 12:10.  A little

5    less.

6        Q. Have you worked -- and I'm sorry, I should know

7    this right off the top of my head, but now we're getting

8    to that point where we've been going for a while.

9        Remind me, the CEP sites you've worked for are

10   Seton Coastside --

11       A. I've worked at South Valley --

12       Q. Right.

13       A. -- I worked at Palo Alto, occupational

14   medicine; Redwood City, occupational medicine; Gateway,

15   primary care, urgent care and occupational medicine;

16   Pinole; Coastside.

17       And I think at one point in time I almost -- I did

18   all of them at the same time except Pinole because when it

19   closed it was over.

20       Q. Okay.  I knew there were others but I couldn't

21   think of what they were so thank you for reminding me.

22       Are you still working at the Palo Alto CEP site?

23       A. I am not working at any CEP site.

24       Q. Okay.  So that's a no.

25       How did it come to pass that you're no longer

1          Q. And if I remember right, you first started

2    working at Coastside in late 2004, right?

3          A. Something like that.

4          MR. GREEN:  September -- fall, summer or fall, '04.

5          MS. ROBERTSON:  I have September '04.

6          Q.  First shift you did, you had the temporary --

7          A.  In terms of work, pull up the pay checks.

8    We'll know the exact dates from the pay checks.

9          Q. So how long did it take for Coastside

10   approximately in months to let you be full time?

11         A. It was about a year.  I was working there about

12   a year.  Because I kept asking -- they don't give you

13   information --

14         MR. GREEN:  Just answer the question.

15         THE WITNESS:  I'm sorry.

16         MS. ROBERTSON:  Q.  So approximately give or

17   take -- it doesn't have to be exact, but in roughly the

18   fall of '05 would have been you went full time at

19   Coastside and therefore withdrew your application in the

20   central valley.  Right?

21         A. Something like that.  I knew it was coming.

22   Somewhere in there.

23         Q. Just trying to get the timeline.

24         So did you have any more conversations with that

25   medical director whose name you can't remember after you

```
1   STATE OF CALIFORNIA    )
                           )    ss
2   COUNTY OF ALAMEDA      )

3

4

5        I, Karen A. Crangle, hereby certify that the

6   witness in the foregoing deposition named

7

8               DONALD GOLDEN, M.D.

9

10  was by me duly sworn to testify to the truth, the whole

11  truth, and nothing but the truth in the within-entitled

12  cause; that said deposition was taken at the time and

13  place herein named; that the testimony of said witness was

14  reported by me, a certified shorthand reporter and a

15  disinterested person, and thereafter transcribed into

16  typewriting.

17

18        And I further certify that I am not of counsel or

19  attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said caption.

22

23

24  Date 2/24/09                 Karen A. Crangle
                                 Karen A. Crangle, C.S.R.
25
```

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

**COPY**

DONALD GOLDEN, M.D.,

        Plaintiff,

-vs-
                        CASE NO. RG08388602

CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, MEDAMERICA, MARK
ALDERDICE, ROBERT BUSCHO, and DOES
1-100, inclusive,

        Defendant.
_____/


DEPOSITION OF DONALD GOLDEN, M.D.

VOLUME IV (pages 527 - 647)



Taken before KAREN A. CRANGLE
Certified Shorthand Reporter
State of California
C.S.R. License No. 3816




June 29, 2009

1    (Defendant's Exhibit 73 was marked for

2 identification.)

3    MS. ROBERTSON:  Q.  Take a look at Exhibit 73.  Is

4 that your signature --

5    A. Yes.

6    Q. -- on the document?  And you did sign a

7 partnership -- you saw a copy of a partnership agreement

8 at or around the time you signed Exhibit 73.  Correct?

9    A. I don't remember.

10    Q. Have you ever reviewed the partnership

11 agreement, CEP's partnership agreement?

12    A. I think so.

13    (Defendant's Exhibit 74 was marked for

14 identification.)

15    MS. ROBERTSON:  Q.  Dr. Golden, if you'd just flip

16 through this, I'm certainly not asking you to read it

17 right now.

18    Does this appear to be a version of the partnership

19 agreement that you have reviewed for CEP?

20    A. Don't remember.

21    Q. Okay.  Do you know when you first reviewed the

22 CEP partnership agreement?

23    A. Oh, probably like about maybe four years ago or

24 so.  I don't remember exactly.

25    Q. Okay.

1     Q. Okay.

2     Are you still a level four partner?

3     A. I don't know.

4     Q. As a level four partner, which we know you have

5  been at some point in time, were you eligible to vote on

6  amendments to the partnership agreement?

7     A. That sounds correct.

8     Q. Do you know if you were eligible to vote on

9  admission of new partners to the partnership?

10     A. I don't -- I don't recall that.

11     Q. Do you know if you were eligible to vote on

12  representatives --

13     A. Hold on.  In terms of new partners to the

14  partnership, I don't remember anything about me voting on

15  a new partner to the partnership, no.

16     Q. Okay.  Do you know if you are eligible to vote

17  for people who serve on the board of directors?

18     A. Yes.

19     Q. Do you know if you're eligible to vote if the

20  partnership were to decide to dissolve?

21     A. I don't know anything about that statement.

22  It's confusing to me.

23     Q. Well, partnerships can vote to disband and not

24  be partnerships any more.  Okay?  Is that a familiar

25  concept to you?

1          A. No, I mean --

2          Q. Okay.

3          A. -- I haven't heard of that.

4          Q. So you don't know one way or the other whether

5    you would have the right to vote if the partnership were

6    to decide to split up or dissolve?

7          A. No.

8          Q. While you've been a partner you've been allowed

9    to attend meetings of the board of directors, correct?

10         A. Yep.

11         Q. Do you know how many meetings you've attended?

12         A. No.

13         Q. Can you give me an estimate?

14         A. Ten.

15         Q. You've also attended medical director meetings.

16   Correct?

17         A. Yes.

18         Q. Can you estimate for me how many medical

19   director meetings you've attended?

20         A. One or two.

21         Q. Now, at the end of the year what kind of tax

22   form do you get from CEP?

23         A. I don't think I get one.

24         Q. Okay.  Do you know if you get something called

25   a K-1 on which your earnings with the partnership are

1  reported?

2      A. My wife and my tax guy take care of all of

3  that. That sounds familiar.

4      Q. Do you know if you get a W-2 form from CEP?

5      A. I don't think I do.

6      Q. Okay. Do you pay for your own fringe benefits

7  like medical insurance with CEP?

8      THE WITNESS: Do you want to step outside, Mitch?

9  I have to ask you a question.

10     (Recess.)

11     MS. ROBERTSON: Q. So the question that was

12 pending was do you pay for your own fringe benefits like

13 medical insurance at CEP?

14     A. Yes.

15     Q. Have you ever gotten a bonus while you've been

16 employed or while you've been a partner with CEP?

17     A. Yes.

18     Q. How many years have you received a bonus?

19     A. I don't remember.

20     Q. Most years?

21     A. I think so.

22     Q. Do you know how the bonus is calculated?

23     A. No.

24     Q. Do you think that there's anything unfair about

25 the way the bonus was calculated as it relates to you?

1      A. I don't know how it's calculated so I can't

2  tell you whether or not it's unfair.

3      Q. Okay. Did you ever look at the partnership

4  agreement to see how the bonus is calculated?

5      A. No. I may have at some time but I don't

6  remember.

7      Q. I believe you've already testified that you

8  have a capital account with the partnership. Is that

9  correct?

10     A. I don't remember testifying to that. And I

11  don't know -- I don't understand myself to have anything

12  with CEP. I think everything has been severed.

13     Q. Okay. Have you at any time had a capital

14  account with the partnership?

15     A. I think so.

16     Q. At some point in time was your capital account

17  paid out to you?

18     A. I think it was. I think what I received is the

19  capital account. I'm not sure.

20     Q. When did you receive it?

21     A. Couple of days ago. About a week ago.

22     Q. How much was it?

23     A. If it's the capital account that you're asking

24  about, I think it was $7,000.

25     Q. Okay. In your work treating patients while

1    you've worked for CEP you have not been directly

2    supervised in your interactions with patients. In other

3    words, nobody was standing in the room with you while you

4    were examining patients. Correct?

5          A. Wrong.

6          Q. Okay. When was someone directly observing you

7    treating patients?

8          A. The nurses always observe me seeing patients.

9          Q. But no one from CEP was observing you while you

10   were treating patients. Correct?

11         A. There were occasions that we shared patients

12   and CEP people have seen me take care of patients.

13         Q. Okay. But as a general rule, let's go to

14   Coastside, when you worked at Coastside you worked a

15   24-hour shift all by yourself with nobody else there

16   during most of that from CEP. Correct?

17         A. Correct. With no other CEP person there.

18         Q. Right.

19         A. But then I think that supervision -- I think

20   you're supervised if a regional director tells a nurse to

21   supervise you. Which was Cyn.

22         Q. Do you have any information to suggest that a

23   regional director told a nurse to supervise you?

24         A. Yeah, Dr. Alderdice testified to that.

25         Q. Other than that testimony, whatever that may

1         Q. Did you ever look at the partnership agreement

2    with regard to that question?

3         A. I don't remember doing that.

4         Q. And I believe you've already testified before

5    that you got paid a particular hourly rate for each

6    clinical hour that you've worked at various CEP sites.

7    Correct?

8         A. I believe I testified that I get an hourly

9    wage. Yes.

10        Q. Okay. So my question for you is do you know --

11   first of all, I think you testified that the rate at

12   Coastside was $58 an hour?

13        A. Yes.

14        Q. Do you know how that is calculated?

15        A. No.

16        Q. Have you ever looked at the partnership

17   agreement to see how site revenues are determined?

18        A. Not that I recall.

19        Q. Apart from the issue of who has the authority

20   to terminate someone's partnership, do you know if the

21   partnership agreement addresses under what circumstances a

22   partner's partnership at CEP can be terminated?

23        A. No.

24        Q. Were taxes withheld from the checks that you've

25   received for CEP while you've been a partner there?

1      A. I don't know but I do not believe so.

2      Q. Have you had to make quarterly estimated tax

3   payments during the time that you've been a CEP

4   partnership with respect to your income from CEP?

5      A. The details of that my tax guy and my wife

6   would know.

7      Q. All right.

8      (Defendant's Exhibit 75 was marked for

9   identification.)

10     MS. ROBERTSON:  Q.  Have you seen Exhibit 75

11  before?

12     A. Um-hum.

13     Q. An exchange of e-mails between you and Jennifer

14  Munkner?  Part of it is cc'd to Reza.  Correct?

15     A.  Yes.

16     Q. Did Jennifer tell you in June of 2007 that

17  Dr. Alderdice was board certified through AAPS?

18     A. What's written here I believe I received.

19     Q. Okay.  When you say in the e-mail at the top of

20  the page, "That is why he told me he grandfathered in," do

21  you see that statement?

22     A. Um-hum.

23     Q. Who told you that Dr. Alderdice grandfathered

24  in?

25     A. I don't -- I don't recall.

```
1   STATE OF CALIFORNIA      )
                             )    ss
2   COUNTY OF ALAMEDA        )

3

4

5        I, Karen A. Crangle, hereby certify that the

6   witness in the foregoing deposition named

7

8                    DONALD GOLDEN, M.D.

9

10  was by me duly sworn to testify to the truth, the whole

11  truth, and nothing but the truth in the within-entitled

12  cause; that said deposition was taken at the time and

13  place herein named; that the testimony of said witness was

14  reported by me, a certified shorthand reporter and a

15  disinterested person, and thereafter transcribed into

16  typewriting.

17

18       And I further certify that I am not of counsel or

19  attorney for either or any of the parties to said

20  deposition, nor in any way interested in the outcome of

21  the cause named in said caption.

22

23

24  Date  8/04/09                  Karen A Crangle

25                            Karen A. Crangle, C.S.R.
```

646





## CALIFORNIA EMERGENCY PHYSICIANS®

**M E D I C A L   G R O U P**

**To:** CEP Physicians

**From:** John Gravette

**RE:** Partnership Agreement

Attached is a signature page for the Partnership Agreement for which you have been provided a copy. The Agreement does not take effect until you work your first shift for CEP.

Failure to perform any services for CEP makes the Agreement null and void. You will not be considered a Partner until you have worked your first shift for CEP.

Please sign the signature page in the appropriate place and send it along with this signed memo. Both should be returned with your application package.

I understand that, I will not be considered a Partner, until the date of my first shift for California Emergency Physician. I further understand that should I not perform services for California Emergency Physician that the Partnership Agreement will be considered null and void.

_____7/18/00_____
Date

_____
Signature

_____
Print Name



DEFENDANT'S
EXHIBIT
**73**
GOLDEN

**CEP 00046**
**CONFIDENTIAL**

2101 Webster Street, Suite 1770, Oakland, CA 94612-3027   510.832.6400   FAX 510. 832.1914

26

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA


DONALD GOLDEN, M.D.,

        Plaintiff,

-vs-

CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, MEDAMERICA, MARK
ALDERDICE, ROBERT BUSCHO, and DOES
1-100, inclusive,

        Defendant.

_____/

**COPY**

CASE NO. RG08388602


DEPOSITION OF DONALD GOLDEN, M.D.

VOLUME IV (pages 527 - 647)


Taken before KAREN A. CRANGLE
Certified Shorthand Reporter
State of California
C.S.R. License No. 3816


June 29, 2009

1    (Defendant's Exhibit 73 was marked for

2    identification.)

3    MS. ROBERTSON:  Q.  Take a look at Exhibit 73.  Is

4    that your signature --

5    A. Yes.

6    Q. -- on the document?  And you did sign a

7    partnership -- you saw a copy of a partnership agreement

8    at or around the time you signed Exhibit 73.  Correct?

9    A. I don't remember.

10   Q. Have you ever reviewed the partnership

11   agreement, CEP's partnership agreement?

12   A. I think so.

13   (Defendant's Exhibit 74 was marked for

14   identification.)

15   MS. ROBERTSON:  Q.  Dr. Golden, if you'd just flip

16   through this, I'm certainly not asking you to read it

17   right now.

18   Does this appear to be a version of the partnership

19   agreement that you have reviewed for CEP?

20   A. Don't remember.

21   Q. Okay.  Do you know when you first reviewed the

22   CEP partnership agreement?

23   A. Oh, probably like about maybe four years ago or

24   so.  I don't remember exactly.

25   Q. Okay.

1    STATE OF CALIFORNIA     )
                             )    ss
2    COUNTY OF ALAMEDA       )

3

4

5         I, Karen A. Crangle, hereby certify that the

6    witness in the foregoing deposition named

7

8                    DONALD GOLDEN, M.D.

9

10   was by me duly sworn to testify to the truth, the whole

11   truth, and nothing but the truth in the within-entitled

12   cause; that said deposition was taken at the time and

13   place herein named; that the testimony of said witness was

14   reported by me, a certified shorthand reporter and a

15   disinterested person, and thereafter transcribed into

16   typewriting.

17

18        And I further certify that I am not of counsel or

19   attorney for either or any of the parties to said

20   deposition, nor in any way interested in the outcome of

21   the cause named in said caption.

22

23

24   Date _8/04/09_                    _Karen A Crangle_
                                       Karen A. Crangle, C.S.R.
25

646



EXHIBIT C

1　　SUPERIOR COURT OF THE STATE OF CALIFORNIA

2　　　　IN AND FOR THE COUNTY OF ALAMEDA

3　　　　　RENE C. DAVIDSON COURTHOUSE

4　　　　　　　　--oOo--

5

DONALD GOLDEN, M.D.,　　　　　　　　)

6　　　　　　　　　　　　　　　　　)

　　　　Plaintiff,　　　　　　　　)

7　　　　　　　　　　　　　　　　　)

　　　　vs.　　　　　　　　　　　　)　No. RG08388602

8　　　　　　　　　　　　　　　　　)　Pages 1 thru 197

CALIFORNIA EMERGENCY　　　　　　　　)　Volume I

9　PHYSICIANS MEDICAL GROUP;　　　　)

　MEDAMERICA; MARK ALDERDICE;　　　　)

10　ROBERT BUSCHO; AND DOES 1　　　　)

　THROUGH 1000, AND EACH OF　　　　　)

11　THEM, INCLUSIVE,　　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

12　　　　Defendants.　　　　　　　　)

　　　　　　　　　　　　　　　　　　)

13

14

15

16　　　　　　　DEPOSITION OF

17　　　　　ROBERT F. BUSCHO, M.D.

18　　　　　　　May 13, 2009

19　Reported by ELIZABETH J. WOOD　　COPY

　License No. CSR-5134

20　---------------------------------------------------------

21　　　　　JAN BROWN & ASSOCIATES

22　　　　CERTIFIED SHORTHAND REPORTERS

23　　　　701 Battery Street, 3rd Floor

24　　　　San Francisco, California 94111

25　　　　(415) 981-3498 or (800) 522-7096

1

10:18  1      Q.   Uh-huh.

10:18  2      A.   Emergency medical services committee.

10:18  3      Q.   Uh-huh.

10:18  4      A.   I think that was it.

10:18  5      Q.   Okay.  Now, by -- in what capacity were you on

10:18  6  the medical executive committee from 2000 to 2006?

10:18  7      A.   Because I was chairman of the department of

10:18  8  family practice.

10:18  9      Q.   And when you became the -- in the fall of 2006,

10:18 10  you became the medical director of the emergency

10:18 11  department at Coastside, correct?

10:18 12      A.   Yes.

10:18 13      Q.   Were you -- did you continue on at the medical

10:18 14  executive committee at this time by virtue of that

10:18 15  position?

10:18 16      A.   No.

10:19 17      Q.   When did you -- when you became the chairman in

10:19 18  2006, did your membership on the medical executive

10:19 19  committee terminate?

10:19 20      MS. ROBERTSON:  When you say chairman, are you

10:19 21  talking about medical director?

10:19 22      MR. GREEN:  I'm sorry.

