# EXHIBIT 70

1  Mitchell J. Green  (SBN 127718)
2  CURTIS & GREEN, LLP
   1101 Fifth Ave, Suite 310
3  San Rafael, CA 94901
   Tel: 415.456.4600 / Fax: 415.455.0270
4  Email: mgreen@curtisgreenlaw.com
5  Attorney for Donald Golden, M.D.

6

7

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA
9                COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

10

11  DONALD GOLDEN, M.D.,                    )
                                           )   Case No. RG 08388602
12         Plaintiff,                       )
                                           )   EVIDENCE IN OPPOSITION TO
13  v.                                      )   MOTIONS BY ALL DEFENDANTS
                                           )   FOR SUMMARY
14  CALIFORNIA EMERGENCY                    )   JUDGMENT/SUMMARY
    PHYSICIANS MEDICAL GROUP;               )   ADJUDICATION
15  MEDAMERICA; MARK ALDERDICE;             )
    ROBERT BUSCHO; AND DOES 1               )   Date:   December 10, 2009
16  THROUGH 100, AND EACH OF THEM,          )   Time:   8:30 a.m.
17  INCLUSIVE,                              )   Dept:   19
                                           )   Judge: Stephen Dombrink
18         Defendants.                      )   Reservation No.  986983

19

20         Plaintiff Donald Golden, M.D., hereby submits the attached evidence in opposition the

21  motions by all defendants for summary judgment/summary adjudication.

22

23

24  Dated: November 21, 2009              CURTIS & GREEN, LLP

25

26                                        By:_____

27                                            Mitchell J. Green
                                              Attorney for Donald Golden, M.D.
28

EVIDENCE IN OPPOSITION

FILED
ALAMEDA COUNTY
NOV 2 4 2009
CLERK OF THE SUPERIOR COURT
By R.C. Hughes
                              Deputy

*7935920*

TABLE OF CONTENTS

| EX. | |
|---|---|
| 1 | Declaration of Donald Golden, M.D. |
| 2 | Declaration of Mitchell J. Green (all Deposition Transcript Excerpts are authenticated in this declaration). |
| 3 | Deposition Transcript Excerpt, Mark Alderdice, M.D. |
| 4 | Deposition Transcript Excerpt, Mark Spiro, M.D. |
| 5 | Deposition Transcript Excerpt, Robert Buscho, M.D. |
| 6 | Buscho Dep. Ex. 2. |
| 7 | Deposition Transcript Excerpt, Marcia Shaikin |
| 8 | Shaikin Dep. Ex. 12 |
| 9 | Deposition Transcript Excerpt, Jocelyn Lim, M.D. |
| 10. | Request for Judicial Notice |



1 | Mitchell J. Green  (SBN 127718)
2 | CURTIS & GREEN, LLP
  | 1101 Fifth Ave, Suite 310
3 | San Rafael, CA 94901
  | Tel: 415.456.4600 / Fax: 415.455.0270
4 | Email: mgreen@curtisgreenlaw.com

5 | Attorney for Donald Golden, M.D.

6

7

8 | SUPERIOR COURT FOR THE STATE OF CALIFORNIA
  | COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

9

10 | DONALD GOLDEN, M.D.,                          )
                                                  )  Case No. RG 08388602
11 |        Plaintiff,                             )
                                                  )  DECLARATION OF DONALD
12 | v.                                           )  GOLDEN, M.D.
                                                  )
13 |                                              )
   | CALIFORNIA EMERGENCY                         )  Date:   December 10, 2009
14 | PHYSICIANS MEDICAL GROUP;                     )  Time:   8:30 a.m.
   | MEDAMERICA; MARK ALDERDICE;                  )  Dept:   19
15 | ROBERT BUSCHO; AND DOES 1                     )  Judge: Stephen Dombrink
   | THROUGH 100, AND EACH OF THEM,               )  Reservation No.  986983
16 | INCLUSIVE,                                    )
                                                  )
17 |                                              )
                                                  )
18 |        Defendants.                            )

19

20 | I, Donald Golden, M.D., declare:

21 |        1. I am the plaintiff in this case.  I have personal knowledge of the following facts and am

22 | competent to testify as to their truth if called as a witness.

23 |        2. I applied to and was first admitted to the Medical Staff of Seton Medical Center in

24 | 2004, at which time I had temporary privileges. I was granted regular privileges in 2005.

25 |        3. I worked at Seton Coastside, a standby emergency room operated by Seton Medical

26 | Center from 2004 until 2007. During this time I was the only African-American working there. I

27 | was not board certified. I know from personal conversations with Matthew Vuksinich, M.D., that

28

DECLARATION-GOLDEN

1  he was not only not board certified, but was not even what is called "board eligible", an even

2  lower standard of qualification then I had. Vuksinich was Caucasian.

3       4.  At no time did Mark Alderdice, M.D., ever inform me that anyone affiliated with Seton

4

5  Medical Center had represented to him that I would be grandfathered in or otherwise excused

6  from any board certification requirement.   At no time did Mark Alderdice, M.D., ever inform me

7  that it was possible to obtain a waiver from Seton of a board certification requirement. To the

8  contrary, in October 2006, I received an e mail from Robert Buscho, M.D., in which I was told

9
   that my shifts were being cut because I was not board certified. Following this, I had several

10
11  conversations with Dr. Buscho in which he reiterated this. My shifts at Coastside were in fact cut

12  following this e mail. Exhibit 8 to the document titled *Evidence in Opposition to Motions by All*

13  *Defendants for Summary Judgment/summary Adjudication* is a true and correct copy of the

14  October 2006 e mail.

15       5.  I also worked at another CEP site, South Valley Occupation Clinic until 2008.  During

16
17  the time I worked at South Valley and during the time I worked at Coastside, the schedules were

18  prepared by the Medical Directors, who had complete control over scheduling. I made repeated

19  and continuing requests to both Medical Directors for additional shifts. These requests were

20  routine denied. I was not able to work as many shifts as I would have liked to work. I was

21  eventually completely removed from shifts at Coastside and South Valley, against my will. I also

22
23  attempted to obtain work at a CEP site at Selma Community Hospital in 2006, but was denied the

24  opportunity to work there by the Medical Director, Imanu Tomlinson, M.D.

25       6.  During the entire time I was a CEP partner, I made a continuing effort to participate in

26  CEP management by applying for committee positions. For every year from 2001 to 2007, I

27  applied to every CEP committee I knew about.  This included the New Partners Committee, the

28
   Compliance Committee, The Continuing Medical Education Committee, the Regional Director

DECLARATION-GOLDEN                                    - 2 -

1  Committee and the Liaison Committee. I also applied for training to become a Medical Director.
2  I repeatedly asked Drs. Buscho and Alderdice for their permission to attend Medical Director
3  committee meetings, for which I need their approval. Every application and request I made was
4  rejected except one. At one point, I was able to get on the Liaison Committee. However, shortly
5  after I was appointed, the committee was discontinued.

7      7. After being removed from both Coastside and South Valley schedules, I no longer had
8  any CEP work, nor could I find CEP work under the circumstances. This was my status at the
9  time I filed my complaint. After filing my complaint, I was terminated from the CEP partnership
10  for failure to comply with CEP policies regarding minimum work activity.

13      I declare under penalty of perjury under the laws of the State of California that the
14  foregoing is true and correct.

15      Executed on November 21, 2009 in Berkeley, California.

Donald Golden, M.D.



1 | Mitchell J. Green  (SBN 127718)
2 | CURTIS & GREEN, LLP
 | 1101 Fifth Ave, Suite 310
3 | San Rafael, CA 94901
 | Tel: 415.456.4600 / Fax: 415.455.0270
4 | Email: mgreen@curtisgreenlaw.com
5 | Attorney for Donald Golden, M.D.
6 |
7 |
8 |        SUPERIOR COURT FOR THE STATE OF CALIFORNIA
 |        COUNTY OF ALAMEDA - UNLIMITED JURISDICTION
9 |

10 | DONALD GOLDEN, M.D.,                    )    Case No. RG 08388602
11 |         Plaintiff,                      )
     |                                       )    DECLARATION OF MITCHELL J.
12 | v.                                      )    GREEN.
13 |                                         )
14 | CALIFORNIA EMERGENCY                    )    Date:   December 10, 2009
     | PHYSICIANS MEDICAL GROUP;             )    Time:  8:30 a.m.
15 | MEDAMERICA; MARK ALDERDICE;             )    Dept.  19
     | ROBERT BUSCHO; AND DOES 1             )    Judge: Stephen Dombrink
16 | THROUGH 100, AND EACH OF THEM,          )    Reservation No.  986983
     | INCLUSIVE,                            )
17 |                                         )
18 |         Defendants.                     )
     |                                       )

19 |
20 | I, Mitchell J. Green, declare:
21 |      1. I am an attorney licensed to practice law in California. I am the attorney for the / in this
22 | action. I have personal knowledge of the following facts and am competent to testify as to their
23 | truth if called as a witness.
24 |      2. Exhibit 3 to the document titled *Evidence in Opposition to Motions by All Defendants*
25 | *for Summary Judgment/summary Adjudication* is a true and correct copy of excerpts from the
26 | deposition transcript of defendant Mark Alderdice, M.D., taken in this case.
27 |
28 |      3. Exhibit 4 to the document titled *Evidence in Opposition to Motions by All Defendants*
     | *for Summary Judgment/summary Adjudication* is a true and correct copy of excerpts from the

DECLARATION-GREEN

1  deposition transcript of Mark Spiro, M.D., taken in this case.

2    4. Exhibit 5 to the document titled *Evidence in Opposition to Motions by All Defendants*

3  *for Summary Judgment/summary Adjudication* is a true and correct copy of excerpts from the

4

5  deposition transcript of defendant Robert Buscho, M.D., taken in this case.

6    5. Exhibit 7 to the document titled *Evidence in Opposition to Motions by All Defendants*

7  *for Summary Judgment/summary Adjudication* is a true and correct copy of excerpts from the

8  deposition transcript of Marcia Shaikin, taken in this case.

9    6.  Exhibit 9 to the document titled *Evidence in Opposition to Motions by All Defendants*

10  *for Summary Judgment/summary Adjudication* is a true and correct copy of excerpts from the

11

12  deposition transcript of Joceyln Lim, M.D., taken in this case.

13    I declare under penalty of perjury under the laws of the State of California that the

14  foregoing is true and correct.

15    Executed on November 21, 2009 in San Rafael, California.

16

17

18    _____
     Mitchell J. Green

19

20

21

22

23

24

25

26

27

28

DECLARATION-GREEN                                          - 2 -





SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
RENE C. DAVIDSON COURTHOUSE

DONALD GOLDEN, M.D.,        )
        Plaintiff,        )
                          )  Case No.: RG08388602
vs.                       )    VOLUME I
                          )  Pages 1 to 233
CALIFORNIA EMERGENCY       )
PHYSICIANS MEDICAL GROUP;  )
MEDAMERICA; MARK ALDERDICE; )
ROBERT BUSCHO; AND DOES 1  )
THROUGH 1000, AND EACH OF  )
THEM, INCLUSIVE,           )
        Defendants.       )
_____)

DEPOSITION OF MARK ALDERDICE, M.D.
Friday, May 22, 2009

Reported by:
HEIDI BELTON, CSR #12885, RPR

JAN BROWN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
701 Battery Street, 3rd Floor, San Francisco, CA 94111
(415) 981-3498

1

1    BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition, and on Friday, May 22, 2009, commencing
3  at the hour of 10:05 a.m. thereof at FITZGERALD, ABBOTT &
4  BEARDSLEY, 1221 Broadway, 21st Floor, Oakland, California
5  94612, before me, Heidi Belton, CSR No. 12885, State of
6  California, there personally appeared
7      MARK ALDERDICE, M.D.,
8  who was provided as a witness under the provisions of the
9  Superior Court of California.
10
11              --oOo--
12
13      A P P E A R A N C E S
14
15     MITCHELL J. GREEN, Attorney at Law, of CURTIS &
16  GREEN, 1101 Fifth Avenue, San Rafael, California 94901,
17  appeared as counsel on behalf of the plaintiff.  Phone:
18  (415) 456-4600 Fax: (415) 455-0270 E-mail:
19  mgreen@curtisgreenlaw.com
20
21     SARAH ROBERTSON, Attorney at Law, of FITZGERALD,
22  ABBOTT & BEARDSLEY, 1221 Broadway, 21st Floor, Oakland,
23  California 94612, appeared as counsel on behalf of the
24  defendants California Emergency Physicians Medical Group,
25  et al.  Phone: (510) 451-3300 Fax: (510) 451-1527 E-mail:

3

1              I N D E X

3
4  EXAMINATION:                    PAGE
5  BY MR. GREEN                     5
6
7
8
9
10
11
12              INDEX OF
13              EXHIBITS
14                          PAGE

15  1    Document entitled "Response to Grievance    63
         by Dr. Golden to CPAC"
16
    2    Collection of correspondence regarding Dr.  63
17       Golden
18  3    Document entitled "California Emergency     112
         Physicians Advancement Evaluation by
19       Regional Director"
20  4    Resume for Donald Golden, M.D.              139
21  5    E-mail string dated 1/1/07          164
22  6    E-mail string, top e-mail dated 1/27/07   170
23  7    E-mail string, top e-mail dated 1/2/07    173
24  8    E-mail string; top e-mail dated 2/12/07   186
25

2

1  srobertson@fablaw.com
2
3      Also present:  Donald Golden, M.D., Robert
4  Buscho, M.D.
5              --oOo--
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

Pages 1 to 4



1     Q. As to what happened to that requirement through
2   2002, 2003, 2004, and 2005, do you have any information
3   about whether it continued, whether it was changed,
4   whether it was removed?
5     A. I believe it remained unchanged until
6   approximately -- I would -- let's put it this way: I was
7   not aware of any changes until 2005.
8     Q. Your understanding was that in 2005 it was
9   changed as a consequence of the merger of the Seton Daly
10   City and the Seton Coastside medical staffs?
11     A. That is correct.
12     Q. And your understanding of the nature of the
13   change is that the requirement was somehow -- it was
14   expanded beyond just emergency room physicians; is that
15   correct?
16     A. Yes.
17     Q. And it was somehow diminished in severity,
18   correct?
19     A. Correct.
20     Q. And how was it diminished in severity?
21     A. The fact that many of the physicians practicing
22   at Seton Coastside were not board-certified in emergency
23   medicine. And the fact that we as a group recognized that
24   it would be virtually impossible to staff that department
25   with 100 percent ABEM board-certified physicians because

33

1     A. That's not correct.
2     Q. Explain to me how that's wrong.
3     A. I was board-certified in family practice and
4   recertified in family practice.
5     Q. Oh, I see.
6     A. And that was valid through 2006.
7     Q. Okay. And notwithstanding what you just
8   testified to, you're not able to find that provision in
9   the 2005 bylaws; is that correct?
10     A. I am not.
11     Q. And then we have the 2006 bylaws, Shaikin
12   Deposition Exhibit 1. And how does that language compare
13   in terms of severity to what was in the 2001 -- well, let
14   me strike that.
15     How does that language compare in terms of
16   severity to the language you thought was in the 2005
17   bylaws? Is it more --
18     A. It specifies that "Applicants for medical staff
19   membership must be board-certified by a board recognized
20   by ABEMS or AOA" -- the American Osteopathic
21   Association -- "or APMA" --
22     MS. ROBERTSON: Don't read too fast because
23   there's a lot --
24   BY MR. GREEN:
25     Q. Let me try and shortcut this. Am I reading that

35

1   of the nature of the practice and the compensation there.
2     We spoke with the hospital. "We" being
3   Dr. Goldschmid -- who is the medical director at Seton
4   Daly City and remains so -- and myself spoke with
5   Bernadette Smith, the then CEO of the hospital about
6   coming up with wording that would accommodate the blended
7   requirements for both the emergency departments at Seton
8   Daly City and at Seton Coastside.
9     Q. And that was wording for the medical staff
10   bylaws?
11     A. Correct.
12     Q. What was the wording you came up with? Well,
13   forget about the wording. What was the -- in what way was
14   the change that you're thinking of less severe than the
15   2001 requirement?
16     A. That in addition to recognizing board
17   certification in emergency medicine, it would also allow
18   board certification in another primary care specialty
19   recognized by ABMS such as family practice, internal
20   medicine, pediatrics. I can't remember the entire list.
21   But our proposal was that the language include other ABMS
22   specialties.
23     Q. And even under that relaxed standard you, with
24   the board certification you had would not have qualified;
25   is that correct?

