# EXHIBIT 110

## Jennifer A. Brooks

**From:** Jennifer A. Brooks
**Sent:** Tuesday, January 19, 2010 3:48 PM
**To:** 'Dept. 19, Superior Court'
**Cc:** Sarah E. Robertson; 'Mitchell J. Green'
**Subject:** Donald Golden v. California Emergency Physicians Medical Group, et al. (Case No. RG08388602)

Pursuant to the court's January 18, 2010 order in the above-referenced matter, requiring that an amended Stipulated Order Granting Leave to File Third Amended Complaint be submitted to the court with Sarah Robertson's signature, please find attached the parties' original Stipulated Order Granting Leave to File Third Amended Complaint submitted to the court on December 22, 2009 with Sarah Robertson and Mitchell Green's signatures. Please advise if this document will satisfy the court's requirement or if a new amended submission should be made. Also attached is a copy of the order signed by Judge Bereola including the compliance hearing date.

Thank you for your attention to this matter.

Jennifer A. Brooks
Paralegal
Fitzgerald Abbott & Beardsley LLP
1221 Broadway, 21st Floor
Oakland, CA 94612
tel 510.451.3300
fax 510.451.1527
jbrooks@fablaw.com
www.fablaw.com

 FITZGERALD ABBOTT & BEARDSLEY LLP
ATTORNEYS AT LAW

Important: This electronic mail message, including any attached files, is being sent by or on behalf of a lawyer; it is confidential and it may contain or constitute information protected by the attorney-client and/or the attorney work-product privileges. If the person actually receiving this message, or any other reader of this message, is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are not authorized to retain, read, copy or disseminate this communication or any part of it. If you have received this communication in error, please immediately notify Fitzgerald Abbott & Beardsley LLP at (510) 451-3300. Thank you.

1/28/2010

1  Mitchell J. Green  (SBN 127718)
2  Curtis & Green, LLP
   1101 Fifth Ave, Suite 310
3  San Rafael, CA 94901
   Tel: 415.456.4600 / Fax: 415.455.0270
4  Email: mgreen@curtisgreenlaw.com
5  Attorney for Donald Golden, M.D.

F I L E D
ALAMEDA COUNTY

DEC 2 3 2009

CLERK OF THE SUPERIOR COURT
By_____
                        Deputy



6
7        SUPERIOR COURT FOR THE STATE OF CALIFORNIA
8        COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

9  DONALD GOLDEN, M.D.,              )
                                    )   Case No. RG 08388602
10        Plaintiff,                )
                                    )   **STIPULATED ORDER GRANTING**
11  v.                              )   **LEAVE TO FILE THIRD AMENDED**
                                    )   **COMPLAINT**
12  CALIFORNIA EMERGENCY            )
13  PHYSICIANS MEDICAL GROUP et al.,)
                                    )
14        Defendants.               )

15
16       Leave is hereby granted to plaintiff to file a Third Amended Complaint, attached hereto as

17  Exhibit 1, which adds a Sixth Cause of Action for violation of 42 U.S.C.A. § 1981. Plaintiff shall

18  file and serve the Third Amended Complaint within 10 days of this order.

19       IT IS SO ORDERED.
20
21  Date: December ___, 2009        _____
                                     Judge, Superior Court
22
23  AGREED (without prejudice to any claim or defense):
24  Fitzgerald Abbott & Beardsley            Curtis & Green
25
26
    By :_____    By:_____
27  By Sarah Robertson                Mitchell J. Green
28  Attorney for defendants           Attorney for Donald Golden, M.D.
    Date: December 21 2009            Date: December 21, 2009

# EXHIBIT 1

EXHIBIT 1

1  Mitchell J. Green (SBN 127718)
   CURTIS & GREEN, LLP
2  1101 Fifth Ave, Suite 310
   San Rafael, CA 94901
3  Tel: 415.456.4600 / Fax: 415.453.4095
   Email: mgreen@curtisgreenlaw.com
4
   Attorney for Donald Golden, M.D.
5

6          SUPERIOR COURT FOR THE STATE OF CALIFORNIA
7          COUNTY OF ALAMEDA - UNLIMITED JURISDICTION
8
   DONALD GOLDEN, M.D.,                    )
9                                          )   Case No. 08388602
           Plaintiff,                      )
10                                         )   [PROPOSED] THIRD
   v.                                      )   AMENDED COMPLAINT
11                                         )
   CALIFORNIA EMERGENCY                    )
12 PHYSICIANS MEDICAL GROUP;               )
   MEDAMERICA; MARK ALDERDICE;             )
13 ROBERT BUSCHO; AND DOES                 )
   1 THROUGH 100, AND EACH OF THEM,        )
14 INCLUSIVE,                              )
                                           )
15         Defendants,                     )
   _____)
16
17 Plaintiff alleges the following:

18                          **PARTIES**

19      1.  DONALD GOLDEN, M.D., is, and at all times herein mentioned was, an individual,

20 residing in the County of Alameda, State of California.  Plaintiff is now and at all times

21 mentioned herein was a duly licensed physician in good standing in the State of California.

22 Plaintiff is African-American.

23      2.  Defendant CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP

24 ("CEP") is, and at all times mentioned herein was a business entity purporting to be a

25 partnership, organized and existing under the laws of the State of California, and qualified to do

26 business and doing business in the State of California.  CEP's principal place of business is in

27 Alameda County, California.  With over 800 physicians, CEP is the largest provider of physician

28 staffing and management services for Emergency Departments in California.  CEP's clients

1 include more than 60 district and county hospitals and trauma centers, as well as non-profit and
2 academic university hospitals.

3     3. Defendant MEDAMERICA is a practice management support company created by
4 CEP in or about 1975.

5     4. Defendant MARK ALDERDICE, M.D. was the San Francisco Regional Medical
6 Director for CEP at the time of the incidents set forth herein. As such, he was a managing agent
7 of and partner in Defendant CEP.

8     5. Defendant ROBERT BUSCHO, M.D. was the Medical Director at Seton Coastside
9 Medical Facility ("SMCC") for CEP at the time of the incidents set forth herein. As such, he was
10 a managing agent of and partner in Defendant CEP.

11     6. The true names and capacities, whether individual, corporate, associate or otherwise of
12 Defendants DOES 1 through 100, inclusive (collectively "Defendants"), are unknown to
13 Plaintiff, who therefore sues such Defendants by such fictitious names, and will amend this First
14 Amended Complaint to show their true names and capacities when ascertained. Plaintiff is
15 informed and believes, and thereupon alleges, that each of the DOE Defendants aided and abetted
16 and acted in concert with and in conspiracy with Defendants Alderdice and Buscho in
17 discriminating and retaliating against and wrongfully terminating Plaintiff.

18     7. Plaintiff is informed and believes and thereon alleges that at all times herein
19 mentioned each of Defendants was the agent and employee of each of the remaining Defendants
20 and in doing the things hereinafter alleged, was acting within the scope of such agency or
21 employment.

22     **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

23     8. In 2000, Plaintiff became a party to a written partnership agreement with CEP.
24 ("Agreement"). A true and correct copy of this Agreement is attached hereto as Exhibit 1 and
25 incorporated herein for all purposes

26     9. Although he was a partner in the terminology of the Agreement, Plaintiff was
27 sufficiently under the supervision, regulation, and control of CEP as to be an employee for
28 purposes of applying the California Fair Employment and Housing Act.

1      10. Plaintiff was subject to the supervision and control of CEP through rules and

2 regulations regarding conduct and assignment of work locations and hours. CEP set the number

3 of hours he worked and controlled the sites to which he was assigned.

4      11. Plaintiff was paid as an employee. Like all CEP doctors, he was paid on an hourly

5 basis, at a hourly rate specific to site at which he worked. He did not share in CEP's profits and

6 losses.

7      12. Plaintiff was subject to termination by CEP like an employee.

8      13. Plaintiff, as one of just 800 physicians, did not have the ability to control or influence

9 CEP.

10      14. Plaintiff worked at several health care facilities under contract with CEP. In or

11 abound 2004, Plaintiff was hired to work at an emergency room facility known as Seton

12 Coastside. Plaintiff is not board certified in emergency room medicine or any other speciality.

13 At the time he applied to Seton Coastside he did not know and was not given notice by anyone

14 that board certification was a requirement for a position at Seton Coastside.

15      15. At the time Plaintiff was hired to work at Seton Coastside, one or more Caucasian

16 physicians worked at Coastside without board certification.

17      16. In or about 2006, Plaintiff was favorably reviewed by his supervisors and

18 recommended for advancement within CEP. Plaintiff was promoted in or about 2007.

19      17. In 2007, Alderdice and Buscho removed Plaintiff from the Seton Coastside schedule

20 on the alleged ground that he was not board certified and that board certification was a Medical

21 Staff Bylaw requirement and an essential qualification for working at Seton Coastside.

22      18. At the time Alderdice and Buscho removed Plaintiff, one or more Caucasian

23 physicians who, like Plaintiff, were not board certified, worked at and were allowed to continue

24 working at Seton Coastside.

25      19. Shortly after Plaintiff was removed from the Seton Coastside schedule, Plaintiff's

26 Medical Staff privileges came up for renewal before the Medical Staff of Seton Medical Center.

27      20. The Medical Staff solicited recommendations directly from Buscho and Alderdice for

28 the manner in which to handle Plaintiff's reappointment. Both recommended to the Medical

1    Staff that Plaintiff's reappointment be denied on the grounds that Plaintiff was not board

2    certified. At the time of these recommendations, one or more Caucasian physicians who, like

3    Plaintiff, were not board certified, worked at and were allowed to continue working at Seton

4    Coastside.

5        21. At or about this same time, Alderdice actively misled Plaintiff in an attempt to obtain

6    his voluntary resignation from the Medical Staff. Alderdice did so by making knowingly false

7    statements to Plaintiff that his reappointment application would be denied because he lacked

8    board certification, that such denial would be a reportable event on all future medical staff

9    applications, and that he (Alderdice) had no control over the Medical Staff's decision.

10       22. As a result of Alderdice's refusal to seek a waiver of the purported board certification

11    requirement for Plaintiff under terms and conditions substantially similar to those obtained for

12    one or more Caucasian physicians practicing at Seton Coastside, Plaintiff's application for

13    renewal of his Medical Staff privileges at Seton Medical Center was denied.

14       23. Following this discriminatory conduct, Plaintiff initiated an internal grievance

15    proceeding challenging his removal from the Seton Coastside schedule based on race

16    discrimination and other claims.

17       24. The grievance was protected activity in opposition to unlawful discrimination.

18       25. On review, CEP denied the grievance and, in so doing, ratified and approved the

19    discriminatory conduct of both Buscho and Alderdice.

20       26. Thereafter, Defendants retaliated against Plaintiff for having initiated and pursued the

21    grievance. Pursuant to the Agreement, Defendants were required to assist Plaintiff in obtaining

22    comparable employment once he was removed from the Seton Coastside schedule. Defendants

23    made no attempt to place Plaintiff at another CEP facility. To the contrary and unbeknownst to

24    Plaintiff, Defendants took affirmative steps to block Plaintiff from obtaining gainful employment

25    at other CEP facilities and CEP removed Plaintiff without cause or justification from one or more

26    employment positions that he held as of the time of the grievance and in which he had previously

27    received excellent evaluations.

28

1     27. As a consequence of Defendants' wrongful and retaliatory conduct, Plaintiff is not

2 currently being assigned work at any CEP facility. Pursuant to CEP policies and procedures, the

3 failure to meet a specified minimum number of hours results in adverse action, including

4 termination from CEP. Plaintiff's termination from CEP for insufficient hours is impending.

5     28. As a proximate result of Defendants' wrongful and discriminatory actions against

6 Plaintiff as set forth herein, Plaintiff has been harmed in an amount to be shown according to

7 proof in that Plaintiff has suffered and will continue to suffer the loss of wages, salary, benefits,

8 and other amounts of compensation that Plaintiff would have received had Plaintiff not been

9 removed from his position at Seton Coastside, been denied reappointment and thereafter

10 retaliated against.