10:19 23      Q.   When you became the medical director in the

10:19 24  fall of 2006 at Coastside, did your membership on the

      25  medical executive committee terminate?

                                                          14

10:53 1     Q.  A monthly meeting?

10:54 2     A.  No.  A biannual meeting.

10:54 3     Q.  Oh.

10:54 4     A.  And I conducted the first meetings during that

10:54 5  time, the first two, and I think Dr. Alderdice was

10:54 6  invited.  I don't recall if he was able to come or not.

10:54 7     Q.  Did Dr. Alderdice -- can you think of any other

10:54 8  purposes for which Dr. Alderdice was physically present

10:54 9  at Seton Coastside?

10:54 10     A.  No.

10:54 11     Q.  Let's talk about Seton Coastside as a facility.

10:54 12  It has been referred to as a standby facility.

10:54 13     A.  It is.

10:54 14     Q.  Are you familiar with that phrase?

10:54 15     A.  Yes.

10:54 16     Q.  What does that mean?

10:54 17     A.  It means it's an emergency department that has

10:54 18  a lower level of care.

10:54 19     Q.  As compared to other emergency departments?

10:54 20     A.  As compared to other emergency departments that

10:54 21  have higher levels of care.

10:54 22     Q.  Okay.  Did it have, during the time you were

10:55 23  medical director, any protocols or procedures in place

10:55 24  to handle complaints from physicians about equipment,

25  supplies, facilities, or anything like that?

43

STATE OF CALIFORNIA    )
                       )        ss.
COUNTY OF CONTRA COSTA)


    I, ELIZABETH J. WOOD, CSR, a Certified shorthand
Reporter, hereby certify that the witness in the
foregoing deposition was by me duly sworn to testify to
the within-entitled cause; that said deposition was
taken at the time and place therein stated; that the
testimony of the said witness was reported by me, a
Certified Shorthand Reporter, and was thereafter
transcribed under my direction into typewriting; and
that the witness was given an opportunity to read, and
if necessary, correct said deposition and to subscribe
the same.

    I FURTHER CERTIFY that I am not of counsel or
attorney for either or any of the parties in the
foregoing deposition and caption named or in any way
interested in the outcome of the cause named in such
caption.

    IN WITNESS WHEREOF, I have hereunto set my hand
this date, the 18th day of May, 2009.


_Elizabeth J. Wood_

ELIZABETH J. WOOD, CSR, License No. C-5134,
County of Contra Costa, State of California.

197



1        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            IN AND FOR THE COUNTY OF ALAMEDA

3                UNLIMITED JURISDICTION

4   DONALD GOLDEN, M.D.,            )
                                    )
5        Plaintiff,                 )
                                    )
6        vs.                        )   Case No. 08388602
                                    )
7                                   )     Volume 1
                                    )
8   CALIFORNIA EMERGENCY            )   Pages 1 thru 96
    PHYSICIANS MEDICAL GROUP;       )
9   MEDAMERICA; MARK ALDERDICE;     )
    ROBERT BUSCHO; AND DOES 1       )
10  THROUGH 100, AND EACH OF THEM   )
    INCLUSIVE,                      )
11                                  )
         Defendants.                )
12                                  )
                                    )
13  _____

14

15                Deposition of

16               MARCIA SHAIKIN

17               October 2, 2008

18

19  Reported by:

20  Colleen Alvarado CSR # 11987        COPY

21  -----------------------------------------------------------------

22            JAN BROWN & ASSOCIATES

23          CERTIFIED SHORTHAND REPORTERS

24  701 Battery Street, 3rd Floor, San Francisco, California 94111

25                (415) 981-3498

                                                              1

| | | |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | We should both try and go slowly so the court reporter can |
| 3 | | get a good record and try to avoid speaking over each |
| 4 | | other. I'll wait for you to finish your answer, and you |
| 5 | | please wait for me to finish my question. |
| 6 | A | Okay. |
| 7 | Q | And I think that's -- you will have a chance to review the |
| 8 | | transcript that's going to be made of this testimony and |
| 9 | | make whatever corrections you want. |
| 10 | A | Okay. |
| 11 | Q | And I will -- if you make a correction, I certainly will |
| 12 | | have a chance to comment on the fact at trial. But you're |
| 13 | | free to make corrections. |
| 14 | A | Okay. |
| 15 | Q | When did you start your employment at Seton Hospital? |
| 16 | A | November, 1994. |
| 17 | Q | Okay. Would you just go through and outline the |
| 18 | | chronology of your employment? |
| 19 | A | Sure. I was -- I was hired as medical group staff |
| 20 | | services assistant for approximately four years. And then |
| 21 | | I became the coordinator, medical group staff coordinator, |
| 22 | | for approximately three years. And then the remainder of |
| 23 | | the time, I've been manager of the medical group staff |
| 24 | | services department. |
| 25 | Q | So you were -- is it accurate that you were manager of the |

7

| | | |
|---|---|---|
| 1 | | medical group staff services department since in or around |
| 2 | | 2001? |
| 3 | A | Yes, that is correct. |
| 4 | Q | Tell me, if you would, your job duties as manager of the |
| 5 | | medical group staff services department? |
| 6 | A | Well, I oversee the credential's coordinator, the |
| 7 | | meeting's coordinator, data entry clerk, and another |
| 8 | | medical group staff assistant. |
| 9 | Q | Who is the credential's coordinator? |
| 10 | A | Her name is Jennifer Siapno, S-I-A-P-N-O. |
| 11 | Q | And who is the meeting's coordinator? |
| 12 | A | Lily, L-I-L-Y, Wong. |
| 13 | Q | And other than overseeing these employees that you |
| 14 | | identified, what other duties do you have? |
| 15 | A | I'm in charge of -- I have several meetings of my own that |
| 16 | | I'm responsible for. And I have oversight over the |
| 17 | | nominations of the medical staff officers. I'm in charge |
| 18 | | of the contracts, processing the contracts. And I'm |
| 19 | | charge of maintaining the bylaws. And I deal with various |
| 20 | | complaints and issues. |
| 21 | Q | Okay. Do you regularly attend CEP meetings? |
| 22 | A | Every month. |
| 23 | Q | And who takes the minutes of the meetings? |
| 24 | A | I do. |
| 25 | Q | And you review them and send them back to MEC the next |

8

THE WITNESS: Let me mark this as Exhibit 1.

(Whereupon a document entitled Seton Medical
Center, Medical Staff Bylaws Seton Medical
Center was marked Plaintiff's Exhibit 1
For identification.)

MR. GREEN:

Q   And I want to ask you if you -- I'm going to refer to this
    as the 2006 bylaws and direct your attention to the second
    paragraph of 3.2.1 and just ask if you recognize this as
    an excerpt from the 2006 bylaws?

A   Yes, I do.

Q   Okay.  Now, Jennifer Siapno is still employed by Seton?

A   Yes, she is.

Q   And who -- let's look at the reporting relationships going
    the other direction.  To whom do you report?

A   I report to Tim McMerdow.  He's the vice-president of
    medical staff and business development.

Q   And to whom does Mr. McMerdow report?

A   Currently he reports to the interim CEO, and her name is
    Lorraine Haurbach.

Q   When did she become interim CEO?

A   June of this year.

Q   And until then was Bernadette Smith the CEO?

12

| | | |
|---|---|---|
| 1 | | they had with Seton? |
| 2 | A | Yes. |
| 3 | Q | And there was a talk about the -- it was a contract that |
| 4 | | was entered into on or around February 1st, 2005? |
| 5 | A | (Witness nods head.) |
| 6 | Q | Do you recall that? |
| 7 | A | Yes, I do. |
| 8 | | MR. GREEN: Mark this as 2. |
| 9 | | |
| 10 | | (Whereupon a document dated February 1, 2005 |
| 11 | | Professional and Administrative Services |
| 12 | | Agreement Emergency Services between Seton |
| 13 | | Medical Center and California Emergency |
| 14 | | Physicians Medical Group was marked Plaintiff's |
| 15 | | Exhibit 2 for identification.) |
| 16 | | |
| 17 | | |
| 18 | | MR. GREEN: |
| 19 | Q | And do you recognize this, in particular section 1.3, as |
| 20 | | an excerpt from that 2005 contract? |
| 21 | A | Yes. |
| 22 | Q | Okay. Were you yourself involved in any way in the |
| 23 | | negotiations of that contract? |
| 24 | A | No. |
| 25 | Q | And how was it that you became familiar with this |

17

STATE OF CALIFORNIA      )  SS

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a certified shorthand reporter and a disinterested person, and was under my supervision thereafter transcribed into typewriting, and when so transcribed was carefully read to or by the said witness, and, being in every desire, was thereafter by the said witness duly subscribed; that if unsigned by the witness, signature has been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 15th day of October 2008.

_____
COLLEEN ALVARADO
Certified Shorthand Reporter

96



EXHIBIT E



# MEDICAL STAFF BYLAWS
# SETON MEDICAL CENTER

Approved: _____   12-5-06
Julius Zsigmond, M.D.                    Date
President, Medical Staff


_____   6-5-06
Bernadette M. Smith          Date
President and Chief Executive Officer


_____   12-5-06
Sister Judith Lynn Gardenhire, DOC    Date
Chair of the Board, Seton Medical Center


_____   12/05/06
Bernard Roazen, M.D.          Date
Chairman, Bylaws Committee

Δ π EXHIBIT ___
Deponent ___
Date ___ Rptr ___
WWW.DEPOBOOK.COM

# ARTICLE III
## MEDICAL STAFF MEMBERSHIP

3.1   Nature of Medical Staff Membership

Membership on the Medical Staff of the Hospital shall be extended only to professionally competent, licensed physicians, dentists and podiatrists who are privileged to attend patients in the Hospital and who are professionally competent and who continually meet the qualification standards and requirements set forth in these Bylaws. No applicant shall be denied membership on the basis of sex, age, race, creed, color, religion, political affiliation, national origin, or gender preference. Appointment to, and membership on the Medical Staff, shall confer on the appointee or member only the clinical privileges as have been granted by the Governing Body in accordance with these Bylaws. Appointment or reappointment to the medical staff is made for a period of no more than two years.

3.2   Qualifications for Membership

3.2.1   Only individuals licensed to practice in the State of California, who can document their background, experience, training and demonstrated competence, their adherence to the ethics of their profession, their good reputation, their ability to work with others, their willingness to participate in the discharge of staff responsibilities, and can attest that their physical and mental health, with reasonable accommodation, is sufficient to allow them to practice medicine and exercise privileges, shall be eligible for membership on the Medical Staff. No applicant shall be entitled to membership on the Medical Staff or to the exercise of particular clinical privileges in the Hospital simply because he is duly licensed to practice a health profession in this or in any other state, or that he is a member of some professional organization or that he had in the past, or presently has, privileges at another hospital.

Effective January 1, 2007, applicants for Medical Staff membership must be Board certified by a Board recognized by the American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA) or the American Podiatric Medical Association (APMA), as applicable. Applicants who have recently completed a residency program and are Board eligible may qualify for Medical Staff membership on that basis, but must become board certified within five years of attaining Board eligibility and must demonstrate throughout the five year period active pursuit of Board certification. Failure to attain board certification by the end of the five year period will be deemed a voluntary resignation from the medical staff.

Applicants who are not Board certified, or progressing towards Board certification as outlined above, may still apply for membership. However, appointment to membership in such circumstances will require Departmental approval that the physician has equivalent competence/qualifications to Board certification. Any such determination, positive or negative, must be reviewed by the Medical Executive Committee prior to a final decision. Recertification is strongly encouraged.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

UNLIMITED JURISDICTION

DONALD GOLDEN, M.D.,                )
                                    )
        Plaintiff,                  )
                                    )
                                    )
        vs.                         )       Case No. 08388602
                                    )
                                    )       Volume 1
CALIFORNIA EMERGENCY                )
PHYSICIANS MEDICAL GROUP;           )       Pages 1 thru 96
MEDAMERICA; MARK ALDERDICE;         )
ROBERT BUSCHO; AND DOES 1           )
THROUGH 100, AND EACH OF THEM       )
INCLUSIVE,                          )
                                    )
        Defendants.                 )
                                    )
_____)


                    Deposition of

                    MARCIA SHAIKIN

                    October 2, 2008


Reported by:

Colleen Alvarado CSR # 11987                    COPY

---------------------------------------------------------------

JAN BROWN & ASSOCIATES

CERTIFIED SHORTHAND REPORTERS

701 Battery Street, 3rd Floor, San Francisco, California 94111

(415) 981-3498

                                                1

THE WITNESS: Let me mark this as Exhibit 1.

(Whereupon a document entitled Seton Medical
Center, Medical Staff Bylaws Seton Medical
Center was marked Plaintiff's Exhibit 1
For identification.)

MR. GREEN:

Q   And I want to ask you if you -- I'm going to refer to this
    as the 2006 bylaws and direct your attention to the second
    paragraph of 3.2.1 and just ask if you recognize this as
    an excerpt from the 2006 bylaws?

A   Yes, I do.

Q   Okay.  Now, Jennifer Siapno is still employed by Seton?

A   Yes, she is.

Q   And who -- let's look at the reporting relationships going
    the other direction.  To whom do you report?

A   I report to Tim McMerdow.  He's the vice-president of
    medical staff and business development.

Q   And to whom does Mr. McMerdow report?

A   Currently he reports to the interim CEO, and her name is
    Lorraine Haurbach.

Q   When did she become interim CEO?

A   June of this year.

Q   And until then was Bernadette Smith the CEO?

12

STATE OF CALIFORNIA        )   SS

         I do hereby certify that the witness in
the foregoing deposition was by me duly sworn to
testify to the truth, the whole truth, and nothing
but the truth in the within-entitled cause; that
said deposition was taken at the time and place
therein stated; that the testimony of said witness
was reported by me, a certified shorthand reporter
and a disinterested person, and was under my
supervision thereafter transcribed into typewriting,
and when so transcribed was carefully read to or by
the said witness, and, being in every desire, was
thereafter by the said witness duly subscribed; that
if unsigned by the witness, signature has been
waived in accordance with stipulation between
counsel for the respective parties.

         And I further certify that I am not of
counsel or attorney for either or any of the parties
to said deposition nor in any way interested in the
outcome of the cause named in said caption.

         IN WITNESS WHEREOF, I have hereunder subscribed my
hand this 15th day of October 2008.

                        _____
                        COLLEEN ALVARADO
                        Certified Shorthand Reporter

                                                    96



EXHIBIT F

# PROFESSIONAL AND ADMINISTRATIVE SERVICES AGREEMENT
## EMERGENCY SERVICES

between

## SETON MEDICAL CENTER

and

## CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP

### FEBRUARY 1, 2005



Δ π EXHIBIT _____

Deponent _____

Date _____ Rptr _____

WWW.DCKOBOOK.COM

Contractor shall, when possible, and where doing so would not delay needed treatment or jeopardize the life or health of a patient, endeavor to ascertain from each patient seeking emergency treatment whether such patient has a personal physician. If the patient so desires, his or her personnel physician shall be called and consulted, as appropriate, with respect to the care and management of the patient. This procedure is subject to modification by Seton after consultation with its medical staff and medical group. If the Physician providing Professional Services to the patient determines that the patient requires hospitalization or specialty treatment and the patient has no private physician, then, consistent with the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), the patient shall be referred to the physician on-call at the applicable Hospital who is able to provide such follow-up treatment or shall be referred to another appropriate institution if the necessary specialty is not reasonably available.

    1.2.6.    <u>In-house Emergencies</u>. Contractor shall ensure that each Physician shall respond to an in-house emergency such as cardiac arrest or precipitous delivery if he/she is not previously engaged in a life-threatening emergency in either of Departments. In such cases, the attending physician will be immediately notified and the Physician will limit his/her treatment to measures which in his/her judgment are essential to management of the emergency situation until the attending physician can be contacted to assume responsibility for the patient.

    1.2.7.    <u>Pronouncements of Death</u>. Contractor shall ensure that each Physician shall assist in the pronouncements of death of in-patients at the personal request of attending physicians if he/she is not previously engaged in a preempting medical priority in either of Departments.

    1.3.    <u>Qualifications of Physician(s)</u>. Contractor shall ensure that each Physician, at all times during the term of this Agreement, (a) is duly licensed as a physician under California law, (b) is board certified in emergency medicine, internal medicine, family practice or pediatrics, (c) is a member in good standing of the Active Medical Staff, (d) holds all clinical privileges on the Active Medical Staff appropriate to the provision of Professional Services hereunder, (e) is a participating provider in the Medicare and Medicaid/Medi-Cal programs (Titles XVIII and XIX of the Social Security Act, respectively), (f) is or agrees to apply for participating physician status in any insurance coverage arrangement or managed care plan in which Seton participates and that is reasonably available to the Physician, either through Contractor or individually, (g) maintains an unrestricted federal Drug Enforcement Administration ("DEA") registration number, (h) is employed by or under contractual arrangement with Contractor, and (i) maintains insurance coverage as set forth in Section 5 of this Agreement. Contractor shall provide documentation of compliance with all provisions of this Section to Seton upon request. Furthermore, for each Physician not certified in emergency medicine, Contractor shall ensure (a) that Physician, at all times during the term of this Agreement, is currently certified in Advanced Cardiac Life Saving ("ACLS") and Pediatric Advanced Life Saving ("PALS") and (b) that then current ACLS and PALS certifications are submitted to the Seton Medical Staff office along with the initial application for appointment.