34

1   correctly that that provision is generally along the lines
2   of what it is you described having talked to Ms. Smith
3   about?
4     A. Yes, it is.
5     Q. Less severe than 2001?
6     A. That is correct. Well, apparently not.
7     MS. ROBERTSON: For Daly City?
8     THE WITNESS: Less severe than what I thought
9   was in the bylaws in 2001. I can't understand why I had
10   to appear before the credentials committee if in fact
11   board certification was not a bylaws requirement. I was
12   always under the understanding that it was.
13   BY MR. GREEN:
14     Q. So the fact that you're not able to find it in
15   the 2005 bylaws suggests to you that it may not have been
16   in the 2001 bylaws?
17     A. Makes me wonder.
18     Q. Why did you appear before the committee?
19     A. I was told that it was necessary that they were
20   going to consider whether or not I should be granted an
21   exception based on my training and experience in emergency
22   medicine. And that is what I did.
23     Q. You made a statement that one of the reasons
24   that you went to speak to Ms. Smith in connection with the
25   2005, I guess I'll have to call it, attempted change was

36

Pages 33 to 36



1    A.  Yes.
2    Q.  And would you agree with me that that was not a
3  requirement that every CEP physician had to be
4  board-certified?
5    A.  Yes.
6    Q.  Okay.  Do you remember any discussions about the
7  board-certification issue in connection with this 2002
8  negotiation?
9    A.  No.  I can state that there were none.
10    Q.  Okay.  And do you ever recall at any time
11  focusing on the "whenever possible" language in the
12  2002 — the 2002 contract?
13    A.  Yes.
14    Q.  In what context --
15    A.  Oh, in the 2002 contract?  No.
16    Q.  You anticipate where I'm going.
17      Would you agree with me that that similar
18  language appears -- that "whenever possible" language
19  appears in subsequent contracts?
20    A.  Until, I believe, 2005.
21    Q.  Correct.  And in the subsequent years, do you
22  recall any discussions about the "whenever possible"
23  language?
24    A.  Yes, I do.
25    Q.  And tell me what you recall.
                                              41

1    A.  It's a misnomer to call it the 2005 contract.
2  The discussions always took place — the contract rollover
3  date was always February 1 and -- of the odd-numbered
4  years.  So there was a 2001 contract, 2003 contract --
5  wait.  Is that right?  Or the even-numbered years?  2002,
6  '4, '6, and '8.
7    Q.  Understood.  So when I refer to a 2005 contract,
8  for example, that would suggest that it is negotiated at
9  the end of 2004?
10    A.  No.  I believe -- I don't know.
11      MS. ROBERTSON:  Hang on.  Let's fix this.
12      MR. GREEN:  Off the record.
13      (Discussion held off the record.)
14  BY MR. GREEN:
15    Q.  Notwithstanding the dates on these various
16  contracts that we have looked at, Smith Exhibit 14, 15 --
17  we'll look at some more -- was it generally the case that
18  the contracts were negotiated in the weeks and months
19  preceding the dates on the contracts?
20    A.  Yes, it is.
21    Q.  Okay.  So we've looked at -- and to summarize
22  where we were, there was a change in the language of the
23  contract in the contract title, the 2005 contract?
24    A.  That is correct.
25    Q.  That facial change on its face, that change
                                              43

1    A.  A discussion with both Tim McMurdo and with
2  Bernadette Smith at different times, although again, as I
3  recall, my actual negotiation of the contact was with
4  Bernadette that year.  That because of the merger of the
5  two medical staff organizations at Coastside and at Daly
6  City, we needed to come up with -- and also, second --
7  perhaps primarily because they were interested in having a
8  general board certification requirement for all
9  specialists within the hospital because of the perceived
10  quality statement that that made, that we needed to come
11  up with a standard that would accommodate both Seton Daly
12  City and Seton Coastside.  But whereby we would -- we made
13  a, let's call it, a gentlemen's agreement with Tim McMurdo
14  that we would continue the standard of 100 percent board
15  certification in emergency medicine at Seton Daly City and
16  we would adhere to the lesser standard at Seton Coastside.
17    Q.  Notwithstanding the language that was eventually
18  used?
19    A.  Notwithstanding the language that was eventually
20  used.
21    Q.  That is in 2005?
22    A.  That is correct.
23    Q.  So the 2005 contract --
24    A.  May I?
25    Q.  Please.
                                              42

1  purported to eliminate a discretionary or lesser
2  requirement for board certification and make board
3  certification an absolute requirement for Seton Coastside
4  work?
5    A.  Yes.
6    Q.  Nevertheless, there was what you referred to as
7  a gentlemen's agreement that that requirement for Seton
8  Coastside would not be enforced immediately?
9    A.  No.
10    Q.  No?  Go ahead.
11    A.  No, that's a misunderstanding.
12      The gentlemen's agreement was that although
13  there was a lesser standard for both Seton Coastside and
14  Seton Daly City, that we would apply the higher standard
15  of board certification in emergency medicine at Seton.
16  That we would not propose candidates for Seton Daly City
17  emergency department, which is a quote, unquote, real
18  emergency department -- we would not propose candidates
19  who did not -- who were not board-certified in emergency
20  medicine.
21    Q.  Meaning, what would be the practice in regards
22  to Seton Coastside?
23    A.  And at Seton Coastside we would adhere to the
24  lower standard of having people who were board-certified
25  or board-eligible in other primary care specialties or
                                              44



1 emergency medicine.
2    Q.  And what effect would the prior "whenever
3 possible" language have after 2005 under this gentlemen's
4 agreement?
5    A.  The gentlemen's agreement only was that we would
6 agree to adhere to the higher standard at Seton.  There
7 was no under-the-table agreements about any lower standard
8 at Seton Coastside.  There was nothing other than the
9 contract language.  And we were told that physicians who
10 were already working there who were not board-certified or
11 did not meet the 2005 medical staff-- or contract
12 requirements would be grandfathered; would be okay.
13    Q.  Who told you that?
14    A.  I think Bernadette Smith.
15    Q.  And this was in connection with the negotiation
16 of the 2005 contract?
17    A.  Actually, I believe it was largely in terms of
18 the discussion of the by-- -- what we had been told would
19 be a change in the bylaws regarding the standards for
20 working in both departments.
21    Q.  And when did this comment get made?
22    A.  In any one of a series of meetings that I had
23 with Bernadette at that time about the whole issue of the
24 merger of the medical staffs.
25    Q.  So sometime in 2005?
                                                          45

1 Exhibit 17 from the Smith deposition, the February 1,
2 2005, agreement.  And refer you to paragraph 1.3.
3        This agreement is different, in effect, than the
4 prior agreements, is it not?
5    A.  Yes, it is.
6    Q.  And in what way is it different?
7    A.  The language for regarding qualifications for
8 physicians is different.
9    Q.  And it eliminates the "whenever possible"
10 language, correct?
11    A.  That is correct.
12    Q.  Was it your understanding that under this
13 language Seton Coastside physicians would, unlike in the
14 past, have to be board-certified or board-eligible within
15 a year?
16    A.  That is correct.
17    Q.  Now, tell me what -- do you have any
18 recollection of -- other than what you've already
19 testified to about how this change came about, who was the
20 impetus for this change; was it Seton Coastside or was it
21 CEP?
22    A.  Definitely Seton, but not Seton Coastside.
23    Q.  I'm sorry.  Seton rather than CEP.  Thank you.
24        Do you recall anything about when this idea was
25 first presented to you by Seton?
                                                          47

1    A.  Correct.
2    Q.  And Dr. Golden had already been working at Seton
3 in -- at Seton Coastside in 2004?
4    A.  That is correct.
5    Q.  So let's finish off the bookkeeping here, if you
6 will.
7        Let me show you what's been shown as Exhibit --
8 previously marked as Smith Exhibit 16 and ask you if you
9 recognize that as the 2003 Seton Coastside emergency room
10 agreement?
11    A.  Yes, I do.
12    Q.  And you'll notice in section 1.3, that has the
13 "whenever possible" language.
14    A.  Yes, I do.
15    Q.  Do you recall at any point any discussions with
16 anybody about what exactly that language meant, in terms
17 of what it is that was expected or required of Seton
18 Coastside physicians?
19    A.  No.  I took it at face value.
20    Q.  Was the face value that you didn't have to be
21 board-certified --
22    A.  Yes.
23    Q.  -- in anything?
24    A.  Correct.
25    Q.  And then let me show you what's been marked as
                                                          46

1    A.  I believe during the time that we were
2 discussing this contract renewal.
3    Q.  And do you recall anything about what you said
4 in terms of the burden it would impose on CEP in staffing
5 Seton Coastside?
6    A.  I wanted clarification regarding those members
7 of the Seton Coastside medical staff they knew to not be
8 board-certified in any specialty who were already working
9 there.
10    Q.  Which was approximately 25 percent?
11    A.  More or less.
12        MS. ROBERTSON:  Of eight people, right?
13        MR. GREEN:  Of eight people.
14        THE WITNESS:  So two or three of the doctors.
15 BY MR. GREEN:
16    Q.  Golden was one of them.
17    A.  Golden was one, Vuksinich was another, Guyer was
18 another.
19    Q.  Anyone else come to mind?
20    A.  No.
21    Q.  And you were told that if the people were
22 working there, they would be allowed to continue there?
23    A.  That is what I was told.
24    Q.  So really am I correct with that assurance,
25 the -- and which came through Bernadette Smith?
                                                          48



1   A. I don't recall exact words. But I told him
2   about what I had learned about his training and
3   background. That I had particular concerns about his
4   representation of his experience at Seton Coastside on his
5   CV; that I thought his CV contained multiple untruths and
6   lies. That he had tried to use that document to get other
7   jobs at other emergency departments within CEP. That I
8   was concerned about not only his training and experience
9   and lack thereof, but about his personality, his
10  character. That I thought he was a significant problem.
11      Q. What was it about his training and background
12  that you found of concern?
13      A. That he had flunked out of a low-level internal
14  medicine residency, which is essentially the easiest
15  residency to get into in the United States.
16      Q. And you're referring there to Highland?
17      A. Correct. That he had not been good enough --
18  that he had had academic problems as an undergraduate in
19  medical school and in residency.
20      Q. And this is all from Rampulla?
21      A. From digging that I did after Ram- -- after I
22  got the -- I mean, he gave me enough information that I
23  could find out other stuff.
24      Q. What else did you do after you spoke to
25  Rampulla? Where else did you look to get information?

133

1   a presence within the organization. That in applying for
2   positions for which he had absolutely no qualifications,
3   he just seemed to be blindly trying to insinuate himself
4   into a higher position than he had the experience or
5   training or qualifications or -- I mean, nobody --
6       We, for example, offer Medical Director Academy
7   for people who are nominated by their medical directors as
8   potential new leaders in the organization that we could
9   send out if we get a new contract in another emergency
10  department as a potential new medical director. It's
11  described as such in our website. It's described such
12  in the cover letters that go out with invitations for
13  nominations for people to do that.
14      Donald was never nominated by anyone. Nobody in
15  the organization had ever considered Donald to be a rising
16  star and yet Donald would persistently and assiduously
17  attempt to get on every one of those things that came up,
18  including applying for the position of division vice
19  president when we created a new position for the top
20  echelon of leadership in the partnership. It's just
21  strange that anyone would do that with his experience in
22  the organization. Nothing that had ever happened to
23  Donald in CEP would have given any normal person an
24  indication that they were doing well, getting good
25  feedback, rising to the top of the organization. And yet

135

1   A. Talked to Desmond Carson, who basically filled
2   in the rest of the blanks.
3       Q. All right. So training and background. What
4   was it about his personality that you told Dr. Buscho?
5       A. That I found his overall demeanor and his
6   response to criticism or his response to suggestions for
7   improvement to be bizarre, to be kind of legalistic and
8   confrontational. That I -- that there were other issues
9   that -- not specifically related to his practice at Seton
10  Coastside that concerned me such as his trying to get jobs
11  at other CEP emergency departments where he was not
12  qualified to work. And that he was in the habit of
13  applying for medical-director academies, committee
14  positions, and leadership roles within CEP that were
15  basically not being offered to him and with no
16  encouragement from anybody in the organization to pursue
17  on a regular basis, which struck me as unrealistic and
18  strange. It's not behavior that I had seen in any other
19  CEP partner or in any other organization I had ever
20  participated in.
21      Q. What was strange about it that he wanted to
22  advance himself within CEP?
23      A. Unrealistically. That he seemed to feel that
24  by, for example, attending board meetings uninvited, that
25  he could somehow make himself more influential or more of

134

1   Donald continually put himself out as if that were the
2   case.
3       Q. You said you were critical of him for being
4   legalistic. In what way was he legalistic?
5       A. When I told him about the cardiac case in
6   particular but also when I told him about my concerns
7   about his CV, he wanted to challenge -- he talked to me
8   like you talk to me. He wanted to know every word, what
9   did you mean when you said this, what did you mean that
10  you have a problem with this. Bit by bit, item by item,
11  letter by letter, parsing out what problem I had. Not
12  acknowledging, yeah, I guess it is a little bit weird to
13  be describing cases that I've only seen one of. I mean,
14  any normal person would see that. But that wasn't the
15  case. Donald wanted to know why did I have -- it was as
16  if he thought a doctor's CV should look something like his
17  did. But it doesn't. And he didn't get that.
18      When I talked to him about the chest pain case,
19  there's ample reason -- first of all, the main concern
20  that I had raised with him in the first place was that he
21  had told the lady who had never had an MI that she had had
22  an MI. He had told her that she was coming to the
23  emergency department -- or to Seton in particular -- to
24  have a cath to have a -- probably an angioplasty to take
25  care of this problem that had been missed by all of these

136



1  discussions about the number of shifts that Dr. Golden
2  would be given?
3      A. Yes, I do.
4      Q. Tell me what you recall happening at that
5  meeting.
6      MS. ROBERTSON: Just on that topic?
7      MR. GREEN: Yeah.
8      THE WITNESS: I recall -- this was the first
9  department meeting that had ever taken place at Seton
10 Coastside. It was chaired by Dr. Buscho. I was present
11 as the regional director, Donald was present, Larry Guyer
12 was present, Mark Sears, Vuksinich, Raj Gopal, Poindexter.
13 I think that's everybody that was there.
14     And we talked about -- towards the end of the
15 meeting about our plans going forward with the new
16 leadership at the site and that there would be some
17 changes in the roster. We would be bringing in a new
18 doctor who had not yet started working there.
19 BY MR. GREEN:
20     Q. Who was that?
21     A. That was Dr. Don McIntyre. That we needed to
22 accommodate Bob Buscho having some shifts, because he
23 had -- I think prior to that he had been working maybe a
24 couple -- one or two a month. And I thought it was
25 prudent for him to be more present at the site to become

161

1  more of an influence there. So I thought he needed to be
2  working for, like, six shifts a month there. And we
3  wanted to bring in Dr. McIntyre, who is a highly qualified
4  ABEM board physician to work there as part of our effort
5  to improve the overall quality of medicine being practiced
6  there. And that we were going to need to make room in the
7  roster out of the 20 -- or the 30 shifts per month that
8  were typically worked there, we needed to make some room
9  and there were going to be some changes.
10     And Bob again, I think, made a stronger point
11 that those changes would be made in part with a view
12 towards decreasing those of the nonboard-certified
13 doctors -- in other words, that some of those decisions
14 were going to be based on certification issues.
15     Donald challenged that and began asking a series
16 of very pointed questions to find out what this meant for
17 him and wanted Bob to tell him an exact number of shifts
18 that he was going to get.
19     His response was again categorically different
20 from the response of the other doctors in the room. He
21 wanted to know exactly how many, exactly why, exactly
22 when, very -- you know, pointed, detailed -- taking notes.
23 And was pressing Bob for really, really specific answers
24 in front of everybody else.
25     And the one point my perception was that Bob was

162

1  feeling kind of cornered and he had to say something in
2  response to this barrage. And he said something to the
3  effect of Yes, I can guarantee you -- I think he said four
4  to six shifts going forward, or something like that. I
5  can't remember the exact words. But the word "guarantee"
6  or "assure" was there and a number of shifts was there,
7  and something about "in the future" or "going forward" or
8  "heretofore" or whatever. And I said wait, wait, wait.
9  You can't say that, Bob. Because no one had -- and I
10 basically quoted the CEP partnership agreement.
11     Q. Right.
12     A. Because, again, it's sort of a key feature of
13 our agreement that no partner has a guarantee of shifts at
14 a specific site at any time. And Bob made a statement
15 that would have been construed by a mind like Donald's as
16 being a guarantee in perpetuity of a fixed number of
17 shifts. And I needed to correct that before he went any
18 further with that.
19     Q. And when you corrected that, was there any
20 comment from Dr. Golden?
21     A. I think there were -- he continued to press with
22 questions and whatnot.
23     Q. Did Dr. Vuksinich suffer any reduction in shifts
24 as a result of any concerns about board certification?
25     A. No, he did not.

163

1      Q. Did Dr. Guyer suffer any reduction in shifts?
2      A. Yes, he did.
3      Q. And what was the nature of the reduction of
4  shifts?
5      A. He was taken off the schedule altogether.
6      Q. When did that happen?
7      A. November, I think. Maybe December. I can't
8  remember exactly.
9      Q. Okay. And was that for both quality reasons and
10 board certification reasons?
11     A. Yes. And general reasons.
12     MS. ROBERTSON: Well, we don't need to get too
13 deeply. I think he has enough to understand.
14 BY MR. GREEN:
15     Q. You call it general. Give me a --
16     A. Comportment.
17     Q. "Comportment," by which you mean behavior?
18     A. His behavior relative to being available to get
19 on the schedule. He was a pain in the ass. Forgive my
20 French.
21     MR. GREEN: Let's mark this as the next
22 numbered.
23          (Plaintiff's Exhibit 5 marked
24          for identification.)
25 BY MR. GREEN:

164



MARK ALDERDICE, M.D. - MAY 22, 2009

```
 1   STATE OF CALIFORNIA   ) ss.
 2
 3          I hereby certify that the deponent in the
 4   forgoing deposition was by me duly sworn to testify to
 5   tell the truth, the whole truth and nothing but the truth
 6   in the within-entitled cause; that said deposition was
 7   taken at the time and place therein stated; that the
 8   deposition is a true record of the deponent's testimony as
 9   reported to the best of my ability by me, a duly certified
10   shorthand reporter and a disinterested person, and was
11   thereafter transcribed under my direction into typewriting
12   by computer.
13          I further certify that I am not interested in
14   the outcome of the said action, nor connected with, nor
15   related to any of the parties in said action, nor to their
16   respective counsel.
17          IN WITNESS WHEREOF, I have hereunto set my hand
18   this 2nd day of June, 2009.
19
20
21          _____
22          HEIDI BELTON, CSR #12885, RPR
23
24
25
                                                      233
```

JAN BROWN & ASSOCIATES   (800)   522-7096   (415)   981-3498

MARK ALDERDICE, M.D. - VOLUME II - JUNE 29, 2009

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
RENE C. DAVIDSON COURTHOUSE
--oOo--

DONALD GOLDEN. M.D.,        )
                            )
    Plaintiff,              )
                            )
    vs.                     ) No. RG08388602
                            ) Pages 234 thru 329
CALIFORNIA EMERGENCY        ) Volume II
PHYSICIANS MEDICAL GROUP;   )
MEDAMERICA; MARK ALDERDICE; )
ROBERT BUSCHO; AND DOES 1   )
THROUGH 1000, AND EACH OF   )
THEM, INCLUSIVE,            )
                            )
    Defendants.             )
_____    )

DEPOSITION OF

MARK ALDERDICE, M.D.