11     29. As a further proximate result of Defendants' wrongful and discriminatory actions

12 against Plaintiff as set forth herein, Plaintiff has been harmed in an amount to be shown

13 according to proof in that Plaintiff has suffered and will continue to suffer the loss of intangible

14 employment-related opportunities in that the medical community is closely connected and

15 Plaintiff, by reason of having brought this action against CEP, will be denied other opportunities

16 that would have benefitted him economically.

17     30. As a proximate result of Defendants' wrongful and discriminatory actions against

18 Plaintiff as set forth herein, Plaintiff has been harmed in that Plaintiff has suffered and will

19 continue to suffer mental anguish and emotional distress in an amount to be shown according to

20 proof.

21     31. The wrongful and discriminatory actions against Plaintiff as set forth herein were

22 done by Defendants with malice, fraud and oppression, and with reckless disregard of the

23 Plaintiff's rights under state and federal statutes. The conduct was intended to harm Plaintiff.

24 all of which entitle Plaintiff to recovery of exemplary and punitive damages, and to recovery of

25 reasonable attorneys fees.

26     32. Plaintiff has exhausted all administrative remedies required as a condition to bringing

27 this action. On or around February 28, 2008, the California Department of Fair Employment and

28 Housing issued Plaintiff right to sue letters naming each defendant herein.

## FIRST CAUSE OF ACTION
### (Violation of FEHA)
### CEP

33. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through 32 above as though fully set forth herein.

34. All of Defendants' conduct toward Plaintiff as alleged herein was motivated by an impermissible discriminatory or retaliatory intent and adversely affected the terms, conditions and privileges of Plaintiff's employment.

35. Defendants' conduct in removing Plaintiff from the Seton Coastside schedule was undertaken on account of his race.

36. Defendants' conduct in refusing to waive the purported board certification requirement for Medical Staff membership at Seton Medical Center was undertaken on account of his race.

37. Defendants' conduct in preventing Plaintiff from obtaining employment at other CEP facilities and in removing him from such employment as he held following the grievance proceeding was in retaliation for Plaintiff's conduct in opposing Defendants' discriminatory conduct and initiating and participating in a grievance proceedings intended to correct that wrongful conduct.

38. All of Defendants' conduct as alleged herein was in violation of California Fair Employment and Housing Act, Government Code § 12940.

## SECOND CAUSE OF ACTION
### (Public Policy Tort)
### CEP

39. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through 32 above as though fully set forth herein.

40. The California Constitution (Article I, §§7 and 8) and the California Fair Employment and Housing Act (Government Code §12900 et seq. and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et. seq.) establish a fundamental public policy forbidding discrimination against any person based on race.

1  41. All of Defendants' conduct toward Plaintiff as alleged herein was motivated by an
2  impermissible discriminatory and retaliatory intent based on race and, as such, were in violation
3  of the public policy of the State of California.

4  **THIRD CAUSE OF ACTION**
   (Unruh Act, Civ. Code § 51)
5  **All Defendants**

6  42. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through
7  32 above as though fully set forth herein.

8  43. All of Defendants' conduct as alleged herein denied Plaintiff his right to full and
9  equal accommodations, advantages, facilities, privileges, and services in business establishments
10 of every kind, and did so on account of his race.

11 **FOURTH CAUSE OF ACTION**
   (Breach Of Fiduciary Duty)
12 **Defendants Alderdice and Buscho**

13 44. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through
14 32 above as though fully set forth herein.

15 45. A partner owes a fiduciary duty of care to the partnership and other partners in the
16 conduct of the partnership business..

17 46. Alderdice, Buscho and Golden were partners in CEP.

18 47. Alderdice, Buscho breached their duty of care to CEP and to Plaintiff by knowingly
19 and intentionally removing Plaintiff from the Seton Coastside schedule and refusing to waive the
20 purported board certification requirement so as to allow him to be recredentialed by Seton
21 Medical Center and by the other conduct alleged herein.

22 **FIFTH CAUSE OF ACTION**
   (Breach Of The Covenant of Good Faith And Fair Dealing)
23 **All Defendants**

24 48. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through
25 32 above as though fully set forth herein.

26 49. An implied term of the Agreement is a covenant of good faith and fair dealing that
27 neither party will take any action to make the fulfillment of the obligations of the contract
28 unreasonably difficult or impossible.

50. Pursuant to Corporations Code § 16404(d), a partner shall discharge all duties to the partnership and the other partners and exercise any rights consistently with the obligation of good faith and fair dealing.

51. Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Agreement.

52. Defendants breached the implied covenant of good faith and fair dealing by conjuring up false disputes with Plaintiff, by refusing to wave or attempt to waive the purported board certification requirement on behalf of plaintiff has it had previously done on behalf of others, and by interfering with plaintiff's ability to obtain or maintain a position at one or more other sites at which CEP was contracted to provide medical care through its partners.

### SIXTH CAUSE OF ACTION
(Violation of 42 U.S.C.A. §1981)
All Defendants

53. Plaintiff incorporates and realleges those allegations set forth in Paragraphs 1 through 52 above as though fully set forth herein.

54. Defendants, and each of them, intentionally discriminated against plaintiff on the basis of race in regard to the performance of; enjoyment of benefits, privileges, terms, and conditions of; and termination of his contractual partnership relationship with CEP. As more particularly described in paragraphs 17-22 and 27, plaintiff was removed from the schedule at Seton Coastside and has, a consequence thereof, in fact been terminated from the CEP partnership because of insufficient hours.

55. Defendants, and each of them, intentionally retaliated against plaintiff for engaging in protected activity in connection with the terms and conditions of his contractual partnership relationship with CEP. As more particularly alleged in paragraphs 23-27, plaintiff engaged in protected activity by filing a grievance, after which he suffered adverse employment action at hands of defendant CEP, which acted in retaliation against plaintiff because of the protected activity in which he engaged.

1    IN WITNESS WHEREFORE, Plaintiff prays judgment as follows:

2  FOR THE FIRST CAUSE OF ACTION

3        For general damages for lost wages, salary, benefits and compensation;

4        For damages for loss of economic opportunity;

5        For damages for mental anguish and emotional distress;

6        For punitive damages; and

7        For injunctive relief enjoining Defendants from terminating Plaintiff, or, as appropriate,

8        ordering him reinstated.

9  FOR THE SECOND CAUSE OF ACTION

10        For general damages for lost wages, salary, benefits and compensation;

11        For damages for loss of economic opportunity;

12        For damages for mental anguish and emotional distress; and

13        For punitive damages.

14  FOR THE THIRD CAUSE OF ACTION

15        For general damages for lost wages, salary, benefits and compensation;

16        For damages for loss of economic opportunity;

17        For damages for mental anguish and emotional distress; and

18        For treble damages.

19  FOR THE FOURTH CAUSE OF ACTION

20        For general damages for lost wages, salary, benefits and compensation;

21        For damages for loss of economic opportunity;

22        For damages for mental anguish and emotional distress; and

23        For punitive damages.

24  FOR THE FIFTH CAUSE OF ACTION

25        For general damages for lost wages, salary, benefits and compensation.

26  FOR THE SIXTH CAUSE OF ACTION

27        For general damages for lost wages, salary, benefits and compensation;

28        For damages for loss of economic opportunity;

[PROPOSED] THIRD AMENDED COMPLAINT

- 9 -

1   For damages for mental anguish and emotional distress, to the maximum extent allowed

2 by law; and

3   For punitive damages, to the maximum extent allowed by law.

4

5 FOR ALL CAUSES OF ACTION

6   Costs of suit, including attorney's fees; and

7   For such other relief as the Court may see fit to grant.

8

9 Dated: December 19, 2009                 CURTIS & GREEN, LLP

10

11                                          By:_____
                                                Mitchell J. Green
12                                              Attorney for Donald Golden, M.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

EXHIBIT 1

**Partnership Agreement**
**Table of Contents**

1.  **Name and Principal Place of Business** ........................................................... 5

2.  **Purpose** ...................................................................................................... 5

    2.1   *General Purpose* ................................................................................. 5
    2.2   *Service Locations* ................................................................................ 5

3.  **Term** .......................................................................................................... 6

4.  **Capital Contributions** ................................................................................. 6

    4.1   *Mandatory Capital Contributions* .......................................................... 6
    4.2   *Special Capital Accounts* ...................................................................... 7
    4.3   *Payment of Capital Contribution* ........................................................... 7
    4.4   *Voluntary Capital Contributions* ............................................................ 7
    4.5   *Capital Accounts* .................................................................................. 7
    4.6   *Negative Capital Account* ...................................................................... 8

5.  **Accrual Account** ......................................................................................... 8

    5.1   *Definition of Net Current Assets* ............................................................ 8
    5.2   *Allocation of Annual Increase and Decrease* ........................................... 8
    5.3   *Vesting* ............................................................................................... 8
    5.4   *Negative Accrual Account* ..................................................................... 9

6.  **Fiscal Year and Accounting** ......................................................................... 9

7.  **Inspection of Records** ................................................................................. 9

8.  **Bank Accounts** ........................................................................................... 9

9.  **Quality of Performance** ............................................................................... 9

10. **Definition, Appointment, and Responsibilities of Board of Directors** ............ 10

    10.1   *Election* ............................................................................................ 10
    10.2   *Meetings* .......................................................................................... 10

CEP 00320
CONFIDENTIAL

10.3    Responsibility ...................................................................................... 10

10.4    Delegate Responsibility............................................................................ 11

10.5    Majority Vote........................................................................................ 11

10.6    Signature Authority ............................................................................... 11

10.7    Directive Procedures............................................................................... 12

10.8    Removal of Director ............................................................................... 12

11.  **Regional Directors and Medical Directors**................................................... **13**

11.1    Regional Directors .................................................................................. 13

11.2    Medical Directors ................................................................................... 13

11.3    Appointment of Physicians to Service Locations ........................................... 13

12.  **Qualification, Categories, and Admission of Partners**................................... **13**

12.1    Basic Qualifications for All Partners........................................................... 13

12.2    Board Determines Partner's Category ........................................................ 14

12.3    Partner Categories.................................................................................. 15

12.4    No Guarantee of Hours............................................................................ 16

12.5    Additional Partner Categories ................................................................... 16

13.  **PARTNERSHIP DISTRIBUTIONS** ................................................................... **17**

13.1    Definitions ............................................................................................ 17

13.2    Service Location Revenue Distributions ...................................................... 18

13.3    Compensation for Other Administrative and Management Services.............. 20

13.4    Partners' Drawing Accounts and Interest .................................................. 20

13.5    Allocation of Net Income and Net Loss....................................................... 21

13.6    Distributions of Cash Available for Distribution ........................................... 22

13.7    Retirement Plan Contributions ................................................................. 22

13.8    Other Salary or Compensation.................................................................. 23

13.9    Guaranteed Payments............................................................................. 23

14.  **Partner Withdrawal or Termination and Buy-out**..................................... **23**

14.1    Voluntary Withdrawal............................................................................. 23

14.2    Expulsion of a Partner............................................................................. 23

14.3    Withdrawal on Retirement, Death or Disability .......................................... 24

14.4    Combined Accounts ................................................................................ 24

14.5    *Buy-Out Points*..................................................................... 24

14.6    *Payment of Partner's Buy-Out*.............................................. 26

14.7    *Offset for Claims*............................................................... 27

14.8    *Forfeitures* ..................................................................... 27

**15. Authority of Partners** ........................................................ **27**

15.1    *Voting Rules*..................................................................... 27

15.2    *Limitation on Partner's Authority*......................................... 28

15.3    *Indemnification for Unauthorized Activity*.............................. 29

15.4    *Agreements With Healthcare Organizations* ........................... 29