    Contractor represents and warrants to Seton that (a) no Physician's license to practice medicine in any state has ever been suspended, revoked or restricted; (b) neither Contractor nor any Physician has ever been reprimanded, sanctioned or disciplined by any licensing board or state or local medical society or specialty board; (c) no Physician has ever been denied membership or reappointment of membership on the medical staff of any hospital and no hospital medical staff membership or clinical privileges of any Physician have ever been suspended, curtailed or revoked for a medical disciplinary cause or reason; (d) neither Contractor nor any of its officers, directors, employees, contractors, or agents is excluded from participation in any local, state or federal health care program; (e) neither Contractor nor any Physician has ever been reprimanded, sanctioned or disciplined by the DEA, been denied a DEA registration number or had a DEA registration number restricted; (f) neither Contractor nor any Physician has been

Professional and Administrative Services Agreement between California Emergency Physicians Medical Group Contract Feb 2005 DOC

4

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

UNLIMITED JURISDICTION

DONALD GOLDEN, M.D.,                )
                                    )
        Plaintiff,                  )
                                    )
                                    )
        vs.                         )        Case No. 08388602
                                    )
                                    )        Volume 1
CALIFORNIA EMERGENCY                )
PHYSICIANS MEDICAL GROUP;           )        Pages 1 thru 96
MEDAMERICA; MARK ALDERDICE;         )
ROBERT BUSCHO; AND DOES 1           )
THROUGH 100, AND EACH OF THEM       )
INCLUSIVE,                          )
                                    )
        Defendants.                 )
                                    )
_____)


Deposition of

MARCIA SHAIKIN

October 2, 2008


Reported by:

Colleen Alvarado CSR # 11987

COPY

-----------------------------------------------------------------

JAN BROWN & ASSOCIATES

CERTIFIED SHORTHAND REPORTERS

701 Battery Street, 3rd Floor, San Francisco, California 94111

(415) 981-3498

1

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | they had with Seton?                                     |
| 2  | A | Yes.                                                     |
| 3  | Q | And there was a talk about the -- it was a contract that |
| 4  |   | was entered into on or around February 1st, 2005?   |
| 5  | A | (Witness nods head.)                                     |
| 6  | Q | Do you recall that?                                      |
| 7  | A | Yes, I do.                                               |
| 8  |   | MR. GREEN:  Mark this as 2.                              |
| 9  |   |                                                          |
| 10 |   | (Whereupon a document dated February 1, 2005            |
| 11 |   | Professional and Administrative Services                |
| 12 |   | Agreement Emergency Services between Seton               |
| 13 |   | Medical Center and California Emergency                  |
| 14 |   | Physicians Medical Group was marked Plaintiff's          |
| 15 |   | Exhibit 2 for identification.)                           |
| 16 |   |                                                          |
| 17 |   |                                                          |
| 18 |   | MR. GREEN:                                               |
| 19 | Q | And do you recognize this, in particular section 1.3, as |
| 20 |   | an excerpt from that 2005 contract?                      |
| 21 | A | Yes.                                                     |
| 22 | Q | Okay.  Were you yourself involved in any way in the     |
| 23 |   | negotiations of that contract?                           |
| 24 | A | No.                                                      |
| 25 | Q | And how was it that you became familiar with this       |

17

STATE OF CALIFORNIA        )   SS

          I do hereby certify that the witness in
the foregoing deposition was by me duly sworn to
testify to the truth, the whole truth, and nothing
but the truth in the within-entitled cause; that
said deposition was taken at the time and place
therein stated; that the testimony of said witness
was reported by me, a certified shorthand reporter
and a disinterested person, and was under my
supervision thereafter transcribed into typewriting,
and when so transcribed was carefully read to or by
the said witness, and, being in every desire, was
thereafter by the said witness duly subscribed; that
if unsigned by the witness, signature has been
waived in accordance with stipulation between
counsel for the respective parties.

          And I further certify that I am not of
counsel or attorney for either or any of the parties
to said deposition nor in any way interested in the
outcome of the cause named in said caption.

          IN WITNESS WHEREOF, I have hereunder subscribed my
     hand this 15th day of October 2008.

                         _____
                         COLLEEN ALVARADO
                         Certified Shorthand Reporter

                                                    96



1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2       IN AND FOR THE COUNTY OF ALAMEDA

3          RENE C. DAVIDSON COURTHOUSE

4

5  DONALD GOLDEN, M.D.,              )
                    Plaintiff,      )
6                                    )   Case No.:  RG08388602
   vs.                              )      VOLUME I
7                                    )   Pages 1 to 233
   CALIFORNIA EMERGENCY             )
8  PHYSICIANS MEDICAL GROUP;        )
   MEDAMERICA; MARK ALDERDICE;      )
9  ROBERT BUSCHO; AND DOES 1        )
   THROUGH 1000, AND EACH OF        )
10 THEM, INCLUSIVE,                 )
                    Defendants.     )
11 _____  )

12

13

14      DEPOSITION OF MARK ALDERDICE, M.D.

15          Friday, May 22, 2009

16

17

18  Reported by:

19  HEIDI BELTON, CSR #12885, RPR       COPY

20  _____

21          JAN BROWN & ASSOCIATES

22       CERTIFIED SHORTHAND REPORTERS

23  701 Battery Street, 3rd Floor, San Francisco, CA 94111

24              (415) 981-3498

25

1

1    Q.   And what happened in July of 2001?

2    A.   I was offered the position of regional director

3 for the San Francisco area of CEP.

4    Q.   And who offered that to you?

5    A.   Mark Spiro, who is our chief operating officer.

6    Q.   And you accepted that?

7    A.   Yes, I did.

8    Q.   And the time again?

9    A.   July of 2001.

10    Q.   And that transition away from Doctors Medical

11 Center in Modesto, that was voluntary also?

12    A.   Absolutely.

13    Q.   So you became regional director for

14 San Francisco in July 2001 and you have continued in that

15 position to the present date?

16    A.   Yes.  However, in 2007 because of the growth of

17 our partnership as a whole and specifically because of the

18 growth in my region, we had a fairly significant

19 reorganization of our regional structure.  And my region

20 had grown to include not only San Francisco, but I was

21 also responsible for Marin General, Sutter Roseville, and

22 Rideout Memorial in Marysville.  And at very end of that

23 period took on -- developed and took on the contracts at

24 St. Elizabeth's Hospital in Red Bluff, and Mercy Hospital

25 in Merced.

21



1          So my region, although it was still called the

2     San Francisco region, had become untenably large.  And I

3     appointed an assistant regional director.  And we made the

4     decision as part of the reorganization of the partnership

5     structure -- management structure that we would split my

6     region into two.  And I became the regional director for

7     what is now called the North State and Oregon region.

8          Q.   And who was this assistant you brought in?

9          A.   Keith Loring, who was my medical director at

10    St. Mary's Medical Center in San Francisco.

11         Q.   And other than that reorganization, you've

12    maintained essentially the regional director position that

13    you assumed in July '01 through today?

14         A.   Correct.

15         Q.   When you started as regional director in

16    July 2001, what was the status of Seton Coastside as one

17    of the facilities that you were in charge of supervising?

18    Was it in your stable of hospitals at that point?

19         A.   Yes, it was.

20         Q.   And so -- and who was the medical director at

21    Seton Coastside when you started?

22         A.   Mark Sears.

23         Q.   And you were regional director supervising

24    Coastside when Dr. Golden was first hired at Seton

25    Coastside; is that correct?

                                                            22

 1       A.    That is correct.

 2       Q.    Let's talk a little bit about your board

 3  certification.  You were certified by the board of

 4  certification in emergency medicine; is that correct?

 5       A.    That is correct.

 6       Q.    And when did you obtain that board

 7  certification?

 8       A.    In 1997.

 9       Q.    And in regard to residencies or fellowships, was

10  there any requirement for board certification by that

11  entity that you have -- that you would complete a

12  residency of any sort?

13       A.    Yes.

14       Q.    What were the requirements?

15       A.    The requirement was that you had to have

16  completed a residency in a recognized residency by the

17  American Board of Medical Specialties, ABMS.

18       Q.    The board of certification in emergency medicine

19  required that you complete an ABMS certified residency?

20       A.    That is correct.

21       Q.    And you had done that?

22       A.    Yes, I had.

23       Q.    And which residency was that?

24       A.    Family practice residency at UCedars-SinaiF

25  Natividad.

                                                            23

1     Q.   Did you have any role in the -- in his hiring?

2     A.   I did not.

3     Q.   It was -- was that in any way unusual?

4     A.   Yes, it was.

5     Q.   In what way was it unusual?

6     A.   The hiring process by definition, by description

7 of the role of the medical director in the medical

8 director job description within the CEP operations policy

9 manual, is to hire based on interviews and reviews of

10 credentials and references physician staff in conjunction

11 with the regional director.  And it is certainly the

12 uniform practice of medical directors in California

13 Emergency Physicians to apprise their regional directors

14 of staffing needs when they come up so that we can liaise

15 with our recruiting office.  And we routinely are given

16 the CVs of all physician applicants and usually discuss

17 the applicants, and probably 50 percent to 70 percent of

18 the time participate in the interviews with applicants who

19 are hired at sites.

20     Q.   What was it that first brought Dr. Golden to

21 your attention, if you were not involved in the initial

22 interviews?

23     A.   Dr. Sears told me that he had hired a

24 replacement for another physician.  And that it was

25 Dr. Golden.  And he was hired.  It was a fait accompli.  I

67

1      A.   Yes.

2      Q.   -- right?

3           Which you thought he was -- bad judgment in

4    transferring, right?

5      A.   Correct.

6      Q.   You had an -- hold on.  You had an interaction

7    about a heart condition in a 56-year-old woman which you

8    thought was bad judgment.

9      A.   Correct.

10     Q.   You had a couple of grumblings from people

11   without any specifics about transfer?

12     A.   Not a couple.

13     Q.   Well, how many?  I mean you've --

14          MS. ROBERTSON:  He's testified.

15          THE WITNESS:  Five to six.

16          MS. ROBERTSON:  Four to five just now.

17          THE WITNESS:  Oh, I thought I said five to six.

18   But it was --

19   BY MR. GREEN:

20     Q.   That's what you're referring to.  Is there

21   anything else you're referring to when you say his subpar

22   performance as of October '06?

23     A.   No.

24     Q.   Now, you terminated Dr. Sears as medical

25   director at some point in the fall of 2006; is that

                                                    124

1   correct?

2        A.    That is correct.

3        Q.    And why did you terminate him from that

4   position?

5        A.    Because he had failed to meet an agreement to

6   improve performance in a variety of very specific

7   parameters that had been laid out for him in a meeting

8   between him and myself in September of 2004.

9        Q.    You had a meeting in September 2004?

10       A.    That is correct.

11       Q.    You spoke with Dr. Sears about Dr. Golden in

12  particular after your April 2005 conversation with

13  Dr. Rampulla, correct?

14       A.    That is correct.

15       Q.    You spoke to Dr. Sears about Dr. Golden in

16  particular in -- sometime in 2006 after the emergency

17  department meeting; is that correct?

18       A.    That is correct.

19       Q.    Did you have any other conversations with Dr.

20  Sears -- I guess you spoke with him about the time that

21  Dr. Golden was initially hired to express your criticism

22  about the hiring procedures?

23       A.    That is correct.

24       Q.    Any other conversations with Dr. Sears that you

25  can recall in which you were critical of Dr. Golden?

125

1    Q.    But this was the so-called straw that broke the

2    camel's back?

3        A.    In my mind it was.

4        Q.    So my question, again, why didn't you just

5    immediately remove him from clinical duties?

6        A.    We took him off -- he was scheduled for -- that

7    was on March 11.  And he may have had two or three more

8    shifts in March.  And he was -- the schedule at that time

9    for April had already been done.  It was my judgment that

10   although his -- his knowledge, training, all of the things

11   we have previously talked about were problematic, that

12   given a history of his having been there for two to three

13   years and so far avoided any real major screwups, that it

14   would be safe to allow him to continue there with

15   surveillance and supervision and peer review and if -- and

16   to allow him to complete the shifts that he had already

17   agreed to perform and which we had already agreed by

18   publishing the schedule to give him.

19       Q.    And how -- the shifts that you agreed to give

20   him were immaterial if you believed that there was a

21   patient risk; isn't that true?

22       A.    I did not believe there was an imminent patient

23   risk.  The --

24       Q.    It is, however, true that the decision to remove

25   him from the schedule -- how many more -- how many more

208

1  shifts did he work after March 12; can you estimate?

2      A.   I don't know for sure.  But probably on the

3  order of six.

4      Q.   But nevertheless, the decision to make -- to

5  remove him ultimately was made in very short order after

6  receiving this e-mail?

7      A.   My recollection is that Dr. Buscho and I were on

8  the phone with each other within 12 hours of receiving

9  this e-mail.

10     Q.   Well, it may have even been sooner than that.

11 This e-mail --

12     A.   Sort of a bell ringer.

13     Q.   -- came to you -- the e-mail came March 11,

14 2007.  Okay.  12 hours is about right.

15          Tell me about what your communication was with

16 Dr. Buscho in response to receiving this e-mail.

17     A.   I asked Bob if he had seen this e-mail.

18     Q.   And what did he say?

19     A.   He said that he had.

20     Q.   And where did the conversation go from there?

21     A.   I basically asked him if it seemed as bizarre to

22 him as it seemed to me.  And I asked him if he had any

23 further details about the case from either Dr. Golden or

24 from anybody at Seton Coastside.  And he responded that he

25 had not.  I told him that I thought it highly important

209

1  that we look into it and make sure that whoever this

2  patient was, they had adequate treatment.  And I asked him

3  to please check into the case and find out what happened

4  to the patient, where did they end up going, what ended up

5  happening to him.

6      Q.   Did Dr. Buscho report anything to you in that

7  regard?

8      A.   I believe he said that he would look into it.

9  And I don't recall whether or not he got back to me with

10  details on it or not.

11      Q.   So in your conversation with Dr. Buscho

12  following this e-mail, Exhibit -- Buscho Exhibit 3, tell

13  me the road you followed from there to the termination

14  decision to take Dr. Golden off the rotation.

15      A.   We basically discussed this case in

16  conjunction -- and the hand case that had taken place

17  within 48 hours before that, and the story that I had

18  heard in the week or so before that from Dr. Schuller

19  about the Demerol case.  And said I think we've basically

20  let this go on for as long as we can afford to.  Do you

21  agree?  He said absolutely.  I said, you know, at this

22  point I'm becoming less concerned about having a

23  completely bulletproof paper trail than I am about just

24  ending this.  I think this has to end and we need to do it

25  sooner rather than later.

                                                        210



1    Q.   What kind of paper trail do you think you had

2  created from the time you first spoke with Dr. Buscho when

3  he started in '06?  Other than the e-mails we've looked at

4  where you --

5    A.   Between October of '06 and March of '07?

6    Q.   Yeah.

7    A.   None.

8    Q.   The -- so whose decision -- whose decision was

9  it to terminate Dr. Golden from the rotation?

10    A.   It was mutual.  It was equal.  I do not make the

11  primary decision about whether a practicing physician at a

12  given site stays or goes.  I reach a decision with the

13  medical director whose primary responsibility that is.  I

14  support them in that decision and we usually -- because

15  the potential consequences of that kind of decision are

16  significant both for the physician involved and certainly

17  for us, if that decision is not made advisedly, that we

18  confer to make sure that we have our ducks lined up.

19    Q.   Did you ever tell Dr. Sears that one of the

20  reasons he was removed as medical director was because of

21  his failure to properly supervise or deal with Dr. Golden?

22    A.   Not specifically, no.  He asked me that question

23  when I told him that I was removing him.

24    Q.   And what did you say in response?

25    A.   I told him that it -- that was one part of his

211

1  failure to adequately supervise the quality of care at the
2  site but that there were many others.
3      Q.    And in what particular respect was it his
4  failure to --
5      A.    Because there was no -- as I've stated before,
6  there was no meaningful peer review going on.  He had
7  doctors working at that site that were practicing well
8  below the standard of care.  In one particular case I had
9  to arm-twist him to recognize that a particularly
10 egregious incident did constitute grounds for taking a
11 very poor quality physician off the schedule.  I had
12 had -- and we did do that.  But he resisted and definitely
13 defended the physician unreasonably and for an extended
14 period of time, ignoring multiple requests from the
15 hospital that we remove that physician based on what they
16 felt were adequate grounds.
17     Q.    So the decision that you made really -- in this
18 conversation with Dr. Buscho in response to the Mucomyst
19 e-mail, did you talk about board certification?
20     A.    No.
21     Q.    And so when it actually came to taking
22 Dr. Golden off the rotation, the precipitating reasons
23 were quality-of-care reasons; were they not?
24     A.    They were.
25     Q.    Board certification had nothing to do with it?

                                                    212

1    A.    Not true.

2    Q.    Explain to me why that's false.

3    A.    I've already explained that to you.  I'll do so

4    again if you like.

5    Q.    Please.

6    A.    Board certification was a legitimate issue on

7    the part of the medical staff who were pushing us as a

8    group to have a 100 percent board-certified group of

9    physicians practicing at Seton Coastside.  The

10   grandfathering business notwithstanding, the pressure was

11   not to have everybody but grandfathered doctors there.

12   They wanted us to have a roster of board-certified

13   physicians and to raise the level of quality by so doing

14   of the entire group.

15   Q.    And you had been aware of that preference on the

16   part of Seton for some extended period of time?

17   A.    Yes.

18   Q.    And Seton never came to you and said you need to

19   get rid of Golden now?

20   A.    No.

21   Q.    And Seton never came to you and said we need you

22   to get rid of any other nonboard-certified doc right now?

23   A.    Correct.

24   Q.    And nobody ever said do something this week,

25   this month, you've got to take action on this more

213

1  only discussed those issues with Dr. Buscho, I discussed

2  them with Dr. Spiro.

3      Q.   Before you made the termination decision?

4      A.   That is correct.

5      Q.   My question, though, is I'm trying to identify

6  the specific medical care issues that were on the table at

7  the time of the termination.