JUNE 29, 2009

Reported by ELIZABETH J. WOOD
License No. CSR-5134

JAN BROWN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
701 Battery Street, 3rd Floor
San Francisco, California 94111
(415) 981-3498 or (800) 522-7096

234

1   BE IT REMEMBERED, that pursuant to notice to the
2   respective parties, and on Monday, the 29th day of June,
3   2009, commencing at the hour of 10:12 a.m. thereof, at
4   the offices of FITZGERALD, ABBOTT & BEARDSLEY, LLP, 1221
5   Broadway, 21st Floor, Oakland, California, 94612, before
6   me, ELIZABETH J. WOOD, a Certified Shorthand Reporter,
7   License No. C-5134, in and for the County of Contra
8   Costa, State of California, there personally appeared:
9           MARK ALDERDICE, M.D.,
10  called as a witness on behalf of the Plaintiff, who,
11  being first duly sworn, was then and there examined and
12  interrogated as hereinafter set forth.
13          --oOo--
14  MITCHELL J. GREEN, Attorney at Law, representing
15  the Law Offices of CURTIS & GREEN, LLP, 1101 Fifth
16  Avenue, Suite 310, San Rafael, California, 94901, Phone:
17  (415) 456-4600. Fax: (415) 455-0270.
18  Email: mgreen@curtisgreenlaw.com, appeared as counsel
19  on behalf of the plaintiff DONALD GOLDEN, M.D.;
20      SARAH ROBERTSON, Attorney at Law, representing the
21  Law Offices of FITZGERALD, ABBOTT & BEARDSLEY, LLP, 1221
22  Broadway, 21st Floor, Oakland, California, 94612,
23  Phone: (510) 451-2200. Fax: (510) 451.1527.
24  Email: www.fablaw.com, appeared as counsel on behalf of
25  the defendants CALIFORNIA EMERGENCY PHYSICIANS MEDICAL

236

1       INDEX
2                       Page
3   Continued direct examination by Mr. Green...........238
4           --oOo--
5       INDEX OF
6       EXHIBITS
7   Plaintiff's No.              Page
8   9.  2-page document, 3.1.9, Provider Counseling
9       Guidelines, Bates stamped CEP 000638 - CEP
10      000689, Confidential...........................262
11          --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

235

1   GROUP; MEDAMERICA; MARK ALDERDICE; ROBERT BUSCHO; AND
2   DOES 1 THROUGH 1000, AND EACH OF THEM, INCLUSIVE;
3   Also present: DONALD GOLDEN, M.D.
4           --oOo--
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

237

Pages 234 to 237

MARK ALDERDICE, M.D. - VOLUME II - JUNE 29, 2009

1    And would you agree generally we can characterize
2  those as notice and hearing rights?
3    A. Yes.
4    MS. ROBERTSON: Objection. Calls for a legal
5  conclusion.
6    Go ahead.
7    MR. GREEN:
8    Q. And were you aware of whether CEP had any
9  obligations under 805 at the time of -- Dr. Golden was
10 removed from the rotation?
11   A. No.
12   Q. Okay. You recall you testified previously
13 regarding a meeting you had with Bernadette Smith at
14 which there was requested from the hospital a waiver of
15 the board certification requirements so that you would
16 be allowed to practice in some capacity or other,
17 just --
18   A. Not correct at all.
19   Q. I'm not trying to characterize -- I'll give you
20 a chance to clarify that.
21   Did you have a meeting with Bernadette Smith?
22   A. No.
23   Q. No?
24   A. No, I don't ever recall a discussion of my
25 board certification.

274

1    You're talking about my board certification at the
2  time I started working there?
3    Q. Yes.
4    A. No?
5    Q. You didn't testify that --
6    A. The credentials committee --
7    Q. Oh, I'm sorry. I'm sorry.
8    A. -- at which she was not present.
9    Q. Okay. So you had -- I got that wrong.
10   You had a meeting at some point with the hospital's
11 credentials committee, in which you asked for and were
12 given, a waiver of what you believed to be a board
13 certification requirement.
14   MS. ROBERTSON: I think that misstates the witness'
15 testimony.
16   THE WITNESS: It misstates my testimony.
17   MS. ROBERTSON: Go ahead.
18   MR. GREEN:
19   Q. I'm just trying to set our place, so you
20 correct me if I'm wrong. I'm not trying to
21 mischaracterize your testimony.
22   You had a meeting at which there was some
23 discussion of a waiver of a board certification
24 requirement; is that not correct?
25   A. No.

275

1    Q. Correct me then.
2    A. I'll correct you.
3    At the time that I was applying for privileges at
4  Seton Daly City, which was, I believe, in December of
5  2001, the medical director, Dr. Goldschmiedt, was under
6  the impression that ABEM certification in emergency
7  medicine was a requirement, and told me that it would be
8  a good idea for me to -- that he was uncertain as to
9  whether or not the hospital's credentials committee --
10 the medical staff credentials staff committee, more
11 specifically, would be willing to waive that
12 requirement, and that it would be a good idea for me to
13 meet with the -- to be presented to the credentials
14 committee.
15   So at the time that I -- that my file came up
16 before the credentials committee, I was -- I attended
17 that meeting --
18   Q. Uh-huh.
19   A. -- and they basically asked me questions.
20   There was no specific mention of a waiver or of
21 anything like that.
22   We just went over my training and my background and
23 my board certification in emergency medicine, and I was
24 excused.
25   I was there for probably all of five minutes of a

276

1  probably ninety-minute meeting. I don't recall any
2  mention of the word waiver.
3    Q. Okay. Do you recall -- do you recall any
4  discussion about the fact that you were not ABEM board
5  certified?
6    A. I believe there was a question about the
7  difference between ABPS and ABEM certification, yes.
8    Q. And in response to that question -- well,
9  strike that.
10   You went into that meeting with the understanding,
11 right or wrong, that A-B-E-M, all caps, certification,
12 which you did not have, was required for medical staff
13 membership?
14   A. I had that understanding from Dr.
15 Goldschmiedt --
16   Q. Right or wrong.
17   And you had ABPS, A-B-P-S, certification?
18   A. That is correct.
19   Q. Did you feel that the -- and you, I think,
20 somewhat self-disparagingly described this as a second
21 class sort of certification in your prior deposition
22 testimony?
23   A. I didn't say second class certification. I
24 said this gives me second class citizenship.
25   Q. But really you -- am I correct that you don't

277

Pages 274 to 277

MARK ALDERDICE, M.D. - VOLUME II - JUNE 29, 2009

1  Shaikin when she replied to my email stating that we
2  can't do that because -- dot, dot, dot.
3       Q.  Well, you certainly knew that on May 7th at
4  11:34 a.m., Exhibit 7, when you wrote to Donald and gave
5  him your advice.
6       A.  Yes.
7       Q.  Okay.
8       A.  I would say that's accurate.
9       Q.  Okay.
10      MS. ROBERTSON:  So you're asking about a pretty
11  tight chronology where there's tons and tons of
12  documents and I think what we're looking at on the
13  Shaikin Deposition is a subset of emails, so --
14      MR. GREEN:
15      Q.  Let's look at exhibit -- Shaikin Exhibit No.
16  10.
17      A.  Uh-huh.
18      Q.  Were you aware, as of any time around May 9th,
19  that Dr. Buscho thought that Seton should acknowledge
20  that both CEP and Seton had made an error in getting Dr.
21  Golden on staff?
22      A.  I had -- I did not see this email at that time,
23  no.
24      Q.  Regardless of whether or not you saw this
25  email, had you had any such discussions with Dr. Buscho?
                                                        310

1       A.  No.
2       Q.  And, in fact, you would disagree with Dr.
3  Buscho, that there had been an error, wouldn't you?
4       A.  He refers to essentially two errors because he
5  said we, CEP, and Seton made an error.
6       I believe that -- my understanding was that Donald
7  was hired at Seton Coastside and began working there in
8  2004; and, therefore, I was under the impression that
9  that was before the time -- and then I was corrected
10  subsequently by Marcia, who told me that even though he
11  had started working at that time, he wasn't
12  officially -- there was some delay in his medical staff
13  credentialing such that he did not meet --
14      Q.  Go ahead and finish.
15      A.  -- the criteria.
16      Q.  As you sit here today, do you believe that CEP
17  made any error in putting Dr. Golden -- in connection
18  with getting Dr. Golden on staff at Seton initially?
19      MS. ROBERTSON:  Relating to board certification?
20      MR. GREEN:  Yeah.
21      THE WITNESS:  Relating to quality -- I have
22  previously stated, and continue to believe, that Dr.
23  Sears should not have hired Dr. Golden.
24      MR. GREEN:
25      Q.  No.  Let me refine the question.
                                                        311

1       Did CEP make any error in regard to Dr. Golden's
2  board certification status in connection with the
3  initial credentialing?
4       A.  I do not believe so.
5       Q.  Okay.  Do you believe that Seton made any error
6  at that time?
7       A.  I do believe so.
8       Q.  What was the error you believe Seton made?
9       A.  It's the one described in the email from
10  Jennifer -- I guess it was an email from Marcia about
11  Jennifer Siapno having discovered that they thought
12  that -- well, there are two Donald Goldens, one of whom
13  is a GI specialist with a different birth date or
14  something.
15      Q.  Okay.  All right.  Let's look at No. 11,
16  Shaikin Exhibit No. 11.
17      Now, during this whole exchange of emails, starting
18  with the Exhibit No. 5 in March of 2007, was there any
19  distinction in your mind between a bylaws board
20  certification requirement and a contractual board
21  certification requirement?
22      A.  Yes.
23      Q.  What was the distinction?
24      A.  That the contract, as it usually does, was
25  written to reflect bylaw requirements --
                                                        312

1       Q.  Okay.
2       A.  -- so that the contract is the binding
3  document --
4       Q.  Right.
5       A.  -- that describes the relationship between CEP
6  and Seton.
7       The medical staff bylaws is the -- the medical
8  staff's set of rules and regulations that pertain to the
9  members of the medical staff.
10      Q.  So your understanding is the board
11  certification requirements in the contract were there to
12  mirror the bylaw board certifications?
13      A.  That is correct.
14      Q.  So it really didn't matter whether somebody
15  said it's a bylaw requirement or a contractual
16  requirement, they were, in effect, referring back to the
17  same bylaw requirement?
18      A.  My understanding was that a bylaws amendment
19  was in process and that changes in our contract were
20  made to reflect the bylaws amendment.
21      Q.  Okay.  So, again, the -- any confusion or
22  inability to distinguish or failure to distinguish
23  between contract or bylaw, or invoking bylaws rather
24  than contract, or contract rather than bylaws, is
25  basically meaningless?
                                                        313

MARK ALDERDICE, M.D. - VOLUME II - JUNE 29, 2009

1  candidate who was not board certified. Please screen --
2  will you in future screen such candidate.
3     So they were essentially saying that we had
4  committed an error.
5     Q. Well --
6     A. I did not believe that to be the case, but --
7     Q. -- look at Exhibit 5.
8     Is that the email -- Shaikin Exhibit 5, is that the
9  email that you are referring to?
10    A. Is it possible for --
11    MS. ROBERTSON: You don't need to read it. The
12  whole thing is Exhibit 5.
13    THE WITNESS: Yes, yes.
14    MR. GREEN:
15    Q. That's the email you're referring to?
16    A. Yes.
17    Q. And read for me from Exhibit 5, what it is in
18  which you believe Seton is accusing CEP of having made
19  an error.
20    A. Is it possible for CEP to prescreen the ER
21  applicants to Seton Coastside to ensure that they are
22  already board certified before they request an
23  application from us.
24    Q. In fact, the email acknowledges an error by
25  Seton, not by CEP, doesn't it?

326

1     A. Remember that there were multiple telephone
2  conversations around this whole issue as well and it was
3  clearly represented to me that somehow or other, we had
4  goofed by presenting Donald as an applicant for the
5  medical staff who was not board certified.
6     Q. But that email is asking you to make amends
7  going forward, correct?
8     A. To correct a past error, yes.
9     Q. No. Is that email --
10    A. When somebody asks you to make amends for
11  something, it's usually for a past problem.
12    Q. Did you interpret that email as a request from
13  Seton to take any action again Dr. Golden?
14    A. No.
15    Q. Okay. Did you ever have any other discussions
16  with Marcia Shaikin about the relationship between the
17  bylaws and contract terms?
18    A. No.
19    Q. Did you ever have any follow-up discussions
20  with Marcia Shaikin about the contract?
21    A. No.
22    Q. Okay. Let me show you what's previously been
23  marked as -- I'm not sure what exhibit number it is.
24    MR. GREEN: Let's take a short break. Doctor,
25  would you step out with me for a moment?

327

1     (Whereupon, a brief recess was taken from
2  12:34 p.m. to 12:40 p.m.)
3     MR. GREEN: Thank you, Dr. Alderdice. No further
4  questions at this time.
5     THE REPORTER: We have marked one exhibit for the
6  transcript as Exhibit No. 9. Thank you.
7     (The deposition was concluded at 12:40 p.m.)
8     --oOo--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  _____    _____
25  DATE              MARK ALDERDICE, M.D.

328

1  STATE OF CALIFORNIA  )
                       )  ss.
2  COUNTY OF CONTRA COSTA)
3
4     I, ELIZABETH J. WOOD, CSR, a Certified shorthand
5  Reporter, hereby certify that the witness in the
6  foregoing deposition was by me duly sworn to testify to
7  the within-entitled cause; that said deposition was
8  taken at the time and place therein stated; that the
9  testimony of the said witness was reported by me, a
10 Certified Shorthand Reporter, and was thereafter
11 transcribed under my direction into typewriting; and
12 that the witness was given an opportunity to read, and
13 if necessary, correct said deposition and to subscribe
14 the same.
15    I FURTHER CERTIFY that I am not of counsel or
16 attorney for either or any of the parties in the
17 foregoing deposition and caption named or in any way
18 interested in the outcome of the cause named in such
19 caption.
20    IN WITNESS WHEREOF, I have hereunto set my hand
21 this date, the 2st day of June, 2009.
22
23
24
25    _____
      ELIZABETH J. WOOD, CSR, License No. C-5134,
      County of Contra Costa, State of California.

329

Pages 326 to 329



MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

**Page 1**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
RENE C. DAVIDSON COURTHOUSE
--oOo--

DONALD GOLDEN, M.D.,                )
                                    )
        Plaintiff,                  )
                                    )
    vs.                             )  No. RG08388602
                                    )  Pages 1 thru 53
CALIFORNIA EMERGENCY                )  Volume I
PHYSICIANS MEDICAL GROUP;           )
MEDAMERICA; MARK ALDERDICE;         )
ROBERT BUSCHO; AND DOES 1           )
THROUGH 1000, AND EACH OF           )
THEM, INCLUSIVE,                    )
                                    )
        Defendants.                 )
                                    )
_____     )

DEPOSITION OF

MARK J. SPIRO, M.D.

NOVEMBER 5, 2009

Reported by ELIZABETH J. WOOD
License No. CSR-5134

JAN BROWN & ASSOCIATES
NATIONWIDE REPORTERS & VIDEOGRAPHERS
701 Battery Street, 3rd Floor
San Francisco, California 94111
(415) 981-3498 or (800) 522-7096

**Page 2**

                    INDEX
                                Page
Direct examination by Mr. Green.......................5
                    --oOo--

**Page 3**

1   BE IT REMEMBERED, that pursuant to notice to the
2   respective parties, and on Thursday, the 5th day of
3   November, 2009, commencing at the hour of 9:46 a.m.
4   thereof, at the offices of California Emergency
5   Physicians Medical Group, 2100 Powell Street, Suite 920,
6   Emeryville, 94608, before me, ELIZABETH J.
7   WOOD, a Certified Shorthand Reporter, License No.
8   C-5134, in and for the County of Contra Costa, State of
9   California, there personally appeared:
10      MARK J. SPIRO, M.D.,
11   called as a witness on behalf of the Plaintiff, who,
12   being first duly sworn, was then and there examined and
13   interrogated as hereinafter set forth.
14      --oOo--
15      MITCHELL J. GREEN, Attorney at Law, representing
16   the Law Offices of CURTIS & GREEN, LLP, 1101 Fifth
17   Avenue, Suite 310, San Rafael, California, 94901, Phone:
18   (415) 456-4600.  Fax: (415) 455-0270.
19   Email:  mgreen@curtisgreenlaw.com, appeared as counsel
20   on behalf of the plaintiff DONALD GOLDEN, M.D.;
21      SARAH ROBERTSON, Attorney at Law, representing the
22   Law Offices of FITZGERALD, ABBOTT & BEARDSLEY, LLP, 1221
23   Broadway, 21st Floor, Oakland, California, 94612,
24   Phone: (510) 451-2200.  Fax: (510) 451.1527.
25   Email: srobertson@fablaw.com, appeared as counsel on

**Page 4**

1   behalf of the defendants CALIFORNIA EMERGENCY PHYSICIANS
2   MEDICAL GROUP; MEDAMERICA; MARK ALDERDICE; ROBERT
3   BUSCHO; AND DOES 1 THROUGH 1000, AND EACH OF THEM,
4   INCLUSIVE;
5      Also present:  DONALD GOLDEN, M.D. and MARK
6   ALDERDICE, M.D.
7      --oOo--