**16. Assignment of PARTNERSHIP Interests**.............................. **30**

**17. Agreement Concerning PARTNERSHIP Goodwill** ................... **30**

**18. Agreement Concerning Hospital and Other Contracts** ........... **31**

**19. Management Contracts**...................................................... **31**

**20. Partners' Meetings**........................................................... **31**

**21. Fiduciary Relationship of Partners**..................................... **31**

21.1    *Prohibited Interference* ..................................................... 31

21.2    *Non-Competition*.............................................................. 32

21.3    *Incorporated Partners* ...................................................... 32

21.4    *Injunctive Relief* .............................................................. 32

21.5    *Attorney's Fees*............................................................... 33

21.6    *Healthcare Organizations*.................................................. 33

21.7    *Protection of Trade Secrets* ............................................... 33

21.8    *Prohibited Interference - Non-Hospital Service Locations*........... 33

21.9    *Intellectual Property Rights* ............................................... 35

**22. Termination, Dissolution, and Liquidation**............................ **35**

22.1    *Events Causing* ............................................................... 35

22.2    *Events Not Causing*.......................................................... 35

22.3    *Complete Termination* ...................................................... 36

22.4    Partial Liquidation ....................................................................... 36

22.5    Assignment .................................................................................. 37

**23. Miscellaneous Provisions** .............................................................. **37**

23.1    Notices ......................................................................................... 37

23.2    Caption ........................................................................................ 37

23.3    Governing Laws ........................................................................... 37

23.4    Assignment .................................................................................. 37

23.5    Amendment .................................................................................. 37

**24. Leave of Absence** ......................................................................... **38**

24.1    Request ........................................................................................ 38

24.2    Failure to Return ......................................................................... 38

24.3    Sabbatical for Senior Partner .................................................... 38

**25. Indemnification and Insurance** ...................................................... **38**

25.1    Indemnification of Partnership .................................................. 38

25.2    Indemnification of Partners ....................................................... 38

25.3    Professional Liability Coverage and Reporting of Claims .............. 39

CEP 00323
CONFIDENTIAL

## Partnership Agreement

This Partnership Agreement (hereinafter "Agreement") restates in its entirety the Partnership Agreement for CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP, and is entered into as the Fourteenth Amendment effective January 1, 2004 by the partners with reference to the following facts:

Each of the parties hereto (the "Partner(s)") is an individual, a medical corporation, or a medical partnership. Although such medical corporation or medical partnership will be the Partner under this Agreement in the performance of clinical and administrative services to the PARTNERSHIP, each such medical corporation and each such partnership shall require its physician-employees and its physician-partners, respectively, to sign a copy of this Agreement agreeing to its terms and conditions, and, at all times to act consistent with the terms of this Agreement.

NOW, THEREFORE, the parties hereby agree as follows:

1. **Name and Principal Place of Business.** The Partners agree to be general partners of a California general partnership under the name CALIFORNIA EMERGENCY PHYSICIANS MEDICAL GROUP (hereinafter referred to as the "PARTNERSHIP"). The principal place of business of the PARTNERSHIP shall be at 2101 Webster St., Suite 1770, Oakland, California 94612-3027, or at such other place or places as may from time to time be agreed upon by the Board.

2. **Purpose.**

    2.1 **General Purpose.** The principal purpose of the PARTNERSHIP is to conduct a medical practice that provides quality, cost effective ambulatory care and emergency medical services to patients, hospitals and communities, and in so doing to enable partners and affiliated physicians to realize the full benefits of a group medical practice.

    2.2 **Service Locations.** The term "service location(s)" in this Agreement shall as determined by the Board refer to each separate medical business of the PARTNERSHIP conducted at a single medical facility or to group of medical businesses of the PARTNERSHIP conducted at a single or at multiple medical facilities (or portions thereof). Service locations

CEP 00324
CONFIDENTIAL

may be combined as a single service location for an important business purpose - for example, without limitation, to establish a regional system for a particular health system or to accommodate a group of low volume contracts. A service location(s) established by the PARTNERSHIP on or before January 1, 1998 shall not be combined with another service location(s) as a single service location unless approved by the Board and approved by a majority of those partners who perform full-time services at the affected established service location(s). In no event will all service locations be combined as a single service location.

3.    Term. The PARTNERSHIP, which commenced on July 1, 1975, shall continue in existence until terminated as hereinafter provided at Section 22.

4.    Capital Contributions. Capital contributions shall be governed by this Agreement and applicable policy established by the Board which shall take into account the following:

    4.1    Mandatory Capital Contributions.

        4.1.1    Partners shall make capital contributions to the PARTNERSHIP at such time, in such manner, and in such amounts as the Board in its discretion from time to time requires. If the Board requests additional capital contributions from Partners, each Partner shall make capital contributions in proportion to the capital accounts of Partners unless the Board determines otherwise. Each Partner shall make capital contributions required to reach the level of capital contribution per Partner most recently determined by the Board. All Partners will be required to maintain a minimum Capital Account (defined at Section 4.5). The Board may change the Capital Account minimum capital contribution requirement. If a Partner is or becomes delinquent in making the Partner's required capital contributions in a form satisfactory to the Board, such Partner shall be charged simple interest on the amount of any such deficiency at two percentage points above the Section 14.4 rate (but, not in excess of the maximum legal rate of interest in the State of California, upon a loan or forbearance).

        4.1.2    A Partner to maintain Full Partner status will be required to maintain his Capital Account at the same level required by the Board for all Full Partners, which initially shall be a maximum level of $15,000. The value of a Full Partner's Buy-Out Points (Defined at Section 14.5) shall be deemed to be zero until the required capital contribution is completed, and in such case, at the Board's discretion, the Partner shall not be entitled to any

distribution from the Partnership of any kind until the required capital contribution is fulfilled.

4.1.3 The Board may at any time readjust the capital accounts of Partners upward by requiring additional capital contributions or downward by returning capital contributions to Full Partners in order to maintain a level of capital which the Board determines to be in the best interest of the PARTNERHSIP. The intent is that all Full Partners and Senior Partners shall be required to have made the same capital contributions to their Capital Accounts.

4.2 Special Capital Accounts. The Board may establish a separate capital account for a Partner in the PARTNERSHIP ("Special Capital Account") in exchange for additional capital contributions in cash, property, or other valuable considerations acceptable to the Board. Special Capital Accounts will be subject to such terms and conditions as the Board shall determine, including without limitation special tax allocations, and the Partner shall agree to all such terms and conditions in a separate agreement so long as doing so does not unreasonably dilute the interest of all Partners in the value of their Buy-Out Points. Special Capital Accounts will not be considered for the allocation of Buy-Out Points at Section 14.5.

4.3 Payment of Capital Contribution. Capital contributions shall be paid as determined by the Board in cash, property, or other consideration acceptable to the Board. The Board may permit contribution in the form of a promissory note upon such terms and conditions determined by the Board, which shall include, without limitation, adequate security by an assignment of the Partner's various interests in the PARTNERSHIP and/or of outside assets of the Partner. If a Partner does not cure a default in making any payment required by a promissory note within thirty (30) days after receiving written notice of default, the Board may apply any distribution to which the Partner is entitled from the PARTNERSHIP to payment of the promissory note.

4.4 Voluntary Capital Contributions. The Board may from time to time permit any Partner to make voluntary capital contributions to the PARTNERSHIP upon terms and conditions determined by the Board.

4.5 Capital Accounts. Individual Capital Accounts shall be maintained for each Partner to reflect each separate component of a Partner's capital contributions. Capital

Accounts shall account for all contributions to the capital of the PARTNERSHIP at Section 4 and any credit balances transferred from a Partner's Section 13.4 Drawing Account to his Capital Account; and decreased by (a) distributions in reduction of PARTNERSHIP capital and (b) his share of PARTNERSHIP losses, if charged to the Capital Accounts of the Partners.

4.6  Negative Capital Account. If a Partner, upon leaving the PARTNERSHIP has a negative balance in his Capital Account, he shall be obligated to repay any portion of the negative balance, which is not offset by other distributions owing to him, in equal monthly installments with simple interest at the Section 14.4 rate over the one (1) year period following his termination from the PARTNERSHIP.

5.  Accrual Account. The PARTNERSHIP shall establish an Accrual Account for each Partner to take into account his share of the annual increase/decrease in the Net Current Assets of the PARTNERSHIP (Defined at Section 5.1). The Partners' Accrual Accounts shall be administered and allocation shall be made each year, as follows:

5.1  Definition of Net Current Assets. Net Current Assets of the PARTNERSHIP means total current assets minus total current liabilities of the PARTNERSHIP calculated on a non-consolidated basis in accordance with generally accepted accounting principles (GAAP), and subject to such adjustments as the Board determines to be in the best interest of the PARTNERSHIP.

5.2  Allocation of Annual Increase and Decrease. As of each December 31, each Partner's Accrual Account will be incrementally increased or decreased by his share of the increase or decrease in the Net Current Assets of the PARTNERSHIP as of each December 31. A Partner's share of the increase or decrease in the Net Current Assets of the PARTNERSHIP will be determined in the same proportions as the allocation of Net Income at Section 13.5.1 following.

5.3  Vesting. A Partner shall vest in his Accrual Account upon becoming a Full Partner. A Partner's Accrual Account shall be forfeited for any of the reasons set out in Section 14 of this Agreement and shall also be forfeited if the Partner withdraws or is terminated for any reason as a Partner of the PARTNERSHIP prior to becoming a Full Partner. A forfeited

CEP 00327
CONFIDENTIAL

Accrual Account shall be redistributed to the Partners based on a methodology determined by the Board.

5.4 Negative Accrual Account. If a Partner, upon leaving the PARTNERSHIP has a negative balance in his Accrual Account, he shall be obligated to repay any portion of the negative balance, which is not offset by other distributions owing to him, in equal monthly installments with simple interest at the Section 14.4 rate over the one (1) year period following his termination from the PARTNERSHIP.

6. Fiscal Year and Accounting. The books of account of the PARTNERSHIP shall be kept on the cash method of accounting on a calendar year basis. An annual accounting shall be delivered to each Partner as soon as practicable after the close of the calendar year. It shall be conclusive on the Partners and shall not be modified except for an error which the Board, within one (1) year from the date of said accounting, determines to materially affect the PARTNERSHIP. Each Partner agrees to accept as correct the amended accounting of the PARTNERSHIP including without limitation the calculation of his Capital Accounts, Drawing Account, Accrual Account and Buy-Out Points unless the Partner objects in writing within thirty (30) days after such information is generally available to Partners.

7. Inspection of Records. Complete and accurate accounts of all transactions of the PARTNERSHIP shall be kept in proper books, which books of account and other records of the PARTNERSHIP shall, at all times, be kept at the principal place of business of the PARTNERSHIP. Each Partner shall have access to and may inspect and copy any books and records of the PARTNERSHIP at reasonable business hours subject however to such reasonable restrictions as the Board shall determine in order to protect the confidentiality of PARTNERSHIP books and records.

8. Bank Accounts. All funds of the PARTNERSHIP shall be deposited in accounts in the name of the PARTNERSHIP at such bank or banks selected by the Board acting through the Vice President of Operations. All withdrawals from any such account or accounts shall be made only by signature authority granted at Section 10.6.

9. Quality of Performance. Each Partner shall perform his respective services on behalf of the PARTNERSHIP at his service location pursuant to policies of the Board and in

accordance with the highest degree of professional competency in the professional specialty of each Partner and shall further comply with the by-laws, rules and regulations of such service location and with the usual and customary procedures of its medical staff, as the same apply to all physicians admitted to practice at each service location. Each Partner, prior to being scheduled for professional services shall establish his professional credentials according to policies of the Board.