8      A.   I believe at that time -- and, again, I'm not

9  100 percent sure about the sequence of when I knew this

10  and when I didn't know that.  But I believe at that time

11  when I was saying, you know, okay, we've got this, we've

12  got the CV issues, we've got the Mucomyst e-mail, and the

13  Tyl- -- you know, presumably a Tylenol overdose case,

14  we've got the hand case, we've got the Demerol case, we've

15  got the cardiac case, we've got the appendicitis transfer,

16  we've got the concerns raised by the medical staff at

17  Seton Medical Center.

18          Bob --

19      Q.   Is that your list?

20      A.   That was my list.  And Bob I believe at that

21  time told me about a case that I had not previously been

22  aware of.

23      Q.   Was that the nursemaid's elbow?

24      A.   No.  Well, I think the one he told me about at

25  that time was a transfer to him as a treating physician at

216

1      Q.   That's a good way to start.  Was he in good

2  standing with you?  The answer's got to be no.

3      A.   No.

4      Q.   Was he in good standing with CEP?

5      A.   No.

6           May I elaborate?

7      Q.   One second.

8           Yes, please.

9      A.   We do as much as we can to make the departure of

10  a physician who has not performed well and who is usually

11  feeling berated, insulted, whatever they might feel by

12  being told that they're going to be removed from the

13  schedule, we give them as much opportunity to save face

14  and to move forward as possible.  If you completely bring

15  a person in that condition in that situation to their

16  knees, it usually makes the departure very, very

17  difficult.  So I tried to do and say everything in my

18  power to leave Donald with the impression that his future

19  and present employment opportunities within CEP at an

20  urgent care center would remain.

21      Q.   What --

22      A.   And that was true.

23      Q.   What did Dr. Golden say at the meeting?

24      A.   Very little.  He took notes copiously, much as

25  he's doing now.  He asked very pointed, specific questions

223

STATE OF CALIFORNIA      )   ss.

    I hereby certify that the deponent in the forgoing deposition was by me duly sworn to testify to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the deposition is a true record of the deponent's testimony as reported to the best of my ability by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting by computer.

    I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

    IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June, 2009.

HEIDI BELTON, CSR #12885, RPR

233



1

2

3       SUPERIOR COURT OF THE STATE OF CALIFORNIA

4           IN AND FOR THE COUNTY OF ALAMEDA

5                UNLIMITED JURISDICTION

6

7  DONALD GOLDEN, M.D.,              )
                                     )        Case No.
8                      Plaintiff,    )        08388602
        vs.                          )
9                                    )        Volume I
                                     )
   CALIFORNIA EMERGENCY              )
10 PHYSICIANS MEDICAL GROUP;         )
   MEDAMERICA; MARK ALDERDICE;       )
11 ROBERT BUSCHO; AND DOES 1         )
   THROUGH 100, AND EACH OF THEM     )
12 INCLUSIVE,                        )
                                     )        Pages 1 thru 67
13                     Defendants.   )
   _____ )

14

15                   Deposition of

16                  BERNADETTE SMITH

17                  January 15, 2009

18

19 Reported By:

20 CYNTHIA J. POLISERI CSR # 11448              COPY

21 ----------------------------------------------------------

22               JAN BROWN & ASSOCIATES

23            CERTIFIED SHORTHAND REPORTERS

24 701 Battery St., 3rd Floor, San Francisco, California 94111

25          (800) 522-7096   (415) 981-3498

                                                           1

1    2006 bylaws, previously marked as Exhibit 1 to the

2    Shaikin deposition, contain the only terms that there

3    are regarding board certification and board

4    eligibility requirements in 3.2.1.

5              MR. TABARI:  Correct.  And to be more

6    specific, that her prior testimony was mistaken that

7    there's some other version of 2006 bylaws.

8              MR. GREEN:  So stipulated?

9              MS. ROBERTSON:  Sure.

10             MR. GREEN:  Okay.  All right.  I think that

11   takes care of the housekeeping.

12                        --oOo--

13   CONTINUED EXAMINATION BY MR. GREEN:

14   Q.    Ms. Smith, would you give us your full name for the

15         record?

16   A.    Yes.  Bernadette M. Smith.

17   Q.    And you are, if I'm correct, formerly the chief

18         executive officer of Seton Medical Center?

19   A.    Correct.

20   Q.    And can you give me the approximate dates during

21         which you held that position?

22   A.    Yes, from approximately 2000 through July of 2008.

23   Q.    And following your termination, do you have any

24         continuing relationship with Seton Medical Center?

25   A.    No.

                                                              11

1       Coastside ER without complying with the contract

2       requirement.

3              And I guess the phrase that I've heard you use is

4       that they were grandfathered in.

5              Are you familiar with that phrase?

6    A.   Yes.

7    Q.   Have you ever -- do you remember hearing that phrase

8       being used at the time in connection with these other

9       two?

10   A.   Well, there were general discussions of the medical

11      staff at some point to require board certification in

12      general for the medical staff.  And therefore, there

13      was discussion on grandfathering in physicians that

14      had been with the medical center for many years and

15      had active status and so forth.  But my recollection

16      is general discussion around the issue, nothing very

17      specific.

18   Q.   But that was in connection with the 2006 amendment to

19      the bylaws, 3.2.1, wasn't it?

20   A.   Yes.

21   Q.   And what that said was that it -- it set up some

22      board certification requirements for the entire

23      medical staff membership --

24   A.   Yes.

25   Q.   -- that had not previously been in place, correct?

50

1 STATE OF CALIFORNIA )   SS.

2       I do hereby certify that the witness in the

3 foregoing deposition was by me duly sworn to testify to the

4 truth in the within-entitled cause; that said deposition

5 was taken at the time and place therein stated; that the

6 testimony of said witness was correctly reported by me, a

7 certified shorthand reporter and a disinterested person,

8 and was under my supervision thereafter transcribed and

9 when so transcribed was carefully read to or by the said

10 witness, and, being in every desire, was thereafter by the

11 said witness duly subscribed; that if unsigned by the

12 witness, signature has been waived in accordance with

13 stipulation between counsel for the respective parties.

14       And I further certify that I am not of counsel or

15 attorney for either or any of the parties to said

16 deposition nor in any way interested in the outcome of the

17 cause named in said caption.

18       IN WITNESS WHEREOF, I have hereunto set my hand

19 and affixed my seal of office this 28th day of January,

20 2009.

21

22 _____

   Cynthia J. Poliseri
23 Certified Shorthand Reporter
   CSR #11448

24

25

67



1  SARAH E. ROBERTSON #142439
   MARK A. DELGADO #215618
2  FITZGERALD ABBOTT & BEARDSLEY LLP
   1221 Broadway, 21st Floor
3  Oakland, California 94612
   Telephone: (510) 451-3300
4  Facsimile: (510) 451-1527
   Email: srobertson@fablaw.com
5         mdelgado@fablaw.com

6  Attorneys for Defendants
   CALIFORNIA EMERGENCY
7  PHYSICIANS MEDICAL GROUP,
   MARK ALDERDICE, M.D.,
8  and ROBERT BUSCHO, M.D.

9              SUPERIOR COURT OF CALIFORNIA

10      COUNTY OF ALAMEDA - RENE C. DAVIDSON COURTHOUSE

| | |
|---|---|
| 11  DONALD GOLDEN, M.D., | Case No.: RG08388602 |
| 12 | ASSIGNED FOR ALL PURPOSES TO JUDGE STEPHEN DOMBRINK DEPARTMENT 19 |
| 13              Plaintiff, | |
| 14      vs. | **DECLARATION OF MARK SPIRO, M.D. IN SUPPORT OF MOTIONS FOR** |
| 15 | **SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY** |
| 16 | **ADJUDICATION OF ISSUES SUBMITTED BY DEFENDANTS** |
| 17  CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP; | **CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP,** |
| 18  MEDAMERICA; MARK ALDERDICE; ROBERT BUSCHO; AND DOES 1 | **MARK ALDERDICE, M.D. AND ROBERT BUSCHO, M.D.** |
| 19  THOUGH 1000, AND EACH OF THEM, INCLUSIVE, | |
| 20 | Date:        December 10, 2009 |
| 21              Defendants. | Time:        8:30 am Dept.:        19 |
| 22 | Judge:        Stephen Dombrink Reservation Nos.  986935, 986983 |
| 23 | |
| 24 | |

25        I, Mark Spiro, declare as follows:

26        1.    The following information is personally known to me, except as to the facts

27  referred to below as being based upon information and belief.

28        2.    I have been a partner in California Emergency Physicians Medical Group

                              1.

("CEP") since 1986. CEP—a democratic, physician-owned partnership of emergency medicine doctors—provides physician staffing and comprehensive management services for hospital Emergency Departments in California. The records of CEP establish that it was formed as a general partnership in California in 1975, and that it complies with all state partnership law requirements, such as filing the appropriate certificates, keeping partnership records, and so on. CEP's clients include more than 60 district and county hospitals and trauma centers, as well as independent non-profit and academic university hospitals.

3.      I am a staff physician in the Emergency Department at Palomar Medical Center, a trauma center and teaching facility located in Escondido, California. I am a member of the California Medical Association, San Diego Medical Society, and the California Chapter of the American College of Emergency Physicians. I received a BS from Wayne State University and an MD from Michigan State University. I completed my residency in emergency medicine at St. Vincent Medical Center in Toledo, Ohio and am a Diplomate of the American Board of Emergency Medicine and a Fellow of the American College of Emergency Physicians.

4.      Since 1998, I have served as CEP's Chief Operating Officer and Vice President of Operations. Prior to becoming an officer of the partnership, I served on CEP's Board of Directors beginning in 1991.

5.      During my tenure at CEP, I have become acquainted with the Plaintiff in this case, Dr. Donald Golden. Dr. Golden became a CEP partner in 2000, and from 2000 through 2007, he advanced through four levels of partnership. Dr. Golden's status as a partner is reflected in the Partnership Agreement he has entered into and in a variety of other ways, including without limitation: his exposure to unlimited liability for partnership debts; his eligibility to participate in partnership management; his payment of his own insurance and social security taxes and his inability to take tax deductions permitted to employees; his enjoyment of significantly greater security than is enjoyed by CEP employees; his receipt of a distributive share of partnership profits; his right to vote in partnership elections; his sharing in the partnership's profits and losses; and his ability to review partnership financial and other records, including information regarding the amounts of other partners' compensation. These

1   partnership traits are spelled out in more detail below.

2       6.      CEP operates pursuant to a written Partnership Agreement ("Agreement"),

3   which all partners must sign. Under the Agreement, all partners are classified in six categories

4   of partnership: Categories 1 through 4, Full Partners, and Senior Partners. The last time the

5   Partnership Agreement ("Agreement") was amended by a vote of the full partnership was on

6   January 1, 2004 (14th amended Agreement). A true and correct copy of the currently

7   applicable Agreement is attached hereto as Exhibit A. The last occasion where we had each

8   partner sign the Agreement was when we adopted the 13th amended Agreement. Attached as

9   Exhibit B, is Dr. Golden's signature page on that version of the Partnership Agreement.

10      7.      All CEP Partners, including Dr. Golden, are subject to unlimited liability for

11  debts and judgments against the partnership. Nothing in the Agreement restricts in any way Dr.

12  Golden's potential liability as a general partner. Should the assets of the partnership and those

13  contractually obligated to satisfy judgments become exhausted, partners would have their

14  personal assets subject to levy for partnership debts and judgments.

15      8.      At CEP, active physician-partners typically perform clinical services at one or

16  more CEP-contracted sites, or service locations. According to the Agreement, however, CEP

17  partners are not guaranteed any particular number of clinical hours or any opportunity to

18  perform services at any service location. At each site, a local partner acts as "Medical

19  Director" to oversee CEP's performance of the contract for emergency medical services. Each

20  site's partners collectively determine how clinical hours are scheduled at the site. The practice

21  at most CEP sites for determining the physicians' work schedule is that each partner submits his

22  or her availability limitations and desired number of shifts to the Medical Director, who either

23  puts the schedule together or delegates that responsibility to another partner.

24      9.      All CEP partners treat patients without direct immediate supervision.

25      10.     Compensation for all CEP partners is determined in accordance with the terms

26  of the Agreement. As compensation, all partners receive a percentage share of the net profits

27  for the clinical services they perform at the various hospitals and other sites where they work,

28  based on a formula set forth in the Agreement. More specifically, the Agreement provides that

3.

1   each CEP partner's compensation for clinical services shall be based on the "Service Location
2   Revenue," which is in turn defined as the "income collected at each service location from the
3   respective hospital or other contract for physicians' services rendered at the service location
4   reduced by PARTNERSHIP expenses directly allocable to the service location..." As a result
5   of this formula, the CEP partners who work at the different service locations are paid
6   differently. They receive an hourly pay rate for clinical hours at each site, which rate
7   represents a draw against that partner's share of the site's net operating revenue. The rate is
8   calculated throughout the year and depends primarily on the types of services rendered at the
9   site and the percentage of billings collected. Thus, the amount of compensation that any
10  particular CEP partner receives for his or her clinical services depends on how that partner's
11  service location performs. This method for calculating each partner's compensation for clinical
12  services performed is largely a matter of administrative convenience chosen by the partners.

13      11.    At the end of each fiscal year, the partners' total distributions for clinical
14  services (based on the Agreement's hourly rate formula discussed above) are reconciled with
15  the service location's actual earnings for that year. If the site's actual earnings exceed the
16  amount of the distributions, the overage is given back to the site as a surplus payment, which is
17  then distributed to that site's partners in proportion to their earnings. If the site's actual earnings
18  are less than the estimated distribution, there is a financial deficit at that site and that site is
19  generally expected to repay that deficit to CEP. That can be done by reducing the site's hourly
20  rate until the earnings are recouped or by deducting the overpaid draw from each affected
21  partner, over a period of time.

22      12.    All CEP partners pay self-employment taxes, not employee taxes, and receive a
23  Schedule K-1, detailing their share of annual income, with credits and deductions. CEP
24  withholds no income or employment taxes from any of its partners' compensation. Unlike
25  partners, CEP employees—including physician assistants, nurse practitioners, and
26  administrative personnel—are paid either a set salary or a set hourly wage that is not affected
27  by CEP's overall annual profitability or the service location revenue of any site.

28      13.    In addition to their compensation for clinical hours, at the end of each year, all

4.

1 CEP partners receive a distribution of partnership-wide profits, if any, through the Bonus Pool.

2 The amount of each physician-partner's profit distribution is based on an equal percentage of

3 the partner's earnings. So, for example, if the Bonus Pool percentage for any given year is ten

4 percent, that percentage is applied to each partner's annual earnings for clinical services

5 performed and that amount is the partner's annual bonus distribution.

6     14. In accordance with the Partnership Agreement, CEP maintains a "drawing

7 account" for every CEP Partner. Each year, every partner's Drawing Account is credited with

8 the partner's compensation for clinical services, the partner's share of the Bonus Pool, and

9 Partnership Net Income attributable to sale, disposition, financing, and refinancing of

10 Partnership assets. Each partner's Drawing Account is also charged with his share of CEP's net

11 loss, if any.

12     15. All CEP partners are eligible for benefits not available to CEP employees.

13 These benefits, considered "imputed income," include the Defined Benefit Plan, Long-term

14 Disability, Health Plan for Retired Partners, Dependant Care Assistance, and Sabbatical.

15     I declare under penalty of perjury under the laws of the State of California, that the

16 foregoing is true and correct, and this declaration was executed on September 25, 2009 at

17 _____, California.

18

19                                     Mark Spiro, M.D.

20

21

22

23

24

25

26

27

28

1   CEP partners receive a distribution of partnership-wide profits, if any, through the Bonus Pool.

2   The amount of each physician-partner's profit distribution is based on an equal percentage of

3   the partner's earnings. So, for example, if the Bonus Pool percentage for any given year is ten

4   percent, that percentage is applied to each partner's annual earnings for clinical services

5   performed and that amount is the partner's annual bonus distribution.

6         14.    In accordance with the Partnership Agreement, CEP maintains a "drawing

7   account" for every CEP Partner. Each year, every partner's Drawing Account is credited with

8   the partner's compensation for clinical services, the partner's share of the Bonus Pool, and

9   Partnership Net Income attributable to sale, disposition, financing, and refinancing of

10   Partnership assets. Each partner's Drawing Account is also charged with his share of CEP's net

11   loss, if any.

12         15.    All CEP partners are eligible for benefits not available to CEP employees.