Pages 1 to 4

| | |
|---|---|
| 1 THURSDAY          NOVEMBER 5, 2009 | 1 four plus years ago, so I don't remember exactly |
| 2 VOLUME I | 2 verbatim -- |
| 3 P R O C E E D I N G S | 3 Q. Uh-huh. |
| 4 --oOo-- | 4 A. -- but there were discussions with -- concerns |
| 5 DIRECT EXAMINATION | 5 about his practice level of competence in the emergency |
| 6 BY MR. GREEN: | 6 department, and this is after he had been there for a |
| 7 Q. Doctor, would you give us your full name for | 7 while. I can't tell you exactly how long a while is. |
| 8 the record, please? | 8 Concerns about the way he presents cases, that they |
| 9 A. Mark Jeffrey Spiro. | 9 seem disjointed, giving the appearance to the people |
| 10 Q. And am I correct that since 1998, you have been | 10 that were hearing these presentations that he did not |
| 11 CEP's chief operating officer and the vice president of | 11 really have a good comprehension of the medicine that |
| 12 operations? | 12 was needed to deal with those patients. |
| 13 A. Not exactly correct, but pretty close. I've | 13 Q. Did you have, at the time of these |
| 14 been the vice president of operations and a year later | 14 conversations, any discussions with Dr. Alderdice |
| 15 they added the chief operating officer. The job hasn't | 15 regarding what Dr. Alderdice was contemplating doing |
| 16 changed since 1998. | 16 about this situation? |
| 17 Q. Okay. And what are those duties that you have | 17 A. Yes. |
| 18 as the chief operating officer? | 18 Q. And what do you recall about that? |
| 19 A. I supervise the day-to-day running of the | 19 A. That's not as clear in my mind right now, |
| 20 partnership. | 20 and -- but I recall having discussions about whether |
| 21 Q. In preparation for the deposition here today, | 21 he should be continuing at the site or not continuing at |
| 22 did you have any discussions with any other CEP partners | 22 the site, because of his level of care being below what |
| 23 or employees outside of the presence of your counsel? | 23 he considered -- what Dr. Alderdice considered |
| 24 A. No. | 24 acceptable for the site. |
| 25 Q. Any discussions with Dr. Alderdice? | 25 Q. Do you recall any of the discussions about what |
| 5 | 7 |

| | |
|---|---|
| 1 A. You know, no, other than maybe just saying I | 1 alternative role he might have in CEP, if he were not |
| 2 have a deposition today. | 2 allowed to continue at the Coastside site? |
| 3 Q. You are familiar with Dr. Golden? | 3 A. At the time he was working at a couple of |
| 4 A. Yes, I am. | 4 urgent cares, and people felt that he would be -- his |
| 5 Q. And you are aware that his partnership status | 5 medical knowledge was probably -- was appropriate for |
| 6 with CEP has been terminated? | 6 working at an urgent care. |
| 7 A. Correct. | 7 Q. Do you remember any of the particulars about |
| 8 Q. I want to go back prior to the events of that | 8 the patient care concerns that Dr. Alderdice discussed |
| 9 termination and we'll talk about that in a minute. | 9 with you? |
| 10 Do you recall at some point having discussions with | 10 MS. ROBERTSON: Other than what he's talked about |
| 11 Dr. Alderdice in or around perhaps the 2005 time frame | 11 already? |
| 12 about Dr. Golden's qualifications or work history? | 12 MR. GREEN: Uh-huh. |
| 13 A. On or about -- on or around 2005, yes, I do | 13 THE WITNESS: You know, I -- not really. I mean, I |
| 14 have a recollection. | 14 remember -- I remember bits and pieces, but not enough |
| 15 Q. Tell me what you recall about those | 15 to give a really good answer right now. |
| 16 conversations, please. | 16 MR. GREEN: |
| 17 A. Mark -- | 17 Q. All right. Do you remember anything about any |
| 18 Q. Dr. Alderdice? | 18 decision making that involved Mucomyst? |
| 19 A. That's correct. | 19 A. No. |
| 20 Mark and I would have occasional conversations | 20 Q. Okay. |
| 21 about a lot of things, because that was a part of my | 21 A. I remember that there was a number of cases, |
| 22 responsibility, and one of them was the sites and the | 22 and the case that I remember actually the most was -- |
| 23 partners in the sites, and he would tell me about | 23 actually, there were a few. |
| 24 different partners. | 24 The case where he sent over a patient for a |
| 25 One of the partners was Donald and -- oh, you know, | 25 possible overdose of Demerol, which, when I heard about |
| 6 | 8 |



1  it, it seemed very inappropriate to me.
2  I wasn't there, but it seemed very inappropriate to
3  me.
4      And I remember he talked about a cardiac case with
5  a woman, and the issue wasn't so much the care, but
6  the -- creating the expectations of a certain thing to
7  be done that wasn't necessarily going to be done.
8      And I remember some issue about a -- I think it was
9  a hand -- a laceration, a significant laceration,
10  where -- and I don't remember even enough, without
11  looking at the records, to give more than that.
12     Q.  Over what period of time did these discussions
13  about patient care issues relating to Dr. Golden go on
14  between you and Dr. Alderdice?
15     A.  I can't give you a good answer without looking
16  at previous records.
17     Q.  What previous records do you have in mind?
18     A.  If you have -- you've subpoenaed a lot of
19  things. I'm assuming it would be in email records and
20  things like that.
21     Q.  Do you have any records in mind that you would
22  know about that would refresh your memory?
23     A.  If there was email records, that would be it;
24  but I don't recall anything specifically.
25     Q.  Well, do you recall whether this was just one

9

1      A.  I don't recall that discussion.
2      Q.  Okay.  You are familiar with the concept of
3  peer review, are you not?
4      A.  Yes, I am.
5      Q.  And Dr. Golden would have been subject to peer
6  review through the hospital's medical staff for his care
7  at Coastside; is that your understanding?
8      A.  I did not have an understanding about that,
9  really.
10     Q.  Okay.
11     A.  You know, I don't generally get involved at
12  that -- that much into the difficulties at the local
13  sites.
14     Q.  As a general matter, you are aware that the
15  hospital's medical staff conducts peer review?
16     A.  Yes.
17     Q.  And you're generally familiar with the fact
18  that if a physician has a concern about the quality of
19  care, that the medical staff is capable of investigating
20  that concern within the peer review process?
21     A.  That's correct.
22     Q.  Okay.  Did you and Dr. Alderdice ever suggest
23  submitting Dr. Golden's -- the concerns you had about
24  Dr. Golden, to the hospital's staff for peer review?
25     A.  I do not recall.

11

1  single conversation?
2      A.  Oh, no, no. It was more than one conversation.
3      Q.  Approximately how many conversations?  A dozen?
4  More or less?
5      A.  Probably less.
6      Q.  Half a dozen?
7      A.  Maybe half a dozen.
8      Q.  Okay.  And did this happen in a concentrated
9  period of time or did it go over -- can you say days,
10  weeks or months?
11     A.  Probably.
12     Q.  Best recollection.
13     A.  My best recollection, based more on how things
14  work --
15     Q.  All right.
16     A.  -- would be it went over a period of months.
17     Q.  Okay.  Did you have any concerns about Dr.
18  Golden treating patients at Coastside in light of what
19  Dr. Alderdice was telling you?
20     A.  I had some concerns.
21     Q.  What were they?
22     A.  That he was in over his head as far as his
23  ability to function in an emergency department.
24     Q.  Okay.  Did you and Dr. Alderdice discuss
25  removing him from Coastside immediately?

10

1      Q.  Okay.  Does CEP conduct its own independent
2  peer review, apart from the hospital's medical staff
3  peer review, at any site?
4      A.  CEP, through its -- the credentials and
5  partnership affairs committee is the de facto peer
6  review body for CEP --
7      Q.  Okay.
8      A.  -- and they review individual's advancements
9  and qualifications.
10     Q.  That's in the context of advancing through the
11  different partnership levels?
12     A.  Right.  They rarely investigate a particular
13  case, but they are the designated peer review body.
14     Q.  Do they have a set of policies and procedures
15  for investigating specific issues of patient care
16  unrelated to partnership advancement?
17     A.  Yes.
18     Q.  And can you identify those policies?
19     What's the name of them?  Where are they to be
20  found?
21     A.  They are to be found in the policy book on the
22  CEP website.  CEP operational policies, fair hearing.
23     Q.  CEP operational policies, fair hearing?
24     A.  Yes.
25     Q.  That's the name of it?

12

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

1    A. I think that's the name of it.
2    Q. Okay. And do you know when those were
3  instituted or implemented?
4    MS. ROBERTSON: Objection. Compound.
5  Go ahead.
6    THE WITNESS: They have been implemented and
7  revised over many years.
8    MR. GREEN:
9    Q. Okay. Now, is this in your mind a policy
10  distinct from the general CEP grievance policy?
11    A. Yes.
12    Q. And it relates specifically to medical care?
13    A. Correct.
14    Q. Okay. Are you familiar with Business and
15  Professions Code 805?
16    A. Yes.
17    Q. And do these policies have any relationship to
18  the Business and Professions Code 805?
19    A. Yes, they do.
20    Q. What is your understanding of what that
21  relationship is?
22    A. The policy is to help guide us in making a
23  determination whether an 805 report is needed and the
24  procedure to investigate and conduct such a matter.
25    Q. Do you know whether or not any such procedure
                                                13

1    A. I had conversation years ago prior to that with
2  John Rampulla, who was his medical director.
3    Q. At which facility?
4    A. At San Pablo/Pinole.
5    Q. And —
6    A. And John did not have — he did not feel that
7  Donald was competent in that setting, and so I told Mark
8  that he should speak with John directly, because all I
9  was being able to do was give him hearsay, and he should
10  actually speak to John directly to see — before he kind
11  of made a decision.
12    Q. Can you give me any sort of time estimate about
13  when this conversation happened in terms of the
14  subsequent conversations you had with Dr. Alderdice
15  about patient care issues?
16    A. I cannot.
17    Q. Weeks? Months? Years?
18    A. Probably, you know —
19    Q. Best recollection?
20    A. You could say days, if there was enough days —
21    Q. Uh-huh.
22    A. — you know.
23    Q. Days less than a week? Weeks less than a
24  month? Months less than a year?
25    MS. ROBERTSON: His point is you can measure any
                                                15

1  complying with the CEP fair hearing policy was
2  instituted against Dr. Golden?
3    A. I know there was not.
4    Q. Okay. And do you know why there was not?
5    A. Do I know why there was not?
6    Q. Yes.
7    Let me rephrase it. It's a little — I'm asking
8  you to prove a negative. That's a little hard.
9    Did you ever have any discussions with anybody as
10  to the application of this CEP fair hearing policy to
11  Dr. Golden's situation?
12    A. I did not.
13    Q. Okay. Do you know of anybody who ever
14  considered that?
15    A. I am unaware of anyone that considered it.
16    Q. Okay. Let me go back to a period of time even
17  before these conversations regarding patient care took
18  place.
19    Do you recall some point earlier in time when Dr.
20  Alderdice came to speak to you about Dr. Golden for
21  purposes of learning more about Dr. Golden's background,
22  qualifications and credentials?
23    A. Yes.
24    Q. All right. And tell me what it is you recall
25  about that.
                                                14

1  period of time in days, I think. That's what you were
2  talking about.
3    THE WITNESS: So I don't know. I would say at
4  least a year —
5    MR. GREEN:
6    Q. Okay.
7    A. — but that's just off the top of my head.
8    Q. Okay. What is it that you recall -- I know
9  it's a long time ago, but give me your best recollection
10  about exactly what it was Dr. Rampulla was complaining
11  to you about in regard to Dr. Golden.
12    What were his criticisms of Dr. Golden?
13    A. He didn't go into detail.
14    Q. Okay.
15    A. He just told me that he was very difficult to
16  work with. That he was -- that his care was not up to
17  snuff.
18    Q. Okay.
19    A. And he described him as a pimple on his butt.
20    Q. And if I am correct, is it your understanding
21  that Dr. Golden worked at Doctors Medical Center under
22  Dr. Rampulla before he went to Coastside?
23    A. Correct.
24    Q. Okay. So at some point he's at Coastside and
25  Dr. Alderdice is coming to speak to you about him?
                                                16

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

| | |
|---|---|
| 1   A. Correct. | 1  Golden? |
| 2   Q. And what is that time frame?  Do you have any | 2   A. I mean, I'm not sure I understand the question. |
| 3  sense of that? | 3   Q. Dr. Alderdice comes to you initially in regard |
| 4   A. It's probably -- I'm going to guess a year or | 4  to Dr. Golden to inquire about his credentials? |
| 5  two. | 5   A. Correct. |
| 6   Q. Okay.  And when you spoke with Dr. Rampulla | 6   Q. And then at some later date, he comes to you |
| 7  initially, what was it that prompted that conversation? | 7  again, and you communicate regarding concerns that Dr. |
| 8   Can you remember anything about the circumstances | 8  Alderdice has about Dr. Golden's competence and his |
| 9  that led Dr. Rampulla to make those remarks to you? | 9  patient care; is that correct? |
| 10   A. I do not. | 10   A. I guess that's a fair statement. |
| 11   Q. Okay.  And can you recall whether there was any | 11   Q. And it's about a year between those two sets of |
| 12  discussion at that time with Dr. Rampulla about what to | 12  conversations, best estimate? |
| 13  do about Dr. Golden? | 13   A. It could be -- could have been four months.  It |
| 14   A. I do not recall. | 14  could have been two years. |
| 15   Q. Okay.  So when Dr. Alderdice came to you | 15   Q. Okay.  But did you ever have any communications |
| 16  initially to speak -- | 16  with anyone about any credentialing -- I'm sorry -- any |
| 17   MS. ROBERTSON:  Are you talking about a phone call? | 17  board certification issues as they applied to Dr. Golden |
| 18  Does it matter if it's a phone conversation or an | 18  and his service at Coastside? |
| 19  in-person meeting? | 19   A. Yes. |
| 20   MR. GREEN: | 20   Q. Tell me what you recall about those. |
| 21   Q. At some point you had communications with Dr. | 21   A. I had conversations with Dr. Alderdice about |
| 22  Alderdice who was inquiring about Dr. Golden? | 22  the issue of board certification being needed for |
| 23   A. Correct. | 23  Coastside hospital, and that the -- the fact that Seton |
| 24   Q. Do you recall anything about the circumstances | 24  wanted to increase the staff credentials to have board |
| 25  that led him to make that inquiry? | 25  certified, and I recall, to the best of my recollection |
| 17 | 19 |

| | |
|---|---|
| 1   A. Well, he was considering him for medical | 1  now, that there was an issue that Donald was hired too |
| 2  director of Coastside. | 2  late to be grandfathered in, whereas there were some |
| 3   Q. Okay.  He told you that? | 3  other people that weren't board certified that were able |
| 4   A. Yes. | 4  to be grandfathered in. |
| 5   Q. All right.  And did he tell you why he was | 5   Q. Okay. |
| 6  considering him for medical director? | 6   A. In other words -- you know what I mean by |
| 7   A. I'm sure he did.  I don't remember at this | 7  grandfathered in? |
| 8  time, but I'm sure he would have. | 8   Q. Yes, yes. |
| 9   Q. And was your response something to the effect | 9   Was it your understanding that this grandfathering |
| 10  of, well, Dr. Rampulla has some concerns about Dr. | 10  related to contract terms or bylaw terms or any other |
| 11  Golden and -- | 11  document? |
| 12   A. Correct. | 12   A. It was my understanding at the time -- at least |
| 13   Q. -- let me finish. | 13  now, as I recall it, that it had to do with bylaw terms. |
| 14   A. Okay. | 14   Q. And that would -- that understanding would have |
| 15   Q. You should go speak to Dr. Rampulla? | 15  come from Dr. Alderdice? |
| 16   A. Yes. | 16   A. Correct. |
| 17   Q. Okay.  Did you ever get any feedback or | 17   Q. And did Dr. Alderdice ever mention to you that |
| 18  follow-up from anybody about what Dr. Golden -- what Dr. | 18  -- oh, that anybody affiliated with Seton had told him |
| 19  Alderdice learned from Dr. Rampulla? | 19  that Dr. Golden would be grandfathered? |
| 20   A. I probably did from Dr. Alderdice, but I don't | 20   A. I do not recall that. |
| 21  recall. | 21   Q. And do you recall when this conversation |
| 22   Q. Okay.  So the next time -- some period of time | 22  regarding the grandfathering took place with -- this |
| 23  later, the next time you communicated with Dr. | 23  communication with Dr. Alderdice with regard to the |
| 24  Alderdice, is some period of time later, when he's | 24  grandfathering took place? |
| 25  coming to discuss with you problems he's having with Dr. | 25   A. It was in the same realm of -- during our |
| 18 | 20 |

Pages 17 to 20

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

1 conversations when he would tell me about some of the
2 problem cases. It was a — oh, here is one more thing.
3 Q. You are aware, are you not, that at some point
4 Dr. Golden was removed from the Coastside schedule?
5 A. Correct.
6 Q. And were these conversations you were having
7 with Dr. -- these communication you were having with Dr.
8 Alderdice regarding board certification issues and
9 patient care issues, were they at or about the same time
10 roughly as the removal?
11 A. Yes.
12 Q. Okay. Did Dr. Alderdice ever communicate with
13 you about his plans to remove Dr. Golden from the
14 Coastside schedule any time before that happened?
15 A. Yes, he would have.
16 Q. Okay. And do you recall any specific
17 communications you had?
18 A. Not specifically, no.
19 Q. And did he tell you the reasons that he wanted
20 Dr. Golden removed from the schedule?
21 A. It was for the care that he was providing at
22 the site.
23 Q. Was it because of the credentialing issue?
24 A. I think --
25 MS. ROBERTSON: Objection. Vague and ambiguous.
                                                    21

1 You're talking about the board certification?
2 MR. GREEN: Right. The board certification issue.
3 THE WITNESS: No, I think the — as I recall, the
4 board certification, as I say, was one more thing that
5 made it more difficult; but it was more that he was just
6 in over his head.
7 MR. GREEN:
8 Q. Okay.
9 A. That he was not equipped or trained to function
10 in an emergency department.
11 Q. Now, removing Dr. Golden from the schedule at a
12 particular site is not the same thing as terminating his
13 membership in the partnership; is that correct?
14 A. That's correct.
15 Q. Explain to me — but his membership in the
16 partnership was, in fact, terminated?
17 A. Correct.
18 Q. Okay. Explain to me what the difference is, if
19 you would.
20 A. You can work at any number of sites, and he
21 continued to work at other sites and was obviously still
22 a member of the partnership.
23 So the board or -- or the policy dictates when you
24 are removed from the partnership, and it's not -- the
25 medical director, regional director do not remove
                                                    22

1 somebody from the partnership, but they can remove them
2 from a site.
3 Q. And what are the circumstances — one way
4 somebody can be removed from the partnership is
5 expulsion by a two-thirds vote of the board?
6 A. Correct.
7 Q. Are there any other ways that somebody can lose
8 their partnership status?
9 A. Oh, by far, you're just not working, and that's
10 what happens almost all the time.
11 Q. Is that what happened to Dr. Golden?
12 A. Yes.
13 Q. Explain to me how that works, please.
14 A. If you're not working for three months, you are
15 taken off the rolls of the partnership.
16 That is — now, Donald actually asked for a leave
17 of absence, and was granted a leave of absence; so it
18 was longer than three months before he was actually
19 removed from the partnership.
20 Q. So he was given, I think, a six-month leave of
21 absence?
22 A. Correct.
23 Q. And that sort of stayed the application --
24 A. He --
25 Q. — let me finish — that stayed or suspended
                                                    23

1 the application of the rule --
2 A. Right.
3 Q. — correct?
4 And then if I understand it correctly, three months
5 after the leave of absence ended, his partnership status
6 terminated?
7 A. I do not know — I don't know the date, but --
8 Q. At whatever point it terminated, it would have
9 been because he had not worked for a three-month period?
10 A. Correct, correct.
11 Q. Is that a provision of the partnership
12 agreement or of some other document?
13 A. It's not a provision of the partnership
14 agreement.
15 I don't know if it's in the policy manual or if
16 it's just been advice from our counsel to keep our
17 roster is clean of — so — so we have an accurate — so
18 people that are, quote, general partners, are people
19 that are working for us.
20 Q. And is there some minimum number of hours that
21 somebody has to work during that three-month period of
22 time in order to avoid termination?
23 A. No.
24 Q. I guess what happens if you're working a very
25 low number of hours, you're still maintaining
                                                    24