       10.    Definition, Appointment, and Responsibilities of Board of Directors. In order to carry out the business affairs, management, and administration of the PARTNERSHIP, there shall be a Board of Directors ("Board") to be elected by the Partners and to have the responsibilities set forth as follows:

       10.1    Election. The Board shall consist of nine (9) members all of whom shall be Full or Senior Partners as defined by Sections 12.3.1 and 12.3.2. A board member shall serve for a three-year term. The annual election to fill vacancies shall be valid if a simple majority of the number of Partners eligible to vote for board members returns valid ballots. The candidates receiving the highest number of votes shall be elected to the vacancies. Balloting shall be conducted by mail ballot held not later than the first day of each Board Year. Interim vacancies will be filled by the Board to serve until the end of the then current calendar year. Thereafter, the remaining term for such appointed director shall be filled by a Partner elected by the PARTNERSHIP pursuant to the election rules of the PARTNERSHIP. The Board Year shall be from the first day of January to the last day of December. Election rules set by the Board from time to time shall be conclusively binding on all Partners.

       10.2    Meetings. The Board will meet at least quarterly at a time and place determined by the Chairman of the Board and all Board members shall be given personal notice at least one week before the Board meeting.

       10.3    Responsibility. The Board shall have the final responsibility for establishing policies relating to medical care, and the business affairs, administration, and management of the PARTNERSHIP, including but without being limited to, the following matters:

       10.3.1 Entering into all contracts binding the PARTNERSHIP, including contracts with any person or persons for the rendition of professional services, other incidental

CEP 00329
CONFIDENTIAL

administrative services, hospital contracts, urgent care centers, business at other service locations, the defense, pursuit, and settlement of legal action, the hiring and discharging of all employees of the PARTNERSHIP, and the basic review of incoming Partners and Partners to be terminated;

10.3.2 The lease, purchase, or other acquisition or disposal of PARTNERSHIP property;

10.3.3 All policies implementing the Partnership Agreement provisions concerning compensation of Partners for services to or for the benefit of the PARTNERSHIP including, without limitation, clinical services, administrative services and miscellaneous incentive compensation.

10.3.4 Voting any common stock in other entities owned by the . PARTNERSHIP.

10.3.5 Borrowing money for PARTNERSHIP purposes, and in doing so encumbering or hypothecating PARTNERSHIP property by mortgage, deed of trust, pledge, or otherwise.

10.4    Delegate Responsibility.  The Board may select and delegate its responsibilities with respect to any of the foregoing matters to such officers or committees having such responsibilities as the Board shall designate which may include, without limitation, a Chairman of the Board, President, Vice President of Operations, Chief Executive Officer, Chief Operating Officer, Managing Partner, Regional Directors, Medical Directors, or Executive Committee.  Reference in this PARTNERSHIP Agreement and Board Policies to the "Managing Partner" shall, after April 1, 1998 (and until such Board Policies are updated), mean the President, his designee, or such other officer designated by the Board or by the President.

10.5    Majority Vote.  Except as otherwise provided, decisions shall be made by a majority of the entire Board.

10.6    Signature Authority.  The Board shall designate the Partner(s) and officers of the PARTNERSHIP who shall have the authority to sign on behalf of and to bind the PARTNERSHIP with respect to all PARTNERSHIP business including, without limitation, the

signing of all contracts, negotiable instruments, and lawsuit pleadings. A resolution signed by a majority of the Board members shall be conclusive proof on which third persons or entities doing business with the PARTNERSHIP may rely.

     10.7   Directive Procedures. The Partners may remove any Board member or direct the Board to undertake or create any activity (hereinafter collectively referred to as "Directive") by the following procedure:

     10.7.1 Partners may submit a proposed Directive to the Board after first obtaining on the Directive signatures showing approval of Partners holding at least one-fifth (1/5) of the voting interests of the PARTNERSHIP in the case of a Directive to remove a Board member and showing one-third (1/3) of the voting interests of the PARTNERSHIP in the case of a Directive for the Board to undertake or cease any activity.

     10.7.2 The Board shall then submit the signed Directive to the Partners within thirty (30) days after the first board meeting following the Board Chairman's receipt of the Directive with the requisite signatures by mailing an appropriate ballot to each Partner having a voting interest. The ballots shall be tallied upon the expiration of three (3) weeks from date of mailing the ballots or, if sooner, upon the receipt of completed ballots from all of the Partners. The affirmative vote of Partners holding at least a majority of the voting interests of the PARTNERSHIP shall be required to pass the Directive.

     10.7.3 Upon passage of a Directive to remove a Board member, such removal shall be effective immediately. Upon passage of a Directive for the Board to undertake or cease any activity, the Board shall comply with the Directive at the next regularly scheduled Board meeting.

     10.8   Removal of Director. A Board member may also be removed by a two thirds' (2/3) vote of Board members (not counting the vote of the Board member removed).

///

11.   Regional Directors and Medical Directors.

11.1   Regional Directors.  Regional Directors shall be appointed by such officer designated by the Board for a probationary period of six (6) months at which time such appointment shall be confirmed by the Board or its designee.  The Regional Directors may be removed at any time by the Board for any reason whatsoever.  Regional Directors shall be evaluated annually as determined by the Board. The responsibilities of each Regional Director shall be determined from time to time by the Board or its designated officer or committee as required to assure the smooth and efficient administration of each region.

11.2   Medical Directors.  After considering recommendations of the appropriate Regional Director, each Medical Director shall be appointed by the Vice President of Operations of the Partnership for a probationary period of six (6) months, at which time such appointment shall be confirmed by the Board.  Medical Directors may be removed at any time by the Regional Director with the consent of the Vice President of Operations for any reason whatsoever.  The primary responsibility of the Medical Director shall be the administration of the department in his service location.  Specific responsibilities of the Medical Director may be determined and revised from time to time by the Board or its designated officer or committee in order to maintain quality medicine and smooth, efficient administration of the department.

11.3   Appointment of Physicians to Service Locations.  Each Medical Director shall recommend the appointment of Partners and employment of non-partner physicians, and the termination of such appointments or employment, in his or her service location to his Regional Director.  The Regional Director shall make such decisions based on the Medical Director's recommendation, the provisions of Section 12, and policies adopted by the Board.

12.   Qualification, Categories, and Admission of Partners.

12.1   Basic Qualifications for All Partners.  Except as otherwise provided by Board which takes into account the Board's authority to designate other categories of Partners and other PARTNERSHIP divisions, all Partners of the PARTNERSHIP shall at all times meet the following basic minimum qualifications.  In addition, a Partner shall meet such other qualifications and requirements as may be determined from time to time by the Board of Directors.  In the

case of a corporate Partner, the requirements at Section 12 shall also apply to each physician-employee of each corporate Partner performing services for the PARTNERSHIP.

12.1.1 Each Partner (and the employee-physicians of a medical corporation and the partner-physicians of a partnership) is a physician and surgeon, duly licensed to practice medicine in the State of California and/or is a professional medical corporation licensed by the Board of Medical Quality Assurance and is in good standing;

12.1.2 Such Partner makes all required contributions to the capital of the PARTNERSHIP;

12.1.3 Such Partner adopts in writing all of the provisions of this Agreement and amendments thereto;

12.1.4 Such Partner agrees to be bound by all of the terms and conditions of the Agreement and amendments thereto;

12.1.5 Such Partner meets such professional medical and other standards for Partner performance as determined by the Board from time to time; and

12.1.6 Such Partner agrees to be bound by all policies of the Board established from time to time.

12.2 <u>Board Determines Partner's Category.</u> A Partner's eligibility for and retention of his Partner category shall be determined by the Board in its sole discretion taking into account the minimum requirements of Section 12.3 and the following guidelines:

12.2.1 The Board may give or withhold its approval to a Partner's advancement to a higher level of Partner category or retention by a Partner of his Partner category based on Board policies established from time to time and after taking into account various subjective factors concerning a Partner's performance including, without limitation, the quality of his practice of medicine; his ability to interact favorably with patients, service location, personnel and administration, other non-physician staff, referral sources and other Partners; his outside activities that may conflict with his performance and loyalty to PARTNERSHIP; and such other factors as the Board shall deem appropriate to consider in each individual case.

CEP 00333
CONFIDENTIAL

12.2.2 The Board in its discretion may waive one or more of the basic Partner category requirements specified in Section 12.3 and its policies established from time to time on a case by case basis after taking into account special considerations determined appropriate by the Board in its sole discretion.

12.2.3 A change in a Partner's category shall become effective on the date designated by the Board.

12.2.4 The term "Hours of Service" for purposes of Partner categorization shall include both clinical hours and hours reasonably required to carry out a Partner's responsibility for those management duties to the PARTNERSHIP designated by the Board as eligible for inclusion in this definition.

12.2.5 A Partner's "Years of Service" means the number of twelve consecutive month periods as a Partner commencing with the effective date of his becoming a Partner of the PARTNERSHIP. A Partner's "Years of Full-Time Service" means Years of Service in which the Partner performed such number of Hours of Service as required by Board policy.

12.2.6 The Board shall formulate reasonable transition rules to assimilate old Partner into new Partner categorization in the event of any change in the rules described in this Section 12.2.

12.3    Partner Categories. The PARTNERSHIP will have categories of Partners ("Partner Category"). To attain and retain a Partner Category, the Partner is required to meet any requirements established by the Board at Section 12.2, and to have completed a combination of minimum Hours of Service as established by Board policy and the minimum Years of Service indicated below unless waived by the Board or changed by the Board; provided that, if the Board changes the minimum Years of Service to be eligible for consideration of advancement or retention of a Partner Category, the Board may not lengthen the time required for an existing Partner to advance to a higher Partner Category. The basic Partner Categories are as follows:

12.3.1 Senior Partner – Completion of at least ten (10) Years of Full-Time Service as a Partner of the PARTNERSHIP.

CEP 00334
CONFIDENTIAL

12.3.2 Full Partner- Completion of at least four (4) Years of Service as a Partner of the PARTNERSHIP.

12.3.3 Category Four Partner - Completion of at least three (3) Years of Service as a Partner of the PARTNERSHIP.

12.3.4 Category Three Partner - Completion of at least two (2) Years of Service as a Partner of the PARTNERSHIP.

12.3.5 Category Two Partner - Completion of at least one (1) Year of Service as a Partner of the PARTNERSHIP.

12.3.6 Category One Partner - A Physician (or professional corporation) engaged by the PARTNERSHIP and reasonably expected to become a permanent full or part-time provider to CEP as defined by Board policy from time to time and providers who have been Partners of the PARTNERSHIP but have not retained the requirements for a higher partner category.

12.4  No Guarantee of Hours.  No provision in this Agreement shall be construed as a guarantee that the PARTNERSHIP will be able to make available to a Partner a sufficient number of Hours of Service in order for that Partner to become eligible for or to retain eligibility for a Partner category, nor that the PARTNERSHIP will be able to provide an opportunity for a Partner to perform services at any service location.

12.5  Additional Partner Categories.  The Board may establish separate business divisions and/or different categories or subcategories of Partners ("Divisions") either within the Partnership or by sponsoring the formation of a separate organization outside of the PARTNERSHIP directly or indirectly owned in whole or in part by the PARTNERSHIP or not owned by but indirectly affiliated by agreement with the PARTNERSHIP to carry out one or more business opportunities.  Each such Division and the physicians and other staff performing services in connection with such Division shall operate and be governed by such terms and conditions and have such rights and responsibilities as the Board shall determine notwithstanding any different, contrary, or inconsistent provision in this Agreement to the contrary.  If the rights (for example, compensation) and responsibilities of Partners at a service location existing prior to January 1, 1999 are adversely affected at the time of establishing the Division,

CEP 00335
CONFIDENTIAL

approval by the Board and by a vote of a majority of the Partners who performed full-time services at the affected services location(s) shall be required.

13. PARTNERSHIP DISTRIBUTIONS.

13.1 Definitions.

13.1.1 Service Location Revenue shall mean income collected at each service location from the respective hospital or other contract for physicians' services rendered at the service location reduced by PARTNERSHIP expenses directly allocable to the service location pursuant to policies established by the Board from time to time which may include without limitation billing and collection costs, malpractice insurance premiums, interest allocation to fund accounts receivable, a reserve for "tail" or other extended professional liability coverage, contract acquisition costs, and service site income adjustments.