13   These benefits, considered "imputed income," include the Defined Benefit Plan, Long-term

14   Disability, Health Plan for Retired Partners, Dependant Care Assistance, and Sabbatical.

15         I declare under penalty of perjury under the laws of the State of California, that the

16   foregoing is true and correct, and this declaration was executed on September 25, 2009 at

17   Encinitas   , California.

18

19                                  Mark Spiro, M.D.

20

21

22

23

24

25

26

27

28

SPIRO DECLARATION IN SUPPORT OF SUMMARY JUDGMENT MOTIONS BY ALL DEFENDANTS

9/24/09 \256151 #346570.1



## Partnership Agreement
## Table of Contents

1. **Name and Principal Place of Business** ........................................................ **5**

2. **Purpose** ................................................................................................... **5**

    2.1    *General Purpose* ................................................................................. *5*

    2.2    *Service Locations* ............................................................................... *5*

3. **Term** ........................................................................................................ **6**

4. **Capital Contributions** ............................................................................. **6**

    4.1    *Mandatory Capital Contributions* ...................................................... *6*

    4.2    *Special Capital Accounts* .................................................................... *7*

    4.3    *Payment of Capital Contribution* ........................................................ *7*

    4.4    *Voluntary Capital Contributions* ......................................................... *7*

    4.5    *Capital Accounts* ............................................................................... *7*

    4.6    *Negative Capital Account* ................................................................... *8*

5. **Accrual Account** ...................................................................................... **8**

    5.1    *Definition of Net Current Assets* ......................................................... *8*

    5.2    *Allocation of Annual Increase and Decrease* ....................................... *8*

    5.3    *Vesting* .............................................................................................. *8*

    5.4    *Negative Accrual Account* .................................................................. *9*

6. **Fiscal Year and Accounting** .................................................................... **9**

7. **Inspection of Records** ............................................................................. **9**

8. **Bank Accounts** ........................................................................................ **9**

9. **Quality of Performance** .......................................................................... **9**

10. **Definition, Appointment, and Responsibilities of Board of Directors** ........... **10**

    10.1    *Election* ........................................................................................... *10*

    10.2    *Meetings* .......................................................................................... *10*

10.3  Responsibility .................................................................. 10

10.4  Delegate Responsibility .................................................. 11

10.5  Majority Vote ................................................................... 11

10.6  Signature Authority ......................................................... 11

10.7  Directive Procedures ....................................................... 12

10.8  Removal of Director ......................................................... 12

**11.  Regional Directors and Medical Directors ............................ 13**

11.1  Regional Directors ........................................................... 13

11.2  Medical Directors ............................................................ 13

11.3  Appointment of Physicians to Service Locations .............. 13

**12.  Qualification, Categories, and Admission of Partners ........... 13**

12.1   Basic Qualifications for All Partners ............................... 13

12.2  Board Determines Partner's Category ............................. 14

12.3  Partner Categories .......................................................... 15

12.4  No Guarantee of Hours .................................................. 16

12.5  Additional Partner Categories ........................................ 16

**13.  PARTNERSHIP DISTRIBUTIONS .......................................... 17**

13.1  Definitions ..................................................................... 17

13.2  Service Location Revenue Distributions .......................... 18

13.3  Compensation for Other Administrative and Management Services ............. 20

13.4  Partners' Drawing Accounts and Interest ........................ 20

13.5  Allocation of Net Income and Net Loss ........................... 21

13.6  Distributions of Cash Available for Distribution ............... 22

13.7  Retirement Plan Contributions ....................................... 22

13.8  Other Salary or Compensation ....................................... 23

13.9  Guaranteed Payments ................................................... 23

**14.  Partner Withdrawal or Termination and Buy-out ................. 23**

14.1  Voluntary Withdrawal ..................................................... 23

14.2  Expulsion of a Partner .................................................... 23

14.3  Withdrawal on Retirement, Death or Disability ............... 24

14.4  Combined Accounts ....................................................... 24

14.5 Buy-Out Points................................................................. 24

14.6 Payment of Partner's Buy-Out............................................ 26

14.7 Offset for Claims............................................................. 27

14.8 Forfeitures .................................................................... 27

**15. Authority of Partners .......................................................... 27**

15.1 Voting Rules ................................................................. 27

15.2 Limitation on Partner's Authority........................................ 28

15.3 Indemnification for Unauthorized Activity.............................. 29

15.4 Agreements With Healthcare Organizations ........................... 29

**16. Assignment of PARTNERSHIP Interests.................................... 30**

**17. Agreement Concerning PARTNERSHIP Goodwill ........................ 30**

**18. Agreement Concerning Hospital and Other Contracts ................ 31**

**19. Management Contracts........................................................ 31**

**20. Partners' Meetings............................................................. 31**

**21. Fiduciary Relationship of Partners......................................... 31**

21.1 Prohibited Interference ................................................... 31

21.2 Non-Competition............................................................ 32

21.3 Incorporated Partners .................................................... 32

21.4 Injunctive Relief ............................................................ 32

21.5 Attorney's Fees............................................................. 33

21.6 Healthcare Organizations................................................. 33

21.7 Protection of Trade Secrets.............................................. 33

21.8 Prohibited Interference - Non-Hospital Service Locations .......... 33

21.9 Intellectual Property Rights .............................................. 35

**22. Termination, Dissolution, and Liquidation................................ 35**

22.1 Events Causing ............................................................. 35

22.2 Events Not Causing........................................................ 35

22.3 Complete Termination ..................................................... 36

CEP 00322
CONFIDENTIAL

22.4    Partial Liquidation ............................................................ 36

22.5    Assignment ...................................................................... 37

23.  **Miscellaneous Provisions** ........................................... **37**

23.1    Notices............................................................................. 37

23.2    Caption ............................................................................ 37

23.3    Governing Laws................................................................ 37

23.4    Assignment...................................................................... 37

23.5    Amendment...................................................................... 37

24.  **Leave of Absence** ........................................................ **38**

24.1    Request ........................................................................... 38

24.2    Failure to Return............................................................. 38

24.3    Sabbatical for Senior Partner .......................................... 38

25.  **Indemnification and Insurance** ................................... **38**

25.1    Indemnification of Partnership ........................................ 38

25.2    Indemnification of Partners ............................................. 38

25.3    Professional Liability Coverage and Reporting of Claims.............................. 39

## Partnership Agreement

This Partnership Agreement (hereinafter "Agreement") restates in its entirety the Partnership Agreement for CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP, and is entered into as the Fourteenth Amendment effective January 1, 2004 by the partners with reference to the following facts:

Each of the parties hereto (the "Partner(s)") is an individual, a medical corporation, or a medical partnership. Although such medical corporation or medical partnership will be the Partner under this Agreement in the performance of clinical and administrative services to the PARTNERSHIP, each such medical corporation and each such partnership shall require its physician-employees and its physician-partners, respectively, to sign a copy of this Agreement agreeing to its terms and conditions, and, at all times to act consistent with the terms of this Agreement.

NOW, THEREFORE, the parties hereby agree as follows:

1.　　Name and Principal Place of Business. The Partners agree to be general partners of a California general partnership under the name CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP (hereinafter referred to as the "PARTNERSHIP"). The principal place of business of the PARTNERSHIP shall be at 2101 Webster St., Suite 1770, Oakland, California 94612-3027, or at such other place or places as may from time to time be agreed upon by the Board.

2.　　Purpose.

　　　2.1　General Purpose. The principal purpose of the PARTNERSHIP is to conduct a medical practice that provides quality, cost effective ambulatory care and emergency medical services to patients, hospitals and communities, and in so doing to enable partners and affiliated physicians to realize the full benefits of a group medical practice.

　　　2.2　Service Locations. The term "service location(s)" in this Agreement shall as determined by the Board refer to each separate medical business of the PARTNERSHIP conducted at a single medical facility or to group of medical businesses of the PARTNERSHIP conducted at a single or at multiple medical facilities (or portions thereof). Service locations

may be combined as a single service location for an important business purpose - for example, without limitation, to establish a regional system for a particular health system or to accommodate a group of low volume contracts. A service location(s) established by the PARTNERSHIP on or before January 1, 1998 shall not be combined with another service location(s) as a single service location unless approved by the Board and approved by a majority of those partners who perform full-time services at the affected established service location(s). In no event will all service locations be combined as a single service location.

3.    Term. The PARTNERSHIP, which commenced on July 1, 1975, shall continue in existence until terminated as hereinafter provided at Section 22.

4.    Capital Contributions. Capital contributions shall be governed by this Agreement and applicable policy established by the Board which shall take into account the following:

4.1    Mandatory Capital Contributions.

4.1.1   Partners shall make capital contributions to the PARTNERSHIP at such time, in such manner, and in such amounts as the Board in its discretion from time to time requires. If the Board requests additional capital contributions from Partners, each Partner shall make capital contributions in proportion to the capital accounts of Partners unless the Board determines otherwise. Each Partner shall make capital contributions required to reach the level of capital contribution per Partner most recently determined by the Board. All Partners will be required to maintain a minimum Capital Account (defined at Section 4.5). The Board may change the Capital Account minimum capital contribution requirement. If a Partner is or becomes delinquent in making the Partner's required capital contributions in a form satisfactory to the Board, such Partner shall be charged simple interest on the amount of any such deficiency at two percentage points above the Section 14.4 rate (but, not in excess of the maximum legal rate of interest in the State of California, upon a loan or forbearance).

4.1.2   A Partner to maintain Full Partner status will be required to maintain his Capital Account at the same level required by the Board for all Full Partners, which initially shall be a maximum level of $15,000. The value of a Full Partner's Buy-Out Points (Defined at Section 14.5) shall be deemed to be zero until the required capital contribution is completed, and in such case, at the Board's discretion, the Partner shall not be entitled to any

distribution from the Partnership of any kind until the required capital contribution is fulfilled.

4.1.3  The Board may at any time readjust the capital accounts of Partners upward by requiring additional capital contributions or downward by returning capital contributions to Full Partners in order to maintain a level of capital which the Board determines to be in the best interest of the PARTNERHSIP. The intent is that all Full Partners and Senior Partners shall be required to have made the same capital contributions to their Capital Accounts.

4.2  Special Capital Accounts. The Board may establish a separate capital account for a Partner in the PARTNERSHIP ("Special Capital Account") in exchange for additional capital contributions in cash, property, or other valuable considerations acceptable to the Board. Special Capital Accounts will be subject to such terms and conditions as the Board shall determine, including without limitation special tax allocations, and the Partner shall agree to all such terms and conditions in a separate agreement so long as doing so does not unreasonably dilute the interest of all Partners in the value of their Buy-Out Points. Special Capital Accounts will not be considered for the allocation of Buy-Out Points at Section 14.5.

4.3  Payment of Capital Contribution. Capital contributions shall be paid as determined by the Board in cash, property, or other consideration acceptable to the Board. The Board may permit contribution in the form of a promissory note upon such terms and conditions determined by the Board, which shall include, without limitation, adequate security by an assignment of the Partner's various interests in the PARTNERSHIP and/or of outside assets of the Partner. If a Partner does not cure a default in making any payment required by a promissory note within thirty (30) days after receiving written notice of default, the Board may apply any distribution to which the Partner is entitled from the PARTNERSHIP to payment of the promissory note.

4.4  Voluntary Capital Contributions. The Board may from time to time permit any Partner to make voluntary capital contributions to the PARTNERSHIP upon terms and conditions determined by the Board.

4.5  Capital Accounts. Individual Capital Accounts shall be maintained for each Partner to reflect each separate component of a Partner's capital contributions. Capital

CEP 00326
CONFIDENTIAL

Accounts shall account for all contributions to the capital of the PARTNERSHIP at Section 4 and any credit balances transferred from a Partner's Section 13.4 Drawing Account to his Capital Account; and decreased by (a) distributions in reduction of PARTNERSHIP capital and (b) his share of PARTNERSHIP losses, if charged to the Capital Accounts of the Partners.

4.6 Negative Capital Account. If a Partner, upon leaving the PARTNERSHIP has a negative balance in his Capital Account, he shall be obligated to repay any portion of the negative balance, which is not offset by other distributions owing to him, in equal monthly installments with simple interest at the Section 14.4 rate over the one (1) year period following his termination from the PARTNERSHIP.

5. Accrual Account. The PARTNERSHIP shall establish an Accrual Account for each Partner to take into account his share of the annual increase/decrease in the Net Current Assets of the PARTNERSHIP (Defined at Section 5.1). The Partners' Accrual Accounts shall be administered and allocation shall be made each year, as follows:

5.1 Definition of Net Current Assets. Net Current Assets of the PARTNERSHIP means total current assets minus total current liabilities of the PARTNERSHIP calculated on a non-consolidated basis in accordance with generally accepted accounting principles (GAAP), and subject to such adjustments as the Board determines to be in the best interest of the PARTNERSHIP.

5.2 Allocation of Annual Increase and Decrease. As of each December 31, each Partner's Accrual Account will be incrementally increased or decreased by his share of the increase or decrease in the Net Current Assets of the PARTNERSHIP as of each December 31. A Partner's share of the increase or decrease in the Net Current Assets of the PARTNERSHIP will be determined in the same proportions as the allocation of Net Income at Section 13.5.1 following.

5.3 Vesting. A Partner shall vest in his Accrual Account upon becoming a Full Partner. A Partner's Accrual Account shall be forfeited for any of the reasons set out in Section 14 of this Agreement and shall also be forfeited if the Partner withdraws or is terminated for any reason as a Partner of the PARTNERSHIP prior to becoming a Full Partner. A forfeited

CEP 00327
CONFIDENTIAL

Accrual Account shall be redistributed to the Partners based on a methodology determined by the Board.

     5.4   Negative Accrual Account. If a Partner, upon leaving the PARTNERSHIP has a negative balance in his Accrual Account, he shall be obligated to repay any portion of the negative balance, which is not offset by other distributions owing to him, in equal monthly installments with simple interest at the Section 14.4 rate over the one (1) year period following his termination from the PARTNERSHIP.

     6.   Fiscal Year and Accounting. The books of account of the PARTNERSHIP shall be kept on the cash method of accounting on a calendar year basis. An annual accounting shall be delivered to each Partner as soon as practicable after the close of the calendar year. It shall be conclusive on the Partners and shall not be modified except for an error which the Board, within one (1) year from the date of said accounting, determines to materially affect the PARTNERSHIP. Each Partner agrees to accept as correct the amended accounting of the PARTNERSHIP including without limitation the calculation of his Capital Accounts, Drawing Account, Accrual Account and Buy-Out Points unless the Partner objects in writing within thirty (30) days after such information is generally available to Partners.

     7.   Inspection of Records. Complete and accurate accounts of all transactions of the PARTNERSHIP shall be kept in proper books, which books of account and other records of the PARTNERSHIP shall, at all times, be kept at the principal place of business of the PARTNERSHIP. Each Partner shall have access to and may inspect and copy any books and records of the PARTNERSHIP at reasonable business hours subject however to such reasonable restrictions as the Board shall determine in order to protect the confidentiality of PARTNERSHIP books and records.

     8.   Bank Accounts. All funds of the PARTNERSHIP shall be deposited in accounts in the name of the PARTNERSHIP at such bank or banks selected by the Board acting through the Vice President of Operations. All withdrawals from any such account or accounts shall be made only by signature authority granted at Section 10.6.

     9.   Quality of Performance. Each Partner shall perform his respective services on behalf of the PARTNERSHIP at his service location pursuant to policies of the Board and in

CEP 00328
CONFIDENTIAL

accordance with the highest degree of professional competency in the professional specialty of each Partner and shall further comply with the by-laws, rules and regulations of such service location and with the usual and customary procedures of its medical staff, as the same apply to all physicians admitted to practice at each service location. Each Partner, prior to being scheduled for professional services shall establish his professional credentials according to policies of the Board.

10. **Definition, Appointment, and Responsibilities of Board of Directors.** In order to carry out the business affairs, management, and administration of the PARTNERSHIP, there shall be a Board of Directors ("Board") to be elected by the Partners and to have the responsibilities set forth as follows:

10.1 **Election.** The Board shall consist of nine (9) members all of whom shall be Full or Senior Partners as defined by Sections 12.3.1 and 12.3.2. A board member shall serve for a three-year term. The annual election to fill vacancies shall be valid if a simple majority of the number of Partners eligible to vote for board members returns valid ballots. The candidates receiving the highest number of votes shall be elected to the vacancies. Balloting shall be conducted by mail ballot held not later than the first day of each Board Year. Interim vacancies will be filled by the Board to serve until the end of the then current calendar year. Thereafter, the remaining term for such appointed director shall be filled by a Partner elected by the PARTNERSHIP pursuant to the election rules of the PARTNERSHIP. The Board Year shall be from the first day of January to the last day of December. Election rules set by the Board from time to time shall be conclusively binding on all Partners.

10.2 **Meetings.** The Board will meet at least quarterly at a time and place determined by the Chairman of the Board and all Board members shall be given personal notice at least one week before the Board meeting.

10.3 **Responsibility.** The Board shall have the final responsibility for establishing policies relating to medical care, and the business affairs, administration, and management of the PARTNERSHIP, including but without being limited to, the following matters:

10.3.1 Entering into all contracts binding the PARTNERSHIP, including contracts with any person or persons for the rendition of professional services, other incidental

CEP 00329
CONFIDENTIAL



administrative services, hospital contracts, urgent care centers, business at other service locations, the defense, pursuit, and settlement of legal action, the hiring and discharging of all employees of the PARTNERSHIP, and the basic review of incoming Partners and Partners to be terminated;

   10.3.2 The lease, purchase, or other acquisition or disposal of PARTNERSHIP property;

   10.3.3 All policies implementing the Partnership Agreement provisions concerning compensation of Partners for services to or for the benefit of the PARTNERSHIP including, without limitation, clinical services, administrative services and miscellaneous incentive compensation.

   10.3.4 Voting any common stock in other entities owned by the PARTNERSHIP.

   10.3.5 Borrowing money for PARTNERSHIP purposes, and in doing so encumbering or hypothecating PARTNERSHIP property by mortgage, deed of trust, pledge, or otherwise.

   10.4 Delegate Responsibility. The Board may select and delegate its responsibilities with respect to any of the foregoing matters to such officers or committees having such responsibilities as the Board shall designate which may include, without limitation, a Chairman of the Board, President, Vice President of Operations, Chief Executive Officer, Chief Operating Officer, Managing Partner, Regional Directors, Medical Directors, or Executive Committee. Reference in this PARTNERSHIP Agreement and Board Policies to the "Managing Partner" shall, after April 1, 1998 (and until such Board Policies are updated), mean the President, his designee, or such other officer designated by the Board or by the President.

   10.5 Majority Vote. Except as otherwise provided, decisions shall be made by a majority of the entire Board.

   10.6 Signature Authority. The Board shall designate the Partner(s) and officers of the PARTNERSHIP who shall have the authority to sign on behalf of and to bind the PARTNERSHIP with respect to all PARTNERSHIP business including, without limitation, the

CEP 00330
CONFIDENTIAL

signing of all contracts, negotiable instruments, and lawsuit pleadings. A resolution signed by a majority of the Board members shall be conclusive proof on which third persons or entities doing business with the PARTNERSHIP may rely.

10.7 Directive Procedures. The Partners may remove any Board member or direct the Board to undertake or create any activity (hereinafter collectively referred to as "Directive") by the following procedure:

10.7.1 Partners may submit a proposed Directive to the Board after first obtaining on the Directive signatures showing approval of Partners holding at least one-fifth (1/5) of the voting interests of the PARTNERSHIP in the case of a Directive to remove a Board member and showing one-third (1/3) of the voting interests of the PARTNERSHIP in the case of a Directive for the Board to undertake or cease any activity.