                                        Pages 21 to 24

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

1 partnership status?
2    A. Correct.
3    Q. Doesn't matter how many hours you work as long
4 as you work some hours?
5    A. Correct.
6    Q. Did you become aware at any point that Dr.
7 Golden had filed a grievance against Dr. Alderdice
8 regarding Dr. Golden's removal from the Coastside
9 schedule?
10    A. Yes.
11    Q. How did you find out about that?
12    A. I don't know how I found out about it.
13    Q. Did you have any role to play in that grievance
14 proceeding?
15    A. No.
16    Q. Do you know what the basis of the grievance
17 was?
18    A. I'm not — you know, I'm —
19    Q. Don't guess.
20    A. I won't guess.
21    Q. I mean, do you —
22    A. I knew at that time.
23    Q. You just don't recall now?
24    A. I just don't recall now.
25    Q. Do you recall whether Dr. Golden was ever
                                                   25

1 suggesting, through the grievance, that there had been
2 any racial discrimination against him?
3    A. I don't recall.
4    Q. You know Dr. Pamela Stuart; is that correct?
5    A. That's correct.
6    Q. And you know Dr. Ellis Weeker?
7    A. I do.
8    Q. Did you ever have any discussions with either
9 of them regarding Dr. Golden's performance at the South
10 Valley Occupational Clinic?
11    A. Yes.
12    Q. Tell me what you recall in that regard.
13    A. I do not know if I spoke with Dr. Stuart.
14 I did speak with Dr. Weeker, and I got a lot of
15 email communication from Dr. Stuart, and the
16 communication — the concern that was relayed to me by
17 Dr. Weeker was that Donald was not fulfilling the needs
18 of the urgent care clinic.
19    Q. Do you recall anything about the time frame
20 over which you were receiving emails from Dr. Stuart
21 about Dr. Golden?
22    A. I think it was a couple of months.
23    Q. Okay. And you are aware that Dr. Golden was
24 removed from the schedule at South Valley at some point?
25    A. That's correct.
                                                   26

1    Q. And can you place this period of time when you
2 were receiving emails from Dr. Stuart at or about the
3 time leading up to that removal?
4    A. Yes. It would be obviously before the removal.
5    Q. And the same thing with the — you had, what, a
6 face-to-face or telephone conversation with Dr. Weeker?
7    A. It would have been probably telephone
8 conversations.
9    Q. Were they taking place about the same time
10 period?
11    A. Yes.
12    Q. Do you recall anything about the content of the
13 emails you were receiving from Dr. Stuart?
14    A. Dr. Stuart was concerned about records not
15 being completed.
16    Q. Patient charts?
17    A. Yes.
18    Q. Okay. Anything else?
19    A. There was discussion about staff discomfort. I
20 don't remember — I don't recall the specifics.
21    Q. Uh-huh, okay. And anything else?
22    A. That's all that I recall at this time.
23    Q. And what about Dr. Weeker, did he communicate
24 to you about the same issues?
25    A. Yes.
                                                   27

1    Q. Anything else?
2    A. That's all I recall.
3    Q. What do you remember about the staff discomfort
4 issue?
5    A. I recall them — I recall Dr. Weeker stating
6 that they were concerned about Donald and not
7 comfortable around him, which is why he, Dr. Weeker,
8 participated in a meeting with Donald, because he felt
9 there needed to be a male in attendance.
10    Q. Were they describing an isolated number of
11 events to you?
12    A. I do not know.
13    Q. Were they suggesting to you that this was a
14 sort of ongoing and pervasive problem?
15    A. I don't recall.
16    Q. Okay. What committees does CEP have that a
17 level four partner would be eligible to serve on?
18    A. They would be eligible to serve on the new
19 partner committee, the compliance committee, the
20 regional director operations committee.
21    Q. Is there a CME committee?
22    A. There is a CME committee, but I don't know if
23 they had a CME committee when Donald was —
24    Q. Is there a liaison committee?
25    A. That's not a committee.
                                                   28

Pages 25 to 28

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

1    Q. What is it?
2    A. It's -- we choose new partners -- we solicit
3  for new partners to sit as nonvoting members on certain
4  committees.
5    Q. When you say new partners, is there some
6  limitation of the level of the partner eligible to sit?
7    A. There is not formal, but we try to -- the
8  practice is to choose partners that are level one, level
9  two, maybe level three.
10   Q. And would there be liaison -- I'll call them
11  liaison partners on all of the committees?
12   A. No.
13   Q. Would there be liaison partners on CPAC?
14   A. Yes.
15   Q. And just so we have it in the record, what is
16  CPAC?
17   A. Credential partnership affairs committee.
18   Q. Would there be a liaison partner on the
19  compensation committee?
20   A. Yes.
21   Q. Would there be a liaison partner on the
22  compliance committee?
23   A. No.
24   Q. Would there be a liaison partner on the CME
25  committee?

29

1    A. No.
2    Q. Would there be a liaison person on the regional
3  director operations committee?
4    A. Yes.
5    Q. And what was the purpose -- what was the role
6  the liaison partner played?
7    A. The role was to gain a better understanding of
8  what was happening, to demystify the partnership so they
9  would feel comfortable that it wasn't -- that the
10  organization was transparent, and to be able to share
11  their experiences with other new partners.
12   Q. Okay. Was it also an opportunity for them to
13  provide some input to these committees?
14   A. Minimal.
15   Q. Okay.
16   A. Minimal, minimal. It was more for them to
17  learn from us than for us to learn from them.
18   Q. I'm sorry, the ones on which level -- the ones
19  on which a level three or a level four partner could sit
20  directly would be -- it would not include CPAC. That's
21  for senior partners?
22   A. No. Full partners.
23   Q. So could a level three or a level four be on
24  CPAC?
25   A. No.

30

1    Q. Could he be on the compensation committee?
2    A. I do not think so.
3    Q. Could he be on the new partner committee?
4    A. Yes.
5    Q. Could he be on the compliance committee?
6    A. Yes.
7    Q. Could he be on the CME committee?
8    A. Yes.
9    Q. Okay. So those three.
10   Could he be on the regional director committee?
11   A. Yes.
12   Q. So those four.
13   What, if anything, can you tell me about the
14  application process that a partner would go through to
15  sit on either -- let's do the committees first and then
16  let's talk about being a liaison partner.
17   What's the process regarding sitting on the
18  committee directly?
19   A. Well, generally I will send out a solicitation
20  to the partnership --
21   Q. Uh-huh.
22   A. -- asking for their interest and the partners
23  that are interested will submit their interest.
24  Sometimes they will submit a little information about
25  themselves.

31

1    And then the committee chair -- I will bring that
2  information to the committee chair. And the committee
3  chair will then often select whoever is going to sit on
4  that committee.
5    Q. Is there a single application process by which
6  a partner can indicate his desire to sit on any and all
7  of the committees that he's eligible for?
8    A. No.
9    Q. So it's a committee-by-committee process?
10   A. Correct.
11   Q. And do you know anything about any attempts or
12  efforts by Dr. Golden -- before we get there, same
13  question about the liaison committee.
14   How does somebody get to sit as a liaison partner
15  on these committees, the same --
16   A. Once a year I send out a solicitation to the
17  general partnership and if they are interested in being
18  on the liaison or new partner committee, it's all at the
19  same time.
20   Q. Do you know anything about any attempts by Dr.
21  Golden to serve on any CEP committees?
22   A. I recall him applying to some committees.
23   Q. Okay. And do you recall anything about the
24  consideration that he got, whether he was ever accepted?
25   A. I do not recall. I don't think he was

32

| | |
|---|---|
| 1   accepted. | 1    A. Voting. |
| 2    Q. Do you know anything about the reasons for | 2    Q. And that would be voting for the board? |
| 3   which he might have been rejected? | 3    A. Or any issues that are up for a partnership |
| 4    A. You know, as I say, the chair of the committees | 4   vote. |
| 5   are the ones that make those determinations -- | 5    Q. Can you give me an estimate of how many CEP |
| 6    Q. Okay. Let me -- | 6   partners there were, say, you know, in 2006 -- at any |
| 7    A. -- and the only committee I'm the chair of is | 7   point from 2006 to 2008? |
| 8   the RD operations committee and that you have to be a | 8    A. Six hundred, seven hundred. |
| 9   regional director to be on that committee. It's not a | 9    Q. Around that number? |
| 10   solicitation. | 10    A. Yeah, around. |
| 11    Q. Okay. Now, is Dr. Golden able to participate | 11    Q. If I said 775 for 2006, would that strike you |
| 12   as a partner in the management of CEP? | 12   as accurate? |
| 13    MS. ROBERTSON: Objection. Vague and ambiguous. | 13    A. That could be accurate. |
| 14    THE WITNESS: I was going to say, I don't know how | 14    Q. Okay. |
| 15   to answer that. | 15    A. I know we're over nine hundred now, so -- |
| 16    MR. GREEN: | 16    Q. Okay. So there's voting. |
| 17    Q. Well, is he eligible to participate in | 17   What are the other ways in which Dr. Golden can |
| 18   partnership management? | 18   participate, or any partner can participate, in |
| 19    MS. ROBERTSON: Same objection. The witness has | 19   management? |
| 20   just testified about a number of committees that a | 20    A. The way that most partners participate is |
| 21   partner is eligible to sit on. Is that what you mean? | 21   through their local site. |
| 22    MR. GREEN: The witness can answer the question. | 22    Q. Explain to me what that means. |
| 23    THE WITNESS: But I don't understand the question. | 23    A. Getting involved at their local site. Managing |
| 24    MR. GREEN: | 24   the site in the sense that -- either the medical |
| 25    Q. That's a little surprising because I'm reading | 25   director -- dealing with the reimbursement, dealing with |
| 33 | 35 |
| 1   right from your declaration, so let me show you your | 1   QI, dealing with EMS, and communicating through either |
| 2   declaration and see if it refreshes your memory. | 2   email or medical director meetings, which actually |
| 3    MS. ROBERTSON: In context, maybe it will. | 3   influence the partnership, also, are ways that that can |
| 4    MR. GREEN: | 4   happen. |
| 5    Q. Paragraph -- page 2, lines 22 to 23, you make | 5   Also, attending partnership meetings, regional |
| 6   reference to, "his," meaning Dr. Golden's, "eligibility | 6   meetings, and partners get up and make suggestions that |
| 7   to participate in partnership management." | 7   can affect the management of the partnership. |
| 8   Do you see that there? | 8    Q. Is any partner allowed to attend medical |
| 9    A. Uh-huh. | 9   director meetings, even if he's not a medical director? |
| 10    Q. Yes? | 10    A. Anybody -- any partner that is serving in an |
| 11    A. Yes. | 11   administrative role at their local site, whether they |
| 12    Q. Okay. Can you tell me what you were referring | 12   are the medical director or assistant medical director |
| 13   to by that phrase? | 13   or QI director, is allowed to participate with -- |
| 14   I take it you were referring to the committee | 14   assuming that their role is not de minimis. |
| 15   structure you just -- | 15    Q. And if they have no administrative role, they |
| 16    A. No, not necessarily the committee structure. | 16   are therefore not allowed to participate? |
| 17   It's also -- there's management on multiple levels. | 17    A. Unless their medical director asks them to |
| 18    Q. Okay. Let's talk about that. | 18   participate. |
| 19   Is, in your opinion, the ability to participate in | 19    Q. Does CEP encourage its partners to participate |
| 20   the committee process part of the -- one of the ways to | 20   in management? |
| 21   participate in management? | 21    A. Yes, yes. |
| 22    A. Correct. | 22    Q. Let's talk a little bit -- let me go back to |
| 23    Q. Okay. What are the other ways to participate | 23   these termination issues. |
| 24   in management? | 24   The partnership agreement provides that a partner |
| 25   Just voting, correct? | 25   can be terminated by a two-thirds vote of the board, |
| 34 | 36 |

Pages 33 to 36

1  correct?
2   A. That's — I'm assuming that's correct.
3   Q. Are there any standards or guidelines that you
4  are aware of that address what the grounds for
5  termination are?
6   A. I am not aware of any grounds, nor am I aware
7  of that being implemented since I've been in this role.
8   Q. Whether or not the board votes to terminate
9  somebody, is that up to the discretion of the board?
10   A. That is up to the discretion of the board, as I
11  understand it.
12   Q. Let me take it another step then. Let's talk
13  about the medical director.
14   The medical director at the site, if I am correct,
15  and I'm going to try to speed this up because I guess I
16  don't believe any of this is controversial, but you may
17  prove me wrong; am I correct that the medical director
18  at a site has the final authority over scheduling?
19   A. Correct.
20   Q. If a physician wants to work more shifts and
21  the medical director doesn't want that physician to work
22  more shifts, the medical director gets to decide?
23   A. Within reason.
24   Q. When you say within reason, what do you mean?
25   A. Well, the partner can appeal to the regional

37

1  and/or the regional director's.
2   Q. And if the medical distributor and the regional
3  director agree that they don't want somebody working
4  above or in addition to a certain number of shifts, and
5  the physician disagrees —
6   A. Then they would have the option of going to me.
7   Q. They'd have some certain appeal options?
8   A. Right.
9   Q. And would you expect the medical director and
10  the — the medical director and the regional director to
11  act at least reasonably in making those decisions?
12   A. Correct.
13   Q. Okay. Let me ask the same sort of questions
14  about the medical director's — the medical director has
15  the discretion to completely terminate somebody from
16  shifts at a particular site?
17   A. Correct.
18   Q. That would be subject, I take it, to additional
19  an appeal procedures?
20   A. Correct.
21   Q. And would you expect that such a decision would
22  be exercised reasonably by the medical director?
23   A. Correct.
24   Q. Okay. Am I correct that you are not aware of
25  any written policy that outlines standards or guidelines

39

1  director, can appeal to the CPAC, file a grievance,
2  which has happened sometimes, so it's not — there's a
3  lot of checks and balances.
4   Q. Okay. Is there any set of written policies or
5  procedures that outline what the factors are that a
6  medical director has to follow in determining how to
7  fill out the schedule?
8   A. The only policy is that the schedule is
9  presented to the doctors at the site every couple of
10  years so there's transparency as to how it's been filled
11  out.
12   Q. But do you expect the medical director —
13  strike that. Let me rephrase that.
14   If the doctor has a disagreement with the medical
15  director over scheduling issues, absent some grievance
16  proceeding the doctor, the medical director's
17  decision controls?
18   A. No, that's not correct.
19   Q. Explain to me how that's wrong.
20   A. Because it can still go to the regional
21  director, and the regional director can influence the
22  medical director, bring in another point of view, which
23  happens not infrequently.
24   Q. But who makes the final decision?
25   A. The final decision is the medical director's

38

1  for the circumstances under which a medical director can
2  terminate somebody's participation in the schedule?
3   A. Are you speaking about the grounds for it?
4   Q. Right.
5   A. No. In fact, you know, if it's — if patient
6  care is in jeopardy, the medical director has an
7  obligation —
8   Q. Right.
9   A. — and if — there's policy about behavioral
10  issues; but, in general, it's been our — our counsel
11  has advised us to leave it vague.
12   Q. Leave it to the discretion of the medical
13  director?
14   A. Yes.
15   MS. ROBERTSON: We want to be careful about
16  divulging attorney/client privileged conversations you
17  may have had with me or other counsel.
18   MR. GREEN: I don't consider that to be a waiver.
19   MS. ROBERTSON: We get that. I'm just making sure
20  that we don't get that argument.
21   MR. GREEN:
22   Q. You are familiar with the no guarantee of hours
23  provision of the partnership agreement?
24   A. Correct.
25   Q. Slow down a little bit. So she gets to write

40

MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

**Page 41**

1  it all out.
2  And that's the section 12.4 of the partnership
3  agreement. Do you recognize that number?
4  A. I do not recognize the number. I know the -- I
5  haven't actually memorized the numbers, but I know --
6  Q. That's excerpts, by the way, of the partnership
7  document that you provided.
8  A. Yeah, I know. I just don't know the -- whether
9  it's 12.4 or 12.3.
10  Q. 12.4 of the partnership agreement is a
11  provision that makes it very clear that there are no
12  guarantee of hours --
13  A. Correct.
14  Q. -- so theoretically, am I correct, that
15  somebody could become a partner on Monday and not have
16  the opportunity to work at all if he can't find him or
17  herself a position at a site?
18  A. They would not become a partner unless they had
19  an opportunity to work at a site.
20  Q. All right. So somebody becomes a partner,
21  correct?
22  A. Correct.
23  Q. Then they are, for whatever reason, unable to
24  find employment -- unable to find an assignment at a
25  particular site.

**Page 42**

1  They have no guarantee once they -- let me strike
2  that.
3  Am I correct they have no guarantee once they
4  become a partner that they will get any particular
5  number of hours at any particular site?
6  A. They wouldn't become a partner unless they
7  already were scheduled for a site.
8  Q. Okay, okay. So at the time you become a
9  partner, one of the conditions is that you have work
10  lined up at a site?
11  A. Correct.
12  Q. Okay. If that work is terminated, the partner
13  has no guarantee that any additional work will be
14  available; is that correct?
15  A. That's correct.
16  Q. And if the partner can't find work for thirty
17  days, the partner is at risk of being terminated from
18  the partnership?
19  A. You mean ninety days.
20  Q. I'm sorry. I thought you said thirty days.
21  A. No. Three months.
22  Q. So it's ninety days, correct?
23  MS. ROBERTSON: He said three months before.
24  MR. GREEN:
25  Q. I misunderstood. I thought you said thirty

**Page 43**

1  days.
2  If the partner can't find work for the next ninety
3  days, he would then or she would then become subject to
4  termination?
5  A. We call it separation; but, yes.
6  Q. Okay. Does the CEP employ physician employees?
7  A. No.
8  Q. It's only partner employees?
9  A. Only partner physicians.
10  MS. ROBERTSON: You are talking about as of now?
11  MR. GREEN:
12  Q. At any time from, say, 2006 forward.
13  A. No.
14  Q. Okay.
15  MS. ROBERTSON: Can we take a quick break for a
16  second?
17  MR. GREEN: Yeah.
18  (Whereupon, a brief recess was taken from
19  10:34 a.m. to 10:42 a.m.)
20  MR. GREEN:
21  Q. You submitted a declaration in the summary
22  judgment proceeding --
23  A. Yes.
24  Q. -- and I want you to just, if you would, take a
25  look at Exhibit B. This is a copy of your declaration.