13.1.2 Net Income or Net Loss shall mean the ordinary income or ordinary loss of the PARTNERSHIP for each of its tax years as determined for federal income tax purposes, together with each PARTNERSHIP item of income, gain, loss, credit or deduction which is separately stated or otherwise not included in computing taxable income or loss.

13.1.3 Net Income or Net Loss From Operations shall mean the Net Income or Net Loss of the PARTNERSHIP other than Net Income or Net Loss attributable to a Sale, Disposition, Financing or Refinancing.

13.1.4 Net Income or Net Loss From Sale, Disposition, Financing or Refinancing shall mean the Net Income or Net Loss attributable to the holding of, or any sale, exchange, or other disposition of PARTNERSHIP assets and any PARTNERSHIP transaction not in the day-to-day operation of its business, including without limitation, the purchase or sale of PARTNERSHIP assets, any mortgage financing or refinancing secured by PARTNERSHIP property, the purchase and sale of equipment, and other assets, or other transaction not in the ordinary course of the PARTNERSHIP operations.

13.1.5 Cash From Operations shall mean all cash receipts during the calendar year of the PARTNERSHIP from Service Location Revenue and other sources in the ordinary course of the PARTNERSHIP's business without deduction for depreciation, but after

CEP 00336
CONFIDENTIAL

deducting from such cash receipts payments disbursed for operating expenses, compensation to Partners, capital expenditures (unless charged by the Board directly to Capital Accounts of Partners), interest paid to Partners, and payments required to be made in connection with any loan to the PARTNERSHIP or secured by a lien on the PARTNERSHIP assets. Proceeds from loans to the PARTNERSHIP used to finance accounts receivables shall be Cash From Operations to the extent determined by the Board.

13.1.6 Cash From Sale, Disposition, Financing or Refinancing shall mean the net cash realized by the PARTNERSHIP from the sale, disposition, financing or refinancing of any PARTNERSHIP assets after payment of related debt and all expenses related to the transaction, together with interest on any notes taken back by the PARTNERSHIP upon the sale of the PARTNERSHIP assets.

13.2 Service Location Revenue Distributions.

13.2.1 The Board shall allocate a percentage of Service Location Revenue to compensation of Partners performing Medical Director services and clinical services as staff physicians at each service location. Generally, the usual and customary percentage has been seventy-nine percent (79%). If the Board determines that it is beneficial to the PARTNERSHIP, the Board by majority vote may increase such allocation above the usual and customary seventy-nine percent (79%) at a particular service location and by a three-fourths' (3/4) vote may reduce such allocation below seventy-nine percent (79%) at a particular service location. However, at all service locations that are part of CEP before March 1, 1997, such reduction requires approval of a majority of full-time Partners at such service location affected. Such portion of Service Location Revenue shall be distributed as follows:

13.2.2 Medical Director services shall be compensated as determined by the Board. In addition, the Medical Director may request a vote of Partners at Medical Director's service location to increase compensation for Medical Director services at such service location. Three-fourths (3/4) of Partners performing "full-time" services at such service location must agree to such change. The Board may approve/disapprove the vote of Partners or return the matter to the Partners for a determination subject to such policies, conditions and restrictions as the Board may impose. A Medical Director may allocate a portion of compensation for Medical Director services to those Partners who assist him in performing

CEP 00337
CONFIDENTIAL

administrative services in such amounts as the Medical Director determines appropriate in his discretion. The Board may establish guidelines or make its own determination binding on all Partners at the service location concerning the allocation of Medical Director compensation and the rules for Partner voting including guidelines for determining "full-time" Partners for voting purposes.

13.2.3 Each Partner's compensation for clinical services shall be determined by dividing the balance of the portion of Service Location Revenue determined at Section 13.2.1 minus payments made at Section 13.2.2 and minus direct Service Location expenses determined by the Board by total clinical Hours of Service which all physician providers have performed at that service location during the month, and multiplying the hourly amount so determined by the number of clinical Hours of Service rendered by each Partner at that service location. Provided that, a portion of the above payments allocated to compensation for clinical services may be distributed in a different manner ("differential compensation") to take into account the needs of the service location, the needs of the PARTNERSHIP, and/or other factors relevant to Partner performance or service. If three-fourths (3/4) of "full-time" Partners at a service location approve a differential compensation proposal, it shall be submitted to the Board for review. The Board may either approve/disapprove the differential compensation proposal, or return the matter to the Partners entitled to vote for reconsideration. The Board may establish policy guidelines setting forth conditions for and restrictions on such differential compensation and the rules for Partner voting including guidelines for determining "full-time" Partners for voting purposes. Notwithstanding the foregoing, the Board by a two-thirds' (2/3) majority vote, may establish and apply a differential compensation plan applicable to a portion of clinical compensation at one or more service locations when it determines that doing so is in the best interest of the Partnership. Further, the Board, in its discretion, may increase the minimum hourly compensation payable to Partners at a particular service location to take into account unusual circumstances.

13.2.4 The balance of Service Location Revenue remaining at a particular service location shall be allocated and distributed as hereinafter provided.

CEP 00338
CONFIDENTIAL

13.3    Compensation for Other Administrative and Management Services.

13.3.1 The Board in its discretion shall establish compensation for Partners performing designated administrative or management services for the PARTNERSHIP.

13.3.2 Regional Director compensation shall be determined by the Board in its discretion, generally based on a percentage of the Service Location Revenue received by the PARTNERSHIP for each service location in the Regional Director's region.

13.3.3 Compensation and/or reimbursement for persons attending Board meetings, committee meetings, other meetings, and stipends for special services shall be determined by the Board.

13.4    Partners' Drawing Accounts and Interest.

13.4.1 A separate Drawing Account shall be maintained for PARTNERSHIP and tax accounting purposes. A Partner's Drawing Account shall be credited with (i) his compensation at Sections 13.2, 13.3, 13.8 and 18 (collectively Guaranteed Payments); (ii) his PARTNERSHIP benefits converted into Partners' compensation (imputed income); (iii) his share of Net Income From Operations allocable at Section 13.5.1; (iv) interest credited to Capital Accounts; (v) interest credited to Accrual Accounts which is taken into account as a deduction from Cash From Operations at Section 13.1.5; and (vi) his share of PARTNERSHIP Net Income attributable to Sale, Disposition, Financing or Refinancing. A Partner's Drawing Account shall be charged with (i) his share of Net Loss from Operations allocable at Section 13.5.1; (ii) his share of Net Loss attributable to Sale, Disposition, Financing or Refinancing; (iii) all withdrawals made by a Partner in compensation paid to a Partner during the calendar year; (iv) distributions at Section 13.6.3 and 13.6.4; (v) any interest paid out to Partners based on Capital Accounts; and (vi) any interest paid out to Partners based on Accrual Accounts at Section 5. Partners may make withdrawals at such times and in such amounts from Cash From Operations and Cash from Sale, Financing or Refinancing as is determined at Sections 13.6.3 and 13.6.4 following. When the PARTNERSHIP completes its accounting each year, the net credit balance or debit balance in a Partner's Drawing Account shall be transferred to his Capital Account.

13.4.2 A Partner's Section 13.4 Drawing Account shall be credited with simple interest as of each December 31 on his Capital Account at Section 4.5 and his Accrual Account at Section 5 as of the preceding January 1 at the Section 14.4 rate. In the alternative, the Board may during a particular year pay such interest out to the Partners and account for it as a deduction from Cash From Operations at Section 13.1.5.

13.5  Allocation of Net Income and Net Loss.  Except as the Board in its discretion may determine otherwise as permitted at Section 10.3, Net Income and Net Loss shall be distributed as follows:

13.5.1 Net Loss From Operations shall be allocated to the Drawing Accounts of Partners proportionate to each Partner's guaranteed payments. Net Income after first allocating guaranteed payments to the Drawing Accounts of Partners, shall be allocated to each Partner's Drawing Account proportionate to each Partner's "qualified earnings." A Partner's "qualified earnings" shall be computed as follows: (i) the Board shall first determine the portion of guaranteed payments to Partners at a particular service location to be counted for purposes of sharing in Bonus Pool distributions at Section 13.6.3; (ii) the guaranteed payments counted shall then be multiplied by a weighted factor determined by the Board for the Partner's category (or Division at Section 12.5). If the Board determines that all or a portion of the guaranteed payments of a Partner(s) at a particular service location will not count, then a Partner with permission of the Board may, in the applicable calendar year, elect to reduce his compensation (or reimburse the PARTNERSHIP) to such a level that the Board determines that such Partner's guaranteed payments attributable to such service location will qualify for purposes of determining his "qualified earnings." The Board must count all guaranteed payments received by Partners at a service location that makes a full contribution as defined by the Board to the PARTNERSHIP. Guaranteed payments for service locations that do not make a full contribution to the PARTNERSHIP will be counted as follows: (i) in the Board's discretion for service locations that join the PARTNERSHIP after July 1, 1998 and (ii) by the Board with approval by a majority of full-time Partners at a service location existing prior to July 1, 1998.

///

CEP 00340
CONFIDENTIAL

13.5.2 Net Income or Net Loss from Sale, Disposition, Financing or Refinancing shall be allocated to each partner for each tax year in proportion to the Partner's Buy-Out Points at Section 14.5 at the end of the year preceding the allocation.

13.6    Distributions of Cash Available for Distribution.

13.6.1 The Board in its sole discretion shall determine the amount of cash "available for distribution" from the PARTNERSHIP to its Partners after providing reasonable reserves for known or unknown PARTNERSHIP requirements, such as accounts receivable financing, malpractice funding, litigation (pending or threatened), capital investment in PARTNERSHIP projects, replacement of equipment, buy-out of Partners and similar PARTNERSHIP current and foreseeable needs and contingencies.

13.6.2 Compensation owing to Partners under Sections 13.2, 13.3, and 18 (if applicable) shall be paid by the twentieth (20th) day of each month following the performance of services by the Partner to the PARTNERSHIP up to and including the last day of the preceding calendar month. Compensation owing to a Partner under Section 13.8 shall be paid at such time as the Board designates.

13.6.3 Cash From Operations available for distribution to Partners (the "Bonus Pool") shall be determined on or before the seventy-fifth (75th) day following the end of the PARTNERSHIP's calendar year. Each Partner shall be entitled to receive a share of the bonus pool determined in the same proportions as the allocation of Net Income at Section 13.5.1 preceding.

13.6.4 Cash From Sale, Disposition, Financing or Refinancing available for distribution shall be distributed annually to Partners at such time as the Board determines in the same proportion as the Partners Buy-Out Points at Section 14.5 at the end of the prior year.

13.7    Retirement Plan Contributions. Distributions made by the Partnership to an unincorporated Partner shall be subject to his election to participate in the retirement plans of the Partnership. Each unincorporated Partner's retirement plan contributions shall be separately allocated to each Partner upon filing of the Partnership's tax return.

CEP 00341
CONFIDENTIAL

13.8   Other Salary or Compensation.  Except as otherwise provided in this Section 13, or at the discretion of the Board to award Partners for special efforts, including, without limitation, finding and developing new opportunities for the PARTNERSHIP, no Partner shall be entitled to a salary or other compensation for his services to the PARTNERSHIP.

13.9   Guaranteed Payments.  Compensation described in Section 13.2, Section 13.3, Section 13.8, and Section 18 shall be treated as guaranteed payments described in Internal Revenue Code Section 707(c).