10.7.2 The Board shall then submit the signed Directive to the Partners within thirty (30) days after the first board meeting following the Board Chairman's receipt of the Directive with the requisite signatures by mailing an appropriate ballot to each Partner having a voting interest. The ballots shall be tallied upon the expiration of three (3) weeks from date of mailing the ballots or, if sooner, upon the receipt of completed ballots from all of the Partners. The affirmative vote of Partners holding at least a majority of the voting interests of the PARTNERSHIP shall be required to pass the Directive.

10.7.3 Upon passage of a Directive to remove a Board member, such removal shall be effective immediately. Upon passage of a Directive for the Board to undertake or cease any activity, the Board shall comply with the Directive at the next regularly scheduled Board meeting.

10.8 Removal of Director. A Board member may also be removed by a two thirds' (2/3) vote of Board members (not counting the vote of the Board member removed).

///

11. Regional Directors and Medical Directors.

11.1 Regional Directors. Regional Directors shall be appointed by such officer designated by the Board for a probationary period of six (6) months at which time such appointment shall be confirmed by the Board or its designee. The Regional Directors may be removed at any time by the Board for any reason whatsoever. Regional Directors shall be evaluated annually as determined by the Board. The responsibilities of each Regional Director shall be determined from time to time by the Board or its designated officer or committee as required to assure the smooth and efficient administration of each region.

11.2 Medical Directors. After considering recommendations of the appropriate Regional Director, each Medical Director shall be appointed by the Vice President of Operations of the Partnership for a probationary period of six (6) months, at which time such appointment shall be confirmed by the Board. Medical Directors may be removed at any time by the Regional Director with the consent of the Vice President of Operations for any reason whatsoever. The primary responsibility of the Medical Director shall be the administration of the department in his service location. Specific responsibilities of the Medical Director may be determined and revised from time to time by the Board or its designated officer or committee in order to maintain quality medicine and smooth, efficient administration of the department.

11.3 Appointment of Physicians to Service Locations. Each Medical Director shall recommend the appointment of Partners and employment of non-partner physicians, and the termination of such appointments or employment, in his or her service location to his Regional Director. The Regional Director shall make such decisions based on the Medical Director's recommendation, the provisions of Section 12, and policies adopted by the Board.

12. Qualification, Categories, and Admission of Partners.

12.1 Basic Qualifications for All Partners. Except as otherwise provided by Board which takes into account the Board's authority to designate other categories of Partners and other PARTNERSHIP divisions, all Partners of the PARTNERSHIP shall at all times meet the following basic minimum qualifications. In addition, a Partner shall meet such other qualifications and requirements as may be determined from time to time by the Board of Directors. In the

CEP 00332
CONFIDENTIAL



case of a corporate Partner, the requirements at Section 12 shall also apply to each physician-employee of each corporate Partner performing services for the PARTNERSHIP.

12.1.1 Each Partner (and the employee-physicians of a medical corporation and the partner-physicians of a partnership) is a physician and surgeon, duly licensed to practice medicine in the State of California and/or is a professional medical corporation licensed by the Board of Medical Quality Assurance and is in good standing;

12.1.2 Such Partner makes all required contributions to the capital of the PARTNERSHIP;

12.1.3 Such Partner adopts in writing all of the provisions of this Agreement and amendments thereto;

12.1.4 Such Partner agrees to be bound by all of the terms and conditions of the Agreement and amendments thereto;

12.1.5 Such Partner meets such professional medical and other standards for Partner performance as determined by the Board from time to time; and

12.1.6 Such Partner agrees to be bound by all policies of the Board established from time to time.

12.2 Board Determines Partner's Category. A Partner's eligibility for and retention of his Partner category shall be determined by the Board in its sole discretion taking into account the minimum requirements of Section 12.3 and the following guidelines:

12.2.1 The Board may give or withhold its approval to a Partner's advancement to a higher level of Partner category or retention by a Partner of his Partner category based on Board policies established from time to time and after taking into account various subjective factors concerning a Partner's performance including, without limitation, the quality of his practice of medicine; his ability to interact favorably with patients, service location, personnel and administration, other non-physician staff, referral sources and other Partners; his outside activities that may conflict with his performance and loyalty to PARTNERSHIP; and such other factors as the Board shall deem appropriate to consider in each individual case.

CEP 00333
CONFIDENTIAL

12.2.2 The Board in its discretion may waive one or more of the basic Partner category requirements specified in Section 12.3 and its policies established from time to time on a case by case basis after taking into account special considerations determined appropriate by the Board in its sole discretion.

12.2.3 A change in a Partner's category shall become effective on the date designated by the Board.

12.2.4 The term "Hours of Service" for purposes of Partner categorization shall include both clinical hours and hours reasonably required to carry out a Partner's responsibility for those management duties to the PARTNERSHIP designated by the Board as eligible for inclusion in this definition.

12.2.5 A Partner's "Years of Service" means the number of twelve consecutive month periods as a Partner commencing with the effective date of his becoming a Partner of the PARTNERSHIP. A Partner's "Years of Full-Time Service" means Years of Service in which the Partner performed such number of Hours of Service as required by Board policy.

12.2.6 The Board shall formulate reasonable transition rules to assimilate old Partner into new Partner categorization in the event of any change in the rules described in this Section 12.2.

12.3 Partner Categories. The PARTNERSHIP will have categories of Partners ("Partner Category"). To attain and retain a Partner Category, the Partner is required to meet any requirements established by the Board at Section 12.2, and to have completed a combination of minimum Hours of Service as established by Board policy and the minimum Years of Service indicated below unless waived by the Board or changed by the Board; provided that, if the Board changes the minimum Years of Service to be eligible for consideration of advancement or retention of a Partner Category, the Board may not lengthen the time required for an existing Partner to advance to a higher Partner Category. The basic Partner Categories are as follows:

12.3.1 Senior Partner – Completion of at least ten (10) Years of Full-Time Service as a Partner of the PARTNERSHIP.

CEP 00334
CONFIDENTIAL

12.3.2 Full Partner- Completion of at least four (4) Years of Service as a Partner of the PARTNERSHIP.

12.3.3 Category Four Partner - Completion of at least three (3) Years of Service as a Partner of the PARTNERSHIP.

12.3.4 Category Three Partner - Completion of at least two (2) Years of Service as a Partner of the PARTNERSHIP.

12.3.5 Category Two Partner - Completion of at least one (1) Year of Service as a Partner of the PARTNERSHIP.

12.3.6 Category One Partner - A Physician (or professional corporation) engaged by the PARTNERSHIP and reasonably expected to become a permanent full or part-time provider to CEP as defined by Board policy from time to time and providers who have been Partners of the PARTNERSHIP but have not retained the requirements for a higher partner category.

12.4   No Guarantee of Hours.  No provision in this Agreement shall be construed as a guarantee that the PARTNERSHIP will be able to make available to a Partner a sufficient number of Hours of Service in order for that Partner to become eligible for or to retain eligibility for a Partner category, nor that the PARTNERSHIP will be able to provide an opportunity for a Partner to perform services at any service location.

12.5   Additional Partner Categories.  The Board may establish separate business divisions and/or different categories or subcategories of Partners ("Divisions") either within the Partnership or by sponsoring the formation of a separate organization outside of the PARTNERSHIP directly or indirectly owned in whole or in part by the PARTNERSHIP or not owned by but indirectly affiliated by agreement with the PARTNERSHIP to carry out one or more business opportunities.  Each such Division and the physicians and other staff performing services in connection with such Division shall operate and be governed by such terms and conditions and have such rights and responsibilities as the Board shall determine notwithstanding any different, contrary, or inconsistent provision in this Agreement to the contrary.  If the rights (for example, compensation) and responsibilities of Partners at a service location existing prior to January 1, 1999 are adversely affected at the time of establishing the Division,

CEP 00335
CONFIDENTIAL

approval by the Board and by a vote of a majority of the Partners who performed full-time services at the affected services location(s) shall be required.

13. **PARTNERSHIP DISTRIBUTIONS.**

    13.1 Definitions.

        13.1.1 Service Location Revenue shall mean income collected at each service location from the respective hospital or other contract for physicians' services rendered at the service location reduced by PARTNERSHIP expenses directly allocable to the service location pursuant to policies established by the Board from time to time which may include without limitation billing and collection costs, malpractice insurance premiums, interest allocation to fund accounts receivable, a reserve for "tail" or other extended professional liability coverage, contract acquisition costs, and service site income adjustments.

        13.1.2 Net Income or Net Loss shall mean the ordinary income or ordinary loss of the PARTNERSHIP for each of its tax years as determined for federal income tax purposes, together with each PARTNERSHIP item of income, gain, loss, credit or deduction which is separately stated or otherwise not included in computing taxable income or loss.

        13.1.3 Net Income or Net Loss From Operations shall mean the Net Income or Net Loss of the PARTNERSHIP other than Net Income or Net Loss attributable to a Sale, Disposition, Financing or Refinancing.

        13.1.4 Net Income or Net Loss From Sale, Disposition, Financing or Refinancing shall mean the Net Income or Net Loss attributable to the holding of, or any sale, exchange, or other disposition of PARTNERSHIP assets and any PARTNERSHIP transaction not in the day-to-day operation of its business, including without limitation, the purchase or sale of PARTNERSHIP assets, any mortgage financing or refinancing secured by PARTNERSHIP property, the purchase and sale of equipment, and other assets, or other transaction not in the ordinary course of the PARTNERSHIP operations.

        13.1.5 Cash From Operations shall mean all cash receipts during the calendar year of the PARTNERSHIP from Service Location Revenue and other sources in the ordinary course of the PARTNERSHIP's business without deduction for depreciation, but after

deducting from such cash receipts payments disbursed for operating expenses, compensation to Partners, capital expenditures (unless charged by the Board directly to Capital Accounts of Partners), interest paid to Partners, and payments required to be made in connection with any loan to the PARTNERSHIP or secured by a lien on the PARTNERSHIP assets. Proceeds from loans to the PARTNERSHIP used to finance accounts receivables shall be Cash From Operations to the extent determined by the Board.

13.1.6 Cash From Sale, Disposition, Financing or Refinancing shall mean the net cash realized by the PARTNERSHIP from the sale, disposition, financing or refinancing of any PARTNERSHIP assets after payment of related debt and all expenses related to the transaction, together with interest on any notes taken back by the PARTNERSHIP upon the sale of the PARTNERSHIP assets.

13.2    Service Location Revenue Distributions.

13.2.1 The Board shall allocate a percentage of Service Location Revenue to compensation of Partners performing Medical Director services and clinical services as staff physicians at each service location. Generally, the usual and customary percentage has been seventy-nine percent (79%). If the Board determines that it is beneficial to the PARTNERSHIP, the Board by majority vote may increase such allocation above the usual and customary seventy-nine percent (79%) at a particular service location and by a three-fourths' (3/4) vote may reduce such allocation below seventy-nine percent (79%) at a particular service location. However, at all service locations that are part of CEP before March 1, 1997, such reduction requires approval of a majority of full-time Partners at such service location affected. Such portion of Service Location Revenue shall be distributed as follows:

13.2.2 Medical Director services shall be compensated as determined by the Board. In addition, the Medical Director may request a vote of Partners at Medical Director's service location to increase compensation for Medical Director services at such service location. Three-fourths (3/4) of Partners performing "full-time" services at such service location must agree to such change. The Board may approve/disapprove the vote of Partners or return the matter to the Partners for a determination subject to such policies, conditions and restrictions as the Board may impose. A Medical Director may allocate a portion of compensation for Medical Director services to those Partners who assist him in performing

CEP 00337
CONFIDENTIAL

administrative services in such amounts as the Medical Director determines appropriate in his discretion. The Board may establish guidelines or make its own determination binding on all Partners at the service location concerning the allocation of Medical Director compensation and the rules for Partner voting including guidelines for determining "full-time" Partners for voting purposes.

13.2.3 Each Partner's compensation for clinical services shall be determined by dividing the balance of the portion of Service Location Revenue determined at Section 13.2.1 minus payments made at Section 13.2.2 and minus direct Service Location expenses determined by the Board by total clinical Hours of Service which all physician providers have performed at that service location during the month, and multiplying the hourly amount so determined by the number of clinical Hours of Service rendered by each Partner at that service location. Provided that, a portion of the above payments allocated to compensation for clinical services may be distributed in a different manner ("differential compensation") to take into account the needs of the service location, the needs of the PARTNERSHIP, and/or other factors relevant to Partner performance or service. If three-fourths (3/4) of "full-time" Partners at a service location approve a differential compensation proposal, it shall be submitted to the Board for review. The Board may either approve/disapprove the differential compensation proposal, or return the matter to the Partners entitled to vote for reconsideration. The Board may establish policy guidelines setting forth conditions for and restrictions on such differential compensation and the rules for Partner voting including guidelines for determining "full-time" Partners for voting purposes. Notwithstanding the foregoing, the Board by a two-thirds' (2/3) majority vote, may establish and apply a differential compensation plan applicable to a portion of clinical compensation at one or more service locations when it determines that doing so is in the best interest of the Partnership. Further, the Board, in its discretion, may increase the minimum hourly compensation payable to Partners at a particular service location to take into account unusual circumstances.

13.2.4 The balance of Service Location Revenue remaining at a particular service location shall be allocated and distributed as hereinafter provided.

CEP 00338
CONFIDENTIAL

### 13.3 Compensation for Other Administrative and Management Services.

13.3.1 The Board in its discretion shall establish compensation for Partners performing designated administrative or management services for the PARTNERSHIP.

13.3.2 Regional Director compensation shall be determined by the Board in its discretion, generally based on a percentage of the Service Location Revenue received by the PARTNERSHIP for each service location in the Regional Director's region.

13.3.3 Compensation and/or reimbursement for persons attending Board meetings, committee meetings, other meetings, and stipends for special services shall be determined by the Board.

### 13.4 Partners' Drawing Accounts and Interest.

13.4.1 A separate Drawing Account shall be maintained for PARTNERSHIP and tax accounting purposes. A Partner's Drawing Account shall be credited with (i) his compensation at Sections 13.2, 13.3, 13.8 and 18 (collectively Guaranteed Payments); (ii) his PARTNERSHIP benefits converted into Partners' compensation (imputed income); (iii) his share of Net Income From Operations allocable at Section 13.5.1; (iv) interest credited to Capital Accounts; (v) interest credited to Accrual Accounts which is taken into account as a deduction from Cash From Operations at Section 13.1.5; and (vi) his share of PARTNERSHIP Net Income attributable to Sale, Disposition, Financing or Refinancing. A Partner's Drawing Account shall be charged with (i) his share of Net Loss from Operations allocable at Section 13.5.1; (ii) his share of Net Loss attributable to Sale, Disposition, Financing or Refinancing; (iii) all withdrawals made by a Partner in compensation paid to a Partner during the calendar year; (iv) distributions at Section 13.6.3 and 13.6.4; (v) any interest paid out to Partners based on Capital Accounts; and (vi) any interest paid out to Partners based on Accrual Accounts at Section 5. Partners may make withdrawals at such times and in such amounts from Cash From Operations and Cash from Sale, Financing or Refinancing as is determined at Sections 13.6.3 and 13.6.4 following. When the PARTNERSHIP completes its accounting each year, the net credit balance or debit balance in a Partner's Drawing Account shall be transferred to his Capital Account.

13.4.2 A Partner's Section 13.4 Drawing Account shall be credited with simple interest as of each December 31 on his Capital Account at Section 4.5 and his Accrual Account at Section 5 as of the preceding January 1 at the Section 14.4 rate. In the alternative, the Board may during a particular year pay such interest out to the Partners and account for it as a deduction from Cash From Operations at Section 13.1.5.

13.5  Allocation of Net Income and Net Loss. Except as the Board in its discretion may determine otherwise as permitted at Section 10.3, Net Income and Net Loss shall be distributed as follows:

13.5.1 Net Loss From Operations shall be allocated to the Drawing Accounts of Partners proportionate to each Partner's guaranteed payments. Net Income after first allocating guaranteed payments to the Drawing Accounts of Partners, shall be allocated to each Partner's Drawing Account proportionate to each Partner's "qualified earnings." A Partner's "qualified earnings" shall be computed as follows: (i) the Board shall first determine the portion of guaranteed payments to Partners at a particular service location to be counted for purposes of sharing in Bonus Pool distributions at Section 13.6.3; (ii) the guaranteed payments counted shall then be multiplied by a weighted factor determined by the Board for the Partner's category (or Division at Section 12.5). If the Board determines that all or a portion of the guaranteed payments of a Partner(s) at a particular service location will not count, then a Partner with permission of the Board may, in the applicable calendar year, elect to reduce his compensation (or reimburse the PARTNERSHIP) to such a level that the Board determines that such Partner's guaranteed payments attributable to such service location will qualify for purposes of determining his "qualified earnings." The Board must count all guaranteed payments received by Partners at a service location that makes a full contribution as defined by the Board to the PARTNERSHIP. Guaranteed payments for service locations that do not make a full contribution to the PARTNERSHIP will be counted as follows: (i) in the Board's discretion for service locations that join the PARTNERSHIP after July 1, 1998 and (ii) by the Board with approval by a majority of full-time Partners at a service location existing prior to July 1, 1998.

///

CEP 00340
CONFIDENTIAL

13.5.2 Net Income or Net Loss from Sale, Disposition, Financing or Refinancing shall be allocated to each partner for each tax year in proportion to the Partner's Buy-Out Points at Section 14.5 at the end of the year preceding the allocation.

13.6 Distributions of Cash Available for Distribution.

13.6.1 The Board in its sole discretion shall determine the amount of cash "available for distribution" from the PARTNERSHIP to its Partners after providing reasonable reserves for known or unknown PARTNERSHIP requirements, such as accounts receivable financing, malpractice funding, litigation (pending or threatened), capital investment in PARTNERSHIP projects, replacement of equipment, buy-out of Partners and similar PARTNERSHIP current and foreseeable needs and contingencies.