**Page 44**

1  Just look at Exhibit B, if you would, please.
2  A. Okay.
3  Q. Do you recognize that as the signature page to
4  the partnership agreement signed by Dr. Golden?
5  A. Yes.
6  Q. And every partner has a signature page to the
7  partnership agreement?
8  A. Correct.
9  Q. Do you see any -- is there any term or content
10  on that page that you believe relates to the terms and
11  conditions of the partnership, because to me it just
12  looks like a signature page.
13  MS. ROBERTSON: I guess I don't know really what
14  you mean.
15  MR. GREEN:
16  Q. There are lots of terms and provisions and
17  conditions and rules and --
18  MS. ROBERTSON: On the first forty-nine pages of
19  the document?
20  MR. GREEN:
21  Q. On the first forty-nine pages of the document.
22  This page doesn't have any substantive content by
23  itself, does it?
24  A. I don't think so.
25  Q. Okay. Does this page -- is it possible that

Pages 41 to 44

MARK J. SPIRO, M.D. – NOVEMBER 5, 2009

| | |
|---|---|
| 1 somebody who -- this goes back to a discussion we had a<br>2 few minutes ago.<br>3     Is it possible that somebody who signs a<br>4 partnership agreement might never be placed in a<br>5 position at a CEP work site at all?<br>6     A. Yes, it is possible.<br>7     Q. Okay. Is there anything -- and under what<br>8 circumstances is it possible?<br>9     A. They have a job. They sign the partnership and<br>10 then they decide they don't want to work.<br>11     Q. Okay. Is it possible that a signatory to the<br>12 agreement might never be placed in a position at a CEP<br>13 work site at all against their wishes?<br>14     MS. ROBERTSON: Objection. Calls for speculation.<br>15     MR. GREEN:<br>16     Q. You testified before, somebody signs a<br>17 partnership agreement. It means they have a position at<br>18 the work site?<br>19     A. Correct.<br>20     Q. Okay.<br>21     A. I mean, do you want me to expand on that?<br>22     Q. Yes, please, please.<br>23     A. Anything is possible.<br>24     Q. Right, okay.<br>25     A. I mean, you have hundreds of employees and<br>                                     45 | 1 are they doing, because we try to have a variety of<br>2 different people from different sites representing --<br>3 being represented on the committees.<br>4     Q. Did you ever make a recommendation or a<br>5 suggestion in regard to Dr. Golden's role on any<br>6 committee?<br>7     A. I can't recall, honestly.<br>8     Q. Okay.<br>9     A. I might have. I can't recall.<br>10     Q. Do you play any role in the process by which<br>11 the decisions are made as to whether or not to advance a<br>12 partner to the next partnership level?<br>13     A. Do I play a role?<br>14     Q. Uh-huh.<br>15     A. I play a role in the sense that if there are<br>16 problems or -- not problems.<br>17     If somebody is doing exceptionally well, the<br>18 regional director will inform me. If they are doing<br>19 poorly, the regional director will usually inform me,<br>20 and I will try to lend the context of all of the other<br>21 regions, all of the other partners.<br>22     Q. Were you involved in any way in the decision to<br>23 advance Dr. Golden to level four partnership status?<br>24     A. You know, the decision to advance him? I don't<br>25 think I was -- I mean, I sat in on the board meeting and<br>                                     47 |
| 1 hundreds of partners and people collecting signatures.<br>2     Is it possible they could have collected a<br>3 signature for someone that wasn't on the schedule? Yes,<br>4 it's possible.<br>5     Q. But in the normal and ordinary course of<br>6 business, if somebody signs this page, it means that<br>7 they are going to work at a site?<br>8     A. Normally that is what it means.<br>9     Q. Okay. May I have that back?<br>10     A. Yes, you may.<br>11     Q. A little follow-up on the issue of committee<br>12 appointments.<br>13     Do you have any influence or role in the selection<br>14 of committee members?<br>15     A. Yes, I do.<br>16     Q. And what is your role or influence?<br>17     A. Yes, I --<br>18     Q. Do you make recommendations?<br>19     A. I make suggestions, more than recommendations.<br>20     My role is -- because of my position, I know more<br>21 partners than anyone else in the partnership --<br>22     Q. Uh-huh.<br>23     A. -- and so frequently the committee chairs will<br>24 ask me, do I know anything about this, or what are your<br>25 thoughts, or what are the other committees like, or what<br>                                     46 | 1 the committee meeting. Did I actually say anything? I<br>2 can't recall.<br>3     Q. When you say the committee meeting, you mean<br>4 CPAC?<br>5     A. Correct.<br>6     Q. How many people usually sit on the CPAC<br>7 committee?<br>8     A. About eight.<br>9     Q. So eight people are on the CPAC committee?<br>10     A. Don't hold me to that.<br>11     Q. And they are the ones who make the preliminary<br>12 decision to advance a partner?<br>13     A. They only make a recommendation.<br>14     Q. And they make that recommendation to the board?<br>15     A. Correct.<br>16     Q. And how many people sit on the board?<br>17     A. Nine.<br>18     Q. Nine people on the board.<br>19     Did those numbers change at any point recently --<br>20     A. The board?<br>21     Q. -- or in the last few years?<br>22     A. The board has been nine members since I've been<br>23 a partner.<br>24     Q. Okay. So is there -- I take it there's an<br>25 overlap between CPAC and board membership?<br>                                     48 |

1    A. No, there isn't.
2    Q. Okay. So basically what we have -- we'd have
3  seventeen people reviewing a partnership termination in
4  the ordinary course of business?
5    MS. ROBERTSON: Advancement?
6    MR. GREEN: Yes.
7    THE WITNESS: Yes. I mean, right.
8    MR. GREEN:
9    Q. Were you aware of any concerns about Dr.
10  Golden's advancement to level four?
11    A. Yes.
12    Q. Tell me what you recall in that regard.
13    A. Dr. Alderdice felt that he shouldn't be
14  advanced to level four because he felt that he was not
15  meeting the standards of what he felt a level four
16  partner should be working at Seton Coastside.
17    Q. In terms of his medical --
18    A. Correct.
19    Q. -- competence?
20    And being Dr. Golden's regional director, that
21  recommendation would have great weight in the review
22  process, would it not?
23    A. Yes, it would.
24    Q. How was it that Dr. Golden got advanced to
25  level four, notwithstanding that communication from Dr.

49

1  that?
2    A. I know he's not board certified, yes.
3    Q. Do you recall any discussions or communications
4  in regard to that issue at the time of the decision to
5  advance him to level four?
6    A. I don't recall.
7    Q. Okay. Is there any explanation you have as to
8  how somebody could be advanced to level four, even if
9  they are not board certified?
10    A. Yes.
11    Q. Explain that it to me.
12    A. We have guidelines. It's not policy, but we
13  have guidelines for partners to advance to level four
14  and full partner even without boards.
15    Q. Are those written guidelines?
16    A. I think that they are in the policy manual.
17    Q. So there are written guidelines regarding
18  advancement to level four --
19    A. And full partner.
20    Q. -- and full partner in the absence of board
21  certification, yes?
22    A. There are written guidelines. I think they are
23  in here, but you can look and verify.
24    Q. And you think -- what's the name of the
25  document you think they are in?

51

1  Alderdice?
2    A. Because he was also working at the urgent care
3  under Dr. Weeker's -- in Dr. Weeker's region, and Dr.
4  Weeker supported his advancement; and Dr. Alderdice
5  actually supported his advancement, if he was working in
6  an urgent care.
7    Q. Well, his advancement was not conditioned on
8  him working at an urgent care to the exclusion of
9  emergency facilities, was it?
10    A. I don't think it was; but at that point in
11  time, when he finally was advanced, I think -- again,
12  this is just the best of my recollection at this time,
13  was that he was only working at urgent cares. He was no
14  longer working at Seton Coastside.
15    Q. But are you aware of any communication that Dr.
16  Golden ever got that said his partnership advancement
17  was somehow limited or restricted?
18    A. I am unaware of any formal communication he
19  got.
20    Q. Okay. Board certification is a requirement for
21  advancement to level four, is it not?
22    A. Board certification is a requirement for
23  advancement to level four full partner.
24    Q. Okay. Dr. Golden was not board certified at
25  the time he was advanced to level four. Do you recall

50

1    MS. ROBERTSON: The policy manual that you've had
2  since the beginning. Do you want the Bates numbers?
3    MR. GREEN: Yes.
4    MS. ROBERTSON: CEP 565 to 631.
5    MR. GREEN:
6    Q. Now, the --
7    MS. ROBERTSON: Excuse me?
8    THE WITNESS: I was asking if you wanted me to
9  check that.
10    MR. GREEN:
11    Q. Would you, please?
12    A. All right. This is in the policy.
13    Q. Okay. All right.
14    DR. GOLDEN: One second.
15    THE WITNESS: It's page 37.
16    (Whereupon, a brief recess was taken from
17  10:55 a.m. to 10:56 a.m.)
18    MR. GREEN: Thank you, Doctor. We're done.
19    MS. ROBERTSON: Great.
20    THE REPORTER: We have no exhibits for the
21  transcript. Thank you.
22    MR. GREEN: Thank you.
23    (The deposition was concluded at 10:56 a.m.)
24  _____
   DATE              MARK J. SPIRO, M.D.
25

52



MARK J. SPIRO, M.D. - NOVEMBER 5, 2009

```
 1   STATE OF CALIFORNIA  )
                          )  ss.
 2   COUNTY OF CONTRA COSTA)
 3
 4       I, ELIZABETH J. WOOD, CSR, a Certified shorthand
 5   Reporter, hereby certify that the witness in the
 6   foregoing deposition was by me duly sworn to testify to
 7   the within-entitled cause; that said deposition was
 8   taken at the time and place therein stated; that the
 9   testimony of the said witness was reported by me, a
10   Certified Shorthand Reporter, and was thereafter
11   transcribed under my direction into typewriting; and
12   that the witness was given an opportunity to read, and
13   if necessary, correct said deposition and to subscribe
14   the same.
15       I FURTHER CERTIFY that I am not of counsel or
16   attorney for either or any of the parties in the
17   foregoing deposition and caption named or in any way
18   interested in the outcome of the cause named in such
19   caption.
20       IN WITNESS WHEREOF, I have hereunto set my hand
21   this date, the 6th day of November, 2009.
22
23
24
         ELIZABETH J. WOOD, CSR, License No. C-5134,
25       County of Contra Costa, State of California.
                                                    53
```



ROBERT F. BUSCHO, M.D. - MAY 13, 2009

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
RENE C. DAVIDSON COURTHOUSE
--oOo--

DONALD GOLDEN, M.D.,          )
                             )
        Plaintiff,           )
                             )
    vs.                      ) No. RG08388602
                             ) Pages 1 thru 197
CALIFORNIA EMERGENCY         ) Volume I
PHYSICIANS MEDICAL GROUP;    )
MEDAMERICA; MARK ALDERDICE;  )
ROBERT BUSCHO; AND DOES 1    )
THROUGH 1000, AND EACH OF    )
THEM, INCLUSIVE,             )
                             )
        Defendants.          )
_____)

DEPOSITION OF

ROBERT F. BUSCHO, M.D.

May 13, 2009

Reported by ELIZABETH J. WOOD
License No. CSR-5134

JAN BROWN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
701 Battery Street, 3rd Floor
San Francisco, California 94111
(415) 981-3498 or (800) 522-7096

1

1      INDEX
2                          Page
3  Direct examination by Mr. Green......................6
4          --oOo--
5      INDEX OF
6      EXHIBITS
7  Plaintiff's No.                Page
8  1.  1-page, Email from Dr. Buscho to Dr. Golden,
9      1/15/07.........................................54
10 2.  1-page, Email from Dr. Buscho to Dr. Golden,
11     10/20/06........................................87
12 3.  1-page, Email from fredricky@pol.net to Dr.
13     Buscho, 3/11/07................................120
14 4.  1-page, Email from Dr. Buscho to Dr. Golden,
15     3/12/07.......................................128
16 5.  1-page, Email from Dr. Buscho to Dr. Golden,
17     4/11/07.......................................136
18 6.  1-page, Email from Dr. Buscho to Dr. Golden,
19     3/14/07.......................................136
20 7.  1-page, Email from Dr. Buscho to Dr. Golden,
21     5/8/07........................................152
22 8.  1-page, Email from Dr. Alderdice to Dr. Golden,
23     5/10/07.......................................160
24 9.  1-page, Letter from Dr. Alderdice to Dr. Golden,
25     5/30/07.......................................163

2

1  10. 4-page, Letter to Dr. Buscho, 10/8/07..........164
2          --oOo--
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1      BE IT REMEMBERED, that pursuant to notice to the
2  respective parties, and on Wednesday, the 13th day of
3  May, 2009, commencing at the hour of 10:03 a.m. thereof,
4  at the offices of FITZGERALD, ABBOT & BEARDSLEY, LLP,
5  1221 Broadway, 21st Floor, Oakland, California 94612,
6  before me, ELIZABETH J. WOOD, a Certified Shorthand
7  Reporter, License No. C-5134, in and for the County of
8  Contra Costa, State of California, there personally
9  appeared:
10         ROBERT F. BUSCHO, M.D., M.D.,
11  called as a witness on behalf of the Plaintiff, who,
12  being first duly sworn, was then and there examined and
13  interrogated as hereinafter set forth.
14         --oOo--
15      MITCHELL J. GREEN, Attorney at Law, representing
16  the Law Offices of CURTIS & GREEN, LLP, 1101 Fifth
17  Avenue, Suite 310, San Rafael, California, 94901,
18  appeared as counsel on behalf of the plaintiff DONALD
19  GOLDEN, M.D.;
20      SARAH ROBERTSON, Attorney at Law, representing the
21  Law Offices of FITZGERALD, ABBOTT & BEARDSLEY, LLP, 1221
22  Broadway, 21st Floor, Oakland, California, 94612,
23  appeared as counsel on behalf of the defendants
24  CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP;
25  MEDAMERICA; MARK ALDERDICE; ROBERT BUSCHO; AND DOES 1

4

JAN BROWN & ASSOCIATES (800) 522-7096 or (415) 981-3498

ROBERT F. BUSCHO, M.D. - MAY 13, 2009

1    MS. ROBERTSON: Which fashion?
2    MR. GREEN:
3      Q. Do other hospitals do it the way Dr. Sears did
4    it?
5      A. Oh, no, no, no. I want to take back my answer.
6    I do not know if other hospitals do it.
7      Q. You do know that other hospitals do it your
8    way, right?
9      A. Yes, because that is the way that is effective.
10     Q. Is that your opinion or is that based on --
11   based on your experience or is it based on some other
12   standard or guideline?
13     A. I think, in my opinion, it is the only
14   effective way.
15     Q. It is your opinion then, correct?
16     A. Yes.
17     Q. Okay. That's all I wanted to establish.
18     Now, you looked at Dr. Golden's resume and you were
19   aware that he wasn't board certified, correct?
20     A. Right.
21     Q. And this was just about the time -- at or about
22   the time you started?
23     A. Uh-huh.
24     Q. Is that a yes?
25     A. Yes.
                                                      85

1    MS. ROBERTSON: As medical director?
2    THE WITNESS: Yes.
3    MR. GREEN:
4      Q. And did you ever learn anything else about Dr.
5    Golden's board certification history?
6    MS. ROBERTSON: Apart from anything he's learned
7    from counsel.
8    MR. GREEN:
9      Q. Apart from anything that you've learned through
10   counsel as a part of this litigation.
11     A. I would have to think about that for a minute.
12   I don't think so.
13     Q. Okay. Did you ever learn of any plans he had
14   to take the boards?
15     A. I believe that it was when he was -- he
16   resigned from the medical staff in May. He had said
17   that he planned to take the boards in August, and the
18   response of the hospital staff was that if he took them
19   and passed them, he would be reinstated to the staff and
20   wouldn't have to pay for it.
21     Q. So you know about what you learned from the
22   resume, correct?
23     A. Right.
24     Q. You know about what you've just described
25   regarding his plans in May 2007 to take the boards --
                                                      86

1      A. Right.
2      Q. -- and that's it?
3      That's all you know about Dr. Golden's board
4    certification --
5      A. Yes.
6      Q. -- other than what you may have learned through
7    counsel?
8      A. Yes.
9      Q. And the -- I know there were lots of concerns
10   about board certification, and we'll get to those; but
11   with Dr. Alderdice, at any time, did you ever discuss --
12   well, let me strike the question. It's too complex a
13   question. I'll come back and pick it up later.
14     Let's mark this as Exhibit No. 2.
15     (Whereupon, Plaintiff's Exhibit No. 2 was
16   marked for identification.)
17   MR. GREEN:
18     Q. Now, a lot of these exhibits have a cut line
19   and a name Patti Moyle on top. That's a function of the
20   printout. So I'm not in any of my questioning referring
21   to that data.
22     Do you recognize Exhibit No. 2 as an email that you
23   sent to Dr. Golden around October 20, 2006?
24     A. I do.
25     Q. Okay. This was just at or about the time you
                                                      87

1    were starting, right?
2      A. Yes.
3      Q. And it says, "I was not able to give you as
4    many shifts as you requested because it has come to my
5    addition..." -- I assume you meant the word attention?
6      A. Yes.
7      Q. -- "...that you are not boarded."
8      Was that a result of your inspection of Dr.
9    Golden's resume when you started as medical director?
10     A. I knew it was a fact and I don't know where I
11   arrived at that fact.
12     Q. You don't recall any discussions or any of
13   the -- the source of that information?
14     A. I don't. I don't recall how I --
15     Q. Okay.
16     A. -- I arrived at that knowledge.
17     Q. Okay. "The executive committee of Seton
18   Medical Center..." -- Seton Coastside is what that
19   abbreviation stands for, correct?
20     A. Yes.
21     Q. "Has been placing a high emphasis on board
22   certification."
23     All right. Tell me what you were referring to
24   there?
25     A. Well, my being -- having come off the executive
                                                      88

Pages 85 to 88



Δ π EXHIBIT _2_
Deponent _Buscho_
Date _5-12-09_ Rptr _EW_
WWW.DEPOBOOK.COM

**Patti Moyle**

From: r.buscho@comcast.net
Sent: Friday, October 20, 2006 1:09 PM
To: Donald Golden
Cc: Mark Alderdice