14.   Partner Withdrawal or Termination and Buy-out.

14.1   Voluntary Withdrawal.  A Partner may voluntarily withdraw or retire from the PARTNERSHIP provided such Partner gives the Board sixty (60) days' written notice prior to the effective date of such withdrawal.  The notice shall not comply with this requirement unless it specifically designates his withdrawal date.  If prior written notice has been properly given by a Partner, such Partner shall be entitled to distributions owing to him at Sections 13.6.2, 13.6.3, and 13.6.4 of this Agreement at such time as all other Partners receive such amounts.  Additionally, such Partner shall be entitled to receive his Combined Accounts and his Buy-Out Points (or alternative distribution at Section 14.5) payable at Section 14.6.

If a Partner withdraws from the PARTNERSHIP without giving such prior written notice or receiving a waiver of such notice from the Board, he shall only be entitled to distributions owing at Section 13.6.2 earned to date.  Such Partner shall forfeit the balance of distributions from the PARTNERSHIP to which he might otherwise be entitled, including without limitation, his Combined Account (defined at Section 14.4) and his Buy-Out Points (defined at Section 14.5).

14.2   Expulsion of a Partner.  Any Partner may be required to withdraw from the PARTNERSHIP at any time upon the vote of at least two-thirds (2/3) of the Board approving the Partner's expulsion.  The effective date of such expulsion shall be the date on which the PARTNERSHIP notifies the Partner of his expulsion, or such other date as the Board may determine in its discretion.  The expelled Partner's compensation at Section 13.6.2 earned to date shall be payable to him on the effective date of expulsion.  The expelled Partner's interest in the Bonus Pool at Section 13.6.3 shall be payable to him without interest in five (5)

CEP 00342
CONFIDENTIAL

equal annual installments commencing on July 1 of the year following the year of expulsion. Such Partner shall forfeit the balance of distributions from the PARTNERSHIP to which he might otherwise be entitled, including without limitation, his Combined Account (defined at Section 14.4) and his Buy-Out Points (defined at Section 14.5).

14.3    Withdrawal on Retirement, Death or Disability.  A Partner shall be deemed to have withdrawn on the date of his retirement on or after age 55 by a withdrawal with proper notice described at Section 14.1, his death, or upon his incurring a disability which in the opinion of the Board renders impossible the performance of services to the PARTNERSHIP by the Partner.  The withdrawing Partner or his estate, whichever is applicable, shall be entitled to receive distributions at Sections 13.6.2, 13.6.3, and 13.6.4 at such time as all other Partners receive such amounts.  Additionally, the withdrawing Partner or his estate, whichever is applicable, shall, notwithstanding Section 14.6, be entitled to receive payment for his Combined Account and Buy-Out Points not later than six (6) months following the end of the calendar year of his withdrawal or death unless the Partner or his estate makes an irrevocable election to be bought out in the manner described at Section 14.6 of this Agreement.

14.4    Combined Accounts.  The Combined Account of a Partner means the sum of a Partner's Capital Accounts (See Section 4.5) and Accrual Account (See Section 5). Except as otherwise provided in Section 14, following a Partner's withdrawal or termination, a Partner's Combined Account shall continue to earn simple interest at a rate which is equal to the prime rate charged by the Bank of America, N.T. & S.A., of Los Angeles, California (but not to exceed the California usury rate [that is, the maximum legal rate of interest allowed in the State of California, upon a loan or forbearance when not otherwise stated]), whichever is less.

14.5    Buy-Out Points.  The PARTNERSHIP shall grant Buy-Out Points to each Full Partner who maintains his Capital Account at the level required by the Board for Full Partners.  All Full Partners will make equal capital contributions for and will be entitled to an equal number of Buy-Out Points.  The Buy-Out Points of a Full Partner (or the remaining number of Buy-Out Points of a withdrawn or terminated Partner) measure the Partner's financial interest in the internal liquid net value ("Liquid Value") in certain long term assets owned by the PARTNERSHIP ("Subsidiary Businesses".  The Buy-Out Points shall be administered by the Board taking into account the following:

CEP 00343
CONFIDENTIAL

14.5.1 "Liquid Value" means current assets minus current liabilities calculated for the Subsidiary Businesses on a non-consolidated basis, in accordance with generally accepted accounting principles (GAAP) subject to such adjustments as the Board determines to reasonably reflect the cash and cash equivalent value of the Subsidiary Businesses to the PARTNERSHIP. "Subsidiary Businesses" mean long term assets of the PARTNERSHIP, the Liquid Value of which the Board determines should be shared by the Partners as part of their financial interest in the PARTNERSHIP, including, without limitation, MedAmerica, Inc. and its subsidiaries.

14.5.2 The Board shall determine the value of Buy-Out Points. The Board may, but is not required, to take into account the following: (i) any valuation assumption most protective for the continuation of the PARTNERSHIP and least protective of terminated Partners; (ii) use of a valuation date (that is, the prior December 31, or an alternate date), which the Board determines most appropriate; and (iii) change its valuation assumptions at any time to take into account the current circumstance of the PARTNERSHIP so long as any change applies to all currently active and all terminated Partners who are receiving or are still entitled to receive payments as a terminated Partner. The outstanding Buy-Out Points allocated to all Full Partners as of December 31 each year, or alternate valuation date, divided into the Liquid Value of Subsidiary Businesses of the PARTNERSHIP as of December 31 each year (or other relevant valuation date) shall establish the price per Buy-Out Point of each Full Partner effective commencing January 1 of the following year (or as of an alternate valuation date). If the Board believes that the value per Buy-Out Point has changed during a year as compared to the value of a Buy-Out Point at the end of the prior year by more than twenty-five percent (25%) upward or downward, the Board may revalue a Buy-Out Point as of an alternate valuation date selected by the Board.

14.5.3 The Board may at any time redeem all or a portion of the Buy-Out Points of Partners by payment of the calculated value per Buy-Out Point and may make adjustments to the number of Buy-Out Points of Partners on a non-discriminatory basis.

CEP 00344
CONFIDENTIAL

14.5.4 A Partner may not at any time assign with or without consideration to another Partner or non-Partner all or any portion of his outstanding Buy-Out Points.

14.6    Payment of Partner's Buy-Out.

14.6.1 Following the termination of a Partner, who is determined to be entitled to a distribution of his Combined Account and Buy-Out Points, or upon a partial liquidation of the PARTNERSHIP, then subject to any policies established by the Board and subject to other applicable provisions of Section 14, the Buy-Out amount shall be paid either in cash or in kind in the Board's discretion and shall be completed over a five (5) year period; provided that, the Board may extend a Partner's payout over a longer period of time with his permission or as provided at Section 14.6.4 and Section 14.6.5.

14.6.2 Except as provided at Section 14.3, the Combined Account of a terminated Partner, who is entitled under this Agreement to payment of his Combined Account, shall be paid in equal annual installments with simple interest at the Section 14.4 rate on the unpaid balance of the Combined Account.

14.6.3 An equal number of Buy-Out Points of a terminated Partner, who is entitled to payment for his Buy-Out Points, shall be redeemed each year (subject to the Board's right to extend payouts) without interest based on the value per Buy-Out Point as recalculated each year.  Buy-Out Points for which payment is made shall be cancelled.  The annual installments (and price for each remaining Buy-Out Point) shall be recalculated as of January 1 of each calendar year, or alternate valuation date, based on the terminated Partner's remaining Buy-Out Points at the then value per Buy-Out Point determined by the Board for all Partners.

14.6.4 The Board may accelerate the payout of a Partner's Combined Account and Buy-Out Points.  Upon payment, the Partner shall give a written release to the PARTNERSHIP for any other or further payment from the PARTNERSHIP with respect to his PARTNERSHIP interest.

14.6.5 If the Board determines that cash is not reasonably available in any year to make full payments owing to terminated Partners without adversely affecting the

CEP 00345
CONFIDENTIAL

financial condition of the PARTNERSHIP, then that cash, which is available to make payments, shall be paid to terminated Partners proportionately first in satisfaction amounts owed for the terminated Partners' Capital Accounts, then for their Accrual Accounts, and then for their Buy-Out Points regardless of the date of termination. In such case the amount to be paid to each terminated Partner may be adjusted and/or the time for payment to all Partners may be extended on a reasonable basis approved by the Board notwithstanding any contrary provision in this Agreement. Further, in lieu of cash installment payments for Buy-Out Points, the Board in its sole and absolute discretion may elect to distribute assets of the PARTNERSHIP which in the case of shares of stock in any company owned by the PARTNERSHIP may include either voting or non-voting common stock or voting stock subject to a voting trust in favor of the PARTNERSHIP. Further, the Board is authorized to establish reasonable reserves to fund the future buy-outs of Partners.

14.7    Offset for Claims. With respect to all distributions to a terminated Partner under this Section 14, and notwithstanding the time at which this Agreement provides that the distribution is to be paid, the Board in its sole and absolute discretion reserves the right to withhold distribution in such amount as the Board determines may be necessary to offset and to satisfy any PARTNERSHIP claims which the Board determines to be owing by such Partner to the PARTNERSHIP until such claims have either been settled or adjudicated by a court of competent jurisdiction.

14.8    Forfeitures. To the extent a Partner forfeits any of his interests in the PARTNERSHP by failing to give proper notice at Section 14.1, or in the case of the expulsion of a Partner at Section 14.2, the Partners agree that the forfeitures described in those Sections will be in addition to any and all rights the PARTNERSHIP may have under this Agreement and in equity or at law to require the Partner or former Partner to comply with any terms and provisions of this Agreement. Further, the forfeitures shall in no way be construed to limit the PARTNERSHIP's right to pursue other legal and equitable remedies resulting from activities of the Partner that adversely affect the PARTNERSHIP.

15.    Authority of Partners.

15.1    Voting Rules. Subject to Section 12.5, active Partners shall have the following votes:  Category Two to Four Partners - one vote, and Full and Senior Partners -

three votes. Wherever it is necessary in this PARTNERSHIP Agreement to obtain the vote of the Partners, the vote of active Partners, who at that time hold two-thirds (2/3) of the voting interests of the PARTNERSHIP, shall be controlling unless otherwise provided by this Agreement or Board policy. Notwithstanding the foregoing, in no event shall Category One Partners be entitled to vote on amendments to the PARTNERSHIP Agreement, the election of members to the Board of Directors, and with respect to a Directive described at Section 10.7. The phrase "Voting interests of the PARTNERSHIP" shall wherever used in this Agreement refer only to the total number of votes held by all active Partners in categories of Partners entitled to vote on any particular matter. Inactive Partners shall only have such voting rights as the Board shall determine. "Inactive Partners" shall include any Partner who has not been scheduled to work at any PARTNERSHIP service location for three (3) months, shall include a Partner on a leave of absence if non-voting is imposed by the Board as a condition to taking the leave of absence, and shall include such other criteria as the Board shall determine by a two thirds' (2/3) vote.

15.2   Limitation on Partner's Authority.  No Partner, including, without limitation, the Executive Committee or any member thereof, or the Managing Partner, shall engage in any of the following acts without prior approval by the Board setting forth in its resolution such limitations and conditions on the authority granted as the Board shall determine:

15.2.1 Assign, pledge, hypothecate, wrongfully take, or mortgage any asset belonging to the PARTNERSHIP, or execute any bond or lease in the PARTNERSHIP name;

15.2.2 Pledge the credit of the PARTNERSHIP in any way except in the ordinary course of PARTNERSHIP business;

15.2.3 Make an assignment for the benefit of creditors;

15.2.4 Release, assign, or transfer a PARTNERSHIP claim, security, commodity, or any other asset belonging to the PARTNERSHIP;

15.2.5 Make, draw, or accept any notice, bill of exchange, or any obligation for the payment of monies;

CEP 00347
CONFIDENTIAL

15.2.6 Become a surety, guarantor, endorser, or accommodation endorser for any person or firm;

15.2.7 Borrow any money in the name of the PARTNERSHIP or lend any money belonging to the PARTNERSHIP;

15.2.8 Submit a PARTNERSHIP claim or liability to arbitration or confess a judgment against the PARTNERSHIP; or

15.2.9 Enter into contracts to provide physician and/or other services to and/or to acquire an ownership interest in third-party payers, insurance companies, health care service plans, health maintenance organizations, Combined provider organizations, individual practice associations, foundations, other medical groups, other managed health care organizations (collectively "Healthcare Organizations") without prior approval of the officer of the Partnership designated by the Board pursuant to policies established by the Board.