13.6.2 Compensation owing to Partners under Sections 13.2, 13.3, and 18 (if applicable) shall be paid by the twentieth (20th) day of each month following the performance of services by the Partner to the PARTNERSHIP up to and including the last day of the preceding calendar month. Compensation owing to a Partner under Section 13.8 shall be paid at such time as the Board designates.

13.6.3 Cash From Operations available for distribution to Partners (the "Bonus Pool") shall be determined on or before the seventy-fifth (75th) day following the end of the PARTNERSHIP's calendar year. Each Partner shall be entitled to receive a share of the bonus pool determined in the same proportions as the allocation of Net Income at Section 13.5.1 preceding.

13.6.4 Cash From Sale, Disposition, Financing or Refinancing available for distribution shall be distributed annually to Partners at such time as the Board determines in the same proportion as the Partners Buy-Out Points at Section 14.5 at the end of the prior year.

13.7 Retirement Plan Contributions. Distributions made by the Partnership to an unincorporated Partner shall be subject to his election to participate in the retirement plans of the Partnership. Each unincorporated Partner's retirement plan contributions shall be separately allocated to each Partner upon filing of the Partnership's tax return.

CEP 00341
CONFIDENTIAL

13.8   Other Salary or Compensation.  Except as otherwise provided in this Section 13, or at the discretion of the Board to award Partners for special efforts, including, without limitation, finding and developing new opportunities for the PARTNERSHIP, no Partner shall be entitled to a salary or other compensation for his services to the PARTNERSHIP.

13.9   Guaranteed Payments.  Compensation described in Section 13.2, Section 13.3, Section 13.8, and Section 18 shall be treated as guaranteed payments described in Internal Revenue Code Section 707(c).

14.   Partner Withdrawal or Termination and Buy-out.

14.1   Voluntary Withdrawal  A Partner may voluntarily withdraw or retire from the PARTNERSHIP provided such Partner gives the Board sixty (60) days' written notice prior to the effective date of such withdrawal.  The notice shall not comply with this requirement unless it specifically designates his withdrawal date.  If prior written notice has been properly given by a Partner, such Partner shall be entitled to distributions owing to him at Sections 13.6.2, 13.6.3, and 13.6.4 of this Agreement at such time as all other Partners receive such amounts. Additionally, such Partner shall be entitled to receive his Combined Accounts and his Buy-Out Points (or alternative distribution at Section 14.5) payable at Section 14.6.

If a Partner withdraws from the PARTNERSHIP without giving such prior written notice or receiving a waiver of such notice from the Board, he shall only be entitled to distributions owing at Section 13.6.2 earned to date. Such Partner shall forfeit the balance of distributions from the PARTNERSHIP to which he might otherwise be entitled, including without limitation, his Combined Account (defined at Section 14.4) and his Buy-Out Points (defined at Section 14.5).

14.2   Expulsion of a Partner.  Any Partner may be required to withdraw from the PARTNERSHIP at any time upon the vote of at least two-thirds (2/3) of the Board approving the Partner's expulsion.  The effective date of such expulsion shall be the date on which the PARTNERSHIP notifies the Partner of his expulsion, or such other date as the Board may determine in its discretion.  The expelled Partner's compensation at Section 13.6.2 earned to date shall be payable to him on the effective date of expulsion.  The expelled Partner's interest in the Bonus Pool at Section 13.6.3 shall be payable to him without interest in five (5)

CEP 00342
CONFIDENTIAL

equal annual installments commencing on July 1 of the year following the year of expulsion. Such Partner shall forfeit the balance of distributions from the PARTNERSHIP to which he might otherwise be entitled, including without limitation, his Combined Account (defined at Section 14.4) and his Buy-Out Points (defined at Section 14.5).

14.3 Withdrawal on Retirement, Death or Disability. A Partner shall be deemed to have withdrawn on the date of his retirement on or after age 55 by a withdrawal with proper notice described at Section 14.1, his death, or upon his incurring a disability which in the opinion of the Board renders impossible the performance of services to the PARTNERSHIP by the Partner. The withdrawing Partner or his estate, whichever is applicable, shall be entitled to receive distributions at Sections 13.6.2, 13.6.3, and 13.6.4 at such time as all other Partners receive such amounts. Additionally, the withdrawing Partner or his estate, whichever is applicable, shall, notwithstanding Section 14.6, be entitled to receive payment for his Combined Account and Buy-Out Points not later than six (6) months following the end of the calendar year of his withdrawal or death unless the Partner or his estate makes an irrevocable election to be bought out in the manner described at Section 14.6 of this Agreement.

14.4 Combined Accounts. The Combined Account of a Partner means the sum of a Partner's Capital Accounts (See Section 4.5) and Accrual Account (See Section 5). Except as otherwise provided in Section 14, following a Partner's withdrawal or termination, a Partner's Combined Account shall continue to earn simple interest at a rate which is equal to the prime rate charged by the Bank of America, N.T. & S.A., of Los Angeles, California (but not to exceed the California usury rate [that is, the maximum legal rate of interest allowed in the State of California, upon a loan or forbearance when not otherwise stated]), whichever is less.

14.5 Buy-Out Points. The PARTNERSHIP shall grant Buy-Out Points to each Full Partner who maintains his Capital Account at the level required by the Board for Full Partners. All Full Partners will make equal capital contributions for and will be entitled to an equal number of Buy-Out Points. The Buy-Out Points of a Full Partner (or the remaining number of Buy-Out Points of a withdrawn or terminated Partner) measure the Partner's financial interest in the internal liquid net value ("Liquid Value") in certain long term assets owned by the PARTNERSHIP ("Subsidiary Businesses". The Buy-Out Points shall be administered by the Board taking into account the following:

CEP 00343
CONFIDENTIAL

14.5.1 "Liquid Value" means current assets minus current liabilities calculated for the Subsidiary Businesses on a non-consolidated basis, in accordance with generally accepted accounting principles (GAAP) subject to such adjustments as the Board determines to reasonably reflect the cash and cash equivalent value of the Subsidiary Businesses to the PARTNERSHIP. "Subsidiary Businesses" mean long term assets of the PARTNERSHIP, the Liquid Value of which the Board determines should be shared by the Partners as part of their financial interest in the PARTNERSHIP, including, without limitation, MedAmerica, Inc. and its subsidiaries.

14.5.2 The Board shall determine the value of Buy-Out Points. The Board may, but is not required, to take into account the following: (i) any valuation assumption most protective for the continuation of the PARTNERSHIP and least protective of terminated Partners; (ii) use of a valuation date (that is, the prior December 31, or an alternate date), which the Board determines most appropriate; and (iii) change its valuation assumptions at any time to take into account the current circumstance of the PARTNERSHIP so long as any change applies to all currently active and all terminated Partners who are receiving or are still entitled to receive payments as a terminated Partner. The outstanding Buy-Out Points allocated to all Full Partners as of December 31 each year, or alternate valuation date, divided into the Liquid Value of Subsidiary Businesses of the PARTNERSHIP as of December 31 each year (or other relevant valuation date) shall establish the price per Buy-Out Point of each Full Partner effective commencing January 1 of the following year (or as of an alternate valuation date). If the Board believes that the value per Buy-Out Point has changed during a year as compared to the value of a Buy-Out Point at the end of the prior year by more than twenty-five percent (25%) upward or downward, the Board may revalue a Buy-Out Point as of an alternate valuation date selected by the Board.

14.5.3 The Board may at any time redeem all or a portion of the Buy-Out Points of Partners by payment of the calculated value per Buy-Out Point and may make adjustments to the number of Buy-Out Points of Partners on a non-discriminatory basis.

CEP 00344
CONFIDENTIAL

14.5.4 A Partner may not at any time assign with or without consideration to another Partner or non-Partner all or any portion of his outstanding Buy-Out Points.

14.6    Payment of Partner's Buy-Out.

14.6.1 Following the termination of a Partner, who is determined to be entitled to a distribution of his Combined Account and Buy-Out Points, or upon a partial liquidation of the PARTNERSHIP, then subject to any policies established by the Board and subject to other applicable provisions of Section 14, the Buy-Out amount shall be paid either in cash or in kind in the Board's discretion and shall be completed over a five (5) year period; provided that, the Board may extend a Partner's payout over a longer period of time with his permission or as provided at Section 14.6.4 and Section 14.6.5.

14.6.2 Except as provided at Section 14.3, the Combined Account of a terminated Partner, who is entitled under this Agreement to payment of his Combined Account, shall be paid in equal annual installments with simple interest at the Section 14.4 rate on the unpaid balance of the Combined Account.

14.6.3 An equal number of Buy-Out Points of a terminated Partner, who is entitled to payment for his Buy-Out Points, shall be redeemed each year (subject to the Board's right to extend payouts) without interest based on the value per Buy-Out Point as recalculated each year. Buy-Out Points for which payment is made shall be cancelled. The annual installments (and price for each remaining Buy-Out Point) shall be recalculated as of January 1 of each calendar year, or alternate valuation date, based on the terminated Partner's remaining Buy-Out Points at the then value per Buy-Out Point determined by the Board for all Partners.

14.6.4 The Board may accelerate the payout of a Partner's Combined Account and Buy-Out Points. Upon payment, the Partner shall give a written release to the PARTNERSHIP for any other or further payment from the PARTNERSHIP with respect to his PARTNERSHIP interest.

14.6.5 If the Board determines that cash is not reasonably available in any year to make full payments owing to terminated Partners without adversely affecting the

CEP 00345
CONFIDENTIAL

financial condition of the PARTNERSHIP, then that cash, which is available to make payments, shall be paid to terminated Partners proportionately first in satisfaction amounts owed for the terminated Partners' Capital Accounts, then for their Accrual Accounts, and then for their Buy-Out Points regardless of the date of termination. In such case the amount to be paid to each terminated Partner may be adjusted and/or the time for payment to all Partners may be extended on a reasonable basis approved by the Board notwithstanding any contrary provision in this Agreement. Further, in lieu of cash installment payments for Buy-Out Points, the Board in its sole and absolute discretion may elect to distribute assets of the PARTNERSHIP which in the case of shares of stock in any company owned by the PARTNERSHIP may include either voting or non-voting common stock or voting stock subject to a voting trust in favor of the PARTNERSHIP. Further, the Board is authorized to establish reasonable reserves to fund the future buy-outs of Partners.

14.7 Offset for Claims. With respect to all distributions to a terminated Partner under this Section 14, and notwithstanding the time at which this Agreement provides that the distribution is to be paid, the Board in its sole and absolute discretion reserves the right to withhold distribution in such amount as the Board determines may be necessary to offset and to satisfy any PARTNERSHIP claims which the Board determines to be owing by such Partner to the PARTNERSHIP until such claims have either been settled or adjudicated by a court of competent jurisdiction.

14.8 Forfeitures. To the extent a Partner forfeits any of his interests in the PARTNERSHP by failing to give proper notice at Section 14.1, or in the case of the expulsion of a Partner at Section 14.2, the Partners agree that the forfeitures described in those Sections will be in addition to any and all rights the PARTNERSHIP may have under this Agreement and in equity or at law to require the Partner or former Partner to comply with any terms and provisions of this Agreement. Further, the forfeitures shall in no way be construed to limit the PARTNERSHIP's right to pursue other legal and equitable remedies resulting from activities of the Partner that adversely affect the PARTNERSHIP.

15. Authority of Partners.

15.1 Voting Rules. Subject to Section 12.5, active Partners shall have the following votes: Category Two to Four Partners - one vote, and Full and Senior Partners -

three votes. Wherever it is necessary in this PARTNERSHIP Agreement to obtain the vote of the Partners, the vote of active Partners, who at that time hold two-thirds (2/3) of the voting interests of the PARTNERSHIP, shall be controlling unless otherwise provided by this Agreement or Board policy. Notwithstanding the foregoing, in no event shall Category One Partners be entitled to vote on amendments to the PARTNERSHIP Agreement, the election of members to the Board of Directors, and with respect to a Directive described at Section 10.7. The phrase "Voting Interests of the PARTNERSHIP" shall wherever used in this Agreement refer only to the total number of votes held by all active Partners in categories of Partners entitled to vote on any particular matter. Inactive Partners shall only have such voting rights as the Board shall determine. "Inactive Partners" shall include any Partner who has not been scheduled to work at any PARTNERSHIP service location for three (3) months, shall include a Partner on a leave of absence if non-voting is imposed by the Board as a condition to taking the leave of absence, and shall include such other criteria as the Board shall determine by a two thirds' (2/3) vote.

15.2 Limitation on Partner's Authority. No Partner, including, without limitation, the Executive Committee or any member thereof, or the Managing Partner, shall engage in any of the following acts without prior approval by the Board setting forth in its resolution such limitations and conditions on the authority granted as the Board shall determine:

15.2.1 Assign, pledge, hypothecate, wrongfully take, or mortgage any asset belonging to the PARTNERSHIP, or execute any bond or lease in the PARTNERSHIP name;

15.2.2 Pledge the credit of the PARTNERSHIP in any way except in the ordinary course of PARTNERSHIP business;

15.2.3 Make an assignment for the benefit of creditors;

15.2.4 Release, assign, or transfer a PARTNERSHIP claim, security, commodity, or any other asset belonging to the PARTNERSHIP;

15.2.5 Make, draw, or accept any notice, bill of exchange, or any obligation for the payment of monies;

15.2.6 Become a surety, guarantor, endorser, or accommodation endorser for any person or firm;

15.2.7 Borrow any money in the name of the PARTNERSHIP or lend any money belonging to the PARTNERSHIP;

15.2.8 Submit a PARTNERSHIP claim or liability to arbitration or confess a judgment against the PARTNERSHIP; or

15.2.9 Enter into contracts to provide physician and/or other services to and/or to acquire an ownership interest in third-party payers, insurance companies, health care service plans, health maintenance organizations, Combined provider organizations, individual practice associations, foundations, other medical groups, other managed health care organizations (collectively "Healthcare Organizations") without prior approval of the officer of the Partnership designated by the Board pursuant to policies established by the Board.

15.3    Indemnification for Unauthorized Activity.  Each Partner shall indemnify and hold the PARTNERSHIP and each of the other Partners harmless from any and all liability and claims, demands, damages, and costs relating thereto, including reasonable attorneys' fees, resulting from or arising out of any action taken without authority under Section 15.2 and, additionally, any negligence or misconduct for activities that he engages in outside the ordinary course of his duties in the conduct of PARTNERSHIP business and not for the benefit of the PARTNERSHIP.

15.4    Agreements With Healthcare Organizations.  In order to compete effectively in the rapidly changing health care environment which includes a variety of healthcare organizations and third-party payor arrangements, it will be necessary to contract with Healthcare Organizations. In all cases where it is possible to do so, the PARTNERSHIP or its affiliated entity shall be the contracting and/or owning party. In any case in which it is necessary for an individual Partner, and not the PARTNERSHIP, to be the contracting party, the Partner shall do so solely for the benefit of the PARTNERSHIP and only after full disclosure to and receipt of written approval from the PARTNERSHIP, and subject to such policies, terms and conditions, and further agreements between the PARTNERSHIP and the Partner as may be required from time to time by the PARTNERSHIP. The officer designated by the Board shall

CEP 00348
CONFIDENTIAL

have the legal right to sign on behalf of Partners concerning all billing and collection matters. Each Partner, by signing this Agreement, assigns his entire right, title and interest in and to all patient billings to the Partnership. The Board shall establish policies to carry out the purposes described in this Section 15.4 which shall take into account, without limitation, the following:

15.4.1 The negotiation and approval of contracts with Healthcare Organizations to secure the benefit thereof for the PARTNERSHIP and not the individual partner.

15.4.2 Ownership of withholds under risk-sharing arrangements.

15.4.3 Restrictions with respect to ownership of and the transfer of interests in Healthcare Organizations and related contracts, including without limitation, the termination and transfer of any contracts with Healthcare Organizations to the PARTNERSHIP or its designee, and reimbursement of Partners for their capital contributions to Healthcare Organizations.

15.4.4 The negotiation and approval of capitation contracts.

16.    **Assignment of PARTNERSHIP Interests.** No Partner shall have the right to sell, assign, hypothecate, or in any way alienate the interest of such Partner in the PARTNERSHIP without the prior written consent of the Board.

17.    **Agreement Concerning PARTNERSHIP Goodwill.** The parties acknowledge and agree that the business of the PARTNERSHIP is and will remain primarily a service business; that the ability of the PARTNERSHIP to earn income depends primarily on the services rendered to it by the Partners and the services thereby provided by the PARTNERSHIP at its service locations; that contracts at service locations, by custom, are often times short-term contracts renewable at the election of both parties and that service location contracts often contain termination provisions without cause; that, therefore, the value of the PARTNERSHIP goodwill, if any, is subjective and difficult to determine; and that any Partner who withdraws or is expelled from the PARTNERSHIP, herein called a "Terminated Partner," carries away with him his said earning ability. Accordingly, each of the Partners agrees that in the event that such Partner shall become a Terminated Partner, he hereby waives any right to an interest in the

CEP 00349
CONFIDENTIAL

PARTNERSHIP based upon alleged goodwill and agrees that the termination payments provided to the Partner under this Agreement are in full satisfaction of any amount owing to him.

18.     Agreement Concerning Hospital and Other Contracts. If, at the time a physician becomes a Partner, he is a party to a contract to provide physician or other services to any service location, and the PARTNERSHIP takes over the ownership and/or operation of such facilities, said physician agrees to assign to the PARTNERSHIP all such contracts held by him upon the effective date of his becoming a Partner. In consideration for said assignments, the parties hereto agree that the PARTNERSHIP shall pay to the assignor(s) of each such contract an amount to be determined by the Board and set forth in a written agreement between the Board and the assignor. Such payments shall be paid to such Partner as a guaranteed payment pursuant to Section 707(c) of the Internal Revenue Code of 1954, as amended. No Partner shall hold a hospital contract as an individual (or have an interest in any such hospital contract) unless otherwise agreed upon by a two-thirds (2/3) vote of the entire Board.