Dear Donald,
I was not able to give you as may shifts as you requested because it has come to my addition that you are not Boarded. The Executive Committee of SMCC/SMC has been placing a high emphasis on Board Certification. I need to be sensitive to these wishes and probably a by-laws directive from the Executive Committee about Board Certification ison its way. I have talked to CEP recruitment and there are other opportunities in CEP. I will plan to schedule you as much as possible but if other opportunities are available I would pursue them.
Bob





MARCIA SHAIKIN - OCTOBER 2, 2008

---

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
UNLIMITED JURISDICTION

DONALD GOLDEN, M.D.,          )
                             )
          Plaintiff,          )
                             )
     vs.                      )     Case No. 08388602
                             )
                             )     Volume 1
CALIFORNIA EMERGENCY          )
PHYSICIANS MEDICAL GROUP;     )     Pages 1 thru 96
MEDAMERICA; MARK ALDERDICE;   )
ROBERT BUSCHO; AND DOES 1     )
THROUGH 100, AND EACH OF THEM )
INCLUSIVE,                    )
                             )
          Defendants.         )
                             )
_____ )

Deposition of
MARCIA SHAIKIN
October 2, 2008

Reported by:
Colleen Alvarado CSR # 11987
_____

JAN BROWN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
701 Battery Street, 3rd Floor, San Francisco, California 94111
(415) 981-3498

1

---

1          INDEX
2                    PAGE
3   Examination by Mr. Green        6
4
5   Reporter's Certificate          96
6
7
8        INDEX OF
         EXHIBITS
9
10                   PAGE
11  PLAINTIFFS
12   1    Excerpt from the Seton      12
         Medical Center Bylaws, dated
13       12/5/06
14   2    Excerpt from the Professional  17
         and Administrative Services
15       Agreement dated 2/1/05
16   3    Seton Medical Center         19
         Temporary Privileges dated
17       8/16/04
18   4    Excerpt from the 2/2003      38
         contract
19
20   5    E-mail dated March 9, 2007   47
         at 10:55 a.m.
21
22   6    E-mail string dated May 7,   49
         2007
23
24   7    E-mail string dated May 7    59
         2007
25

2

---

1   8    E-mail dated May 8, 2007      62
         at 6:19 a.m
2
3   9    E-mail dated May 8, 2007      64
         8:32 a.m.
4
5   10   E-mail dated May 8, 2007      74
6
7   11   E-mail dated May 9, 2007      76
         at 4:40 p.m.
8
9   12   E-mail dated May 30, 2007     78
10
11  13   Excerpt from the Seton        94
         Medical Center bylaws
12
13
14            ---oOo---
15
16
17
18
19
20
21
22
23
24
25

WORK COPY

3

---

1
2          BE IT REMEMBERED, that pursuant to Notice, and on
3   the 2nd day of October 2008, commencing at the hour of
4   12:31 p.m., in the offices of the Seton Medical Center,
5   VIP conference room, 1900 Sullivan Avenue, Daly City,
6   California, before me, COLLEEN ALVARADO, a Certified
7   Shorthand Reporter in and for the County of Alameda, State
8   of California, personally appeared
9          MARCIA SHAIKIN,
10  called as a witness for the Plaintiff, who being
11  by me first duly sworn, was thereupon examined and
12  interrogated as set forth.
13            ---oOo---
14
15      MITCHELL J. GREEN, Attorney at Law, Law Offices of
16  Curtis & Green, 1101 Fifth Avenue, Suite 310, San Rafael,
17  California 94901, appeared as counsel on behalf of the
18  Plaintiff. (415) 456-4600. Fax: (415) 455-0270. Email:
19  Mgreen@curtisgreen.com
20
21
22      CYRUS A. TABARI, Attorney at Law, Sheuerman,
23  Martini & Tabari, 1033 Willow Street, San Jose, California
24  95125, appeared as counsel on behalf of the Deponent,
25  Marcia Shaikin. (408) 288-9700. Fax: (408) 295-9900.

4

Pages 1 to 4



MARCIA SHAIKIN - OCTOBER 2, 2008

| | |
|---|---|
| 1  A   That's correct. | 1 |
| 2  Q   "Voluntarily resign" is sort of you euphemism; is that | 2          MR. GREEN: |
| 3       correct? | 3  Q   Exhibit 12, the bottom of the e-mail, there's the original |
| 4  A   Yes. | 4       message from Bernadette Smith to you May 30, 10:40 a.m.; |
| 5          MR. TABARI: Argumentative but -- | 5       do you see that? |
| 6          MR. GREEN: Okay. | 6  A   Yes. |
| 7  Q   The board took the liberty of resigning -- the credentials | 7  Q   Is that the e-mail you've been referring to? |
| 8       committee resigned Dr. Golden? | 8  A   Yes. |
| 9  A   Yes. | 9  Q   And in it she's telling you Dr. Golden needs to be |
| 10 Q   Okay. And the reason they did it was for lack of | 10      referred back to CEP. He did not meet their standards, |
| 11      compliance with the bylaws? | 11      not Seton or the Seton board? |
| 12 A   No. I misspoke there. It should have been the contract. | 12 A   Correct. |
| 13      That was a typo on my part. | 13 Q   Okay. Now, did you interpret that at the time to mean |
| 14 Q   Was it a typo, or at this point were you confused -- | 14      that there were no circumstances under which Seton would |
| 15 A   No. | 15      accept Golden? |
| 16         MR. TABARI: Let him finish. | 16 A   Yes. |
| 17         MR. GREEN: | 17 Q   And on what basis did you make that interpretation? |
| 18 Q   Were you confused about what the operative provision here | 18 A   Because she was saying that the first level of |
| 19      was -- the contract or the bylaws? | 19      credentialing was with CEP, and it was under their |
| 20         MR. TABARI: Argumentative. Go ahead and | 20      contract. And Seton was a secondary level. So the issue |
| 21      answer. | 21      was with CEP. |
| 22         THE WITNESS: I was not confused. The reason | 22 Q   The rest of this e-mail, there's one May 30, 2007 at 10:41 |
| 23      was for lack of compliance with the contract. | 23      from you to Ms. Smith. |
| 24         MR. GREEN: | 24         Did you exchange with her drafts of the letters |
| 25 Q   "Per Seton's current bylaws, physicians who work in the | 25      that were going to go out and make sure that she reviewed |
| 77 | 79 |

| | |
|---|---|
| 1    Coastside ER must be board certified in something." | 1    and approved them? |
| 2         That's, again, a reference to this 2006 amendment | 2  A   I might have, but I don't recall. |
| 3    that was initiated by Bernadette Smith, that got voted | 3  Q   Do you recall that one of the letters was for her |
| 4    on, got approved by the board, but did not get printed in | 4       signature? |
| 5    the version of the 2006 bylaws that we have? | 5  A   Yes, but we stamped her name on it routinely. |
| 6  A   Yes. | 6  Q   Now, up above you've got an e-mail on May 30, 10:43, to |
| 7  Q   Okay. Did you ever tell Alderdice or Buscho there were no | 7       Jennifer telling her to have no communication with |
| 8    circumstances under which Seton could accept Golden | 8       Dr. Golden. What was that about? Top of the page. |
| 9    because of the contract language? | 9  A   My understanding was that the communication between Seton |
| 10 A   No, I never said that, but the CEO did. | 10      and Dr. Golden was the final decision of the board. And |
| 11 Q   Who did? | 11      that at that point it was out of our hands. It was going |
| 12 A   The CEO when she sent me that e-mail. | 12      to the board, and that would be his next communication |
| 13 Q   Well, she said this was a dispute between Golden and CEP? | 13 Q   Did you ever complain to anybody that Dr. Golden had been |
| 14 A   Right, yes. | 14      intimidating or threatening to you? |
| 15 Q   So you interpreted that to mean that Seton would not | 15 A   I don't believe I used the words intimidating or |
| 16      accept the -- that Seton would not accept the contract -- | 16      threatening. |
| 17      would not accept Golden under any circumstances? Strike | 17 Q   What words did you use? |
| 18      that. | 18 A   I think the word I might have used was -- I don't remember |
| 19         MR. GREEN: Let's look at the e-mail, and we'll | 19      what I used but less than intimidating and threatening. |
| 20      question her about that. Let's mark this as 12. | 20 Q   What was it that -- you were complaining about his |
| 21 | 21      conduct? |
| 22         (Whereupon and e-mail dated May 30, 2007 | 22 A   Yes. |
| 23      Was marked Plaintiff's Exhibit 12 for | 23 Q   And to whom were you making a complaint? |
| 24      Identification.) | 24 A   I complained to Dr. Alderdice. |
| 25 | 25 Q   And tell me the circumstances of that complaint. |
| 78 | 80 |

Pages 77 to 80

 
1   in time to collect information or any documentation or
2   discuss any facts?
3 A No, I don't believe so.
4 Q Did Dr. Alderdice tell you at this time that Dr. Golden
5   had been removed from all of his shifts at Coastside?
6     MR. TABARI: Talking about when they had the
7   conversation?
8     MR. GREEN: This is at or about the time you
9   learned about the grievance.
10    MR. TABARI: Is that when it came up?
11    THE WITNESS: It came up in a prior e-mail. He
12  told me as of April he had been removed from his shifts.
13    MR. GREEN:
14 Q At any point in time did Dr. Alderdice tell you that
15  Dr. Golden had been removed from his shifts for quality
16  reasons?
17 A Yes.
18 Q When did he tell you this?
19 A He told me that -- I believe it was around the time that I
20  got the communication that he been removed from all of his
21  shifts in April because of the bylaws. He said in part
22  because of the bylaws.
23 Q Let's go back to April. In March you discovered that
24  there is a problem mainly as a result of Dr. Golden
25  submitting his reapplication documentation; correct?

85

1 A Correct, yes. Well, not -- it was his board
2   certification.
3 Q Well, but you were alerted to the board certification
4   issue as a consequence of the reapplication process; is
5   that correct?
6 A That's correct.
7 Q Okay. Dr. Alderdice calls you at some point afterwards
8   and tells you that Dr. Golden has been removed from all of
9   his shifts?
10 A Yes.
11 Q And he refers to it as a bylaws issue?
12 A I believe so -- I don't know if he referred to it as a
13  bylaws issue.
14 Q Do you remember one way or the other? Did he call it a
15  contract issue?
16 A I think it was a board certification issue.
17 Q Okay. Did he tell you at this time that one of the
18  reasons is not just board certification, but quality of
19  care?
20 A He did mention that, yes.
21 Q What did he say about quality of care?
22 A Said there were quality issues.
23 Q Did he ever tell you that CEP was not disclosing to
24  Dr. Golden that one of the reasons for removal was
25  quality?

86

1 A I think initially at one point he said he doesn't know
2   that yet or something like that. But I'm not 100 percent
3   positive.
4 Q Tell me best -- paraphrase as best you can Dr. Alderdice's
5   words.
6 A There's some quality issues but -- maybe it was, don't
7   tell him about that, or we haven't said that yet.
8 Q You came away from that conversation -- which was in or
9   around April --
10 A Yes.
11 Q -- with the understanding that Dr. Golden, for whatever
12  reason, had not yet been advised there were quality
13  issues -- quality concerns about his care?
14 A At that point in time, yes.
15 Q Did you ever -- did you ever have any further discussions
16  about this issue of whether or not there were quality
17  concerns?
18 A With Dr. Alderdice?
19 Q Yes. That Dr. Alderdice mentioned the quality issues
20  behind Dr. Golden's care. Did you ever follow up on
21  that -- have any more conversations with anyone?
22 A I might have had a similar conversation with Dr. Buscho.
23  I can't remember. I think that was pretty much the end of
24  it.
25 Q Okay. Did you ever inquire about what those quality

87

1   issues were?
2 A No.
3 Q Did you ever inquire about what steps CEP was taking to
4   address those quality issues?
5 A No.
6 Q Was that a matter that would have been of some concern in
7   the credentialing process?
8 A Quality is reviewed at Seton Coastside. And to the best
9   of my knowledge, it was being done as it should be done,
10  so I had no concerns.
11 Q Well, if Dr. Golden was having quality of care issues at
12  Coastside sufficient to justify removing him from his
13  position, would you not have expected that, in accord with
14  normal bylaw procedures, that there would be some type of
15  peer review or corrective action?
16    MR. TABARI: You're mixing up CEP and medical
17  staff.
18    MR. GREEN: No, I'm not.
19    MR. TABARI: You're asking what the Seton
20  medical staff requirements are?
21    MR. GREEN: Yeah, I'm --
22    MR. TABARI: She wouldn't know about CEP.
23    MR. GREEN: I'm not asking her about CEP. Let
24  me rephrase to be clearer.
25 Q If Dr. Golden was having quality of care issues at

88



MARCIA SHAIKIN - OCTOBER 2, 2008

1  Q   Let me — without marking it as an exhibit, let me show
2      you -- before we get there:  Did you ever tell Dr. Golden
3      directly that the voluntary resignation was not
4      reportable?
5  A   No.
6  Q   Take a look at the top of this page.  Tell me if that
7      refreshes your recollection about whether or not — that's
8      from the grievance proceeding.
9  A   I think I did send this.
10 Q   Do you know who you sent it to?
11         MR. TABARI:  Do you have the first page?
12         THE WITNESS:  That would tell me.
13         MR. GREEN:  If I had that, I would have shown it
14     to you.  It was cut and pasted from the grievance
15     proceeding.
16         THE WITNESS:  I'm pretty sure I did not send it
17     to Jennifer, but I don't know.
18         MR. GREEN:
19 Q   Can you rule out that you sent it to Dr. Alderdice?
20 A   No, I can't.
21 Q   Okay.  Let's take a short break.
22         MR. GREEN:  Before we do that, let's mark this
23     as Exhibit 13 and just tell me if that's -- this provision
24     there — you recognize that as an excerpt from 2005 bylaws
25     regarding Coastside 17.1?

93

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

        MARCIA SHAIKIN
        ---oOo---

95

1         MS. ROBERTSON:  Can I get a copy?
2         THE WITNESS:  Yes.
3         MR. GREEN:  Okay.  Let's take a short break.
4
5         (Recess taken.)
6
7         (Whereupon the Seton Medical Center Medical
8      Staff Bylaws Seton Medical Center was marked
9      Plaintiff's Exhibit 13 for identification.)
10
11        MS. ROBERTSON:  Yes, a copy.
12        MR. GREEN:  From our earlier comments, we are
13     going to recess subject to the documents we resolved with
14     the understanding that Mr. Tabari objects to that and does
15     not agree to it, that the original of the deposition
16     should go to Mr. Tabari to be forwarded to the witness for
17     review.
18        MR. TABARI:  We're not going to do it per the
19     code?
20        MR. GREEN:  I've been in Southern California
21     enough.  The deposition will be handled per the Code.  And
22     on that, we're done.  Thank you everybody.
23
24     (Whereupon, the deposition was concluded at
25     2:58 p.m.)

94

1   STATE OF CALIFORNIA   )  SS
2       I do hereby certify that the witness in
3   the foregoing deposition was by me duly sworn to
4   testify to the truth, the whole truth, and nothing
5   but the truth in the within-entitled cause; that
6   said deposition was taken at the time and place
7   therein stated; that the testimony of said witness
8   was reported by me, a certified shorthand reporter
9   and a disinterested person, and was under my
10  supervision thereafter transcribed into typewriting,
11  and when so transcribed was carefully read to or by
12  the said witness, and, being in every desire, was
13  thereafter by the said witness duly subscribed; that
14  if unsigned by the witness, signature has been
15  waived in accordance with stipulation between
16  counsel for the respective parties.
17      And I further certify that I am not of
18  counsel or attorney for either or any of the parties
19  to said deposition nor in any way interested in the
20  outcome of the cause named in said caption.
21      IN WITNESS WHEREOF, I have hereunder subscribed my
22  hand this 15th day of October 2008.
23
24      _____
            COLLEEN ALVARADO
        Certified Shorthand Reporter
25

96

Pages 93 to 96



**Siapno, Jennifer (SMC)**

| | |
|---|---|
| From: | Shaikin, Marcia (SMC) |
| Sent: | Wednesday, May 30, 2007 10:43 AM |
| To: | Siapno, Jennifer (SMC) |
| Subject: | FW: Volunteer service |

Per below, please have no more communications with Dr. Golden by email, letter or phone. Once he gets the Board letter, if he calls us, we will refer him back to CEP. Thx.

Marcia Shaikin, MA, CMSC, CPCS
Manager, Medical Staff Services Dept.
Seton Medical Center
1900 Sullivan Avenue
Daly City, CA 94015
Ph: 650-991-6408
FAX: 650-991-6483
marciashaikin@dochs.org

-----Original Message-----
From: Shaikin, Marcia (SMC)
Sent: Wednesday, May 30, 2007 10:41 AM
To: Smith, Bernadette
Cc: McMurdo, Tim SMC
Subject: RE: Volunteer service

No problem.  If you are happy with the revised wording on the Board letter re: Dr. Golden's reason for resignation, then we will incorporate that wording into his Board letter and, if he contacts us after receiving the board letter, we will inform him that the issue is between him and CEP.

Marcia Shaikin, MA, CMSC, CPCS
Manager, Medical Staff Services Dept.
Seton Medical Center
1900 Sullivan Avenue
Daly City, CA 94015
Ph: 650-991-6408
FAX: 650-991-6483
marciashaikin@dochs.org

-----Original Message-----
From: Smith, Bernadette
Sent: Wednesday, May 30, 2007 10:40 AM
To: Shaikin, Marcia (SMC)
Cc: McMurdo, Tim SMC
Subject: RE: Volunteer service



He  needs to be referred back to CEP.  The first level of credentialing is through CEP. Please make it clear to him that it is CEP that he should be talking to--he does not meet their standards--not Seton or the Seton Board.

Please do not forward this email--either another e-mail or phone call to him.