15.3 Indemnification for Unauthorized Activity. Each Partner shall indemnify and hold the PARTNERSHIP and each of the other Partners harmless from any and all liability and claims, demands, damages, and costs relating thereto, including reasonable attorneys' fees, resulting from or arising out of any action taken without authority under Section 15.2 and, additionally, any negligence or misconduct for activities that he engages in outside the ordinary course of his duties in the conduct of PARTNERSHIP business and not for the benefit of the PARTNERSHIP.

15.4 Agreements With Healthcare Organizations. In order to compete effectively in the rapidly changing health care environment which includes a variety of healthcare organizations and third-party payor arrangements, it will be necessary to contract with Healthcare Organizations. In all cases where it is possible to do so, the PARTNERSHIP or its affiliated entity shall be the contracting and/or owning party. In any case in which it is necessary for an individual Partner, and not the PARTNERSHIP, to be the contracting party, the Partner shall do so solely for the benefit of the PARTNERSHIP and only after full disclosure to and receipt of written approval from the PARTNERSHIP, and subject to such policies, terms and conditions, and further agreements between the PARTNERSHIP and the Partner as may be required from time to time by the PARTNERSHIP. The officer designated by the Board shall

CEP 00348
CONFIDENTIAL

have the legal right to sign on behalf of Partners concerning all billing and collection matters. Each Partner, by signing this Agreement, assigns his entire right, title and interest in and to all patient billings to the Partnership. The Board shall establish policies to carry out the purposes described in this Section 15.4 which shall take into account, without limitation, the following:

15.4.1 The negotiation and approval of contracts with Healthcare Organizations to secure the benefit thereof for the PARTNERSHIP and not the individual partner.

15.4.2 Ownership of withholds under risk-sharing arrangements.

15.4.3 Restrictions with respect to ownership of and the transfer of interests in Healthcare Organizations and related contracts, including without limitation, the termination and transfer of any contracts with Healthcare Organizations to the PARTNERSHIP or its designee, and reimbursement of Partners for their capital contributions to Healthcare Organizations.

15.4.4 The negotiation and approval of capitation contracts.

16.   Assignment of PARTNERSHIP Interests.  No Partner shall have the right to sell, assign, hypothecate, or in any way alienate the interest of such Partner in the PARTNERSHIP without the prior written consent of the Board.

17.   Agreement Concerning PARTNERSHIP Goodwill.  The parties acknowledge and agree that the business of the PARTNERSHIP is and will remain primarily a service business; that the ability of the PARTNERSHIP to earn income depends primarily on the services rendered to it by the Partners and the services thereby provided by the PARTNERSHIP at its service locations; that contracts at service locations, by custom, are often times short-term contracts renewable at the election of both parties and that service location contracts often contain termination provisions without cause; that, therefore, the value of the PARTNERSHIP goodwill, if any, is subjective and difficult to determine; and that any Partner who withdraws or is expelled from the PARTNERSHIP, herein called a "Terminated Partner," carries away with him his said earning ability.  Accordingly, each of the Partners agrees that in the event that such Partner shall become a Terminated Partner, he hereby waives any right to an interest in the

CEP 00349
CONFIDENTIAL

PARTNERSHIP based upon alleged goodwill and agrees that the termination payments provided to the Partner under this Agreement are in full satisfaction of any amount owing to him.

18.    Agreement Concerning Hospital and Other Contracts.  If, at the time a physician becomes a Partner, he is a party to a contract to provide physician or other services to any service location, and the PARTNERSHIP takes over the ownership and/or operation of such facilities, said physician agrees to assign to the PARTNERSHIP all such contracts held by him upon the effective date of his becoming a Partner.  In consideration for said assignments, the parties hereto agree that the PARTNERSHIP shall pay to the assignor(s) of each such contract an amount to be determined by the Board and set forth in a written agreement between the Board and the assignor.  Such payments shall be paid to such Partner as a guaranteed payment pursuant to Section 707(c) of the Internal Revenue Code of 1954, as amended.  No Partner shall hold a hospital contract as an individual (or have an interest in any such hospital contract) unless otherwise agreed upon by a two-thirds (2/3) vote of the entire Board.

19.    Management Contracts.  The PARTNERSHIP may enter into various agreements with MedAmerica, Inc. or other management companies for the performance of administrative services, a copy of which is available upon request to the Managing Partner.

20.    Partners' Meetings.  There shall be an annual meeting of the Partners and additional meetings may be called at any time by a two-thirds' (2/3) vote of the Board.  Any decision of the Partners may be made either by vote at a meeting or by written consent.  Any Partner may vote at a meeting either in person or by an agent, who must be another Partner, duly authorized in writing executed by the absent Partner.

21.    Fiduciary Relationship of Partners.  Each Partner owes the PARTNERSHIP and every other Partner the highest degree of fiduciary duty and good faith.  Therefore, all Partners must comply with the following:

21.1    Prohibited Interference.  No Partner shall directly or indirectly:

21.1.1 Solicit or respond to the solicitation of a hospital, ambulatory care center, or other business which has (or within one (1) year prior to the date of solicitation has had) a contractual relationship with the PARTNERSHIP at a service location for the purpose of attracting the PARTNERSHIP opportunity at such service location for his own benefit.

CEP 00350
CONFIDENTIAL

21.1.2 Render services at a service location for his own benefit substantially similar to or competitive with services rendered by the PARTNERSHIP at such service location;

21.1.3 Own, manage, operate, control, participate in any manner with or receive an economic benefit from any medical practice or other business which engaged in the solicitation or services described above or which otherwise has a financial interest in a business operated at a service location; or

21.1.4 Interfere with the PARTNERSHIP's contractual relationship at a service location, or induce other Partners or competitors to do so, or induce employees, independent contractors, and other Partners to terminate their relationship with the PARTNERSHIP.

21.1.5 With respect to each Partner this section 21.1 shall apply only with respect to service locations at which the Partner has ever performed or supervised services for the PARTNERSHIP and shall apply only while the Partner is a Partner of the PARTNERSHIP and for one (1) year after the effective date of his termination as a Partner.

21.2    Non-Competition.  Partners shall disclose to the Board the Partner's intention to engage in any activity related or similar to activities of the PARTNERSHIP.  The Board shall then determine if the Partner shall not engage in such activity as being in conflict with his fiduciary duties to the PARTNERSHIP, if he may do so but on behalf of and for the benefit of the PARTNERSHIP, or if he may do so independent of the PARTNERSHIP and for his own benefit, or some combination of the foregoing.  Except as permitted by the Board, no Partner shall have an ownership interest in or engage in any activity which competes with or in the opinion of two-thirds (2/3) of the Board adversely affects CEP, or any CEP contract or service location without prior approval of two-thirds (2/3) of the Board.

21.3    Incorporated Partners.  This section 21 shall apply to each employee, officer, director, and shareholder of an Incorporated Partner.

21.4    Injunctive Relief.  The Partners agree that, from the nature of its hospital contracts and other businesses owned and/or operated by the PARTNERSHIP at service locations, irreparable harm is certain to result to the PARTNERSHIP (for example, from

CEP 00351
CONFIDENTIAL

cancellation of a hospital contract or non-renewal thereof) as a direct consequence of a Partner's violation of this section 21 since actual damages are extremely difficult of calculation, and such a breach arises from a trust; and, therefore, the Partners agree that injunctive relief is an appropriate remedy in addition to any other legal and equitable remedy and damages that may be available to the PARTNERSHIP in any Court of competent jurisdiction. Additionally, when the Board determines in its discretion that a Partner has (or intends to) violate this Section 21, the PARTNERSHIP may retain as an offset against any damages to be later determined by a Court any undistributed amounts to which a Partner would otherwise be entitled under Sections 13.6 and 14 of this Agreement.

21.5 **Attorney's Fees.** In any legal action brought pursuant to this Section 21, the prevailing party shall be entitled to its reasonable attorneys' fees in addition to any other award in the action.

21.6 **Healthcare Organizations.** The provisions in Section 21 shall be construed to apply to the contractual arrangements and ownership interests entered into for the benefit of the PARTNERSHIP with Healthcare Organizations whether directly by the PARTNERSHIP or by a Partner.

21.7 **Protection of Trade Secrets.** In the course of performing services for the PARTNERSHIP, each Partner agrees that he will learn and/or have access to certain . specialized methods of operation and become aware of information confidential to the PARTNERSHIP and its medical practice including, without limitation, financial information concerning all PARTNERSHIP businesses, patient lists, client lists, billing data, the method of doing business, contracts, information systems, practice guidelines, terms of agreements with Healthcare Organizations, pending litigation, documentation concerning the PARTNERSHIP entities and their structure, captive insurance company, and other information and methods and devices of doing business ("trade secrets"). Each Partner agrees that the Partner will use the PARTNERSHIP's trade secrets solely on behalf of and for the PARTNERSHIP and will not, without permission of the PARTNERSHIP, use, publish, disclose or authorize anyone else to use, publish or disclose, any of such trade secrets for non-PARTNERSHIP purposes.

21.8 **Prohibited Interference - Non-Hospital Service Locations.** The PARTNERSHIP's business interests include the ownership of, or contractual relationships with,

CEP 00352
CONFIDENTIAL

non-hospital based facilities, including, without limitation, ambulatory care centers and family practice medical service locations ("non-hospital service locations"). The value of each non-hospital service location is directly tied to the clients and patients who are served there. A "client" includes, but is not limited to, third parties such as Healthcare Organizations and/or occupational/industrial medicine with whom the non-hospital service location has a contract to provide medical services for that party's employees or enrollees. Each Partner's fiduciary duty to the PARTNERSHIP and to every other Partner extends to preserving the clients and patients for the PARTNERSHIP. Therefore, while a Partner is a Partner, and for a period of one year after a Partner's withdrawal or termination:

21.8.1 No Partner shall directly or indirectly solicit or induce patients or clients of a PARTNERSHIP non-hospital service location to become the client or patient of the individual Partner, nor to become the client or patient of any non-PARTNERSHIP physician or medical practice.

21.8.2 No Partner shall directly or indirectly use a list, or any summary or part of a list, of patients and/or clients (for example, without limitation occupational/industrial medicine clients, Healthcare Organizations, etc.) of a PARTNERSHIP non-hospital service location, whether such list is created by the Partner or by the PARTNERSHIP, for the purpose of mailing or delivering any letter, notice, or announcement pertaining to medical services that are or will be provided by anyone or any entity other than by a PARTNERSHIP non-hospital service location.

21.8.3 No Partner shall solicit or induce the employees, independent contractors, or other Partners at a PARTNERSHIP non-hospital service location to terminate their relationship there, to interfere with the PARTNERSHIP's business, to engage in competition against the PARTNERSHIP, or to direct existing or potential clients and/or patients away from the PARTNERSHIP non-hospital service location and toward any competitor of the PARTNERSHIP's non-hospital service location.

21.8.4 No Partner, while a Partner, shall directly or indirectly own, manage, control, provide medical services at, or receive an economic benefit from, a non-hospital service location that is a direct competitor of a PARTNERSHIP non-hospital service location where that Partner performs or has performed services.

CEP 00353
CONFIDENTIAL

21.8.5 No former Partner, during the period of one year after the Partner's withdrawal or termination from the PARTNERSHIP, shall directly or indirectly own, manage, control, provide medical services at, or receive an economic benefit from, a non-hospital service location that provides medical services similar to and/or competitive with those provided by the PARTNERSHIP within a one-mile radius from a PARTNERSHIP non-hospital service location at which the former Partner has worked.