19.     Management Contracts. The PARTNERSHIP may enter into various agreements with MedAmerica, Inc. or other management companies for the performance of administrative services, a copy of which is available upon request to the Managing Partner.

20.     Partners' Meetings. There shall be an annual meeting of the Partners and additional meetings may be called at any time by a two-thirds' (2/3) vote of the Board. Any decision of the Partners may be made either by vote at a meeting or by written consent. Any Partner may vote at a meeting either in person or by an agent, who must be another Partner, duly authorized in writing executed by the absent Partner.

21.     Fiduciary Relationship of Partners. Each Partner owes the PARTNERSHIP and every other Partner the highest degree of fiduciary duty and good faith. Therefore, all Partners must comply with the following:

    21.1    Prohibited Interference. No Partner shall directly or indirectly:

        21.1.1 Solicit or respond to the solicitation of a hospital, ambulatory care center, or other business which has (or within one (1) year prior to the date of solicitation has had) a contractual relationship with the PARTNERSHIP at a service location for the purpose of attracting the PARTNERSHIP opportunity at such service location for his own benefit.

21.1.2 Render services at a service location for his own benefit substantially similar to or competitive with services rendered by the PARTNERSHIP at such service location;

21.1.3 Own, manage, operate, control, participate in any manner with or receive an economic benefit from any medical practice or other business which engaged in the solicitation or services described above or which otherwise has a financial interest in a business operated at a service location; or

21.1.4 Interfere with the PARTNERSHIP's contractual relationship at a service location, or induce other Partners or competitors to do so, or induce employees, independent contractors, and other Partners to terminate their relationship with the PARTNERSHIP.

21.1.5 With respect to each Partner this section 21.1 shall apply only with respect to service locations at which the Partner has ever performed or supervised services for the PARTNERSHIP and shall apply only while the Partner is a Partner of the PARTNERSHIP and for one (1) year after the effective date of his termination as a Partner.

21.2 Non-Competition. Partners shall disclose to the Board the Partner's intention to engage in any activity related or similar to activities of the PARTNERSHIP. The Board shall then determine if the Partner shall not engage in such activity as being in conflict with his fiduciary duties to the PARTHERSHIP, if he may do so but on behalf of and for the benefit of the PARTNERSHIP, or if he may do so independent of the PARTNERSHIP and for his own benefit, or some combination of the foregoing. Except as permitted by the Board, no Partner shall have an ownership interest in or engage in any activity which competes with or in the opinion of two-thirds (2/3) of the Board adversely affects CEP, or any CEP contract or service location without prior approval of two-thirds (2/3) of the Board.

21.3 Incorporated Partners. This section 21 shall apply to each employee, officer, director, and shareholder of an incorporated Partner.

21.4 Injunctive Relief. The Partners agree that, from the nature of its hospital contracts and other businesses owned and/or operated by the PARTNERSHIP at service locations, irreparable harm is certain to result to the PARTNERSHIP (for example, from

CEP 00351
CONFIDENTIAL

cancellation of a hospital contract or non-renewal thereof) as a direct consequence of a Partner's violation of this section 21 since actual damages are extremely difficult of calculation, and such a breach arises from a trust; and, therefore, the Partners agree that injunctive relief is an appropriate remedy in addition to any other legal and equitable remedy and damages that may be available to the PARTNERSHIP in any Court of competent jurisdiction. Additionally, when the Board determines in its discretion that a Partner has (or intends to) violate this Section 21, the PARTNERSHIP may retain as an offset against any damages to be later determined by a Court any undistributed amounts to which a Partner would otherwise be entitled under Sections 13.6 and 14 of this Agreement.

21.5 Attorney's Fees. In any legal action brought pursuant to this Section 21, the prevailing party shall be entitled to its reasonable attorneys' fees in addition to any other award in the action.

21.6 Healthcare Organizations. The provisions in Section 21 shall be construed to apply to the contractual arrangements and ownership interests entered into for the benefit of the PARTNERSHIP with Healthcare Organizations whether directly by the PARTNERSHIP or by a Partner.

21.7 Protection of Trade Secrets. In the course of performing services for the PARTNERSHIP, each Partner agrees that he will learn and/or have access to certain specialized methods of operation and become aware of information confidential to the PARTNERSHIP and its medical practice including, without limitation, financial information concerning all PARTNERSHIP businesses, patient lists, client lists, billing data, the method of doing business, contracts, information systems, practice guidelines, terms of agreements with Healthcare Organizations, pending litigation, documentation concerning the PARTNERSHIP entities and their structure, captive insurance company, and other information and methods and devices of doing business ("trade secrets"). Each Partner agrees that the Partner will use the PARTNERSHIP's trade secrets solely on behalf of and for the PARTNERSHIP and will not, without permission of the PARTNERSHIP, use, publish, disclose or authorize anyone else to use, publish or disclose, any of such trade secrets for non-PARTNERSHIP purposes.

21.8 Prohibited Interference - Non-Hospital Service Locations. The PARTNERSHIP's business interests include the ownership of, or contractual relationships with,

CEP 00352
CONFIDENTIAL

non-hospital based facilities, including, without limitation, ambulatory care centers and family practice medical service locations ("non-hospital service locations"). The value of each non-hospital service location is directly tied to the clients and patients who are served there. A "client" includes, but is not limited to, third parties such as Healthcare Organizations and/or occupational/industrial medicine with whom the non-hospital service location has a contract to provide medical services for that party's employees or enrollees. Each Partner's fiduciary duty to the PARTNERSHIP and to every other Partner extends to preserving the clients and patients for the PARTNERSHIP. Therefore, while a Partner is a Partner, and for a period of one year after a Partner's withdrawal or termination:

21.8.1 No Partner shall directly or indirectly solicit or induce patients or clients of a PARTNERSHIP non-hospital service location to become the client or patient of the individual Partner, nor to become the client or patient of any non-PARTNERSHIP physician or medical practice.

21.8.2 No Partner shall directly or indirectly use a list, or any summary or part of a list, of patients and/or clients (for example, without limitation occupational/industrial medicine clients, Healthcare Organizations, etc.) of a PARTNERSHIP non-hospital service location, whether such list is created by the Partner or by the PARTNERSHIP, for the purpose of mailing or delivering any letter, notice, or announcement pertaining to medical services that are or will be provided by anyone or any entity other than by a PARTNERSHIP non-hospital service location.

21.8.3 No Partner shall solicit or induce the employees, independent contractors, or other Partners at a PARTNERSHIP non-hospital service location to terminate their relationship there, to interfere with the PARTNERSHIP's business, to engage in competition against the PARTNERSHIP, or to direct existing or potential clients and/or patients away from the PARTNERSHIP non-hospital service location and toward any competitor of the PARTNERSHIP's non-hospital service location.

21.8.4 No Partner, while a Partner, shall directly or indirectly own, manage, control, provide medical services at, or receive an economic benefit from, a non-hospital service location that is a direct competitor of a PARTNERSHIP non-hospital service location where that Partner performs or has performed services.

CEP 00353
CONFIDENTIAL

21.8.5 No former Partner, during the period of one year after the Partner's withdrawal or termination from the PARTNERSHIP, shall directly or indirectly own, manage, control, provide medical services at, or receive an economic benefit from, a non-hospital service location that provides medical services similar to and/or competitive with those provided by the PARTNERSHIP within a one-mile radius from a PARTNERSHIP non-hospital service location at which the former Partner has worked.

21.9 Intellectual Property Rights. Each Partner will disclose promptly and in writing to the PARTNERSHIP all inventions, original works of authorship, discoveries, technology, computer programs, designs, formulas, instructions, manuals, and know how ("Intellectual Property") which the Partner, alone or with others, conceives or makes, whether or not commissioned specifically to do so by the PARTNERSHIP which relate directly or indirectly to the business of the PARTNERSHIP. Partner agrees at the PARTNERSHIP's request to assign to the PARTNERSHIP, or its designee, all of the Partner's right, title and interest in and to such Intellectual Property which Partner may solely, or jointly conceive or develop during the time that the Partner is a Partner, and to sign any instruments such as copyright applications in the name of the PARTNERSHIP as may be necessary to perfect the PARTNERSHIP's rights to the Intellectual Property.

22. Termination, Dissolution, and Liquidation.

22.1 Events Causing. Unless earlier terminated in accordance with other provisions in this Agreement, the PARTNERSHIP shall terminate and proceedings to liquidate shall commence immediately upon the first occurrence of either of the following:

22.1.1 A date mutually agreed upon in writing by Partners holding two-thirds (2/3) of the voting interest of the PARTNERSHIP; or

22.1.2 The bankruptcy (either voluntary or in-voluntary) or assignment of assets for the benefit of creditors by the PARTNERSHIP.

22.2 Events Not Causing. It is expressly agreed by the parties that the death of an individual Partner or the dissolution and liquidation of an incorporated Partner, or the bankruptcy, expulsion, or withdrawal of a Partner, or the admission of a new Partner, shall not

CEP 00354
CONFIDENTIAL

be cause for the dissolution of the PARTNERSHIP and, in the event of any such occurrence, the PARTNERSHIP shall continue as so constituted.

22.3    Complete Termination.  Upon the complete termination of the PARTNERSHIP, the Partners shall proceed forthwith to liquidate the assets of the PARTNERSHIP and the PARTNERSHIP shall engage in no further business thereafter other than such business as shall be necessary to wind up its business and distribute the assets.  The PARTNERSHIP assets shall be distributed in complete liquidation of the PARTNERSHIP in cash or in kind in the following order:

22.3.1 The expense of liquidation and the debts of the PARTNERSHIP other than debts owing to the Partners shall be paid.

22.3.2 Such debts as are owing to the Partners, including unpaid loans, and advances made to or for the benefit of the PARTNERSHIP shall be computed.  Such amounts shall be offset against any deficits in the respective Partner's Capital Accounts and the net amount shall be paid or collected from such Partners, as the case may be.

22.3.3 Full liquidating distributions shall be made to Partners in cash or in kind as the Board or other winding up Partners or the court shall determine is available for distribution after all contingencies have been covered first to Partners proportionately for their Combined Accounts and then to Partners proportionately for their Buy-Out Points distributable first as a return of Capital Accounts, then as payment for Accrual Accounts, and the balance proportionate to Buy-Out Points. A debit balance in the account of any Partner after all of the debts of the PARTNERSHIP are paid and the posting of profits, losses, and contingencies completed shall constitute an obligation from that Partner to the other Partners, to be paid forthwith, upon demand.

22.4    Partial Liquidation.  Partial liquidating distributions from the PARTNERSHIP to its Partners shall be made in the discretion of the Board taking into account the following factors:

22.4.1 Partial liquidating distributions and the related tax consequences shall be made based on the Buy-Out Points of Partners determined at Section 14.5 if sufficient to make a fair distribution to Partners; provided that, the Board shall not make a partial

liquidating distribution that impairs the security of the complete liquidation preferences at Section 22.3.3 including, without limitation, the Combined Accounts of Partners.

22.4.2 The Board may impose such conditions and restrictions in making a partial liquidating distribution as it deems necessary in its discretion to take into account the vesting of Buy-Out Points of Partners and any outstanding financial obligations of the Partners with respect to such Buy-Out Points.

22.5 **Assignment.** Any hospital contracts having an unexpired term as of the date of dissolution of the PARTNERSHIP and any interest in a business or contract at other service locations shall be assigned by the PARTNERSHIP to the most appropriate party as determined by the Board.

23. **Miscellaneous Provisions.**

23.1 **Notices.** All notices under this Agreement shall be in writing and shall be given to the parties at their last know addresses by certified mail, return receipt requested, or such other addresses as any of the parties may hereafter specify in the same manner.

23.2 **Caption.** All paragraph headings herein are inserted for convenience only and shall not be deemed a part of this Agreement.

23.3 **Governing Laws.** This Agreement shall be construed in accordance with the laws of the State of California. In the event that any provision hereof shall be legally unenforceable, the remaining provisions shall nevertheless be carried into effect.

23.4 **Assignment.** Subject to the restrictions against assignment as contained herein, this Agreement shall inure to the benefit of and shall be binding upon the parties, and their respective heirs, legatees, personal representatives, successors in interest, and assigns.

23.5 **Amendment.** This Agreement contains the entire understanding between the parties, there being no terms, conditions, warranties, or representations other than those contained herein, and no amendments hereto shall be valid unless made in writing and approved by Partners holding two-thirds (2/3) of the voting interests of the PARTNERSHIP. At such time as the PARTNERSHIP has received the written approval of Partners holding two-thirds

CEP 00356
CONFIDENTIAL

(2/3) of the voting interests of the PARTNERSHIP, the amendment shall thereupon be binding on all Partners whether or not they have given their written approval.

24. Leave of Absence.

24.1 Request. A Partner may request a leave of absence of a minimum of thirty (30) days to a maximum of one hundred eighty (180) days for a medical, professional, or personal reason which may be granted at the discretion of the Board, or its designee, and upon terms as and conditions as the prescribed by Board policy.

24.2 Failure to Return. A Partner who does not return to the PARTNERSHIP as a Partner at the expiration of this leave, will be considered to have voluntarily resigned from the PARTNERHIP with proper notice effective for all purposes as of the date the leave of absence began. Unless the Board determines otherwise in a particular situation, the Partner will not have the privilege of automatically resuming his PARTNERSHIP status upon the Partner's return.

24.3 Sabbatical for Senior Partner. A Senior Partner shall be entitled to a six-month special leave of absence ("Sabbatical") with compensation limited in the manner described by Board policies.

25. Indemnification and Insurance

25.1 Indemnification of Partnership. Each Partner shall indemnify and hold harmless the PARTNERSHIP against any and all losses, damages, liabilities, claims, obligations and expenses (including attorneys' fees and other expenses reasonably incurred in investigating, preparing or defending against any such claim or suit) arising from or based on the operation by the Partner of a motor vehicle while acting within the scope of his responsibilities as a Partner. Each Partner shall keep on deposit with CEP evidence that insurance is in force for injury or death of one person up to $100,000, for injury or death arising from one accident up to $300,000 and for property damage up to at least $50,000, where the use of the Partner's automobile is within the scope of his duties as a Partner.

25.2 Indemnification of Partners. The PARTNERSHIP shall indemnify and hold harmless each Partner against any and all losses, debts, liabilities, claims, obligations and

expenses (including expenses reasonably incurred in investigating, preparing or defending against any such claim or suit) arising from or based on acts performed by such Partner within the scope of his management and administrative responsibilities as a Partner herein, unless such Partner acted with gross negligence or willful disregard of the best interests of the PARTNERSHIP.

25.3    Professional Liability Coverage and Reporting of Claims.

25.3.1 The PARTNERSHIP shall procure and maintain professional liability coverage for the PARTNERSHIP, its physicians, employees, and independent contractors performing services at each service location unless the board in its discretion determines that doing so is economically impracticable or determines that coverage for services at the service location is not reasonably available. Coverage shall be provided in the form of malpractice insurance, indemnification given by a hospital, a self-funded professional liability arrangement entered into by the PARTNERSHIP alone or in conjunction with other health care groups, or a combination of such methods. The PARTNERSHIP acting through its Board shall have no separate responsibility to a particular partner with respect to the extent, duration, and type of coverage, but shall exercise its discretion for the benefit of the PARTNERSHIP as a whole in making decisions regarding the limits of coverage, the insuring arrangement, the purchase of "tail" coverage, the settlement of claims, the allocation of the cost of coverage to the PARTNERSHIP or Partners, and the deductibles under any such coverage.

25.3.2 The PARTNERSHIP shall notify Partners performing services at a particular service location of any cancellations, reduction, or other material change in the amount of scope of coverage at such service location.

25.3.3 Each Partner agrees to promptly report to the PARTNERSHIP any claims arising at his service location, whether asserted or likely to be asserted. Each Partner agrees to notify the PARTNERSHIP before undertaking any separate negotiation with respect to any such claim.

25.3.4 The Board shall determine a mechanism for charging the cost of professional liability coverage (including, without limitation, the deductible amount and tail coverage) to each particular service location in such manner as the Board deems reasonable in

CEP 00358
CONFIDENTIAL

order to allocate to the physicians at such service location the cost of professional liability coverage in an equitable manner. Additionally, the Board in its discretion may establish a mechanism for self-insurance for professional liability claims, tail coverage and possible deductibles.

IN WITNESS WHEREOF, the PARTNERSHIP and each Partner signing below hereby adopt this Fourteenth Amended Partnership Agreement effective January 1, 2004.

CALIFORNIA EMERGENCY PHYSICIANS

MEDICAL GROUP, a California General Partnership

By: _____
       Wesley A. Curry, M.D., President

*PARTNER:

Dated: _____     By: _____, M.D.

_____, M.D.
       Print Name

*If the Partner is a professional corporation, the corporation must sign by completing the information below and signing as indicated:

_____
(Name of Professional Corporation)

By: _____
       President

_____, M.D.
(Physician Employee of Prof. Corp.)

Dated: _____     _____, M.D.
       Print Name

CEP 00359
CONFIDENTIAL



RECEIVED

JUL 24 2000

RECRUITMENT

IN WITNESS WHEREOF, the PARTNERSHIP and each Partner signing below hereby adopt this Thirteenth Amended Partnership Agreement effective January 1, 1998.

CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, a California General
Partnership

By: _Wesley A. Curry MD_____
    Wesley A. Curry, M.D., President

\*PARTNER
By: _Donald Golden_____, M.D.

_Donald Golden_____, M.D.
Print Name
Date _7/20/ 00_____

\*If the Partner is a professional corporation, the corporation must sign by completing the information below and signing as indicated:

_____
(Name of Professional Corporation)

By _____
   President

_____, M.D.
(Physician Employee of Prof. Corp.)

_____, M.D.
Print Name

Date _____

CEP 00047
CONFIDENTIAL