Thanks

Bernadette M. Smith
President & CEO
Seton Medical Center
Seton Medical Center Coastside

-----Original Message-----
From: Shaikin, Marcia (SMC)
Sent: Wednesday, May 30, 2007 8:32 AM



△ π EXHIBIT 12
Deponent
Date_____ Rptr._____
WWW.DEPOBOOK.COM

1





JOCELYN GAYLE LIM, M.D. - NOVEMBER 2, 2009

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA
RENE C. DAVIDSON COURTHOUSE
--oOo--

DONALD GOLDEN, M.D.,               )
                                   )
      Plaintiff,                   )
                                   )
      vs.                          )  No. RG08388602
                                   )  Pages 1 thru 71
CALIFORNIA EMERGENCY               )  Volume I
PHYSICIANS MEDICAL GROUP;          )
MEDAMERICA; MARK ALDERDICE;        )
ROBERT BUSCHO; AND DOES 1          )
THROUGH 1000, AND EACH OF          )
THEM, INCLUSIVE,                   )
                                   )
      Defendants.                  )
_____)


DEPOSITION OF

JOCELYN GAYLE LIM, M.D.

NOVEMBER 2, 2009

Reported by ELIZABETH J. WOOD
License No. CSR-5134, CCRR-093

JAN BROWN & ASSOCIATES
NATIONWIDE REPORTERS & VIDEOGRAPHERS
701 Battery Street, 3rd Floor
San Francisco, California 94111
(415) 981-3498 or (800) 522-7096

1

---

1    BE IT REMEMBERED, that pursuant to notice to the
2  respective parties, and on Monday, the 2nd day of
3  November, 2009, commencing at the hour of 2:32 p.m.
4  thereof, at the Residence Inn, 18620 Madrone Boulevard,
5  Morgan Hill, California, 95037, before me, ELIZABETH J.
6  WOOD, a Certified Shorthand Reporter, License No.
7  C-5134, in and for the County of Contra Costa, State of
8  California, there personally appeared:
9        JOCELYN GAYLE LIM, M.D.,
10  called as a witness on behalf of the Plaintiff, who,
11  being first duly sworn, was then and there examined and
12  interrogated as hereinafter set forth.
13        --oOo--
14    MITCHELL J. GREEN, Attorney at Law, representing
15  the Law Offices of CURTIS & GREEN, LLP, 1101 Fifth
16  Avenue, Suite 310, San Rafael, California, 94901, Phone:
17  (415) 456-4600.  Fax: (415) 455-0270.
18  Email:  mgreen@curtisgreenlaw.com, appeared as counsel
19  on behalf of the plaintiff DONALD GOLDEN, M.D.;
20    SARAH ROBERTSON, Attorney at Law, representing the
21  Law Offices of FITZGERALD, ABBOTT & BEARDSLEY, LLP, 1221
22  Broadway, 21st Floor, Oakland, California, 94612;
23  Phone:  (510) 451-2200.  Fax:  (510) 451.1527.
24  Email:  srobertson.fablaw.com, appeared as counsel on
25  behalf of the defendants CALIFORNIA EMERGENCY PHYSICIANS

3

---

1              INDEX
2                                    Page
3  Direct examination by Mr. Green.......................5
4            --oOo--
5         INDEX OF
6         EXHIBITS
7  Plaintiff's No.                    Page
8  1.  1-page, Email Exchange from Dr. Lim to Dr.
9      Golden, 7/25/07, CEP000843.......................17
10 2.  1-page, Handwritten Notes, CEP000828.............22
11 3.  1-page, Email Exchange from Dr. Lim to Ms.
12     Nobil, 1/3/08, CEP000678.........................33
13 4.  1-page, Email Exchange from Dr. Lim to Dr.
14     Stuart, 4/29/08, CEP000740.......................61
15            --oOo--
16
17
18
19
20
21
22
23
24
25

2

---

1  MEDICAL GROUP; MEDAMERICA; MARK ALDERDICE; ROBERT
2  BUSCHO; AND DOES 1 THROUGH 1000, AND EACH OF THEM,
3  INCLUSIVE;
4    Also present:  DONALD GOLDEN, M.D. and PAMELA
5  STUART, M.D.
6          --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

---

Pages 1 to 4

JOCELYN GAYLE LIM, M.D. - NOVEMBER 2, 2009

1 MONDAY                    NOVEMBER 2, 2009
2                VOLUME I
3        P R O C E E D I N G S
4              --oOo--
5        DIRECT EXAMINATION
6 BY MR. GREEN:
7    Q. Good afternoon, Dr. Lim.  Would you give us
8 your full name for the record?
9    A. Jocelyn Gayle, G-a-y-l-e, Lim.
10   Q. My name is Mitch Green and I am Dr. Golden's
11 attorney and I think you probably understand that Dr.
12 Golden has a lawsuit against CEP?
13   A. Uh-huh.
14   Q. And you are, of course, a CEP partner, and I
15 think have an interest in that for that reason; but
16 you're here today primarily as a witness, somebody whose
17 own conduct is not being accused of being incorrect, but
18 somebody who may have seen or witnessed or heard things
19 that other people said or did.  Kind of like the person
20 standing at the intersection collision who could see
21 what color the traffic light was at the time of the
22 accident.
23   I'm going to be asking you some questions.  Have
24 you ever had your deposition taken before?
25   A. Yes.

                                                    5

1    Q. As what?  As a medical witness?
2    A. It was for a workers' comp case.
3    Q. Okay.  Just a couple of ground rules.  You need
4 to let me finish my question before you answer.  I need
5 to let you finish your answer before I go on to another
6 question, because the court reporter needs to be able to
7 take down what's going on back and forth, and she can
8 only record one person at a time, as good as she is.
9    Also, I need verbal responses.  Nods or uh-huhs
10 don't work because they don't make for a clean record.
11 So I may prompt you a couple of times.  People do that.
12 It's very common in normal everyday speech, but it
13 doesn't work in a deposition; so if you're nodding your
14 head yes, and I'm prompting you to answer, it's not
15 because I don't understand an up-and-down shake of your
16 head means yes.  It's because I'm trying to get
17 something for the record.  Okay?
18   A. Uh-huh, yes.
19   Q. It will happen and I'll correct you and don't
20 worry about it.  I'll remind you.  It's so normal.
21   Tell me when you first joined CEP.
22   A. September 19, 1996.
23   Q. And prior to that, had you been the owner of
24 the South Valley Occupational Clinic or the -- that
25 facility, by whatever other name it went by prior to

                                                    6

1 that?
2    A. No.
3    Q. When you came in to CEP, did you come in as a
4 partner and that was the only basis of your
5 relationship?
6    A. I came in as an employee first.
7    Q. Yes, okay.
8    A. And by January, then I became a level one
9 partner.
10   Q. Okay.  And had you worked at the South Valley
11 facility before you became a CEP partner?
12   A. September 1996 to December 1996, I was an
13 employee --
14   Q. Okay.
15   A. -- because that's how people entered into CEP.
16   Q. Okay.  When you were an employee, what kind of
17 work did you do?  Was it as a physician employee?
18   A. I don't understand your question.
19   Q. When you were an employee for CEP before you
20 became a partner, were you a physician employee?
21   Were you performing -- providing medical care?
22   A. Yes.
23   Q. Okay.  And was that at South Valley?
24   A. Yes.
25   Q. And when you were a physician employee at South

                                                    7

1 Valley, were you on occasion the only physician present?
2    A. Yes.
3    Q. And did you work under any -- as a physician
4 employee, did you work under any direct medical
5 supervision of another physician?
6    MS. ROBERTSON:  Objection.  Vague and ambiguous.
7    MR. GREEN:
8    Q. Do you understand what I'm asking?
9    A. No.
10   Q. Did somebody tell you what kind of medical care
11 to provide when you were a physician employee?
12   A. No.
13   Q. And when you were a physician partner, did you
14 get to exercise your own judgment about the kind of
15 medical care that you would give your patients?
16   A. The care I provided as a partner was not
17 different than as when I was an employee.
18   Q. Okay.  Are there physician employees at South
19 Valley today?
20   A. No.
21   Q. When was the last time a physician employee
22 worked at South Valley?
23   Was it a long time ago?
24   A. I don't know.
25   Q. Okay.  Do you know anything about -- okay.

                                                    8

Pages 5 to 8

JOCELYN GAYLE LIM, M.D. - NOVEMBER 4, 2009

1 the issues brought up in the document."
2 Do you recall him asking for you to do that?
3 A. I don't recall, but that's what is written on
4 the email.
5 Q. Okay. Do you recall what, if anything, you did
6 in regard to trying to set up a meeting?
7 A. I did not try to arrange a meeting.
8 Q. Did you make any effort to -- did you let
9 anybody know that Dr. Golden wanted a meeting?
10 A. That's why I did this email and sent it to Pam.
11 It's her job as medical director.
12 Q. Okay. You didn't want to be involved in it?
13 A. No.
14 Q. But you let her know that Dr. Golden wanted a
15 meeting?
16 A. Correct.
17 Q. Okay. This was a telephone conversation that
18 you had with Dr. Golden?
19 A. Yes. He called me up.
20 Q. Can you remember, was there anything about his
21 demeanor during the conversation -- was he hostile,
22 aggressive, apologetic, accusatory, any --
23 A. He was very upset. He was angry at Pam. He
24 kept his -- his voice was very loud. He kept repeating
25 a lot of the issues over and over again.

69

1 I actually had a hard time getting a word in. His
2 speech was rushed. He sounded pretty agitated on the
3 telephone.
4 Q. Okay. Did you ever have any other
5 communications with either Colleen Nobil or Pam Stuart
6 about meeting with Dr. Golden, other than this
7 communication that we've just looked at?
8 A. I'm sorry. Could you say that again?
9 Q. Did you have any other follow-up that you
10 remember about a meeting with Dr. Golden?
11 A. I don't think a meeting was set up between the
12 four of us.
13 Q. Do you know about any meetings that were set
14 up?
15 A. No.
16 Q. Okay. All right.
17 (Whereupon, a brief recess was taken from
18 4:14 p.m. to 4:16 p.m.)
19 MR. GREEN: All right, Doctor. Thank you.
20 THE REPORTER: We have marked four exhibits for the
21 transcript.
22 (The deposition was concluded at 4:17 p.m.)
23 --oOo--
24 _____
25 DATE          JOCELYN GAYLE LIM, M.D.

70

1 STATE OF CALIFORNIA   )
                        )  ss.
2 COUNTY OF CONTRA COSTA)
3
4 I, ELIZABETH J. WOOD, CSR, a Certified shorthand
5 Reporter, hereby certify that the witness in the
6 foregoing deposition was by me duly sworn to testify to
7 the within-entitled cause; that said deposition was
8 taken at the time and place therein stated; that the
9 testimony of the said witness was reported by me, a
10 Certified Shorthand Reporter, and was thereafter
11 transcribed under my direction into typewriting; and
12 that the witness was given an opportunity to read, and
13 if necessary, correct said deposition and to subscribe
14 the same.
15 I FURTHER CERTIFY that I am not of counsel or
16 attorney for either or any of the parties in the
17 foregoing deposition and caption named or in any way
18 interested in the outcome of the cause named in such
19 caption.
20 IN WITNESS WHEREOF, I have hereunto set my hand
21 this date, the 4th day of November, 2009.
22
23
24
          ELIZABETH J. WOOD, CSR, License No. C-5134,
25        County of Contra Costa, State of California.

71



1  Mitchell J. Green  (SBN 127718)
2  CURTIS & GREEN, LLP
   1101 Fifth Ave, Suite 310
3  San Rafael, CA 94901
   Tel: 415.456.4600 / Fax: 415.455.0270
4  Email: mgreen@curtisgreenlaw.com

5  Attorney for Donald Golden, M.D.

6

7

8                  SUPERIOR COURT FOR THE STATE OF CALIFORNIA
9                  COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

10
11 DONALD GOLDEN, M.D.,                    )
                                           )   Case No. RG 08388602
12         Plaintiff,                       )
                                           )   REQUEST FOR JUDICIAL NOTICE
13 v.                                       )
                                           )   Date:   December 10, 2009
14 CALIFORNIA EMERGENCY                      )   Time:   8:30 a.m.
15 PHYSICIANS MEDICAL GROUP;                 )   Dept:   19
   MEDAMERICA; MARK ALDERDICE;              )   Judge: Stephen Dombrink
16 ROBERT BUSCHO; AND DOES 1                )   Reservation No.  986983
   THROUGH 100, AND EACH OF THEM,          )
17 INCLUSIVE,                               )
                                           )
18         Defendants.                       )
                                           )
19

20         IPursuant to Evid. Code § 452(c), which permits judicial notice of official acts of
21 legislative, executive and judicial departments of any state of the United States, and Evid. Code §
22 452 (h) which permits judicial notice of facts and propositions that are not reasonably subject to
23 dispute and are capable of immediate and accurate determination by resort to sources of
24 reasonably indisputable accuracy, petitioner hereby request that the court take judicial notice of
25 the following: ORDER ON DEFENDANTS (1) CALIFORNIA EMERGENCY MEDICAL
26 PHYSICIANS MEDICAL GROUP, AND MARK SPIRO,. MD.; (2) WESLEY CURRY M.D.;
27 and TED KLOTH MD.'S MOTIONS FOR SUMMARY JUDGMENT OR, IN
28 THE ALTERNATIVE, SUMMARY ADJUDICATION OF ALL ISSUES, (April 2, 2008),

1  MARY FITZSIMONS, MD. , v. CALIFORNIA EMERGENCY MEDICAL PHYSICIANS

2  MEDICAL GROUP, et al. , Alameda County Superior Court, No. RG06-268579.

3

4  Dated: November 21, 2009                        CURTIS & GREEN, LLP

5

6                                                  By: _____

7                                                      Mitchell J. Green
                                                       Attorney for Donald Golden, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



FILED
ALAMEDA COUNTY

APR 0 2 2008

CLERK OF THE SUPERIOR COURT
BY _____
DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| MARY FITZSIMONS, M.D.,<br><br>Plaintiff<br><br>vs.<br><br>CALIFORNIA EMERGENCY MEDICAL PHYSICIANS MEDICAL GROUP, WESLEY CURRY, M.D., TED KLOTH, M.D., MARK SPIRO, M.D. and DOES 1-50, inclusive,<br><br>Defendants. | No. RG06-268579<br><br>ORDER ON DEFENDANTS (1) CALIFORNIA EMERGENCY MEDICAL PHYSICIANS MEDICAL GROUP, AND MARK SPIRO, M.D.; (2) WESLEY CURRY M.D.; and TED KLOTH M.D.'S MOTIONS FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ALL ISSUES |

The Motions of Defendants (1) CALIFORNIA EMERGENCY MEDICAL

PHYSICIANS MEDICAL GROUP, and MARK SPIRO, M.D. ("CEP & Spiro");

(2) WESLEY CURRY M.D. ("Curry"); and (3) TED KLOTH M.D. ("Kloth") for

Summary Judgment, or in the Alternative, Summary Adjudication of Issues came

on regularly for hearing on March 10, 2008, in Department 31 of the above-

entitled court, the Honorable Frank Roesch presiding. Defendants Spiro, Curry and

Kloth appeared by counsel Sarah E. Robertson. Plaintiff Mary Fitzsimons

("Plaintiff") appeared by counsel Richard Raines. Defendant CEP did not appear.

The Court has considered all the papers filed on behalf of the parties, including the parties' separate statements, as well as the arguments presented at the hearing. Based thereon, and good cause appearing, the Court HEREBY ORDERS the following:

"A defendant seeking summary judgment must either prove an affirmative defense, disprove at least one element of the plaintiff's cause of action, or show that some such element cannot be established. [Citations.] The opposing party need not prove his or her case; it is enough to show that a triable issue of material fact exists." (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 100.)

(1)   DEFENDANTS CEP & SPIRO MOTIONS:

The joint Motion of Defendants CEP & Spiro for Summary Judgment is DENIED.  The Court notes that these Defendants' moving papers did not seek individual consideration of issues as to each of them.  (See CEP & Spiro's Notice of Motion, Motion, and Separate Statement).

Defendants CEP & Spiro's Motion for Summary Adjudication of Plaintiff's First Cause of Action, for Wrongful Retaliation in Violation of Public Policy is DENIED.  Defendants have failed to meet the initial burden pursuant to C.C.P. 437c(p)(2) to show that one or more elements of this cause of action cannot be established or that there is a complete defense to this cause of action.  Even

2

assuming arguendo that Defendants had met their initial burden, there are numerous triable issues of fact.

First, though Defendants have failed to shift the burden with regard to whether or not Plaintiff was an employee, Plaintiff has raised triable issues of fact as to this element. (*See Clackamas Gastroenterology Assoc., P.C. v. Wells* (2003) 538 U.S. 440 cited by all Defendants and Plaintiff; See Plaintiff's Statement of Additional Material Facts ("PAMF") Nos. 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, and 83, and evidence cited therein). Second, while Defendants have failed to shift the burden with regard to whether or not Plaintiff engaged in a protected activity, Plaintiff has raised triable issues of fact as to this element. (*See* PAMF, Nos. 90, 91, 97, 99 and 1, and evidence cited therein.) "Protected activity" includes complaining to one's employer or opposing conduct that the employee in good faith believes to be discriminatory or wrongful, whether or not the conduct is ultimately found to be prohibited by FEHA. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043; *Miller v. Dept. of Corrections* (2005) 36 Cal.4th 446.) Third, although Defendants have failed to shift the burden with regard to whether or not there exists a nexus between the protected activity and the adverse employment actions, Plaintiff has raised triable issues of fact exist as to this element. (*See* PAMF, Nos. 83, 84, 97, 99, 100, and 2, and evidence cited therein; *Flait v. North America Watch Corp.* (1992) 3 Cal.App.4th 467, 479-480.)

3

questions of law, breach of fiduciary duty is generally a question of fact. (*See Kirschner v. Natomas, supra,* at 790, internal citation omitted.) However, Defendant did not address the existence or scope of any fiduciary duty and the Court does not consider these issues. (*See* Defendant Kloth's Separate Statement, Issue No. 8 and corresponding UMFs).

Based on the foregoing, Defendant Kloth's Motion for Summary Adjudication of Plaintiff's claim for punitive damages is DENIED.

(4)   PARTIES' OBJECTIONS TO EVIDENCE

Defendants CEP, Spiro, Curry and Kloth's Joint Objections to Evidence filed March 5, 2008, are OVERRULED as to Nos. 1-24, 28-30, 33, 35 and 39-46; and SUSTAINED as to Nos. 25, 26, 31, 32, 34, 36, 37 and 38. The Court notes that Objection No. 27 is a duplicate.

Plaintiff's Objections to Evidence filed on March 5, 2008, are OVERRULED as untimely. (See California Rules of Court, Rule 3.1354(a).)

4/1/09
‾‾‾‾‾‾‾
Date

Frank Roesch
Judge of the Superior Court

10