21.9 Intellectual Property Rights. Each Partner will disclose promptly and in writing to the PARTNERSHIP all inventions, original works of authorship, discoveries, technology, computer programs, designs, formulas, instructions, manuals, and know how ("Intellectual Property") which the Partner, alone or with others, conceives or makes, whether or not commissioned specifically to do so by the PARTNERSHIP which relate directly or indirectly to the business of the PARTNERSHIP. Partner agrees at the PARTNERSHIP's request to assign to the PARTNERSHIP, or its designee, all of the Partner's right, title and interest in and to such Intellectual Property which Partner may solely, or jointly conceive or develop during the time that the Partner is a Partner, and to sign any instruments such as copyright applications in the name of the PARTNERSHIP as may be necessary to perfect the PARTNERSHIP's rights to the Intellectual Property.

22. Termination, Dissolution, and Liquidation.

22.1 Events Causing. Unless earlier terminated in accordance with other provisions in this Agreement, the PARTNERSHIP shall terminate and proceedings to liquidate shall commence immediately upon the first occurrence of either of the following:

22.1.1 A date mutually agreed upon in writing by Partners holding two-thirds (2/3) of the voting interest of the PARTNERSHIP; or

22.1.2 The bankruptcy (either voluntary or in-voluntary) or assignment of assets for the benefit of creditors by the PARTNERSHIP.

22.2 Events Not Causing. It is expressly agreed by the parties that the death of an individual Partner or the dissolution and liquidation of an incorporated Partner, or the bankruptcy, expulsion, or withdrawal of a Partner, or the admission of a new Partner, shall not

CEP 00354
CONFIDENTIAL

be cause for the dissolution of the PARTNERSHIP and, in the event of any such occurrence, the PARTNERSHIP shall continue as so constituted.

22.3    Complete Termination.  Upon the complete termination of the PARTNERSHIP, the Partners shall proceed forthwith to liquidate the assets of the PARTNERSHIP and the PARTNERSHIP shall engage in no further business thereafter other than such business as shall be necessary to wind up its business and distribute the assets.  The PARTNERSHIP assets shall be distributed in complete liquidation of the PARTNERSHIP in cash or in kind in the following order:

22.3.1 The expense of liquidation and the debts of the PARTNERSHIP other than debts owing to the Partners shall be paid.

22.3.2 Such debts as are owing to the Partners, including unpaid loans, and advances made to or for the benefit of the PARTNERSHIP shall be computed.  Such amounts shall be offset against any deficits in the respective Partner's Capital Accounts and the net amount shall be paid or collected from such Partners, as the case may be.

22.3.3 Full liquidating distributions shall be made to Partners in cash or in kind as the Board or other winding up Partners or the court shall determine is available for distribution after all contingencies have been covered first to Partners proportionately for their Combined Accounts and then to Partners proportionately for their Buy-Out Points distributable first as a return of Capital Accounts, then as payment for Accrual Accounts, and the balance proportionate to Buy-Out Points. A debit balance in the account of any Partner after all of the debts of the PARTNERSHIP are paid and the posting of profits, losses, and contingencies completed shall constitute an obligation from that Partner to the other Partners, to be paid forthwith, upon demand.

22.4    Partial Liquidation.  Partial liquidating distributions from the PARTNERSHIP to its Partners shall be made in the discretion of the Board taking into account the following factors:

22.4.1 Partial liquidating distributions and the related tax consequences shall be made based on the Buy-Out Points of Partners determined at Section 14.5 if sufficient to make a fair distribution to Partners; provided that, the Board shall not make a partial

CEP 00355
CONFIDENTIAL

liquidating distribution that impairs the security of the complete liquidation preferences at Section 22.3.3 including, without limitation, the Combined Accounts of Partners.

22.4.2 The Board may impose such conditions and restrictions in making a partial liquidating distribution as it deems necessary in its discretion to take into account the vesting of Buy-Out Points of Partners and any outstanding financial obligations of the Partners with respect to such Buy-Out Points.

22.5 Assignment. Any hospital contracts having an unexpired term as of the date of dissolution of the PARTNERSHIP and any interest in a business or contract at other service locations shall be assigned by the PARTNERSHIP to the most appropriate party as determined by the Board.

23. Miscellaneous Provisions.

23.1 Notices. All notices under this Agreement shall be in writing and shall be given to the parties at their last know addresses by certified mail, return receipt requested, or such other addresses as any of the parties may hereafter specify in the same manner.

23.2 Caption. All paragraph headings herein are inserted for convenience only and shall not be deemed a part of this Agreement.

23.3 Governing Laws. This Agreement shall be construed in accordance with the laws of the State of California. In the event that any provision hereof shall be legally unenforceable, the remaining provisions shall nevertheless be carried into effect.

23.4 Assignment. Subject to the restrictions against assignment as contained herein, this Agreement shall inure to the benefit of and shall be binding upon the parties, and their respective heirs, legatees, personal representatives, successors in interest, and assigns.

23.5 Amendment. This Agreement contains the entire understanding between the parties, there being no terms, conditions, warranties, or representations other than those contained herein, and no amendments hereto shall be valid unless made in writing and approved by Partners holding two-thirds (2/3) of the voting interests of the PARTNERSHIP. At such time as the PARTNERSHIP has received the written approval of Partners holding two-thirds

CEP 00356
CONFIDENTIAL

(2/3) of the voting interests of the PARTNERSHIP, the amendment shall thereupon be binding on all Partners whether or not they have given their written approval.

24.   Leave of Absence.

24.1   Request.  A Partner may request a leave of absence of a minimum of thirty (30) days to a maximum of one hundred eighty (180) days for a medical, professional, or personal reason which may be granted at the discretion of the Board, or its designee, and upon terms as and conditions as the prescribed by Board policy.

24.2   Failure to Return.  A Partner who does not return to the PARTNERSHIP as a Partner at the expiration of this leave, will be considered to have voluntarily resigned from the PARTNERHIP with proper notice effective for all purposes as of the date the leave of absence began. Unless the Board determines otherwise in a particular situation, the Partner will not have the privilege of automatically resuming his PARTNERSHIP status upon the Partner's return.

24.3   Sabbatical for Senior Partner.  A Senior Partner shall be entitled to a six-month special leave of absence ("Sabbatical") with compensation limited in the manner described by Board policies.

25.   Indemnification and Insurance

25.1   Indemnification of Partnership.  Each Partner shall indemnify and hold harmless the PARTNERSHIP against any and all losses, damages, liabilities, claims, obligations and expenses (including attorneys' fees and other expenses reasonably incurred in investigating, preparing or defending against any such claim or suit) arising from or based on the operation by the Partner of a motor vehicle while acting within the scope of his responsibilities as a Partner.  Each Partner shall keep on deposit with CEP evidence that insurance is in force for injury or death of one person up to $100,000, for injury or death arising from one accident up to $300,000 and for property damage up to at least $50,000, where the use of the Partner's automobile is within the scope of his duties as a Partner.

25.2   Indemnification of Partners.  The PARTNERSHIP shall indemnify and hold harmless each Partner against any and all losses, debts, liabilities, claims, obligations and

expenses (including expenses reasonably incurred in investigating, preparing or defending against any such claim or suit) arising from or based on acts performed by such Partner within the scope of his management and administrative responsibilities as a Partner herein, unless such Partner acted with gross negligence or willful disregard of the best interests of the PARTNERSHIP.

25.3    Professional Liability Coverage and Reporting of Claims.

25.3.1 The PARTNERSHIP shall procure and maintain professional liability coverage for the PARTNERSHIP, its physicians, employees, and independent contractors performing services at each service location unless the board in its discretion determines that doing so is economically impracticable or determines that coverage for services at the service location is not reasonably available. Coverage shall be provided in the form of malpractice insurance, indemnification given by a hospital, a self-funded professional liability arrangement entered into by the PARTNERSHIP alone or in conjunction with other health care groups, or a combination of such methods. The PARTNERSHIP acting through its Board shall have no separate responsibility to a particular partner with respect to the extent, duration, and type of coverage, but shall exercise its discretion for the benefit of the PARTNERSHIP as a whole in making decisions regarding the limits of coverage, the insuring arrangement, the purchase of "tail" coverage, the settlement of claims, the allocation of the cost of coverage to the PARTNERSHIP or Partners, and the deductibles under any such coverage.

25.3.2 The PARTNERSHIP shall notify Partners performing services at a particular service location of any cancellations, reduction, or other material change in the amount of scope of coverage at such service location.

25.3.3 Each Partner agrees to promptly report to the PARTNERSHIP any claims arising at his service location, whether asserted or likely to be asserted. Each Partner agrees to notify the PARTNERSHIP before undertaking any separate negotiation with respect to any such claim.

25.3.4 The Board shall determine a mechanism for charging the cost of professional liability coverage (including, without limitation, the deductible amount and tail coverage) to each particular service location in such manner as the Board deems reasonable in

order to allocate to the physicians at such service location the cost of professional liability coverage in an equitable manner. Additionally, the Board in its discretion may establish a mechanism for self-insurance for professional liability claims, tail coverage and possible deductibles.

IN WITNESS WHEREOF, the PARTNERSHIP and each Partner signing below hereby adopt this Fourteenth Amended Partnership Agreement effective January 1, 2004.

CALIFORNIA EMERGENCY PHYSICIANS
MEDICAL GROUP, a California General Partnership

By: _____
Wesley A. Curry, M.D., President

*PARTNER:

Dated: _____     By: _____, M.D.

_____, M.D.
Print Name

*If the Partner is a professional corporation, the corporation must sign by completing the information below and signing as indicated:

_____
(Name of Professional Corporation)

By: _____
President

_____, M.D.
(Physician Employee of Prof. Corp.)

Dated: _____     _____, M.D.
Print Name

CEP 00359
CONFIDENTIAL



1  Mitchell J. Green (SBN 127718)
2  CURTIS & GREEN, LLP
   1101 Fifth Ave, Suite 310
3  San Rafael, CA 94901
   Tel: 415.456.4600 / Fax: 415.455.5276
4  Email: mgreen@curtisgreenlaw.com

5  Attorney for Donald Golden, M.D.

6

**ENDORSED**
**FILED**
ALAMEDA COUNTY

JAN 1 5 2010

CLERK OF THE SUPERIOR COURT
By E. Opelski-Erickson, Deputy

FILED
ALAMEDA COUNTY
DEC 2 2 2009
CLERK OF THE SUPERIOR COURT
By _____
Deputy

7        SUPERIOR COURT FOR THE STATE OF CALIFORNIA
8         COUNTY OF ALAMEDA - UNLIMITED JURISDICTION

9  DONALD GOLDEN, M.D.,               )
                                      )   Case No. RG 08388602
10        Plaintiff,                  )
                                      )   **STIPULATED ORDER GRANTING**
11 v.                                 )   **LEAVE TO FILE THIRD AMENDED**
                                      )   **COMPLAINT**
12 CALIFORNIA EMERGENCY               )
13 PHYSICIANS MEDICAL GROUP et al.,   )
                                      )
14        Defendants.                 )

15

16        Leave is hereby granted to plaintiff to file a Third Amended Complaint, ~~attached hereto as~~

17 ~~Exhibit 1~~, which adds a Sixth Cause of Action for violation of 42 U.S.C.A. § 1981. Plaintiff shall

18 file and serve the Third Amended Complaint within 10 days of this order.

19 *Compliance hearing set for 2/5/10 at 9:00am in Dept. 19.*

   IT IS SO ORDERED.

20
21 Date: ~~December 1, 2009~~ *January 15, 2010*

   _____
   Judge, Superior Court
   **GAIL B. BEREOLA**

22

AGREED (without prejudice to any claim or defense):
23

24 Fitzgerald Abbott & Beardsley              Curtis & Green

25

26 By : _____             By: _____
27    By Sarah Robertson                         Mitchell J. Green
   Attorney for defendants                   Attorney for Donald Golden, M.D.
28 Date: December 21 2009                     Date: December 21, 2009